IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ODELIA ABECASSIS, *et al.*,          §
                                     §
                Plaintiffs,          §
                                     §
V.                                   §      CIVIL ACTION NO. H-09-3884
                                     §
OSCAR S. WYATT, JR., *et al.*,       §
                                     §
                Defendants.          §

**MEMORANDUM AND ORDER**

This suit arises out of terrorist attacks in Israel between 2000 and 2003. Most were suicide bombings; some involved such acts as opening fire on civilians or remotely triggering explosives in crowded public places. The plaintiffs or their family members were wounded or killed in these attacks. Some of the victims were Americans.

The defendants are companies and individuals involved in the oil business. The plaintiffs allege that these defendants purchased oil from Iraq—either directly from Saddam Hussein's government or from third parties who had purchased the oil from Hussein—and made payments that violated the United Nations Oil-for-Food Program. The Oil-for-Food Program required anyone buying oil from Iraq to pay the purchase money into an escrow account monitored by the United Nations. Funds from this account could only be used for humanitarian purposes. The plaintiffs allege that the defendants were involved in buying Iraqi oil with payments that included illegal kickbacks to a secret bank account in Jordan controlled by Hussein. The plaintiffs allege that Hussein used funds from this account to make reward payments to the families of the suicide

bombers and others killed in carrying out the terrorist attacks.  According to the plaintiffs, such payments were important to recruiting terrorists.

All 193 plaintiffs allege violations of the Torture Victims Protection Act ("TVPA").[1]  Most of the plaintiffs are aliens.  They assert that this court has subject-matter jurisdiction under the Alien Tort Statute ("ATS"),[2] which permits aliens to sue for some violations of customary international law.  The plaintiffs allege that the defendants violated international law by financing terrorism and by aiding and abetting and conspiring to commit acts of genocide and crimes against humanity.  The plaintiffs who are United States nationals and their estates, survivors, and heirs allege that the defendants violated the Antiterrorism Act ("ATA")[3] by providing material support to terrorist organizations and by engaging in illegal financial transactions with Iraq.  (Docket Entry No. 3).

The following motions are pending:

- The El Paso Corporation has moved to dismiss under Rule 12(b)(1) for lack of standing, under Rule 12(b)(5) for improper service of process, and under Rule 12(b)(6) for failure to state a claim on the merits of any of the plaintiffs' causes of action.  (Docket Entry No. 26).  The plaintiffs have responded, (Docket Entry No. 42), and El Paso has replied, (Docket Entry No. 47).  El Paso also filed a notice of supplemental authority, (Docket Entry No. 51).  After the case was transferred to this court, El Paso filed a supplement with Fifth Circuit authority, (Docket Entry No. 78), to which the plaintiffs responded, (Docket Entry No. 81).

---

[1] Pub.L. 102-256, Mar. 12, 1992, 106 Stat. 73, *reprinted as a note to* 28 U.S.C. § 1350.

[2] 28 U.S.C. § 1350.  The ATS is sometimes referred to as the Alien Tort Claims Act ("ATCA").

[3] 18 U.S.C. § 2333.

- Oscar Wyatt has moved to dismiss for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  (Docket Entry No. 72).  The plaintiffs have responded, (Docket Entry No. 98), and Wyatt has replied, (Docket Entry No. 105).

- NuCoastal Corporation has moved to dismiss on the same bases as Wyatt.  (Docket Entry No. 74).   The plaintiffs have responded,  (Docket Entry No. 99), and Wyatt has replied, (Docket Entry No. 107).

- Bayoil (USA), Inc. and David Chalmers have also moved to dismiss under Rule 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim.  (Docket Entry No. 76).  The plaintiffs have responded, (Docket Entry No. 97), and Bayoil and Chalmers have replied, (Docket Entry No. 108).

Based on the motions, responses, and replies; the allegations in the complaint; the record; the arguments of counsel; and the applicable law, this court grants the motions to dismiss for lack of standing except with respect to the ATA claims and grants all the motions to dismiss for failure to state a claim.  The plaintiffs may amend their complaint to replead only the ATA claims by **April 23, 2010.**  The remaining allegations are dismissed with prejudice and leave to amend is denied as futile.

The reasons for these rulings are explained in detail below.

## I.      The Allegations in the Complaint

### A.       The Iraq Oil-for-Food Program

Less than a week after Saddam Hussein invaded Kuwait on August 6, 1990, the United Nations issued economic sanctions precluding member states from buying Iraqi oil.  (Docket Entry No. 3, ¶ 145).  The U.N. did not lift the sanctions for five years.  On March 3, 1995, the <u>Houston</u>

Chronicle published a story under the headline "Not Yet; U.N. Sanctions Against Iraq Can't be Safely Ended."  The article stated that Iraq "continues to aid and abet terrorists" by cheating the U.N. on the sanctions with the "connivance of Western oil traders that allow [Hussein] to get away with it, selling bargain-basement oil in order to rearm his troops and sustain the luxury that he and his supporters enjoy."  (*Id.*, ¶ 66).

On April 14, 1995, the U.N. Security Council adopted Resolution 986, lifting the embargo but restricting Iraq's ability to sell its oil.  Iraq's government and the U.N. negotiated the details of the restrictions, resulting in a written agreement sometime in May 1996.  This agreement led to the U.N. Oil-For-Food Program ("OFP").  Under the OFP, a new U.N. office was created to oversee Iraq's sale of oil and purchase of humanitarian goods.  An escrow account was established at the New York branch of the Banque Nacionale de Paris ("BNP").  The proceeds of Iraqi oil sales were to be deposited into the escrow account, which the U.N. monitored.  Iraq could use the funds only to purchase food and other humanitarian goods for the country.  (*Id.*, ¶¶ 152, 154).  The United States government allowed American individuals and companies to enter into executory contracts with Iraq to purchase oil or sell humanitarian goods, including food and medical supplies.  Before they could perform these contracts, the American entities were required to obtain a license from the Treasury Department's Office of Foreign Assets Control ("OFAC").  OFAC evaluated these license applications in conjunction with the State and Commerce Departments and the U.N. committee responsible for overseeing the PNB account.  OFAC issued 1,050 licenses.  (*Id.*, ¶¶ 155-60).

In December 1996, Iraq began selling oil through the OFP.  Under the OFP, even though buyers sent the purchase money to the BNP account in New York, Saddam Hussein's government retained the right to choose the buyers.  Those selected had to purchase the oil at the Official Selling

Price ("OSP"), which was determined by a U.N. committee made up of representatives of the Security Council member states.  The plaintiffs alleged that the U.N. "sought to set a price for Iraqi oil at the highest rate bearable by the market in order to maximize the revenue generated," which "would increase the amount of humanitarian goods that could be purchased" and "minimize the potential for illegal kickbacks" to Saddam Hussein.  Presumably, buyers already paying full market price would be unable or unwilling to pay more in kickbacks.  (*Id.*, ¶¶ 161-62).

The plaintiffs allege that many of the companies and individuals Iraq chose to receive "allocations" of Iraqi oil "were not otherwise involved in the oil industry [and] were able to reap large profits by selling their allocations of Iraqi oil to brokers and/or companies capable of transporting the oil to a refinery."  (*Id.*, ¶ 162).  Beginning in 2000, the plaintiffs allege, Iraqi officials conditioned oil allocations on the buyer's willingness to pay a "surcharge" to Hussein's government.  These surcharges, calculated as a percentage of the total contract price, were not permitted under OFP.  The buyers paid these surcharges to "front companies" or bank accounts Hussein controlled.  The plaintiffs also allege that Hussein charged "port fees" before allowing tankers to receive oil at Iraqi ports.  Like the surcharges, the port fees were paid to Hussein instead of the OFP bank account.  The plaintiffs allege that these surcharges and port fees were kickbacks made possible by lobbying efforts persuading the U.N. to select a below-market OSP.  The plaintiffs also allege that at least some of the cost of these kickbacks was passed on by the direct purchasers to the next purchaser down the line.  (*Id.*, ¶¶ 163-77).

### B.    The Defendants' Actions

Oscar Wyatt, a Texas oil trader, was the Chairman and sole shareholder of Coastal Corporation.  Wyatt later formed NuCoastal Corporation, a Houston energy company, and

NuCoastal Trading, S.A., a Panama corporation.  Both Nucoastal entities are also defendants.  The plaintiffs allege that on the day Iraq invaded Kuwait, Wyatt owed Iraq $90 million.  After the U.N. sanctions froze Iraq's bank accounts, Wyatt began repaying the money directly to the Hussein government and not to the U.N.-controlled accounts.  The payments allegedly amounted to more than $50 million.  Wyatt allegedly made the payments through dummy companies he controlled in Switzerland and Cyprus using two associates who are not named as defendants.  (*Id.*, ¶¶ 21-26, 146).  According to the allegations, Wyatt maintained a close relationship with Hussein while the U.N. embargo was in place, hoping that he would be rewarded with Iraqi oil-purchase contracts once the sanctions were lifted.  Wyatt directed efforts to lobby the U.N. to make Iraqi oil available for purchase.  The plaintiffs allege that Wyatt used false information to lobby the U.N. to reduce the OSP to below market level, enabling Iraq to extract surcharges from Wyatt and other direct buyers while allowing those buyers to make a profit.  (*Id.*, ¶¶ 151, 169, 181).  Wyatt also visited Hussein in Bagdad to secure oil-purchase rights for himself and his companies.  In 1996, Wyatt was awarded the first allocation under the OFP and obtained a license from the U.S. government allowing him to complete the purchase.  During 2001 meetings in Bagdad with Hussein, the Iraqi Oil Minister, and other Iraqi officials, Wyatt agreed to pay under-the-table surcharges in exchange for the right to future oil allocations.  Wyatt was prosecuted for these acts and pleaded guilty to conspiracy to commit wire fraud on October 1, 2007.  (*Id.*, ¶ 186). According to the complaint in this case, Wyatt testified that he caused surcharge payments to be deposited in a bank account in Jordan controlled by Hussein.  Wyatt acknowledged knowing that the payments violated OFP and stated that he had intended to defraud the U.N.  (*Id.*).

Similar allegations are made against David Chalmers; Bayoil (USA), Inc., a Delaware company based in Houston that Chalmers owned; and Bayoil Supply & Trading Limited, a Bahamas affiliate of Bayoil USA, of which Chalmers was the sole director and shareholder. (*Id.*, ¶ 18). On August 17, 2007, Chalmers and the Bayoil Companies also pleaded guilty to conspiracy to commit wire fraud. According to the allegations in this suit, Chalmers admitted that he had made payments that he "both expected and intended" would go to Hussein, and that he had concealed those payments from the U.N. Chalmers stated that he knew the payments violated the OFP. (*Id.*, ¶ 185). Chalmers and Bayoil did not receive allocations of Iraqi oil but purchased the oil from third parties who did receive allocations. Bayoil transferred the purchase money through its Bahamas account to accounts in the Middle East and then paid it to the seller who had received the allocation. The seller then transferred a large portion of the money to accounts controlled by Hussein. Bayoil and Chalmers were allegedly closely involved in the payments to Hussein. The complaint alleges that a Bayoil representative delivered a letter to Iraqi officials in 2002 proposing "a payment plan for certain illegal surcharges owed by another Oil for Food participant." (*Id.*, ¶ 181).

In January 2001, the El Paso Corporation acquired Coastal. El Paso is a large oil and gas company incorporated in Delaware and based in Houston. Wyatt was no longer Coastal's Chairman when the acquisition occurred, and his contract as a consultant to Coastal was terminated when Coastal became an El Paso subsidiary. The plaintiffs allege that El Paso knew when it acquired Coastal that Wyatt had paid illegal surcharges in exchange for oil allocations and had other illegal dealings with Hussein. (*Id.*, ¶ 4). The plaintiffs also allege that El Paso inherited two contracts used to make illegal payments to Hussein. One contract was an oil allocation for which "an El Paso consultant and former Coastal official," likely a reference to Wyatt, paid $201,877 in kickbacks.

The plaintiffs allege that these payments were made in two installments, one on December 19, 2001 and one on March 25, 2002.  These dates were after El Paso acquired Coastal; the plaintiffs do not appear to allege that El Paso made the payments, but that El Paso "ultimately acquired 2,018,770 barrels of oil" under the contract.  The plaintiffs allege that Wyatt sought reimbursement from El Paso for $200,000 he had paid to Iraq through one of his "front" companies but do not allege that El Paso ever reimbursed him.  The second contract was for Coastal's purchase of oil from a third party that agreed to pay an illegal surcharge to Iraq.  This third party allegedly informed Coastal about the surcharge.  The plaintiffs allege that El Paso continued to purchase oil under this contract after the Coastal acquisition and that the third party "passed this cost [for the surcharges] to El Paso in the form of a 'premium.'" (*Id.*, ¶ 181).

The core of the plaintiffs' allegations against El Paso consists of fourteen transactions between June 2001 and June 2002.  In each of these transactions, El Paso purchased Iraqi oil from a third party, allegedly "knowing that the third parties were paying illegal surcharges and kickbacks for the oil and passing the cost to El Paso in the form of a 'premium.'" (*Id.*).  The plaintiffs allege that Hussein illegally received $5.5 million from these transactions.  On February 7, 2007, the Securities and Exchange Commission filed a civil action against El Paso in the Southern District of New York, alleging that El Paso had knowingly and illegally paid $5.5 million to Iraq.  The same day, El Paso entered into a nonprosecution agreement with the U.S. Attorney's office, agreeing to pay $5,482,363 to the United States.  The money was to be paid to the people of Iraq as the OFP's intended beneficiaries.  One week later, on February 14, 2007, the district court entered a consent judgment in the S.E.C. lawsuit.  The judgment incorporated the $5,482,363 payment arranged with the U.S. Attorney's office and included a separate $2.25 million fine to the S.E.C.  (*Id.*, ¶¶ 182-84).

The plaintiffs have not alleged that the consent judgment or nonprosecution agreement included any admission of wrongdoing by El Paso.

### C.    Hussein's Actions

The complaint describes in gruesome detail atrocities committed by Iraq during Saddam Hussein's reign.  Many of these atrocities, including chemical weapons attacks on Kurds living in Northern Iraq, are well known.  The plaintiffs also allege that Hussein was deeply and personally involved in terrorist activities, particularly attacks against Israel.

The complaint describes the chronology of Hussein's rise to power in Iraq and in international terrorism.  After the Ba'ath Party came to power in Iraq in 1968, Hussein was named head of intelligence.  In 1969, Hussein founded the Arab Liberation Front ("ALF"), an Iraqi army affiliate that carried out suicide bombings and other terrorists attacks in Israel, the Phillipines, and elsewhere at least through the 1990s.  He allegedly served as head of the ALF from 1969 until 1980. The plaintiffs allege that "[i]n 2001 the Saddam Regime trained a group of ALF terrorists for suicide missions."  (*Id.*, ¶ 39).

The plaintiffs also allege that Hussein "provided offices, training camps, safe haven, financing and operational and logistical support" for other organizations that have carried out terrorist attacks, including the Abu Nidal Organization ("ANO"), the Palestine Liberation Front ("PLF"), Hamas, Palestinian Islamic Jihad ("PIJ"), and the Al-Aqsa Martyrs' Brigade ("AAMB"). (*Id.*, ¶¶ 40-42).  The plaintiffs focus on the ALF, Hamas, PIJ, and the AAMB, all designated by the United States as terrorist groups.  Beginning in 1990, the State Department designated Iraq as a state sponsor of terrorism.  (*Id.*, ¶ 46).

After the Second Intifada broke out in September 2000, Hussein gave a speech supporting the Palestinian cause and announced that he would provide rewards to the families of Palestinians injured or killed during an attack on Israel.  The plaintiffs allege that "[i]n order to encourage and incentivize suicide bombing attacks against Israeli civilian targets, the Saddam Regime publicized the rewards program providing more than double the reward for suicide bombers' families [as compared to the families of those who died by other means], and handed out checks to surviving family members at public ceremonies which were covered by Palestinian and Iraqi electronic and print media."  (*Id.*, ¶ 48).  Hussein gave $25,000 to families of suicide bombers and $10,000 to families of other Palestinians who died in the Intifada.  (*Id.*, ¶ 50).  These payments were reported in the United States by the Associated Press on March 12, 2002 and by the Washington Post on August 4, 2002.  The plaintiffs allege that the Washington Post report stated that Hussein had "earned over $6 billion from manipulating the Oil for Food program and used such funds to finance Palestinian terror and pay off the families of Palestinian suicide bombers."  (*Id.*, ¶¶ 67, 68).

During the Second Intifada**,** according to the complaint, Hussein "provided funding, weapons, training, and military equipment to the AAMB," "provided Hamas with offices in Iraq, training camps and funding, and held high level meetings with Hamas military leaders," and "provided PIJ with military instructors and held high level meetings with senior PIJ military commanders."  (*Id.*, ¶¶ 76-78).  The plaintiffs allege that documents found in Iraq by the American military show that Hussein provided over $100 million to Palestinian terrorist groups to support the Second Intifiada.  (*Id.*, ¶ 80).  The plaintiffs allege that, "[w]hile separate organizations, the Saddam Regime, ALF, Hamas, PIJ, and AAMB have long and openly adhered to a shared mission: to topple and eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestinian state."  (*Id.*, ¶ 118).  According to the allegations, during the

10

Second Intifada, Hussein allegedly cooperated with the terrorist organizations to obtain weapons and explosives, train potential terrorists, and plan and commit joint attacks. (*Id.*, ¶ 120). The plaintiffs allege that the payments to terrorists, made by the Iraqi Ambassador to Jordan out of secret bank accounts in Jordan, were crucial to recruiting suicide bombers and other terrorist operatives. (*Id.*, ¶¶ 121, 124).

### D. The Plaintiffs' Injuries and this Lawsuit

This case arises out of 21 terrorist attacks in Israel during the Second Intifada. The plaintiffs are individuals who were wounded in the attacks, estates of individuals who were killed in the attacks, and family members of individuals wounded or killed. The plaintiffs allege that Hussein made reward payments to the families of the terrorists who carried out each of the 21 attacks. The details of each attack, including the identities of its victims and perpetrators, are described in the complaint.

• On November 22, 2000, a Hamas suicide bomber detonated an explosive onboard a bus in Hadera, Israel. At least two people were killed, including plaintiff Shoshana Ris, the daughter of plaintiffs Tuvia Ris and Tzvia Ris and the sister of plaintiffs Sabine Ris and Anat Ris. Thirty-six people were injured, including plaintiff Hana Segal, the mother of plaintiff Pnina Alterovich; plaintiff Michal Ganon, the son of plaintiff Viviane Asraf Ganon; and plaintiff Getaun Azanu, the husband of plaintiff Habasta Azanu. Mahmoud al-Madani, a Hamas leader who was involved in the attack but was not himself the suicide bomber, was later killed by the Israeli Defense Forces ("IDF"). His family received a $10,000 check on behalf of Hussein on April 28, 2001. (*Id.*, ¶ 209).

• On January 1, 2001, a Hamas suicide bomber detonated a car bomb in Netanya, Israel. At least thirty-six people were injured, including plaintiff Perach Baruch, the daughter of

plaintiff Naima Shimon and the mother of plaintiff Guy Baruch; Maayan Furman, the daughter of plaintiff Orit Furman; and plaintiffs Dor Hershkovitz, Sapir Hershkovitz, and Zehava Hershkovitz, the family members of plaintiff Shimon Hershkovitz.  On, June 18, 2001, a woman who the plaintiffs allege was the suicide bomber's mother received a $10,000 check on behalf of Hussein.  (*Id.*, ¶ 208).

- On March 4, 2001, a Hamas suicide bomber detonated a case full of explosives in Netanya, killing three people and wounding 65, including plaintiff Bosmat Glam, the son of the plaintiffs David Glam and Rachel Glam; plaintiff Ariel Mahfud; and plaintiff Mazal Alevi. On March 19, 2001 the suicide bomber's family received a check on behalf of Hussein.  (*Id.*, ¶ 207).

- On March 27, 2001, a Hamas suicide bomber detonated explosives on a Jerusalem bus, wounding 28 people including plaintiff Shmuel Shfaim, the husband of plaintiff Iris Shfaim. The plaintiffs allege, upon information and belief, that "the suicide bomber's beneficiary received a payment from Saddam Hussein."  (*Id.*, ¶ 206).

- On March 28, 2001, a Hamas suicide bomber detonated explosives at "the Neveh Yamin/Kfar Saba Junction."  The attack killed two people, plaintiff Naftali Lanzkron, the son of plaintiffs Meir Lanzkron and Hava Lanzkron and the brother of plaintiffs Brakha Hershkovitz, Oria Lanzkron, Yekhiel Lanzkron, Eisheva Lanzkron, Nethanel Lanzkron, Yeddia Lanzkron, Yehuda Lanzkron, Shoshana Rotenberg, and Merav Shamir; and plaintiff Eliran Rozenberg, the son of plaintiff Michal Zayat Rosenberg and the brother of plaintiffs Hila Zayat, Shiran Zayat, Noam Zayat, Noga Zayat, and Zeev Zayat.  Four people were wounded, including plaintiffs Rafael Sommer and Hannanel Touito.  On May 29, 2001, the suicide bomber's father received a $10,000 check on behalf of Hussein.  (*Id.*, ¶ 205).

- On May 18, 2001, a Hamas suicide bomber detonated explosives at a mall in Netanya, killing five people. The dead included plaintiff Vladislav Sorokin, the husband of Olesya Sorokin and the father of Alexander Sorokin, both of whom were injured. Eighty-six people were wounded, including the Sorokins; plaintiffs Hila Chen, Moran Rokach, and Liat Rokach, the daughters of plaintiffs Joseph Rokach and Yaffa Rokach; plaintiff Dikla Hadad; plaintiff Ina Segal, the mother of plaintiffs Diana, Christina, and Sharon Segal; plaintiff Ortal Alevi, the daughter of plaintiff Mazal Alevi; plaintiff Lillian Peretz; plaintiff Solange Azran; plaintiff Maxim Azulai; plaintiff Eli Sarusi; plaintiff Meital Maymony; and plaintiff Yuri Abramov. A woman the plaintiffs allege to be the suicide bomber's mother received a $10,000 check on behalf of Hussein on May 29, 2001 and a $5,000 check on behalf of Hussein on June 19, 2001. (*Id.*, ¶ 204).

- On May 25, 2001, two PIJ suicide bombers drove a car rigged with explosives into a bus in Hadera. The explosion wounded 65 people, including plaintiff Carmela Litmanovic and plaintiffs Shay Amar, Tzachi Amar, and Shir Amar, the children of plaintiffs Negba Amar and Binyamin Amar. On June 18, 2001, one bomber's father and a woman alleged to be the other bomber's mother each received a $15,000 check on behalf of Hussein. (*Id.*, ¶ 203).

- On June 1, 2001, a Hamas suicide bomber detonated explosives at the entrance to a club in Tel Aviv. The attack killed 22 people and wounded 83 others. Many of the victims were the teenage children of Russian immigrants. Among those killed was plaintiff Simona Rudin, the daughter of plaintiffs Mark Rudin and Irina Tal. The 83 wounded included plaintiff Margarita Abramaov; plaintiff Katerina Peline, the daughter of plaintiffs Victor Peline and Galina Peline; plaintiff Alexandra Plotkin; and plaintiff Andrei Tailakov. The

plaintiffs allege that the suicide bomber's family "received a payment from Saddam Hussein." (*Id.*, ¶ 202).

- On July 16, 2001, a PIJ suicide bomber detonated explosives at a bus stop in Binyamina, killing two people and wounding 11, including plaintiff Ben Tzion Avdaev, the son of plaintiffs Ovadia Avdaev and Avigail Avdaev. The suicide bomber's father received a $15,000 check on behalf of Hussein on August 20, 2001. (*Id.*, ¶ 201).

- On August 9, 2001, a Hamas suicide bomber detonated explosives at a restaurant in Jerusalem, killing 15 people and wounding 110, including plaintiffs Anat Amar, David Michael Amar, Eliad Amar, Chagai Amar, Noam Amar, and Gafnit Amar. On August 27, 2001, the suicide bomber's father received a $15,000 check on behalf of Hussein. (*Id.*, ¶ 200).

- On October 4, 2001, a terrorist claimed as a member by both Hamas and the AAMB opened fire at a bus station in Afula. He killed three people, including plaintiff Haim Ben Ezra, the husband of plaintiff Sol Ben Ezra and the father of plaintiffs Lea Ben Ezra, Yossef Ben Ezra, Mordechi Ben Ezra, and Amram Ben Ezra. On November 3, 2001, a woman who the plaintiffs allege was the terrorist's mother received a $15,000 check on behalf of Hussein. (*Id.*, ¶ 199).

- On November 4, 2001, a PIJ terrorist opened fire with automatic weapons in a bus in Jerusalem. He killed two people, including plaintiff Menashe Regev, the son of plaintiff Gidon Regev. Forty people were injured, including plaintiffs Odelia Abecassis, Tzuria Amosi, Oshra Avitzur, Tzvi Yehuda Goldenberg, Miriam Izhaki, Naomi Kalfa, Ricky Kleinman, Yissachar Zvi Lebowitz, Tamar Levenson, Shifra Markowitz, Sarah Mordecai,

Tamar Oziel, Moria Rabi, Ora Rubinoff, and Gila Schnall.  The terrorist's mother received a payment on behalf of Saddam Hussein.  (*Id.*, ¶ 198).

- On November 27, 2001, a PIJ terrorist and an AAMB terrorist armed with assault weapons opened fire at the Afula bus station.  Two people were killed and 50 were injured, including plaintiff Dimitry Gantovnik, the son of plaintiff Faina Gantovnik; plaintiff Shula Gaon; plaintiff Ezra Sharabi; and plaintiff Shoshana Simon.  The families of both terrorists received payments on behalf of Hussein.  (*Id.*, ¶ 197).

- On December 1, 2001, two Hamas suicide bombers detonated explosives on their persons and rigged to a car on Ben Yehudah Street in Jerusalem.  Eleven were killed, including plaintiff Yossi Elezra, the son of plaintiffs Mordechai Elezra and Yael Elezra and the brother of plaintiffs Shirly Elezra and Omer Elezra; and plaintiff Golan Turgeman, the son of plaintiff Edna Turgeman and the brother of plaintiffs Ester Ifat Sultan, Amira Turgeman, Moshe Turgeman, Avi Turgeman, and Orly Turgeman Goldshmit.  The attack wounded 170, including plaintiff Efraim Aroas, the son of plaintiffs Izak and Yaffa Aroas; plaintiff Baruch Yehuda Ziv Brill; plaintiff Omer Eliav; plaintiff Ortal Ganon, the daughter of plaintiff Robert Ganon; plaintiff Sharon Gili Hefetz; plaintiff Adi Hoja, the daughter of plaintiff Malka Nisim; plaintiff Hila Levi, the daughter of plaintiffs Shimon Levi and Aviva Levi; plaintiff Dana Mizrachi; plaintiff Lia Lihi Mizrachi; plaintiff Michael Ysaia; and plaintiff Avi Zino, the son of plaintiff Viki Zino.  On January 22, 2002, the father of one attacker and the mother of the other each received a $15,000 check on behalf of Hussein.  (*Id.*, ¶ 196).

- On March 2, 2002, an AAMB suicide bomber detonated explosives near a yeshiva, or religious school, in Jerusalem where people were gathered for a bar mitzvah celebration.

Four people were killed and fifty-seven injured, including plaintiff Yehiel Bornstein.  On June 14, 2002, the bomber's father received a payment on behalf of Hussein.  (*Id.*, ¶ 195).

- On March 5, 2002, a PIJ suicide bomber detonated explosives on a bus in Afula, killing one person and injuring 11, including plaintiff David Elisha-Sherf.  On May 6, 2002, the bomber's mother received a check on behalf of Hussein.  (*Id.*, ¶ 194).

- On March 9, 2002, a Hamas suicide bomber detonated explosives at a café in Jerusalem. Eleven people were killed, including plaintiff Nir Borocov, the son of plaintiffs Mordechai Borocov and Kochava Borocov and the brother of plaintiffs Iris Shfaim, Yochevet Borocov, Dorit Yadid Borocov, and Doron Borocov.  Fifty-eight people were wounded, including plaintiff Maimon Amsalem; plaintiff Yoseff Cohen; plaintiff Asael Fridman; plaintiff Roy Gordon; plaintiff Assaf Myara, the son of Lisa Myara; and plaintiff Sinai Zaken.  On June 23, 2002, the suicide bomber's mother received a $25,000 check on behalf of Hussein.  (*Id.*, ¶ 193).

- On March 20, 2002 a PIJ suicide bomber detonated explosives on a bus near Afula, killing seven people, including plaintiff Meir Fahima, the son of plaintiffs Shalom Fahima and Kokhava Fahima, the brother of plaintiffs Rachel Assraf, Ben-Israel Fahima, Gabi Fahima, Mazal Fahima, and Daniel Navon Fahima, the husband of plaintiff Ester Fahima, and the father of plaintiffs Lidor Fahima, Natali Fahima, and Ortal Fahima.  The attack also injured thirty people, including plaintiff Yuis Zeid.  On May 6, 2002, the suicide bomber's father received a check on behalf of Hussein.  (*Id.*, ¶ 192).

- On March 31, 2002, a Hamas suicide bomber detonated explosives at a restaurant in Haifa, killing fifteen people and injuring over forty others, including plaintiffs Paul Drimmer, Rahel Drimmer, and Baruch Naim, the relatives of plaintiffs Hani Drimmer and Pnina Drimmer.

16

On May 6, 2002, the suicide bomber's father received a check on behalf of Hussein.  (*Id.*, ¶ 191).

•  On April 10, 2002, a PIJ suicide bomber detonated explosives on a bus traveling from Haifa to Jerusalem.  Seven people died, including plaintiff Zeev Hanik, the son of plaintiff Boris Hanik and the brother of plaintiffs Illana Vaknin and Lior Hanik.  Twenty-two others were injured.  On May 6, 2002, the bomber's father received a check on behalf of Hussein.  (*Id.*, ¶ 190).

•  On April 12, 2002, an AAMB suicide bomber detonated explosives at a bus stop outside of the Mahane Yehuda open-air market in Jerusalem.  Six people were killed and another 104 were injured, including plaintiffs Zila Cohen, Yaakov Shfaym, Naomi Shfaym, Rahmim Hason, and Kineret Rahamim.  On June 14, 2002, the suicide bomber's father received a payment from Hussein.  (*Id.*, ¶ 189).

In this suit, the plaintiffs do not name Hussein, Iraq, the terrorist organizations, or the terrorists responsible for these attacks.  The defendants are El Paso, Wyatt, the NuCoastal Companies, Chalmers, and the Bayoil Companies.  Money allegedly links the bombings and these defendants.  The plaintiffs allege that Hussein used money obtained from the defendants, either directly or through intermediaries,  in violation of the OFP's restrictions, to fund terrorism in Israel primarily by paying "rewards" to the families of the terrorists who killed and injured the plaintiffs and their family members.

The first set of claims is advanced by the plaintiffs who are not American citizens or nationals.  They invoke this court's jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, which allows aliens to bring claims in a district court for torts committed "in violation of the law of nations or a treaty of the United States."  These plaintiffs allege that the defendants violated the law

17

of nations, now known as "customary international law," by financing terrorism and by aiding and abetting and conspiring to commit acts of genocide and crimes against humanity. The plaintiffs who are United States nationals or citizens injured by the attacks (or their estates, survivors, or heirs)[4] bring claims under the Antiterrorism Act of 2001, 18 U.S.C. § 2333, for providing material support to terrorist organizations and engaging in illegal business dealings with Iraq. All the plaintiffs allege that the defendants aided and abetted and conspired to commit violations of the Torture Victim Protection Act, Pub.L. 102-256, Mar. 12, 1992, 106 Stat. 73, *reprinted as a note to* 28 U.S.C. § 1350. All plaintiffs also assert that the defendants are liable for "assisting and conspiring in the intentional injury of others by a third party." The complaint asserts two final counts, one for successor liability against El Paso (for Coastal's liability) and the other for alter ego liability against the NuCoastal Companies (for Wyatt's and Coastal's liabilities).

This suit was filed on January 2, 2009 in the District Court for the District of Columbia. (Docket Entry No. 3). The defendants' motion to transfer venue was granted and the case transferred to this court on December 3, 2009. (Docket Entry No. 60). This court held a hearing on January 21, 2010, during which the parties presented arguments on the pending motions to dismiss.

All the defendants have moved to dismiss on two grounds. The first is that the defendants' actions are too attenuated from the plaintiffs' injuries to permit standing under Article III. The

---

[4] The plaintiffs allege that there are 20 such plaintiffs: Yossef Cohen, Asael Fridman, Baruch Yehuda Ziv Brill, Simon Lebowitz, Rosalyn Shoshana Pearl Lebowitz, Yissachar Zvi Lebowitz, Ester Devora Markowitz, Gerald Markowitz, Shifra Markowitz, Sarah Mordechai, Shirin Mordechai, Aviva Rubinoff, Michael Rubinoff, Ora Rubinoff, Eliezer Rubinoff, Joseph Rubinoff, Shoshana Rubinoff, Gila Schnall, Frances Nati Schnall, and Ira Yehuda Schnall. The defendants have noted that only eight of these 20 names actually appear in the caption as named plaintiffs: Yossef Cohen, Asael Firdman, Baruch Yehuda Ziv Brill, Yissachar Zvi Lebowitz, Shifra Markowitz, Sarah Mordechai, Ora Rubinoff, and Gila Schnall.

second is that the plaintiffs have failed to state a claim on the merits of any of their causes of action. Both grounds are addressed for each defendant.

## II.     Standing to Sue

### A.     The Legal Standard

Article III restricts the federal judicial power to "Cases" and "Controversies."  U.S. Const. Art. III, § 2.  The standing doctrine ensures that courts do not step outside this authority so that the separation of powers is maintained.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560, 112 S. Ct. 2130 (1992).  Under Article III, "the irreducible constitutional minimum of standing contains three elements."  *Id.* at 560.  These elements are "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61, 112 S. Ct. 2130).  As "the party invoking federal jurisdiction," the plaintiffs "bear[] the burden of establishing these elements."  *Lujan*, 504 U.S. at 561, 112 S. Ct. 2130.  They must meet this burden "'with the manner and degree of evidence required at the successive stages of the litigation,'" which means that "on a motion to dismiss, plaintiffs must allege facts that give rise to a plausible claim of [] standing."  *Cornerstone Christian Schools v. Univ. Interscholastic League*, 563 F.3d 127, 133-34 (5th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561, 112 S. Ct. 2130).

The standard of review for a motion to dismiss under Rule 12(b)(1) depends on whether the motion is based on a facial or factual challenge to subject matter jurisdiction.  *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  A facial challenge asserts that a court lacks jurisdiction over the plaintiff's claims on their face.  A factual challenge attacks the existence of a court's subject matter jurisdiction apart from the pleadings.  *Mortensen v. First Fed. Sav. and Loan*

19

*Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  When considering a factual challenge, "no presumti[on of] truthfulness attaches to a plaintiff's allegations." *Martinez v. U.S. Post Office*, 875 F.Supp. 1067, 1070 (D.N.J. 1995) (citing *See Mortensen*, 549 F.2d at 891).  Whether the challenge is facial or factual, the plaintiff bears the burden of persuasion.  *Mortensen*, 549 F.2d at 891.

The dispute in this case centers on the second element of constitutional standing, causation. To satisfy this requirement, the plaintiffs must show that their injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61, 112 S. Ct. 2130 (quotations and alterations removed).  An injury is generally insufficient to "confer standing when the injury's existence depends on the decisions of third parties not before the court." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (citing, *e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41, 96 S. Ct. 1917 (1976)).  That does not mean, however, that the defendant's challenged action must be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168, 117 S. Ct. 1154 (1997).  An injury may, for example, be fairly traceable to the defendant if the injury was "produced by determinate or coercive effect [of the defendant's challenged action] upon the action of someone else." *Id.* at 169.

## B.   Analysis:  Standing to Assert the Non-ATA Claims

The "causal connection" element of standing is analyzed first for the claims other than those brought under the Antiterrorism Act, and second for the claims under that Act.  Only United States nationals injured by terrorist activities—and their estates, survivors, and heirs—can bring ATA claims.

### 1.   El Paso

El Paso argues that the plaintiffs' injuries are not fairly traceable to its purchases of Iraqi oil because the injuries resulted from the independent acts of third parties not before the court.  Those third parties include the direct purchasers that sold the Iraqi oil to El Paso (and paid the illegal kickbacks placed in the Jordanian bank accounts); Hussein; the terrorist organizations; and the terrorists themselves.  (Docket Entry Nos. 26 at 16-20; 47 at 12-15).  The plaintiffs respond that, because they have alleged that El Paso is an accessory rather than a direct tortfeasor, they need not allege that El Paso's acts were a "but for" cause of their injuries.  Instead, they need only allege that El Paso provided substantial assistance to the direct tortfeasors, the terrorists.  (Docket Entry No. 42 at 33-35).

The plaintiffs rely heavily on *Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955(GEL), 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008), another case involving the OFP.  In *Mastafa*, the plaintiffs were Iraqi citizens whose family members had been tortured or killed by Hussein's government.  The plaintiffs alleged that the Australian Wheat Board ("AWB"), a major supplier of wheat purchased for Iraq with the oil-sales revenue in the OFP escrow account, paid kickbacks to Hussein as part of the wheat transactions.  The plaintiffs alleged that the AWB and BNP, the bank the U.N. retained to administer the OFP account, had aided and abetted the Hussein government in causing the plaintiffs' injuries "by providing substantial assistance through the form of kickbacks and/or financial assistance."  *Id.* at *2 (quotations and alterations removed).  The court held this facially sufficient for Article III standing.

The *Mastafa* court based its decision on the nature of aiding and abetting liability.  "If plaintiffs aided and abetted the Hussein regime in the commission of human rights abuses that injured plaintiffs, then defendants are responsible for those acts, not because they caused them, but because the law 'hold[s] the person who aids and abets liable for the tort itself.'"  *Id.* (quoting

*Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (alteration in original)).  "The injuries resulting from the Hussein regime's acts are thus 'fairly traceable' to any who aided and abetted their commission." *Id.*  The court distinguished prior cases finding no standing for the injuries from "independent acts of third parties" on the ground that "the acts of the Hussein regime are not 'independent' of steps taken to aid and abet those acts." *Id.*  While "but for" causation might be required when there are allegations of direct liability, such a causation standard in aiding and abetting cases would "significantly undermine aiding and abetting liability in the federal courts, since it is often the case that an accessorial defendant is not the 'but for' cause of the principal tortfeasor's tortitious acts." *Id.* at \*3.[5]

El Paso cites a later case from the same district, *Rothstein v. UBS AG*, 647 F. Supp. 2d 292 (S.D.N.Y. 2009), reaching a different result.  In *Rothstein*, victims and families of victims of Hamas- and Hezbollah-sponsored suicide bombings in Israel sued UBS, a bank, for aiding and abetting the terrorist attacks.  The plaintiffs alleged that UBS had transferred money to Iran's government in violation of a U.S. regulation against doing so, for which UBS had paid a $100 million civil penalty.  The plaintiffs alleged that:  Iran was a known sponsor of Palestinian terrorist organizations, including Hamas and Hezbollah; these organizations required cash to operate; "UBS's involvement in banknote transactions with Iranian counterparties had the effect of providing U.S. cash dollars to the Iranian government"; and Iran supplied this cash to the terrorist organizations, which used it to carry out the attacks.  *Id.* at 293-94.  The court concluded that "[t]his extended chain of inferences" was "far too attenuated to provide plaintiffs with sufficient standing to bring this action under

---

[5]  As El Paso argues, the reasoning in *Mastafa* was also supported by citations to factually analogous cases in which, without addressing standing, courts had held that the plaintiffs had stated an aiding and abetting claim.  Although "drive-by" jurisdictional rulings do not carry weight, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91, 118 S. Ct. 1003 (1998), this does not necessarily undermine *Mastafa*.  The core of the court's reasoning was the distinction between the causation requirement in direct and accessorial liability actions.

federal law." *Id.* at 294.  The plaintiffs' allegations did not meet the causation element of standing. "Among many other deficiencies in the causal chain," the complaint did "not allege that UBS is a primary or even relatively significant source of U.S. banknotes for the Iranian government," "cash dollars have multiple legitimate uses besides funding terrorism," and there were "no specific allegations showing that the terrorist groups here in question raise their funds from monies transferred from Iran." *Id.*  As a result, "the plaintiffs' allegations [were] far too speculative to provide the plausible indication of proximate causation necessary to establish plaintiffs' standing." *Id.*  Finally, the court distinguished the alleged facts in *Rothstein* from cases in which the allegations are of "direct involvement between the defendant banks and the terrorist organizations or 'fronts' those organizations directly controlled."  *Id.*[6]  The *Rothstein* plaintiffs did not allege a direct relationship between UBS and terrorist organizations that carried out bombings; the relationship was between UBS and the government of Iran, which supplied the cash to the terrorists.  *Id.*

*Rothstein* did not cite *Mastafa*, but in that case, the plaintiffs alleged that the Hussein government injured them directly, not by funneling money to a terrorist organization.  The *Mastafa* plaintiffs alleged that the AWB had a direct relationship with the Hussein government, which arranged to purchase wheat from the AWB and instructed it to pay kickbacks.  In *Rothstein*, the plaintiffs alleged that UBS provided cash to Iran, but they did not allege that Iran carried out the terrorist attacks.  Instead, they alleged that Iran supplied terrorist organizations with money.  As to AWB, the cases are clearly distinguishable.

---

[6]  The leading case is *Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005).  In that case, the plaintiffs were United States victims of Hamas attacks in Israel in 2000.  The plaintiffs sued Arab Bank, a Jordan-based bank with a location in New York, alleging it acted as a claims administrator distributing payments to families claiming financial benefits because their sons had completed successful suicide bombings.  The plaintiffs alleged that the bank, in consultation with Hamas and another entity, maintained a list of "eligible martyrs," "open[ed] a dollar account for each beneficiary," reviewed documentation from families of martyrs to determine if it was sufficient, and, if so, "issue[d] a receipt to the designated recipient of the benefit."  *Id.* at 577.

*Mastafa's* holding that the plaintiffs had standing to sue BNP, the bank managing the escrow account, is harder to reconcile with *Rothstein*.  The *Mastafa* plaintiffs alleged that BNP aided and abetted the terrorism by disbursing OFP funds to AWB, some of which AWB used to pay the kickbacks to Iraq.  Although the plaintiffs apparently alleged that AWB paid some of the kickbacks to BNP, which then paid the Hussein regime, the court found, in analyzing the Rule 12(b)(6) motion,[7] that those general allegations were superceded by more specific allegations that the AWB paid the kickbacks directly to the Hussein regime without BNP's involvement.  *See Mastafa*, No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *4 & n.5.  The presence of even these general allegations of BNP's involvement in the kickback scheme sets *Mastafa* apart from *Rothstein*.  In *Rothstein*, the plaintiffs alleged that Iran was the intermediary between UBS and the terrorist organizations.  Moreover, there were allegations in *Mastafa* of a direct banking relationship between BNP and the Hussein government that committed the atrocities; in *Rothstein*, UBS's relationship was with Iran, not with Hamas and Hezbollah, the organizations responsible for the attacks.

In responding to the other defendants' motions to dismiss, the plaintiffs cited to a decision issued in the Eastern District of New York a month after *Rothstein*.  In that case, *Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (2009), the plaintiffs, U.S.-Israeli joint citizens, were the widow and children of a man killed by a Hamas suicide bomber on a Jerusalem bus in 2004.  They sued UBS for providing banking services to a group called ASP, allegedly a member of the Union of Good.  This group of "charities" was the principal source for funds Hamas used to finance terrorist activities.  ASP had been designated a terrorist group by the United States government.  The plaintiffs alleged that UBS nonetheless continued to provide banking services to ASP, including

---

[7] The *Mastafa* court did not differentiate between the claims against the bank and the claims against AWB in its standing analysis.

making three alleged money transfers to the Tulkarem Zakat Committee, a West Bank organization allegedly controlled by Hamas and designated as an "unlawful organization" by the Israeli government. *Id.* at 415-16. UBS moved to dismiss on standing grounds, arguing that the plaintiffs' injuries were not fairly traceable to the bank's actions. The court disagreed. It held that the plaintiffs had "alleged a coherent and plausible causal nexus linking UBS's alleged wire transfers for ASP to the bombing of Bus 19." The plaintiffs alleged that UBS provided a bank account for ASP and knowingly transferred money to Hamas-controlled entities, that "Hamas's terrorist activities are fueled by the funds the flow into the organization," and that Hamas was responsible for the plaintiffs' injuries. *Id.* at 416-18. The court rejected UBS's argument that there was no standing because the plaintiffs had not shown "but for" causation, noting that such a causation requirement would exceed the showing required on the merits of an aiding and abetting claim and would deprive federal courts of jurisdiction whenever "several acts each independently would have sufficed to cause the harm." *Id.* at 418. It was sufficient for the plaintiffs to "allege facts 'from which it could be reasonably inferred that, absent Defendant's unlawful acts, there is a substantial probability' that plaintiffs wouldn't have suffered harm," *Id.* (quoting *Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001)). In other words, it was sufficient to allege facts "from which it may be inferred that cessation of the defendant's allegedly illegal activity would 'make an appreciable difference' in bringing about the harm." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 758, 104 S. Ct. 3315 (1984)). The court found that this standard was met because the plaintiffs had alleged facts showing that ASP was "'a pivotal part of Hamas's fundraising structure and a significant source of Hamas's financing, and that terrorist activity, including the act that killed Stuart Scott Goldberg, depends on financing of a type similar to the three monetary transfers from ASP to

the Tulkarem Zakar Committee, allegedly effected by UBS." *Id.* at 418-19 (internal citations omitted).

The allegations against El Paso in this case are significantly more attenuated than those against any defendant in *Goldberg*, *Rothstein*, or *Mastafa*.[8]  In fourteen of the sixteen transactions apparently at issue, El Paso bought Iraqi oil from third parties.  In the fifteenth transaction, El Paso assumed a contract under which Coastal had purchased Iraqi oil from a third-party direct purchaser. In all fifteen transactions, these third parties allegedly paid kickbacks to Hussein, which he used to support terrorist activities in Israel primarily by making reward payments to suicide bombers' families.  These third-party sellers and the Hussein government stood between El Paso and the terrorists.  In the remaining alleged transaction, El Paso assumed a contract under which Coastal bought oil directly from the Iraqi government, for which Wyatt allegedly paid a kickback.  There is no allegation that El Paso reimbursed Wyatt for the kickbacks.  Again, the Hussein regime stood between these defendants and the terrorist organizations.  The lack of any allegation of a direct connection between El Paso and the terrorist organizations (or the terrorists' families receiving the payments) distinguishes this case from *Mastafa*, in which the defendants themselves paid Hussein and Hussein's operatives carried out the attacks on Iraqi citizens, and from *Goldberg*, in which UBS itself paid a Hamas entity and Hamas carried out the attacks.  The allegations in this case are much closer to the allegations in *Rothstein* that UBS provided cash to Iran, which then paid cash to Hamas and Hezbollah.  In that case, it was not enough to allege that the defendants' business dealings generally increased funds available to Iran.  Here, it is similarly not enough to allege that the defendant's business dealings increased funds available to the Hussein regime and that Hussein paid

---

[8]*Comer v. Murphy Oil*, 585 F.3d 855 (5th Cir. 2009), which the plaintiffs cite in support of their attenuated theory of causation, has been vacated and the motion for rehearing *en banc* granted.  *Comer v. Murphy Oil*, --- F.3d ----, 2010 WL 685796 (5th Cir. Feb. 26, 2010).

money to reward terrorist acts.  The insufficiency is even more acute when there is no allegation that

the defendant was a substantial source of money for the Hussein regime.[9]  And, as to fifteen of the

sixteen transactions, the third-party seller added an additional layer was not present in *Rothstein*, in

which the court nonetheless found standing.

The clearest distinction between this case and the New York cases is at the other end of the

alleged causation chain.   In *Mastafa*, the plaintiffs alleged that Hussein's government directly

carried out the atrocities on their family members.   In *Goldberg*, the plaintiffs alleged that UBS

transferred funds to an organization controlled by Hamas and that Hamas used the funds to carry out

the attack that killed the plaintiffs' husband and father.   In *Rothstein* (in which the court found no

standing), the plaintiffs alleged that Iran gave cash to Hamas and Hezbollah, which carried out

attacks on the plaintiffs' family members.   Here, the primary allegation is that the Hussein

government gave money to the families of suicide bombers who had previously carried out attacks

to provide an incentive for *prospective* suicide bombers to carry out future attacks.   This is the type

of situation in which the Supreme Court has found that a plaintiff's injury is attributable to the

independent acts of third parties.

In *Allen*, 468 U.S. at 737, 104 S. Ct. 3315 (1984), for example, parents of black public school

students sued the Treasury Secretary and the Commissioner of the Internal Revenue Service.  They

alleged that the IRS was failing to enforce a statutory denial of tax-exempt status to private schools

that discriminated on the basis of race.  The Supreme Court held that the plaintiffs had suffered an

injury-in-fact because the availability of segregated public schools kept white students out of public

schools and led to all-black public schools, depriving the black students of equal educational

---

[9]The amount of money at issue here is apparently less than in *Rothstein*, in which UBS was forced to pay a $100 million
civil fine.  In that case, the court found no allegation that UBS was a "primary or even relatively significant source of
U.S. banknotes" for Iran.  *Rothstein*, 647 F. Supp. 2d at 293-94.

opportunities. *Id.* at 756-57. The Court held that the plaintiffs did not have standing to sue. Racial segregation in public schools was not fairly traceable to IRS policy. *Id.* at 757-59. First, the Court noted that there was no allegation that the number of racially discriminatory private schools in the plaintiffs' communities receiving tax exemptions was sufficiently high that withdrawing the exemptions would change meaningfully the racial makeup of the public schools. More importantly, it was entirely speculative "whether withdrawal of a tax exemption from any particular school would lead the school to change its policies" and "just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school" once the school lost tax-exempt status. *Id.* at 758. Even in the absence of the IRS policy, what ultimately would matter would be the actions of the private schools and white parents. Neither the schools nor the parents which were parties to the suit. *See id.*

The Supreme Court had reached a similar result several years earlier in *Simon*, 426 U.S. at 26, 96 S. Ct. 1917, another case in which the plaintiffs challenged an IRS policy. The plaintiffs alleged that the Treasury Secretary and IRS commissioner had violated their statutory rights by reducing the amount of free medical care hospitals were required to offer to maintain favorable tax status. *Id.* at 28-32. Assuming, without deciding, that the plaintiffs had been injured by the denial of free medical care, the Court held that the plaintiffs lacked standing because they could not show causation. *Id.* at 40-41. The plaintiffs had alleged only that the IRS's decision "had 'encouraged' hospitals to deny services to indigents." *Id.* at 42. According to the Court, it was "purely speculative whether the denials of service specified in the complaint fairly [could] be traced to [the IRS's] 'encouragement' or instead result[ed] from decisions made by the hospitals without regard to the tax implications." *Id.* at 42-43.

28

Two earlier cases are similar.  In *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S. Ct. 1146 (1973), the Court found that the plaintiff lacked standing to bring an Equal Protection Clause challenge to a Texas state court's interpretation of a child support statute as applying only to fathers of marital children.  The plaintiff, who was the mother of a nonmarital child, sought an injunction ordering the State to enforce the statute against her child's father.  The Supreme Court held that, although the plaintiff had alleged an injury, she had "made an insufficient showing of a direct nexus between the vindication of her interest and the enforcement of the State's criminal laws." *Id.* at 618-19.  The relationship between the State's decision not to prosecute and the father's decision not to pay could "at best, be termed only speculative." *Id.* at 618.  While the *Linda R.S.* Court directly addressed redressability and couched its decision in the special context of State enforcement of criminal laws, its analysis is consistent with *Allen* and *Simon*.[10]

In *Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197 (1975), the Court held that low-income plaintiffs lacked standing to raise an Equal Protection Clause challenge to a town zoning ordinance restricting the availability of low-income housing.  The plaintiffs could not demonstrate that the ordinance caused their inability to obtain affordable housing in the town because they had failed to "allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in [the town]." *Id.* at 504.  Whether the plaintiffs could move into the town depended on third parties building housing (only two had tried) and on the plaintiffs' ability to afford such housing if

---

[10] *Linda R.S.* has been criticized for improperly defining (or, defining too narrowly) the "injury-in-fact" as lost child support payments instead of unequal treatment of mothers with nonmarital children. William A. Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 272-73 (1988).  If this equal protection interest were the injury, it would be clear, in Judge Fletcher's view, that the causation  requirement was satisfied. *Id.*  It was not the father's independent failure to pay that caused the law to be applied unequally; it was the State policy of applying it unequally.  The question then would be whether, under the meaning of the Equal Protection Clause, the plaintiff had stated an injury.  This criticism of *Linda R.S.* does not undermine its usefulness in providing an example of the causation analysis, given a particular injury (however incorrectly defined) as the starting point.

it were built.  The Court found nothing in the record showing that any such housing projects would have met the plaintiffs' needs at prices they could have afforded.  *Id.* at 505-07.  This made the plaintiffs' claims too speculative for standing.  Rather than alleging concrete effects of the zoning ordinance, the plaintiffs "rel[ied] on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [the town government] acted otherwise."  *Id.* at 507.

The plaintiffs here allege that the Hussein government caused their injuries by making payments to suicide bombers' families, which encouraged future suicide bombings.  It is speculative whether the bombings that injured the plaintiffs and their family members are fairly traceable to Hussein's prior payments to families of other suicide bombers.[11]  It was the suicide bombers and the terrorist organizations that decided to carry out the specific attacks, not the Hussein government, not the third party that bought Iraqi oil, and not El Paso.  The suicide bombers were independent of El Paso.  The injuries caused by these bombers are not fairly traceable to El Paso.

This conclusion triggers the concerns expressed in *Mastafa* about aiding and abetting liability.  As the court in *Mastafa* stated, a defendant is not *independent* of the principal tortfeasor whom it aids and abets.  *See Mastafa*, No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *2-3.  This point is both a logical and important caveat to the "independent third party" rule and it changed the outcome of the standing analysis in *Mastafa*.  But the caveat has its own limits.  An injury is not always "fairly traceable" to any party accused of "aiding and abetting" a principal tortfeasor, no matter how remote that party's position on the causal chain.  If the *Mastafa* plaintiffs had also

---

[11]  To the extent that the plaintiffs' theory of causation for standing purposes goes beyond the incentive payments to family members and extends to the more general allegations that Hussein, either directly or through the ALF, provided logistical and financial support to Hamas, the AAMB, and PIJ, that is also insufficient to establish a causal connection. The attenuation described above between the defendants and the terrorists still distinguishes this case from *Mastafa* and *Goldberg*.

alleged that individual Australian wheat farmers had aided and abetted Hussein's attacks on the plaintiffs by supplying the AWB with wheat, or if they had alleged that Australian fertilizer manufacturers, or the Australian irrigation company, or individual wheat consumers had aided and abetted Hussein, it would have been difficult to conclude that the plaintiff's injuries were fairly traceable to these defendants' acts.

Again, the facts here are distinguishable from *Mastafa*. The plaintiffs here have not alleged a direct relationship between El Paso and the principal tortfeasors, the suicide bombers. There were independent third parties between Iraq and the plaintiffs (and, in 15 of the 16 alleged transactions, between El Paso and Iraq as well). Even if El Paso was not independent of Hussein because of the aiding and abetting allegations, it was the third-party oil sellers' decision to mark up the oil price to pay the kickbacks and it was the terrorists' decisions to carry out the attacks. What these actors would have done without El Paso's involvement is speculative. The causation prong of the standing test is not met.

El Paso's motion to dismiss for lack of standing is granted on the non-ATA claims.

### 2.    Wyatt and NuCoastal

Standing is a closer question for Wyatt and NuCoastal because the plaintiffs allege that they purchased oil directly from Iraq and paid kickbacks in exchange for receiving oil allocations.[12] The plaintiffs also allege that Wyatt was instrumental in helping Hussein manipulate the OFP so that he could extract kickbacks. The plaintiffs also allege that Wyatt made other illegal payments to Hussein and that he supplied Hussein with electronic equipment while the UN sanctions were in

---

[12] It is assumed that the analysis for Wyatt is identical to the analysis for Coastal before the El Paso acquisition. Coastal is not a defendant, but the plaintiffs have asserted a theory of imputed liability against El Paso and Wyatt for actions taken by Coastal before the acquisition. Under this approach, if the analysis does not reveal any viable allegations against Wyatt, it is unnecessary to consider the imputed liability issues.

place in the early- to mid-1990s.  While these allegations make the claims against Wyatt and NuCoastal less attenuated than those against El Paso, they nonetheless are insufficient for standing.

In *Mastafa*,[13] the plaintiffs alleged that Hussein carried out the terrorist attacks.  Such allegations are not present here.  Instead, the plaintiffs allege that the Hussein government made payments to reward the families of terrorists who committed attacks and gave general financial and logistical support to the Palestinian terrorist organizations to which these terrorists belonged.  The gap between the financial payments by Hussein and the plaintiffs' injuries is too great, and the inferences too speculative, for standing.  Just as the schools in *Allen* were responsible for their own racially discriminatory policies and the hospitals in *Simon* were responsible for their decisions to deny free care, the AAMB, Hamas, PIJ, and the individual terrorists made the ultimate decisions to carry out the attacks.  Hussein made the payments only after they did so.

As in *Rothstein*,[14] there is no factual allegation that the cash Wyatt and NuCoastal illegally gave Hussein was in turn paid to the terrorists' families.  The cash paid in kickbacks could have had multiple uses, even if illegal, other than funding the attacks on the plaintiffs.  Indeed, one of the news articles cited in the plaintiffs' complaint states that Hussein used the money to "rearm his troops and sustain the luxury that he and his supporters enjoy."  (Docket Entry No. 3, ¶ 66).  Despite the distinction between Wyatt and NuCoastal on the one hand and El Paso on the other in their relationships with Hussein, the plaintiffs' injuries are still not fairly traceable to Wyatt's or NuCoastal's actions.  The motions to dismiss the non-ATA claims against Wyatt and NuCoastal are granted.

---

[13]  No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *2-3.

[14]  647 F. Supp. 2d at 293-94.

32

### 3.        Chalmers and Bayoil

Chalmers's and Bayoil's actions are also too attenuated from the plaintiffs' injuries to satisfy the causation prong of Article III standing on the non-ATA claims.  The plaintiffs' asserted causal chain connecting Chalmers and Bayoil to the bombings is similar to the connections involving Wyatt and NuCoastal.  These defendants allegedly paid kickbacks to "front companies" Hussein controlled. The plaintiffs do not allege that Chalmers or Bayoil received oil allocations directly from Hussein. According to the allegations, however, Chalmers and Bayoil, unlike El Paso, did not merely pay Hussein by kickbacks in the form of passed-down oil price increases.  Chalmers and Bayoil allegedly paid money to companies that in turn paid Hussein.  For the reasons stated in the discussion of the plaintiffs' standing to sue Wyatt and NuCoastal, the plaintiffs have not alleged facts showing that their injuries are fairly traceable to Chalmers and Bayoil.  The motions to dismiss the non-ATA claims against Chalmers and Bayoil for lack of standing are granted.

### C.        Analysis: Standing on the ATA Claims

The plaintiffs who have claims under the ATA include United States nationals who were injured in the attacks and their estates, survivors, and heirs.[15]  A recent Seventh Circuit *en banc* opinion demonstrates that the substantive law applicable to these plaintiffs is different.  *See Boim v. Holy Land Foundation* (*Boim III*), 549 F.3d 685 (7th Cir. 2008) (en banc), *cert. denied sub nom Boim v. Salah*, 130 S.Ct. 458 (2009).  Although the substantive right to recover on a claim is not the same as standing to pursue that claim—*Boim III* does not even discuss standing—the issues are connected.  "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents."  *Int'l Primate Protection League v. Administrators of Tulane Educational*

---

[15] Again, there is some dispute as to how many plaintiffs this includes.  It appears that there are eight plaintiffs with ATA claims.

*Fund*, 500 U.S. 72, 77, 111 S. Ct. 1700 (1991); *see also Assn. of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 151, 90 S. Ct. 827 (1970) ("Generalizations about standing to sue are largely worthless as such."); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) ("In most cases, then, a plaintiff's standing tracks his cause of action. That is, the question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief. "); *Long Term Care Partners, LLC v. United States*, 516 F.3d 225 (4th Cir. 2008) (Williams, C.J., dissenting) ("Some cases, such as this one, illustrate that the distinction between the inquiry into a litigant's Article III standing to bring a claim and the inquiry into the ultimate merits of the plaintiff's claim is often a fine one."); *Town of Norwood v. FERC*, 202 F.3d 392, 406 ("the issue of standing and 'the merits' substantially overlap."); William A. Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 239 (1988) ("[T]he question of whether plaintiff 'stands' in a position to enforce defendant's duty is . . . determined by looking to the substantive law upon which plaintiff relies.").

In *Boim III*, the plaintiffs were the parents of an American-Israeli teenager shot at a bus stop in Israel by Hamas terrorists. The parents sued Islamic charities that allegedly provided money to Hamas. One of the defendants did not give the money directly to Hamas but made donations to another defendant that in turn paid Hamas. The plaintiffs alleged that the defendants had provided material support to terrorists violating the ATA. The court held that because Congress had not specifically provided for secondary liability under the ATA, secondary actors could not be held liable for aiding and abetting. *Boim III*, 549 F.3d at 689.[16] The court nonetheless concluded that the

---

[16] Other courts have reached the opposite conclusion. *See Boim v. Quranic Literacy Institute* (*Boim I*), 291 F.3d 1000, 1016-21 (2002) ("aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of [the ATA's civil liability provision]"); *In re Terrorist Attacks on Sept. 11, 2001* (*Terrorist Attacks I*), 349 F. Supp. 2d 765, 828-29 (S.D.N.Y. 2005) (citing *Boim I*, 291 F.3d at 1023); *Linde*, 348 F. Supp. 2d at 583 (same); *see also Rothstein*, 647 F. Supp. 2d at 295 ("assuming *arguendo* that a defendant in a private action brought under the

plaintiffs had a claim against the charities for *primary* liability.  The ATA provided a cause of action

for persons injured "by reason of" acts of "international terrorism," which the statute defined to

include activities involving violent acts and "acts dangerous to human life that are a violation of the

criminal laws of the United States."  18 U.S.C. §§ 2331(1),[17] 2333.  The court concluded that

"[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is

an 'act dangerous to human life,'" *Boim III*, 549 F.3d at 690 (quoting 18 U.S.C. § 2331(1)), that

would violate a U.S. criminal statute, specifically 18 U.S.C. §2339A, a criminal component of the

ATA.  Section 2339A(a) makes it a federal crime to "*provide*[ ] *material support or resources . . .*

*, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of*

*[18 U.S.C. § 2332]*."  18 U.S.C. § 2239A(a) (emphasis added).  To complete the analysis, § 2332

makes it a federal crime to kill, conspire to kill, or inflict bodily injury on a U.S. citizen abroad.  18

U.S.C. § 2332.  The court concluded that "[b]y this chain of incorporations by reference . . . we see

---

Antiterrorism Act can be held liable on an aiding and abetting theory").  *Terrorist Attacks I*, 349 F. Supp. 2d at 829, and *Linde*, 384 F. Supp. 2d at 583, also held that civil conspiracy liability was available (in addition to aiding and abetting liability), a question that had not been addressed by *Boim I*.

[17] "International terrorism" in the statute refers to activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (B) appear to be intended--

>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation or coercion; or
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping;
> and

> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1).

that a donation to a terrorist group that targets Americans outside the United States may violate section 2333." *Boim III*, 549 F.3d at 690.

Because § 2333 by incorporation included "provid[ing] material support or resources" as actionable conduct, the plaintiffs' ATA claim was one for primary liability. The court emphasized, however, that "[p]rimary liability in the form of material support to terrorism has the character of secondary liability." *Id.* at 691. Congress had "expressly imposed liability on a class of aiders and abettors." *Id.* at 692. Because "functionally the primary violator is an aider and abettor or other secondary actor," "the ordinary tort requirements relating to fault, state of mind, causation, and foreseeability" did not apply. *Id.* Instead, the tort requirements ordinarily governing secondary liability applied. *Id.* The *en banc* court issued two dissents. Both took issue with this reasoning as manipulating the ATA to "reap the advantages of both kinds of theories." *Id.* at 721 (Wood, J., concurring in part and dissenting in part); *id.* at 707-09 (Rovner, J., concurring in part and dissenting in part).

*Boim III* held that anyone who provides material support—not necessarily substantial support—to a terrorist organization, directly or indirectly, with knowledge that the organization carries out terrorist attacks in Israel (or with recklessness as to the truth of that fact), is liable under the ATA to an American (or his estate) injured in Israel by that organization.[18] *Boim III*, 549 F.3d at 692-700; *see also id.* at 721 (Wood, J., concurring in part and dissenting in part) (describing the

---

[18] The majority stated that defendants assisting organizations outside the ATA definition of "international terrorism" could not be subjected to liability. If a defendant's assistance did not "appear to be intended . . . to intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnaping," that defendant would not be liable under the ATA because the chain of incorporation by reference establishing primary liability would fall apart. The court provides an example of medical aid given to a terrorist by the Red Cross or Doctors Without Borders. *Boim III*, 449 F.3d at 699. But, as one of the dissenters notes, it is not "evident (to say the least) that financially supporting a Hamas-affiliated charity is an act that 'appear[s] to be intended' to have the sorts of coercive or intimidating effects on government policy or upon a civilian population as described in section 2331(1)(B)." *Id.* at 708-09 (Rovner, J., concurring in part and dissenting in part) (alteration in original).

36

standard created by the majority).   If a plaintiff can show that a defendant made a material contribution, financial or otherwise, with awareness of or deliberate indifference to the fact that the ultimate recipient was a terrorist organization, there is no need for that plaintiff to make an additional showing of causation.  *Id.* at 696-700.  This result was criticized by the dissents.  *See Boim III* at 709 (Rovner, J., concurring in part and dissenting in part) ("[T]he majority relieves the plaintiffs of any obligation to demonstrate a causal link between whatever support the defendants provided to Hamas and Hamas's terrorist activities (let alone David Boim's murder in particular)."); *id* at 722-24 (Wood, J., concurring in part and dissenting in part) ("The *en banc* majority freely concedes that there are no limits at all to its rule, and that a donor who gave funds to an organization affiliated with Hamas in 1995 might still be liable under § 2333 half a century later, in 2045").

As an example, the *Boim* majority stated:

> So consider an organization solely involved in committing terrorist acts and a hundred people all of whom know the character of the organization and each of whom contributes $1,000 to it, for a total of $100,000.  The organization has additional resources from other, unknown contributors of $200,000 and it uses its total resources of $300,000 to recruit, train, equip, and deploy terrorists who commit a variety of terrorist acts one of which kills an American citizen.  His estate brings a suit under section 2333 against one of the knowing contributors of $1,000.  The tort principles that we have reviewed would make the defendant jointly and severally liable with all those other contributors.  The fact that the death could not be traced to any of the contributors . . . and that some of them may have been ignorant of the mission of the organization (and therefore not liable under a statute requiring proof of intentional or reckless misconduct) would be irrelevant.  The knowing contributors as a whole would have significantly enhanced the risk of terrorist acts and thus the probability that the plaintiff's decedent would be a victim, and this would be true even if Hamas had incurred a cost of more than $1,000 to kill the American, so that no defendant's contribution was a sufficient condition of his death.

*Id.* at 698.  It did not affect the result that Hamas, in addition to carrying out terrorist operations, provided health, educational, and social welfare services.  Nor did it matter that the defendants had directed their donations exclusively to those services.  *Id.*  As the majority saw it, "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's nonterrorist activities does not get you off the liability hook."  *Id.*  Because money is fungible, Hamas could reallocate other social services money to terrorism.  And "Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect . . . and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren."  *Id.*

In any event, *Boim III* changes the standing analysis for the ATA plaintiffs by making it so easy for the plaintiffs to satisfy causation.[19]  It would be anomalous for the "causal connection" element of standing to be more onerous than the causation showing required to prevail on the merits.  *Cf. Rothstein*, 647 F. Supp. 2d at 295 ("If the allegations here are so speculative and attenuated as to deprive plaintiffs of standing, it follows *a fortiori* that they fail to adequately plead causation [on the merits].").

---

[19]  The cases before *Boim III* required more in the way of causation.  *See, e.g., Boim I*, 291 F.3d at 1011 ("Additionally, the statute itself requires that in order to recover, a plaintiff must be injured 'by reason of' an act of international terrorism. The Supreme Court has interpreted identical language to require a showing of proximate cause."); *In re Terrorist Attacks on Sept. 11, 2001 (Terrorist Attacks III)*, 462 F. Supp. 2d 561 (S.D.N.Y. 2006) ("Assuming [material] support is alleged, Plaintiffs will have to present a sufficient causal connection between that support and the injuries suffered by Plaintiffs. . . . Proximate cause will support this connection."); *Terrorist Attacks I*, 349 F. Supp. 2d at 825-26 (requiring proximate cause); *Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp. 2d 86, 104-05 (D.D.C. 2003) (same).  *Rothstein*, 647 F. Supp. 2d at 294-95, decided after *Boim III*, stated proximate cause was required both on the merits and for standing.  Another case decided after *Boim III* has also held that a showing of a "sufficient causal connection," although not "but for" causation, is required.  *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litigation*, --- F. Supp. 2d ----, 2010 WL 432426, at *14-16 (Feb. 4, 2010).  *In re Chiquita Brands* concluded that proximate cause could be sufficient and that *Boim III* provided an example of proximate causation.  *See id.* (collecting cases).

Of course, *Boim III* is not controlling law in this court.  The dissents are cogent and forceful.  *Rothstein*, 647 F. Supp. 2d at 292, included an ATA claim.  The court in that case, as discussed above, held that the plaintiffs, victims of suicide bombings in Israel, lacked standing to sue UBS for engaging in illegal transactions with Iran, a known state sponsor of terrorism that gave money to Hamas and Hezbollah, the perpetrators of the attacks.

*Boim III* is also distinguishable on its facts.  In that case, the defendants donated money to organizations serving as fronts for Hamas, which was responsible for the attack that killed Boim.  The majority brushed aside two kinks in the line of causation.  One defendant donated through an intermediary—one of the other defendants—but knew exactly where the money was going and therefore was "deliberately funneling money to Hamas."  *Boim III*, 549 F.3d at 701.  And, as already discussed, the court found no difference between giving money to Hamas's humanitarian arm and giving money to Hamas's terrorist arm.  *Id.* at 698.  Part of the court's concern was that a contrary holding would have encouraged money laundering as a way to escape liability for funding terrorism.  *Id.* at 701-02.  In this case, the allegations are that the defendants provided money, either directly or by paying a sale premium to third-party intermediaries, to Saddam Hussein.  The plaintiffs do not allege that Hussein's operatives carried out the attacks that caused their injuries.  Instead, the plaintiffs allege that members of Hamas, PIJ, and the AAMB carried out the attacks.  Despite some common goals, Hussein was not alleged to be a "front" for any of these organizations.  Although the plaintiffs allege that during Hussein's rule, Iraq provided financial support to terrorist organizations, the country was not merely a source of funds to those groups.  The defendants in this case are at least one step further removed from the terrorists that were the defendants in *Boim III*.  Despite the distinction, out of an abundance of caution, this court assumes that the motion to dismiss the ATA claims on standing grounds could be denied using the *Boim III* loose standard of causation and the

absence of dispute as to injury-in-fact and redressability.  The ATA claims are, however, deficient under Rules 12(b)(6).

### D.        Standing Conclusion

The Rule 12(b)(1) motions to dismiss for lack of standing are granted except with respect to the claims under the ATA.  On the other claims, standing provides a sufficient basis for dismissal. Rule 12(b)(6) provides an independent basis for dismissing all the claims, including the ATA claims.

## III.        The Rule 12(b)(6) Motions

### A.        The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  *Twombly* abrogated the Supreme Court's prior statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Twombly*, 550 U.S. at 562–63 ("*Conley's* 'no set of facts' language . . . is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . .").  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1974).

In *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule

8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). With respect to the "plausibility" standard described in *Twombly*, *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The *Iqbal* Court noted that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* also rejected the theory that Rule 9(b)'s endorsement of pleading generally in certain circumstances permits a complaint to survive based on only conclusory allegations. The Court acknowledged that while Rule 9 requires pleading with particularity "when pleading 'fraud or mistake,'" it allows "'[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally.'" *Id.* at 1954 (alterations in original) (quoting FED. R. CIV. P. 9(b)). But the Court explained that the term "generally," as used in Rule 9, "is a relative term." *Id.* The Court stated that "[i]n the context of Rule 9, ['generally'] is to be compared to the particularity requirement applicable to fraud or mistake," that "Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard," and that Rule 9 "does not give [a party] license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 129 S. Ct. at 1954 (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1301, at 291 (3d ed. 2004)). The Court concluded that "Rule 8 does not empower respondent to plead the bare

elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.*

"'Rule 8(a)(2) . . . requires a showing, rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.'" *Dark v. Potter*, 293 F. App'x 254, 258 (5th Cir. 2008) (unpublished) (per curiam) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1965 n.3).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1964–65); *see also S. Scrap Material Co. v. ABC Ins. Co.* (*In re S. Scrap Material Co.*), 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1965), *cert. denied*, 129 S. Ct. 1669 (2009). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1966).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.");

*see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).  However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ."  6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

### B.      Claims Under The Alien Tort Statute

The Alien Tort Statute ("ATS") was enacted as part of the Judiciary Act of 1789.  Over the next two centuries, it provided the basis for jurisdiction very rarely before being "discovered" around 1980 and increasingly relied upon in the last few decades.  *See Sosa v. Machain*, 542 U.S. 692, 712, 124 S. Ct. 2739 (2004).  In its current form, the statute states: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The "law of nations" is now known as "customary international law."

*Sosa* is the Supreme Court's only extended ATS analysis.  The Court concluded that the ATS does not create a statutory cause of action.  Instead, it grants jurisdiction for district courts to hear suits for violations of substantive international law.  *Sosa*, 542 U.S. at 713-14, 718-19, 124 S. Ct. 2739.  Although the defendants' motions to dismiss on this issue are styled as Rule 12(b)(6)

43

motions, if this court finds that the alien plaintiffs fail to state a claim on one of their ATS causes of action, the effect of that ruling is that this court lacks jurisdiction over that cause of action.

In reviewing the historical record, the *Sosa* Court stated that "the First Congress understood that the district courts would recognize private causes of action for certain torts found in violation of the law of nations," particularly the torts of "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 724. The Court concluded, however, that other international law violations could become actionable if they had the same level of "definite content and acceptance among civilized nations" as the original three torts. *Id.* at 732. "[C]ourts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the [three] 18th-century paradigms." Deference to legislative policymaking and implications for foreign relations require courts to use "great caution" in finding additional international law violations actionable. *Id.* at 725-28; *see also Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 264-68 (2d Cir. 2007) (Katzmann, J., concurring) (stating that the court should exercise its discretion to recognize a cause of action under customary international law only after the court answers the preliminary, nondiscretionary question of whether it has jurisdiction under the ATS, which it will have for any sufficiently definite international norm regardless of countervailing policy concerns). Courts have struggled to determine the scope of the ATS's jurisdictional grants. Some of the difficulties are present here.

All the defendants argue that the plaintiffs fail to state a claim for violation of an international norm actionable under the ATS. The first argument is that the ATS does not permit a cause of action for aiding and abetting or conspiracy. Second, the defendants argue that there is no cause of action under the ATS against a private individual or corporation (as opposed to a state) because neither can violate customary international law. Third, the defendants argue that even if

44

private actors can be sued and accessorial liability is permitted, the plaintiffs have not alleged that any defendant committed any act violating customary international law.  These first three issues present thorny questions of international law, none of which has been addressed by the Fifth Circuit. The final argument is that the plaintiffs have not alleged that any defendant had the requisite *mens rea* to be liable for aiding and abetting or conspiracy under customary international law.  The plaintiffs contest all these arguments.

As to the first issue, courts have examined whether the ATS provides jurisdiction for claims based on secondary liability for accessories and coconspirators, dividing on two questions: whether domestic or customary international law should determine the availability and parameters of liability; and if the latter, whether there is a definite international norm condemning such accessorial or coconspiratorial acts.  In *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009), the court held that customary international law should apply, declined to decide whether accessorial liability is available, and  held that even if international law recognizes aiding and abetting, it only does so to impose liability on "individuals who *purposefully* aid and abet a violation of international law."  *Id.* (emphasis in original).[20]  In  *Khulumani*, 504 F.3d at 268-277, one concurrence relied on international law and concluded that "the recognition of the individual responsibility of a defendant who aids and abets a violation of international law" is a sufficiently definite norm to confer ATS jurisdiction.  Another concurring opinion in the same case used federal common law to determine that accessorial liability was available.  *Id.* at 284-91 (Hall, J.,

---

[20] In *Talisman*, the court noted two possible examples of conspiracy claims under international law, agreement to commit genocide or a common plan to wage a hostile war.  These examples, taken from *Hamdan v. Rumsfeld*, 548 U.S. 557, 610, 126 S. Ct. 2749 (2006), refer to conspiracy as an inchoate offense, "which requires an agreement and overt acts, but no completed deed," whereas the law was different for "conspiracy as a completed offense," which was better understood as a "joint criminal enterprise."  *Talisman*, 582 F.3d at 260 (citing *Hamdan*, 548 U.S. at 611 n.40, 126 S. Ct. 2749).  The *Talisman* court assumed, without deciding, that such a theory of liability could be asserted in an ATS action.  *Id.*

45

concurring).  In *Carmichael v. United Tech. Corp.*, 835 F.2d 109, 113-14 (5th Cir. 1988), the court stated: "We will also only assume, because it is unnecessary to decide, that the Alien Tort Statute does confer subject matter jurisdiction over private parties who conspire in, or aid and abet, official acts of torture by one nation against the citizens of another nation."[21]

Courts have also divided over whether and under what circumstances a private person or corporation can violate customary international law.  In *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1266-67 (11th Cir. 2009), the court held that "plaintiffs need not plead state action for claims of torture and murder perpetrated in the course of war crimes."  The same result was reached in *Kadic v. Karadzic*, 70 F.3d 232, 239 (2d Cir. 1995) ("We do not agree that the law of nations, as understood in the modern era, confines its reach to state action. Instead, we hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.").  But in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985) (Scalia, J.), the court held, with respect to current and former U.S. officials charged with harming Nicaraguan plaintiffs through foreign policy acts, that customary international law "does not reach private, non-state conduct of this sort."  In this circuit, in *Adhikari v. Daoud & Partners*, No. 4:09-cv-1237, slip op. at 12-14 (S.D. Tex. Nov. 3, 2009), the court noted that the Fifth Circuit "has yet to address this precise issue," approved of exceptions to the state-action requirement in cases of alleged genocidal acts or war crimes, and held that the plaintiffs could sue a private actor

---

[21] District court opinions have also divided.  *See, e.g.*, *In re South African Apartheid Litigation*, 617 F. Supp. 2d 228, 255-63 (S.D.N.Y. 2009) (applying customary international law and finding a norm permitting ATS jurisdiction for aiding and abetting but not for conspiracy, except possibly when there are allegations of an agreement to commit genocide or a common plan to wage a war); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 (D.D.C. 2005) (applying customary international law and holding that the defendants could not be held liable under the ATS for aiding and abetting atrocities committed by the Indonesian military).

under the ATS for alleged human trafficking and forced labor because the "internationally accepted prohibitions on those acts are not limited to states, but also extend to private individuals."

On the third issue, the parties appear to disagree, as have courts, about whether secondary liability—either through conspiracy or aiding and abetting—for someone else's violation of customary international law should be judged by customary international law or by domestic law. *See, e.g., Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (using customary international law); *id.* at 286-89 (Hall, J., concurring) (using federal common law); *In re South African Apartheid Litigation*, 617 F. Supp. 2d at 255-57 (using customary international law). The parties also disagree about whether there is an sufficiently definite international norm allowing "primary liability" for financing terrorism and, if so, whether that norm would extend to actors as attenuated from the terrorist act as the defendants. No party has cited a case law addressing these questions. Because ATS jurisdiction fails on the *mens rea* question—not an easy question in its own right—it is unnecessary to address these first three arguments.

The threshold *mens rea* issue is whether the standard should be drawn from domestic law or from customary international law. In *Talisman*, 582 F.3d at 244, the Second Circuit addressed this issue. The court held that customary international law should determine whether a secondary actor is liable. Sudanese citizens alleged that Talisman, a Canadian oil company, had conspired with and aided and abetted Sudan's government in committing human rights abuses. The plaintiffs alleged that Talisman had participated in building roads and airstrips that the Sudanese military used. The plaintiffs also alleged that Talisman had participated in displacing them, by force, from settlements that were near oil facilities. *Talisman*, 582 F.3d at 247-51. The district court granted Talisman's motion for summary judgment, finding that it lacked the *mens rea* needed for liability.

47

*Id.* at 252-53 (citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006).  The Second Circuit affirmed.

The appellate court noted that the plaintiffs had alleged three international law violations— genocide, war crimes, and crimes against humanity—all of which were torts within the ATS's jurisdictional grant.  582 F.3d at 256-57 (citing *Kadic*, 70 F.3d at 236).  Because it was clear that the ATS encompassed primary liability for those torts, the issue was accessorial or secondary liability and the *mens rea* required to state such a claim.  In addressing this issue, the court adopted the standard proposed by Judge Katzmann in his *Khulumani* concurrence.  Judge Katzmann reviewed Second Circuit opinions and concluded that the court consistently relied on international law to define the scope of ATS jurisdiction.  *Id.* at 258 (citing *Khulumani*, 504 F.3d at 269 (Katzmann, J., concurring)).  He also cited a footnote in the *Sosa* opinion, in which the Supreme Court flagged the question of "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."  582 F.3d at 258 & n.9, citing *Sosa*, 542 U.S. at 732 n.20.  Although the *Sosa* footnote did not address secondary liability, it strongly suggested that international law should be used to resolve all issues of the ATS's scope.  The *Talisman* panel agreed "that *Sosa* and our precedents send us to international law to find the standard for accessorial liability."  *Talisman*, 582 F.3d at 259.  The court rejected the plaintiffs' argument, which was also the premise of another concurrence in *Khulumani*, that accessorial liability for a violation of international law is ordinarily decided under the law of the forum country.  The *Talisman* court found that "such an expansion would violate *Sosa*'s command that we limit liability to 'violations . . . of international law . . . with definite content and acceptance among civilized nations [equivalent to] the historical paradigms familiar

when § 1350 was enacted.'" *Id.* (quoting *Sosa*, 542 U.S. at 732, 124 S. Ct. 2739) (alterations added by *Talisman* court).

Talisman's reasoning is persuasive. *Sosa* establishes international law as the touchstone of the ATS analysis. The footnote discussing private actors' liability makes clear that international law plays a role beyond defining whether there is a sufficiently definite norm to create ATS jurisdiction. International law, according to the footnote, also defines who may be sued for violating that norm. There is no reason to believe that international law determines whether private—as well as state—actors can be sued but not whether secondary—as well as primary—actors can be sued. *Sosa* also emphasizes the narrowness of the ATS's jurisdictional grant. Defining the jurisdictional scope of each actionable norm created by international law is just as important to maintaining that narrowness as determining which norms are actionable. As the *Talisman* court observed, "[r]ecognition of secondary liability is no less significant a decision than whether to recognize a whole new tort in the first place." *Id.* at 259. To find ATS jurisdiction over an alleged secondary tort, there must be a sufficient and sufficiently definite international consensus supporting not only the underlying tort but also the form of secondary liability for that tort.

Having concluded that international law should apply, the *Talisman* court held that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone." *Id.* "Even if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law, no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law." *Id.* (internal citations omitted) (emphasis in original). The court noted that purposefulness had been the international law standard applied in the Nuremberg tribunal—a common source of authority for courts analyzing ATS issues—and had continued in effect

throughout the intervening decades with only "sporadic forays in the direction of a knowledge standard." These forays were insufficient to create the universal acceptance necessary for ATS jurisdiction. *Id.*[22] The court also held that the plaintiffs' conspiracy claim would "require the same proof of *mens rea* as their claims for aiding and abetting." *Id.* at 260.

Applying that standard to the facts, the court found that there was no evidence sufficient to establish Talisman's intent to assist Sudan's government in violating international law. Sudan's treatment of the plaintiffs was based on religious, ethnic, and regional persecution; there was no evidence (or argument) that Talisman shared or was interested in these goals. "To the contrary, the actions of the Sudanese government threatened the security of the company's operations, tarnished its reputation, angered its employees and management, and ultimately forced Talisman to abandon the venture." *Id.* at 263. The court agreed with the plaintiffs that, in theory, intent could be inferred without direct evidence. But the court found no circumstantial evidence to support such an inference as to Talisman's intent. The evidence in the record showed only that Talisman knew of the government's actions and their effect on the plaintiffs. *Id.* at 264.

As discussed in the ATA analysis in the following section, the allegations in this case do not even go that far. There are no nonconclusory allegations that any defendant knew that kickbacks paid through the OFP were being used to fund terrorist attacks in Israel, much less that any defendant had the purpose of aiding the terrorist attacks. The complaint does not come close to alleging facts, either direct or circumstantial, that would establish that any of the defendants *intended* to facilitate or encourage terrorist attacks in Israel. It is not sufficient to allege facts showing that

---

[22] The plaintiffs cite to *Doe v. Unocal Corp.*, 395 F.3d 932, 947 (9th Cir. 2002), in which two judges concluded that international law should determine secondary liability but that international law only required knowledge, not purposefulness. That opinion was, however, vacated for rehearing *en banc*. *Doe I v. Unocal Corp.*, 395 F.3d 978 (9th Cir. 2003). The parties then filed a stipulated motion to dismiss, which was granted by the *en banc* court. *Doe I v. Unocal Corp.*, 403 F.3d 708 (9th Cir. 2005).

the defendants intended to violate the OFP or to assist Hussein in violating the OFP. That, while unlawful, is not a violation of the type of definite, universally accepted norm of international law that *Sosa* would include among the small set of norms giving rise to ATS jurisdiction. The allegation would have to be that the defendants acted with the purpose of assisting terrorists to murder or main innocent civilians. No such factual allegation appears in the complaint. Instead, the allegations are that the defendants were serving their own business interests. Even with respect to Wyatt, the defendant most involved with Iraq, the allegation is that his goal was to be the lone American supplier of Iraqi oil.

To the extent the plaintiffs are advancing claims for direct liability based on a separate tort of "financing of terrorism," the analysis is the same. Even if articulated as a theory of direct or primary liability, financing the terrorism of others is inherently accessorial. As Judge Posner put it in *Boim III*, "[p]rimary liability in the form of material support to terrorism has the character of secondary liability." *Boim III*, 549 F.3d at 691-92. No defendant is alleged to have killed or injured any of the plaintiffs or planned any of the attacks. The allegations against the defendants, however the plaintiffs label them, are secondary in nature; the ATS will only confer jurisdiction if there are allegations of purposefulness. No such allegations are present.

The plaintiffs' citation to *Lev v. Arab Bank*, No. 08 CV 3251 (NG) (VVP), 2010 WL 623636 (E.D.N.Y. Jan. 29, 1010), does not compel a different conclusion. That case was based on the same set of facts as the *Linde* case cited in the standing discussion. *See Linde*, 384 F. Supp. 2d at 571. In both cases, the allegations were that Arab Bank had, among other things, acted on behalf of Hamas and other terrorist groups as the administrator of a fund paying death benefits to families of suicide bombers. In *Lev*, the court distinguished *Talisman* based on the allegations that in verifying eligibility for martyr benefits and opening and funding accounts for families it determined to be

eligible, Arab Bank purposefully aided the terrorist organizations' violations of international law. The allegations in this case are not close to those against Arab Bank. The plaintiffs do not allege that the defendants played any role in the terrorist operations other than paying money to Hussein through their business activities. There is no allegation that any defendant purposely arranged payments for terrorist acts to promote such acts. The factual allegations in this case do not support a plausible inference that any defendant acted with the purpose of assisting terrorist attacks. The absence of any such allegations defeats aiding and abetting and conspiracy liability under the ATS.

The motions to dismiss claims under the ATS are granted.

## C.      The Antiterrorism Act Claims

The ATA provides a civil action for treble damages to "[a]ny national of the United States injured in his or her person, property, or business *by reason of an act of international terrorism*, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a) (emphasis added). International terrorism is defined in the statute as "activities that"

> (A) *involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States* or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended--
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to

52

> intimidate or coerce, or the locale in which their perpetrators operate
> or seek asylum;

18 U.S.C. § 2331(1) (emphasis added).

Subsection (A) requires an underlying violation of specified criminal statutes, three of which

warrant analysis.  All of the three are part of the ATA.  The first, 18 U.S.C. § 2339A, makes it a

federal crime to "provide[] material support or resources . . . knowing or intending that they are to

be used in preparation for, or in carrying out, a violation of [various federal criminal statutes]" or

to attempt to or conspire to do such an act.  18 U.S.C. § 2339A(a).  One of the criminal statutes

listed in § 2339A is 18 U.S.C. § 2332, which makes it a crime to kill, attempt to kill, conspire to kill,

or intentionally cause serious bodily injury to a United States national outside the United States.

The second relevant predicate criminal statute, 18 U.S.C. § 2339B, states that "[w]hoever knowingly

provides material support or resources to a foreign terrorist organization, or attempts or conspires

to do so" is guilty of a crime.[23]  "Terrorist organization" is a designated Foreign Terrorist

Organization under 8 U.S.C. § 1189.[24]  Under both § 2339A and § 2339B, "material support or

resources" includes "any property, tangible or intangible, or service, including currency or monetary

instruments or financial securities, financial services, lodging, training, expert advice or assistance,

safehouses, false documentation or identification, communications equipment, facilities, weapons,

lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and

transportation, except medicine or religious materials." 18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4).

---

[23] A 2004 amendment to the statute added the following: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."  18 U.S.C. § 2339B.

[24] The plaintiffs allege that Hamas and PIJ were so designated during the time all of the attacks in this case occurred , and that the AAMB was so designated on March 27, 2002.  Only three of the 21 attacks are alleged to have occurred after that date.

The third relevant criminal statute, 18 U.S.C. § 2339C, punishes:

> Whoever, [subject to jurisdictional requirements in] subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out--
>
> > (A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or
> >
> > (B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act[.]

18 U.S.C. § 2339C(a)(1).  Conspiracy and attempt are also punishable.  18 U.S.C. § 2339C(a)(2).  There is no requirement that the funds provided or collected "were actually used to carry out" an act of international terrorism.  18 U.S.C. § 2339C(a)(3).

The defendants have moved to dismiss the ATA claims on two grounds.  The first is that the plaintiffs have not alleged facts showing that the defendants had the scienter necessary to be liable in an ATA action based on funding terrorism.  Second, the defendants argue that the plaintiffs have not alleged a sufficient causal connection between the defendants' actions (primarily, paying money in commercial transactions) and the terrorist attacks.  The plaintiffs, relying primarily on the Seventh Circuit's *en banc* opinion in *Boim III*, 549 F.3d at 685, respond that their allegations suffice on both grounds.

In *Boim III*, discussed at length above, the Seventh Circuit concluded that giving money to Hamas, "like giving a loaded gun to a child," was an "act dangerous to human life."  *Boim III*, 549 F.3d at 690.  The court found that giving money to Hamas violated § 2339A, because the fact of

54

payment was material support *knowing or intending* that it would be used for violations of § 2332, killing or attempting to kill Americans abroad.[25]   Because the act of giving money to Hamas fit the statutory definition of "international terrorism," it was grounds for primary, not secondary liability, which the court held could only be created expressly by statute.  *Id.* at 690-91.  The court concluded that this was a sensible rule because it is difficult to recover damages from terrorists and terrorist organizations, "whereas suits against financiers of terrorism can cut the terrorists' lifeline" and compensate the plaintiffs.  *Id.* at 691.

Analyzing the hybrid nature of primary liability claim with "the character of secondary liability," in light of the "*sui generis*" nature of terrorism, the court crafted a standard of liability for claims of material support to terrorism.   Parsing the opinion, it appears that such a claim by an American injured by a terrorist attack in Israel has the following elements:[26]

> (1) the defendant provided a material benefit of any value to a terrorist organization, either directly or indirectly ("the fact of contributing to a terrorist organization rather than the amount of the contribution is the keystone of liability");
>
> (2) the defendant, in providing the benefit, gave an outward appearance that its acts are intended to: "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; [or] (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," *see* 18 U.S.C. § 2331(1), which is satisfied by giving a benefit to a

---

[25]  The court did not address § 2339B or § 2339C as predicate criminal statutes giving rise to civil liability under the ATA.  David Boim was killed on May 13, 1996, before § 2339C was enacted on June 25, 2002.  § 2339B was enacted on April 24, 1996, less than a month before Boim's death, but Hamas was not designated a Foreign Terrorist Organization under the statute until 1997. *See Boim I*, 291 F. 3d at 1002.  Presumably, this explains why *Boim III* was limited to § 2339A.

[26]  The *Boim III* court, in equating knowledge of Hamas's "aims and activities" with a sufficient scienter to harm American victims (the only victims covered by the ATA), stated that Hamas limited its terrorism to Israel, "that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel."  *Boim III.*, 549 F.3d at 693-94.  The court cited statistics that in 1999, 184,000 American citizens lived in Israel, which made up 3.1 percent of Israel's population. *Id.* at 694.  It is not clear whether rule would be the same for attacks carried out in other countries or for donations to a group that operates in more than one country.

> terrorist organization when it is a "foreseeable consequence" that, given more money, the organization will kill or wound, or attempt to kill, or conspire to kill more people in Israel; and
>
> (3) the defendant knew or was deliberately indifferent to the character of the organization as one that engages in terrorism.

*See Boim III*, 549 F.3d at 690-702.

No additional showing of causation was required.  *Id.* at 696-700; *see also id.* at 709 (Rovner, J., concurring in part and dissenting in part) ("[T]he majority relieves the plaintiffs of any obligation to demonstrate a causal link between whatever support the defendants provided to Hamas and Hamas's terrorist activities (let alone David Boim's murder in particular)."); *id* at 722-24 (Wood, J., concurring in part and dissenting in part) (making a similar observation).  Nor was there any requirement that the defendant *intend* its contribution to be used for terrorist activities or even *know* that its contribution specifically would be used for terrorism.  *Id.* at 698.  The defendant could "earmark" its contribution for humanitarian purposes and nonetheless be liable if it knew that the organization's activities included terrorism.  *Id.*

The *Boim III* court held that the two charitable organization defendants, which made financial donations to the "social services" wing of Hamas, met this standard.  The court saw no meaningful difference between these donations and directly funding terrorist activities.  One defendant, the American Muslim Society, funneled its donations through a third party (also a defendant, but one whose liability was not considered).  The other, the Quranic Literary Institute, donated directly to Hamas's charitable wing.  The *en banc* court upheld the district court's grant of summary judgment for the plaintiff as to the American Muslim Society and the jury's verdict that the Quranic Literary Institute was liable.  *Id.* at 701-02.  The court held it irrelevant that the American Muslim Society's donations had been indirect.  Because the money ultimately reached

Hamas and because the American Muslim Society knew that Hamas was a terrorist organization, it was appropriate to find liability under the ATA.  The court explained the role of attenuation, stating:

> [A]s the temporal chain lengthens, the likelihood that a donor has or should know of the donee's connection to terrorism shrinks. But to set the knowledge and causal requirement higher than we have done in this opinion would be to invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare). Donor liability would be eviscerated, and the statute would be a dead letter.

*Id.* at 702.  In other words, attenuation was unimportant except insofar as it might make it less likely that the defendant satisfied the scienter requirement.

Other courts have applied a more restrictive standard.  *See* 2 VED P. NANDA & DAVID K. PANSIUS, LITIGATION OF INT'L DISPUTES IN U.S. COURTS § 9.18 (2d ed. 2008 & Supp. 2010) ("*Boim III* arguably advocates the broadest possible civil liability for third parties providing material assistance to terrorist organizations.").  The case of *Terrorist Attacks I*, 349 F. Supp. 2d at 825-37, in which survivors and representatives of victims of the September 11 attacks sued al-Qaeda and some alleged supporters, is a good example.  In that case, the court characterized donors as secondary actors, not primary actors (as *Boim III* did).  For such secondary actions to be liable for aiding and abetting under the ATA, the court held that "[t]o adequately plead the provision of material support, . . . a plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant *desired to help those activities succeed*, and the defendant engaged in some act of helping those activities."  *Id.* at 828 (emphasis added).  For such secondary actors to be liable for conspiracy, the plaintiffs would have to allege that "the Defendants were involved in an agreement to accomplish an unlawful act and that the attacks of September 11 were a reasonably

foreseeable consequence of that conspiracy." *Id*. at 829.  The plaintiffs were not required to allege that the defendants knew about the planned September 11 attacks or that the defendants committed any act in furtherance of those particular attacks.  *Id.*  The court also required that the plaintiffs "present a sufficient causal connection between [the defendant's material] support and the injuries suffered by Plaintiffs," which could be accomplished by showing proximate cause.  *Id.* at 825-26. The court cited a case describing proximate cause as limiting liability to those injured persons "'with respect to whom [the defendants' acts] were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated.'" *Id.* (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)).  The court noted, however, that because al Qaeda had publicly declared war on the United States, it might be that the September 11 attacks were "the natural and probable consequence of *knowingly and intentionally* providing material support to al Qaeda." *Id* (citing *Burnett*, 274 F. Supp. 2d at 104) (emphasis added).

Applying this approach to the defendants' Rule 12(b)(6) motions, the court dismissed the claims against a bank alleged to have aided and abetted the attackers by donating to charities that supported terrorism and by serving as the bank for these charities.  The court noted the absence of any allegations that the bank knew the charities were involved in terrorist activities.  There was "no basis for a bank's liability for injuries funded by money passing through it on routine banking business." *Id.* at 831-33.  The court was not swayed by the allegations that the bank was connected to Hamas because the plaintiffs had not alleged a relationship between Hamas and al Qaeda or the September 11 attacks.  *Id.* at 833.  The court reached the same conclusion for a second bank alleged to have provided an account for charities to deposit money raised to support reward payments to suicide bombers' families.  Because there was no allegation that the bank knew "anything relating

to terrorism was occurring through the services it provided," the allegations were of nothing more than routine banking services, which was not a basis for liability.  *Id.* at 833-34.  This was true despite allegations of close ties generally between the bank and the bin Laden family.  *Id.*  The same result applied for the Arab Bank, which allegedly knew that some of its accounts were used to transfer funds to terrorist organizations, particularly Hamas.  The court dismissed the complaint because, again, there was no allegation that Hamas was connected to bin Laden, al Qaeda, or the September 11 attacks.  *Id* at 835.

In a subsequent opinion, *In re Terrorist Attacks on September 11, 2001* (*Terrorist Attacks II*), 392 F. Supp. 2d 539, 566-67 (S.D.N.Y. 2005), by contrast, the court denied a motion to dismiss by an individual defendant who allegedly gave Osama bin Laden a satellite phone battery.  The ATA included communications equipment as a form of material support.  The plaintiffs had alleged that when the defendant gave Osama bin Laden the phone battery, the defendant knew he was involved in terrorist activities.  *Id.*  There were other defendants in both of these *Terrorist Attacks* opinions. The court's decisions with respect to these other defendants, as in the examples, demonstrate the extent to which the standard was stricter than the one stated and applied in *Boim III*.

Another pre-*Boim III* case carefully analyzed this issue.  In *Linde*, 384 F. Supp. 2d at 571, the court denied the Arab Bank's motion to dismiss the ATA claims brought against it arising out of Hamas suicide bombings in Israel.  The complaint alleged that the Arab Bank, based in Jordan, held an account in which charities controlled by Hamas deposited money to be distributed to the families of suicide bombers.  As described above, the Arab Bank acted as a sort of claims administrator for these reward payments, maintaining a list of "martyrs," consulting with Hamas and related entities, and ultimately deciding whether to pay benefits to a claiming family.  The bank also provided banking services for organizations the plaintiffs alleged were Hamas fronts.  *Id.* at 575-79.

59

The *Linde* court read the relevant ATA language somewhat differently than *Boim III*.   In applying the statutory definition of "terrorist acts," it focused on the actual bombings, rather than the defendant's act of providing money.    The bombings were both "violent acts" and "acts dangerous to human life" (either would have been sufficient), and violated criminal statutes.  *Id.* at 580-81.  The court found that apart from the Arab Bank's actions, the plaintiffs had been injured "by reason of international terrorism," as the ATA requires.  The issue was whether the Arab Bank could be held liable, either primarily or secondarily, for that injury.  *Id*. at 581.  Unlike *Boim III*, the court held that the ATA did permit a cause of action for secondary liability and concluded that such liability was available on both conspiracy and aiding and abetting theories.  *Id.* at 582-83.  The court looked to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) and the *Restatement (Second) of Torts*, on which *Halberstam* had relied.  The *Restatement* recognizes three types of secondary civil liability, as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> > (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> >
> > (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> >
> > (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement (Second) of Torts* § 876 (1979).  In *Linde*, the court found that the plaintiffs' allegations supported all three theories.  The plaintiffs  alleged that the Arab Bank had violated subsection (a) by agreeing to provide banking services to what it knew was a terrorist organization, leading to an overt act in furtherance of the conspiracy that injured the plaintiffs.  *Id.* at 584.  The plaintiffs

alleged that the Arab Bank had violated subsection (b) by being aware of Hamas's "role as a part of an overall illegal activity" and providing "knowing and substantial assistance" in the form of financial services and administration of the death benefits.  These benefits allegedly encouraged terrorist attacks, which was a form of aiding and abetting.  The court found that plaintiffs had also alleged a violation of subsection (c) because they had alleged that the Arab Bank breached independent duties, including by violating the ATA criminal statues.  *Id.* at 584-85.

As to the mental state required, the court held that a bank is liable under § 2339B if it "provides material support in the form of financial services to a designated foreign terrorist organization and the bank either knows of the designation or knows that the designated organization has engaged or engages in terrorist activities."  *Id.* at 587.   Section 2339B is the criminal statute forbidding donations to designated terrorist groups.  For violations of §§ 2339A and 2339C, the court held that it was necessary only to show "knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts."  *Id* at 586 n. 9.   None of the three statutes required "specific intent to commit [the] specific acts of terrorism" that injured the plaintiffs. *Id.* at 586.[27]

As to causation, the court held that "but for" causation is not required to recover against secondary tortfeasors.  *Id.* at 584-85.  The court's discussion indicated that some causal connection had to be alleged, although the limits are not defined.  In finding that the allegations against the Arab Bank were sufficient, the court distinguished *Terrorist Attacks I*, in which the bank defendants were dismissed.  The court emphasized the specific allegations that the Arab Bank "plays a central role

---

[27]  It is somewhat unclear why, having already applied the *Restatement* standard to secondary liability, the court was discussing these criminal statutes at all.  It appears that it had already concluded, by referring to the *Restatement*, that Arab Bank had satisfied the act component of secondary liability and had proceeded to consider whether Arab Bank had the necessary scienter with respect to both direct and secondary liability.  The court used the statutes to help it determine what the scienter requirement was.

in a well-publicized plan to reward terrorists killed and injured in Israel and that the Bank *knows* that the groups to which it provides services are engaged in terrorist activities. *The very groups the Bank is alleged to support are the same groups alleged to be responsible for the terrorist attacks that injured the plaintiffs.*" *Id.* at 588 (emphasis added). These were not "innocent business services.*"*

*Linde* and the *Terrorist Attacks* opinions rely heavily on *Boim I*, 291 F.3d at 1000, in their discussions of donor liability under the ATA. *Boim I*, written in 2002 by Judge Rovner, the author of the primary dissent in *Boim III*, was the Seventh Circuit's panel opinion in an interlocutory appeal from the ruling on the defendants' motions to dismiss. It was not the panel opinion vacated on the rehearing *en banc* that produced *Boim III*. The second, now-vacated, panel opinion, which came after the case was remanded by *Boim I* and continued through trial in the district court, was not issued until December 2007. *See Boim v. Holy Land Foundation for Relief & Development* (*Boim II*), 511 F.3d 707 (7th Cir. 2007), *vacated and reh'g en banc granted*, 511 F.3d 707 (7th Cir. 2007). Although *Boim I* was not vacated, it has been overruled in the Seventh Circuit by *Boim III* to the extent it conflicts with the *en banc* opinion. In other circuits, of course, both opinions are authority only insofar as they are persuasive. *Linde*, an Eastern District of New York case, was particularly clear that it was persuaded by the *reasoning* in *Boim I*. And out-of-circuit courts have continued to rely on *Boim I* (and the courts following it) after the *en banc* decision. *See Chiquita Brands*, --- F. Supp. 2d ----, 2010 WL 432426, at *10; *Rothstein*, 647 F. Supp. 2d at 295.

In *Boim I*, the court first addressed whether funding terrorism was actionable under the ATA. *Boim I*, 291 F.3d at 1010 ("Although the statute defines the class of plaintiffs who may sue, it does not limit the class of defendants, and we must therefore look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute."). With no precedent on the question, the court turned to legislative history, finding "an intent by Congress to allow a plaintiff

to recover from anyone along the causal chain of terrorism." *Id.* at 1011. Nonetheless, the court was unwilling to accept the plaintiffs' argument that giving money to Hamas was, *by itself*, sufficient to give rise to liability under the ATA because it would "give the statute an almost unlimited reach." *Id.* "Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent could be construed to 'involve'" violent acts or acts dangerous to human life. *Id.* The court also held that the "by reason of" language in the ATA required proximate causation. This meant that the plaintiffs were required to "show that murder was the reasonably foreseeable result of making the donation." *Id.* The court also suggested that a showing of knowledge and intent was required. *Id.*

The court addressed whether violations of §§ 2339A and 22339B fit the definition of "international terrorism," making them actionable primary torts under the ATA. The court concluded that there was "no textual, structural, or logical justification for construing the civil liability imposed by section 2333 more narrowly than the corresponding criminal provisions." *Id.* at 1015. This was consistent with the text; even though giving money to terrorists was not itself violent or dangerous to human life, the statute defined "international terrorism" as "activities that *involve* violent acts or acts dangerous to human life." The underlying terrorist attack satisfied the "act" part of the definition, and giving money to terrorists was an activity involving that act. The court then corrected the district court's understanding of the term "material support" in §§ 2339A and 2339B, stating that the question is whether the aid is of a type listed in the statute, not whether it is "substantial or considerable." *Id.* Finally, the court provided the liability standard for direct liability suits under these ATA provisions, stating:

> For civil liability, section 2333 requires that the plaintiff be injured
> "by reason of" the act of international terrorism. Because we believe
> Congress intended to import standard tort law into section 2333,

> causation may be demonstrated as it would be in traditional tort law.
> Congress has made clear, though, through the criminal liability
> imposed in sections 2339A and 2339B, that even small donations
> *made knowingly and intentionally in support of terrorism* may meet
> the standard for civil liability in section 2333. Congress' goal of
> cutting off funding for terrorism would be seriously compromised if
> terrorist organizations could avoid liability by simply pooling
> together small donations to fund a terrorist act.

*Id.* (emphasis added).  The court appeared to conclude that a *knowing and intentional* violation of

§ 2339A or § 2339B could substitute for a showing of causation.  This conclusion seems inconsistent

with the insistence on proximate causation earlier in the opinion.  But, like proximate causation, the

strict scienter requirement alleviates the concern that the ATA will create limitless liability against

anyone whose money ends up in the hands of a terrorist organization.

The final liability issue the court addressed was whether the ATA recognized civil aiding and

abetting liability.  The court noted the Supreme Court's holding in *Central Bank of Denver N.A. v.*

*First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), that aiding and abetting

liability was not available under § 10(b) of the Securities Exchange Act of 1934 because the statute

did not expressly provide for such liability.[28]  But the court distinguished *Central Bank* and held that

aiding and abetting liability was available.  First, § 2333 creates an express cause of action; the

statute at issue in *Central Bank* was only subject to an implied right of action recognized by courts.

Accordingly, there was less risk in *Boim* of stretching the statute beyond Congress's intent.  Second,

the text of § 2333 and its legislative history indicated an "intent to import general tort law

principles," which would include aiding and abetting liability.  *Id.* at 1020.  The court cited

Congress's intent to "make civil liability at least as extensive as criminal liability," based primarily

---

[28] *Central Bank* was the basis for *Boim III*'s holding that secondary liability is not available under the ATA.

on the use of the word "involve" in the definition of "international terrorism." *Id.* As the court stated:

> If we were to interpret "involve" literally, we would be attributing almost unlimited liability to any act that had some link to a terrorist act. Congress could not have meant to attach unlimited liability to even remote acts; it must have meant something else. As we have seen from the language and legislative history of section 2333, that something else is traditional tort and criminal liability. . . . Indeed, limiting the term "involve" to the familiar definitions of aiding and abetting (or even conspiracy, for that matter) provides the necessary clarification that saves the statute from vagueness.

*Id.* at 1020-21. Finally, the court distinguished *Central Bank* based on the ATA's policy objectives. "[I]f we failed to impose liability on aiders and abettors who *knowingly and intentionally* funded acts of terrorism, we would be thwarting Congress'[s] clearly expressed intent to cut of the flow of money to terrorists at every point along the causal chain of violence." *Id* at 1021 (emphasis added). The only effective way to deter terrorism, the court concluded, was to impose aiding and abetting liability because the terrorists were unlikely to have recoverable assets and, more importantly, because the attacks could not go forward without funding. *Id.* To succeed on an aiding and abetting theory, however, the court required that the plaintiff allege and show that the defendant knew of Hamas's terrorist activity, knew that the money was going to Hamas, and *intended* to help Hamas's terrorist activities succeed, although not necessarily the particular acts that injured the plaintiffs. *Id.* at 1021-23.

Reading these opinions together reveals the extent to which courts have struggled to reconcile Congressional intent and policy reasons for an expansive approach to liability for financial supporters of terrorism with traditional tort-law principles and the risks of imposing strict liability on actors with no real connection to terrorism. *Boim III* is so broad that, if taken to its logical extension, it could make any person liable if that person knows that (or is deliberately indifferent

to whether) Hamas commits terrorist attacks in Israel, if even $1 of that person's money ends up in Hamas's bank account.  Could that extend to a man in St. Louis who lacks significant understanding of the OFP or Hussein's funding of terrorism but who is generally aware that Hamas is a Palestinian terrorist group that targets Israelis, and who fills his car with gasoline that the service station had purchased from a refining company that had purchased it from another company that had paid kickbacks to Hussein to receive its allocation of Iraqi oil?  This is clearly not what the *Boim III* court held, as evidenced by its decisions to carve out exceptions for the Red Cross and Doctors Without Borders.  But the limits of liability are unclear under *Boim III*, which removes a causation requirement and removes an intent, or purpose, or knowledge requirement and only demands awareness that the organization that ends up receiving the funds is a terrorist group.

At the same time, the concerns raised by *Boim III* are powerful.  The difficulty of proving intent and the risk that a stringent requirement might make the statute ineffective to attack terrorists by choking off their funding are both apparent.  *Boim I* and Judge Rovner's dissent in *Boim III* may understate these concerns.  These opinions require the plaintiff to show not only that the defendant knew his money was benefitting terrorist activities but also that the defendant intended to further those activities.  Whether liability is direct or secondary, the applicable law does not require both knowledge and intent (except for a conspiracy claim, in which an agreement must be alleged).  Assuming, without deciding, that secondary liability is available under the ATA, it would be governed by the ordinary tort principles cited in *Linde*, which, as to aiding and abetting, require the secondary actor to "*know*[] that the [primary actor's] conduct constitutes a breach of duty."  *Restatement (Second) of Torts* § 876 (emphasis added).  If primary liability is at issue, the criminal material support statutes apply.  Section 2339A criminalizes providing material support "knowing *or* intending" it will be used for carrying out a terrorist attack.  Section 2339B criminalizes

"knowingly" providing material support to a terrorist organization.  And Section 2339C criminalizes "willfully" providing or collecting funds "with the intention that such funds are to be used, *or* with the knowledge" that they will be used for terrorism.  The defendant must collect funds willfully but the only required knowledge is that the funds will be used for terrorism.  Knowledge is sufficient. But unlike the expansive *Boim III* approach, it is not enough to know the character of the ultimate organization.  The defendant must know (or intend) that its money is going to a group engaged in terrorist acts or is being used to support terrorist acts.  Because civil liability under the ATA is restricted to American victims, the defendant must also know (or intend) that the terrorism or terrorist group it is supporting targets Americans.  *See Boim III*, 549 F. 3d at 725-26 (Wood, J., concurring in part and dissenting in part).  To state a conspiracy claim, the plaintiffs must also allege an agreement to accomplish an unlawful act or participation in a common plan to do so.  *Linde*, 384 F. Supp. 2d at 584; *Terrorist Attacks I*, 349 F. Supp. 2d at 829.  All the courts apparently agree that there is no need to allege that when a defendant contributed money, it was aware of a particular planned attack or intended to further that attack.

The courts agree that "but for" causation is not required.  The courts disagree on what causal standard must be alleged and proven.  If the defendant's liability is direct, the "by reason of international terrorism" language in the statute creates a proximate cause requirement.  Under a direct liability theory, the act of giving money is the act of "international terrorism."  *See Boim III*, 549 F. 3d at 690-91, 699.  If the defendant's liability is secondary, proximate cause is required as a matter of ordinary tort law.  *Chiquita Brands*, --- F. Supp. 2d ----, 2010 WL 43426, at *14-16; *Terrorist Attacks I*, 349 F. Supp. 2d at 825-26; *see also Boim III*, 549 F.3d at 724 (Wood, J., concurring in part and dissenting in part).  In either case, "[f]oreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might

67

have reasonably been anticipated as a natural consequence of the defendant's actions." *Boim I*, 291 F.3d at 1012.  The conspiracy claim also requires proximate cause in this sense.  *Terrorist Attacks I*, 349 F. Supp. 2d at 829.

Coming finally to the complaint in this case, the plaintiffs have not alleged a claim under the ATA.  In particular, they have not sufficiently alleged that any defendant had the knowledge necessary for liability.  The only relevant allegations are either wholly conclusory or inadequate. The plaintiffs must allege, at a minimum, that each defendant knew that the oil it was buying through the OFP was tied to a kickback to Hussein and that Hussein was using OFP kickback money to fund terrorism that targeted American nationals.  The plaintiffs alleged facts that, if proven, would show that the defendants knew that Hussein was charging illegal kickbacks in exchange for allocations for at least some Iraqi oil.  The plaintiffs allege that Wyatt, NuCoastal, Chalmers, and Bayoil paid kickbacks.  And they allege that El Paso was told by Wyatt and possibly by others that Hussein was forcing direct buyers to pay kickbacks.  The complaint contains nothing more than conclusory allegations, however, that El Paso knew that it was effectively paying the kickbacks by paying the higher prices that resulted from the direct purchasers' paying kickbacks.  Although the nonprosecution agreement and consent judgment ultimately were based on El Paso's admission that it bought oil for which a kickback had been paid and failed properly to account for premiums resulting from those kickbacks in its books, that is not an allegation as to El Paso's knowledge.

There are no allegations that, if proven, would show that the defendants had information that Hussein was using OFP kickback money to fund terrorism targeting Americans.  The complaint cites to a Houston Chronicle article from 1995, a year before sales began under the OFP and five years before the kickback scheme allegedly began.  The article stated that Hussein used the money from "selling bargain basement oil in order to rearm his troops and sustain the luxury that he and his

supporters enjoy."   Buying guns for troops and building palaces are not the same as funding terrorism targeting American citizens.  The August 2002 <u>Washington Post</u> report was described in the complaint as stating that Hussein was using OFP kickbacks to make payments to families of terrorists.  This article was published four months *after* the last attack alleged.  This does not allege knowledge during the period relevant to this case.

As to the conspiracy claims, there are no factual allegations of an agreement or common plan to fund or otherwise support terrorism targeting Americans.  This case is not close to *Linde*, in which the Arab Bank was alleged to be intimately involved in awarding and distributing death benefits to terrorists' families.  The defendants here were conducting business with Iraq, either indirectly or through third parties, without any alleged direct involvement in Hussein's support for terrorism.[29]

The lack of sufficient factual allegations of scienter is a sufficient basis on which to dismiss the ATA claims.  The proximate cause concern provides further support for dismissal.  The connection between the plaintiffs' injuries and each of the defendants here is more attenuated than in any of the ATA cases discussed in this opinion or cited by the parties.  As the *Mastafa* court stated, "aiding the Hussein regime is not the same thing as aiding and abetting its alleged human rights abuses."  *See Mastafa*, No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *4.  Although Hussein's Iraq was a state sponsor of terrorism, it did not have the same status as the *Boim III* court attributed to Hamas.  Beginning in 1996, corporations around the world were encouraged to do business with Iraq.  The OFP was set up for this purpose.  But the real question in comparing this case and *Boim* is not whether Iraq is distinguishable from Hamas; it is whether Iraq is distinguishable from the fronts for Hamas that funneled money to it.  The allegations and evidence

---

[29]Because there are no allegations of knowledge, intent, or an agreement, Count Five of the complaint, for Assisting and Conspiring in the Intentional Injury of Others by a Third Party, is also dismissed.

in *Boim* were that the defendants gave money to fronts, which passed it to Hamas. The allegations here are that the defendants, directly or indirectly, gave money to Iraq, which gave it to terrorist organizations. Unlike the fronts, however, Iraq was not merely a funnel of funds to terrorists. Iraq was a recognized sovereign nation with a variety of responsibilities and pursuing a variety of interests, with whom American and other companies were encouraged to do business, with restrictions.

The defendants' motions to dismiss the ATA claims are granted. The plaintiffs have indicated in their briefing that some other news articles may have been published. Based on these representations and the fact that standing is proper on the ATA claims, they may amend their complaint to replead the ATA claims no later than **April 23, 2010**.

### D.   The Torture Victim Protection Act Claims

The TVPA, Pub.L. 102-256, Mar. 12, 1992, 106 Stat. 73, *reprinted as a note to* 28 U.S.C. § 1350, states in relevant part:

> (a) Liability.--An individual who, under actual or apparent authority, or color of law, of any foreign nation--
>
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

The plaintiffs have not alleged that any of the defendants were acting "under actual or apparent authority or color of law" of Iraq or any other foreign nation. As to actual or apparent authority, there are no allegations that the defendants were torturing or killing anyone at Iraq's actual or apparent direction.

The plaintiffs focus on the "color of law" issue. To satisfy this standard, the plaintiffs would have to allege that a defendant "acts together with state officials or with significant state aid," *Kadic*, 70 F.3d at 245 (noting that § 1983 color-of-law jurisprudence should be used), creating a sufficiently close nexus that "seemingly private behavior may fairly be treated as that of the State itself." *Abdullahi v. Pfizer, Inc*., 562 F.3d 163, 188 (2d Cir. 2009) (quotations omitted) (relying on § 1983 cases). No such allegations are present here. The defendants allegedly acted solely in their private capacities as companies and individuals in the oil business. The plaintiffs' argument that Hussein and Iraqi officials were acting under color of law is irrelevant because those individuals are not defendants in this case.[30]

### E.   The Miscellaneous Claims

The plaintiffs have also alleged that some of the defendants are liable on various theories of vicarious or imputed liability. Because this court has determined that there are no factual allegations supporting liability on any claim against any named party or, by extension, against Coastal, these claims are dismissed. For the same reason, there is no need to consider El Paso's arguments regarding corporate form and proper party.

## IV.   Conclusion

---

[30]  The plaintiffs may fail to state a TVPA claim against the corporate defendants, El Paso, Bayoil, and NuCoastal for the additional reason that the TVPA only permits claims against natural persons. Courts have split on this issue. The courts holding that only natural persons can be sued note that the statute refers to liability of an "individual" and also refers to killing or torturing an "individual." *See Doe v. Exxon Mobil Corp*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005); *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 56 (E.D.N.Y. 2005). Because corporations cannot be tortured or killed, these courts infer that Congress must have been referring to natural persons only as victims and that Congress would have used the term "individual" consistently in the statute. Courts reaching the opposite result note that, like "person," "individual" often has a broader meaning than natural persons. *See Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008) (citing *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242 (11th Cir. 2005)).

The motions to dismiss for lack of standing are granted except as to the claims under the ATA.  All of the motions to dismiss for failure to state a claim are granted.  The plaintiffs may amend their complaint to replead the ATA claims only by **April 23, 2010.**

SIGNED on March 31, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge