| | | |
|---|---|---|
| Yossef Cohen, Asael Fridman, Baruch Yehuda Ziv Bril, Yissachar Zvi Lebowitz, Rosalyn Shoshana Pearl, Simon Lebowitz, Shifra Markowitz, Ester Devora Markowitz, Gerald Markowtiz, Sarah Mordechai Shirin Mordechai, Ora Rubinoff, Aviva Rubinoff, Michael Jay Rubinoff, Eliezer Rubinoff, Joseph Rubinoff, Shoshana Rubinoff, Gila Schnall, Ira Yehuda Schnall, Frances Nati Schnall, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | **C.A. No. 4:09-cv-03884** |
| v. | ) ) | |
| Oscar S. Wyatt, Jr., NuCoastal Corporation, Nucoastal Trading Co., S.A.., El Paso Energy Corporation, Bayoil (USA), Inc., David B. Chalmers, Jr., Bayoil Supply & Trading Limited. | ) ) ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, through undersigned counsel, respectfully bring this action against the following: Oscar S. Wyatt, Jr., ("Wyatt"); NuCoastal Corporation ("NuCoastal USA"); NuCoastal Trading Co. S.A. ("NuCoastal Panama"); El Paso Energy Corporation ("El Paso"); Bayoil (USA), Inc. ("Bayoil USA"); Bayoil Supply & Trading Limited ("Bayoil Bahamas") (Bayoil USA and Bayoil Bahamas collectively the "Bayoil Companies"); and David B. Chalmers, Jr. ("Chalmers"); jointly and severally, and allege as follows:

1.      Defendants provided illegal, financial and material support to Saddam Hussein ("Saddam") and his regime ("Saddam Regime") who directed, authorized actors within the Islamic Resistance Movement ("Hamas"), the Palestinian Islamic Jihad ("PIJ"), and the Al-Aqsa Martyrs' Brigades ("AAMB"), to commit numerous instances of international terrorist activity

including the murder and maiming of Plaintiffs. Each of these organizations, at the direction and instruction of Saddam Hussein, engaged in international terrorist acts against United States nationals and citizens.

2.      Defendants knew that Saddam and the Saddam Regime were known terrorists and had committed widely publicized crimes against United States citizens including acts of international terrorism and murder, with the publicly stated goal of targeting the United States including citizens residing within Israel.  Furthermore, Defendants knew or should have known that payments of kickbacks, surcharges and other transfers of monies and dual-use, technological equipment, violated United States and international laws and United Nations sanctions. In providing material support to Saddam and the Saddam Regime, Defendants consciously and intentionally disregarded a substantial and unjustifiable risk to the lives and safety of others.

3.      Defendants Wyatt and the Coastal Corporation ("Coastal"), the predecessor of El Paso and NuCoastal USA, NuCoastal Panama, conspired with Saddam and the Saddam Regime to undermine UN Sanctions by implementing a program of attempted bribery of UN officials and leaders of various governments holding seats on the Security Council of the United Nations. Defendants disseminated false and misleading market information to the United Nations 661 Committee and UN overseers responsible for implementing the program commonly known as the Oil-for-Food Program, which was intended to monitor and control the sale of Iraqi oil and utilize substantial all proceeds obtained therefrom for humanitarian purposes for the benefit of the people of Iraq and reimburse persons damaged caused by the Saddam Regime's illegal aggression against Kuwait in 1990-1991 Gulf War.

4.      Defendant El Paso was aware of Coastal Corporation's illegal dealings with the Saddam Regime prior to their acquisition of Coastal in January 2001.  After purchasing Coastal,

Defendant El Paso continued to purchase oil through front companies established by Wyatt, knowing that part of the purchase price was being used to pay illegal surcharges and kickbacks to Saddam Hussein and the Saddam Hussein regime. Between June 2001 and June 2002, El Paso bought approximately $420 million worth of oil from Iraq and knowingly made illegal surcharge payments of approximately $5.5 million dollars to Saddam Hussein and the Saddam Regime.

5. Defendant Wyatt, on behalf of, at the direction of and/or for the benefit of, El Paso, Coastal, NuCoastal USA and NuCoastal Panama, established, maintained and directed a complex international money-laundering operation, which included the formation and control of offshore, shell, front companies in tax haven and bank secrecy venues in order to fund the Saddam Regimes illegal activities, including international terrorism. Defendants Wyatt, El Paso, Coastal, NuCoastal USA and NuCoastal Panama knew that the illegal financing and satellite communications systems provided to the Saddam Regime would be used to cause the death and maiming of United States citizens, including civilian men, women and children and US soldiers.

6. Defendants Wyatt, Coastal, NuCoastal USA, NuCoastal Panama, (collective the "Coastal Group"), and Bayoil USA, Bayoil Bahamas and Chalmers (collectively the "Bayoil Group") and El Paso laundered and delivered to Saddam and the Saddam Regime tens of millions of dollars through circuitous routes involving international wire transfers through numerous countries, tax havens and front companies, specifically for the purpose of hiding such acts from the US government and were in blatant violation of United States and international laws. Defendants knew or should have known as did the world, that Saddam and the Saddam Regime would utilize such illegal funds to commit and finance international terrorist acts inflicted upon the plaintiffs and for other illegal purposes and that such material support of terrorist organizations constitutes an utter indifference to or conscious disregard for the safety of

others, specifically American citizens.

7.      The money provided by Defendants to Saddam Hussein and the Saddam Regime through the illegal surcharges were clearly not monies that were to used for legal purposes and in accordance with UN approved use but merely to further Saddam Hussein's and his Regime's stated goals amongst them, targeting the citizens of United States and Israel, including Plaintiffs.

8.      Defendants recklessly and knowingly aided and abetted and conspired with the Saddam regime in committing acts of international terrorism by paying kickbacks and other unlawful payments to  a ruler and his regime that were known for their use of such monies for terror and  in clear violation of UN resolutions and laws of the United States and international laws. The named Defendants knew or were willfully blind to the fact that these illegal oil surcharge payments were not going to be deposited into the legal UN accounts set aside for humanitarian needs of the Iraqi people but instead would be used by Saddam to make contractual payments to terrorists. The above named Defendants were accomplices, conspirators and substantial actors in Saddam's violent acts  and/or acts dangerous to human life, resulting in the death or substantial injury and damage to each of the plaintiffs.

9.      Defendants through their affirmative misrepresentations and omissions actively concealed from Plaintiffs their illegal surcharge payments to Saddam Hussein. Defendants fraudulently concealed their illegal conduct intentionally misleading the United States, United Nations and Plaintiffs.

## PARTIES

### Plaintiffs

10.      Plaintiffs, described below are United States citizens who suffered substantial injuries as a result of international terrorism, torture, extra-judicial killing, genocidal conduct and crimes against humanity.

11.     Yossef Cohen is a US citizen currently living in Jerusalem, Israel with his wife Rivka. As a result of the suicide attack at Café Moment Yossef suffered serious physical and psychological injuries including broken bones, a torn spleen, chest and face wounds, a perforated ear drum from which he suffers decreased hearing, torn corneas in both eyes which has resulted in permanent vision problems, scarring from shrapnel to his face and serious anxieties which have affected him socially, and financially.

12.     Asael Fridman, is a US citizen born in 1979. He currently lives in Jerusalem. Asael was 22 at the time of the suicide attack at Café Moment. Asael lost a close friend and suffered serious psychological injuries as a result of the suicide attack. He was diagnosed with post traumatic stress disorder necessitating medication and psychotherapy. Asael continues to suffer from serious anxiety and chronic depression.

13.     Baruch Yehuda Ziv Brill is a US citizen born in 1984. As a result of the bomb explosion at Ben Yehuda Street, Baruch Yehuda suffered serious physical and psychological injuries including multiple shrapnel wounds to his arms, back and leg, a perforated left eardrum, lacerations to his scalp, eyes, neck and torso as well as having nails which had been attached to the bomb (so as to maximize injury), penetrate his left wrist and left lower leg. Baruch underwent painful surgery and debridement following his injuries and suffered severe psychological trauma.

14.     Yissachar Zvi Lebowitz is a US citizen currently living in Jerusalem with his parents. Yissacher, who at the time of the attack was 11 years old, suffered psychological injuries in connection with the Nov 4, 2001 terrorist shooting attack at French Hill, Jerusalem. The attack and Yissachar's continuing trauma and anxieties have had psychological affects on his parents Rosalyn Shoshanna Pearl and Shimon Lebowitz. Yissachar Zvi Lebowitz and his parents

Rosalyn Shoshanna Pearl and Shimon Lebowitz each bring an individual action against Defendants for their injuries.

15.     Shifra Markowitz is a US citizen, born in 1985 living in Jerusalem. Shifra suffered serious psychological injuries and trauma in connection with the Nov, 4, 2001 terrorist shooting attack at French Hill in Jerusalem, which killed a close friend. Following the shooting Shifra received medical attention to remove shattered glass from her body and psychological treatment for her trauma and emotional injuries. The attack and Shifra's subsequent trauma had psychological affects on her parents- Ester Devora and Gerald Markowitz. Shifra Markowitz and her parents Ester Devora Markowitz and Gerald Markowtiz each bring an individual action against Defendants for their injuries.

16.     Sarah Mordechai is a US citizen, born in California. Sarah, suffered serious psychological injury in connection with the Nov. 4, 2001 terrorist shooting attack at French Hill, Jerusalem. At the time of the attack Sarah was 15 years old. Sarah also received medical care following the attack to remove shattered glass from her arms and her neck. The attack and Sarah's subsequent trauma had psychological affects on Sarah's mother, Shirin Mordechai. Sarah Mordechai and her mother Shirin Mordechia each bring an individual action against Defendants for their injuries.

17.     Ora Rubinoff, born in 1985, is a US citizen currently living in Jerusalem. Ora suffered serious psychological injuries in connection with the Nov. 4, 2001 terrorist shooting attack at French Hill, Jerusalem.   At the time of the attack Ora was 15 years old. Ora received medical attention to remove shattered glass that had penetrated her thigh and forehead. The attack and Ora's subsequent trauma had psychological affects on Ora's parents Aviva and Mitchell Jay and her siblings Eliezer, Yosef and Shoshana. Ora Rubinoff, her parents Aviva

Rubinoff and Mitchell Jay Rubinoff and her siblings Eliezer Rubinoff, Yoseff Rubinoff and Shoshana Rubinoff al bring a claim for their injuries.

18.      Gila Schnall, is a US citizen, born in Indiana who currently lives in Jerusalem. Gila suffered serious psychological injury in connection with the Nov, 4, 2001 terrorist shooting attack at French Hill, Jerusalem. At the time of the attack Gila was 15 years old. Gila received psychological treatment for her injuries and continues to suffer from anxiety as she recalls vivid details of the attack. The attack and Gila's subsequent trauma had psychological affects on Gila's parents Frances and Ira Schnall. Gila Schnall and her parents Frances Schnall and Ira Schnall each bring an individual claim against Defendants for their injuries.

19.      Plaintiffs were unaware, and could not reasonably have known of Defendants involvement in financing the terrorist attacks that resulted in their serious injury. Plaintiffs had no knowledge that Defendants material support of Saddam Hussein was the proximate cause of their injuries.

**Defendants**

20.      Oscar S. Wyatt, Jr., is a citizen of the United States and a resident of Houston, Texas. From at least December 1991 to January 2001, Wyatt was the sole shareholder and served as Chairman of the Board of Directors of Defendant Coastal Corporation; the predecessor of Defendants NuCoastal and El Paso. Wyatt was the director and beneficial owner of several front companies, on behalf of and for the benefit of El Paso and the Coastal Group in order to conceal illegal funding to Saddam and the Saddam Regime.

21.      Coastal Corporation was an oil company with its principal place of business in Houston, Texas, and incorporated in the State of Delaware. In or about December 1996, Wyatt, on behalf of the Coastal Corporation, received the first allocation of oil, approximately 11.35

million barrels, awarded by the Government of Iraq under the Oil-for-Food Program.

22.     In or about January 2001, the Coastal Corporation was acquired by El Paso Energy Corporation, which is an energy company based in Houston, Texas, and incorporated in the State of Delaware.  Upon information and belief, Wyatt continued to purchase Iraqi oil and pay illegal surcharges to Saddam Hussein, via money laundering through off-shore front companies, and as an agent and executive officer and at the direction of, in coordination with and for the benefit of El Paso.

23.     Subsequent to the acquisition of the Coastal Corporation by El Paso, Wyatt established a new corporate entity, NuCoastal Corporation, which is an energy company based in Houston, Texas.

24.      NuCoastal Trading Co. S.A., upon information and belief, is a shell company registered in Panama on June 28, 2002 but managed from NuCoastal USA's offices in Houston Texas.  Wyatt is a Director and Chairman of the Board of Directors. Upon information and belief Wyatt is the beneficial owner of NuCoastal Panama.

25.     On or about October 21, 2005, Wyatt was indicted and charged with conspiracy to commit wire fraud and conspiracy to engage in prohibited financial transactions with Iraq.  On or about October 1, 2007, after twelve days of trial, Wyatt plead guilty to the charge of wire fraud and admitted to transferring funds to the Saddam Regime in violation of United States and international law and sanctions.

26.     On or about February 7, 2007, the United States Securities and Exchange Commission filed a civil action against El Paso (Case No. 1:07-cv-00899-LAP (SDNY)).  El Paso consented to pay $7 million to settle the charge that it indirectly paid almost $5.5 million in illegal surcharges in order to purchase oil from Iraq via illegal off-shore front companies. El Paso

forfeited $5.48 million in restitution in a non-prosecution agreement and paid civil fines of $2.25 million.

27.     Defendant El Paso, Defendant NuCoastal USA and Defendant NuCoastal Panama are sued independently and jointly and severally as successors to and/or in their capacity as a single business enterprise as alter egos of Defendants Wyatt and Coastal. Such corporations remain liable for the conduct and injuries caused by their predecessor entities under one or more of the following legal theories: liability through merger, mere continuation, single business enterprise, alter ego, and/or sham to perpetrate a fraud

28.     David B. Chalmers, Jr., is a citizen of the United States, a resident of Houston, Texas, and the sole shareholder of Bayoil (USA,), Inc., which was an oil company based in Houston, Texas, and incorporated in the State of Delaware.

29.     Chalmers was, at all times relevant herein, the sole shareholder and sole director of Bayoil Supply & Trading Limited, which was a company registered in Nassau, Bahamas. All accounting, business, and other affairs for Bayoil Bahamas were conducted from Bayoil USA's Houston offices, and by the employees of Bayoil USA.

30.     On or about April 14, 2005, Chalmers, Wyatt, Bayoil USA and Bayoil Bahamas and other persons were indicted in the United States District Court of the Southern District of New York and charged with (1) conspiracy to commit wire fraud and engage in prohibited financial transactions, (2) wire fraud, (3) prohibited financial transactions with Iraq, and (4) violation of the International Emergency Economic Powers Act in violation of the laws of the United States. On or about August 17, 2007 Chalmers and the Bayoil Companies plead guilty to the conspiracy charge.

## NON-PARTY AGENTS OF THE COASTAL DEFENDANTS

31.     Samir Vincent ("Vincent") is an American citizen and sole owner and director of a Virginia corporation, Phoenix International Corp. ("Phoenix").  From about 1992 until 1996 Vincent and Phoenix acted as the agent of the Coastal Group to lobby within the United States and to the United Nations on behalf of the Saddam Regime and to arrange illegal and clandestine visits to Iraq for Wyatt (then Chief Executive Officer and Chairman of the Board of Directors of Coastal) and other senior Coastal managers in violation of US and international laws. At the direction of and in conspiracy with Wyatt and Coastal, Vincent acted as a bag man for the Saddam Regime, transferring millions of dollars in illegal funds and assisted Coastal in illegally providing the Saddam Regime with a sophisticated satellite communication system.  On or about January 18, 2005 Vincent pleaded guilty to being an unregistered agent of the Saddam Regime and related conspiracy and tax-evasion charges.

32.     Tongsun Park ("Park") is a citizen of South Korea who, during all relevant times herein maintained a residence in the United States. Upon information and belief, Park at the direction of Wyatt, assisted the Coastal Group in undermining the sanctions against the Saddam Regime.  Vincent introduced Park to senior government officials of Iraq and between 1992 and 2002 engaged in money laundering and transfers of millions of dollars in cash, received in Washington D.C.  In coordination with the Coastal Group and its agent Vincent, Park entered into agreements with Iraq in or about February 1996 whereby Park would be paid approximately $15 million dollars which would be used to bribe senior UN officials for the benefit of Iraq. Park was paid millions of dollars in partial payment under these contracts. On or about July 13, 2006, Park was found guilty of conspiracy to launder money and act as an unregistered agent of the Saddam Hussein regime.

33.     Catalina del Socorro Miguel Fuentes a\k\a Catalina Miguel a\k\a Cathy Miguel ("Miguel") is a Venezuelan citizen who resides in Geneva, Switzerland.  Upon information and belief, Miguel is a front-man for Wyatt, to serve as a nominee owner and\or nominee director of Swiss and Cypriot companies utilized by Wyatt and El Paso to launder and transfer funds illegally to Saddam and the Saddam Regime. Miguel was a principal actor, within the Coastal Group, assisting in laundering money and transferring funds illegally to Saddam and the Saddam Regime for the benefit of Wyatt, the Coastal Group and El Paso. On or about April 14, 2005, Miguel was charged by a federal grand jury of (1) conspiracy to commit wire fraud and prohibited financial transactions with Iraq, (2) wire fraud, (3) prohibited financial transactions with Iraq, and (4) violation of the International Emergency Economic Powers Act.  Upon information and belief Miguel is a fugitive from justice.

34.     Mohamed Saidji ("Saidji") is an Algerian citizen who resides in Geneva, Switzerland.  Upon information and belief, Saidji is a front-man for Wyatt, to serve as a nominee owner and nominee director of Swiss and Cypriot companies utilized by Wyatt and Coastal to launder and transfer funds illegally to Saddam and the Saddam Regime.  At all relevant times, Saidji was acting on behalf of and for the benefit of Wyatt, the Coastal Group and El Paso, assisting in laundering money and transferring funds illegally to Saddam and the Saddam Regime. On or about April 14 2005, Saidji was charged by a federal grand jury of (1) conspiracy to commit wire fraud and prohibited financial transactions with Iraq, (2) wire fraud, (3) prohibited financial transactions with Iraq, and (4) violation of the International Emergency Economic Powers Act.  Upon information and belief Saidji is a fugitive from justice.

35.     Nafta Petroleum Company Limited ("Nafta") is a Cypriot private company with a registered address in Nicosia nominally owned and nominally managed by Nestor Cacoyiannis

and Nestor Cacoyiannis (Holding). Upon information and belief, Nafta is owned and managed by Wyatt for his, the Coastal Group's and El Paso's benefit. Upon information and belief Nafta acted as a front company for Coastal, Wyatt and El Paso and other members of the Coastal Group and facilitated money laundering for El Paso and the Coastal Group in making illegal kickbacks and providing illegal financing to Saddam and the Saddam Regime to be used for international terrorism, weapons procurement and military financing to be used against American civilians and soldiers. On or about April 14, 2005, Nafta was charged by a federal grand jury of (1) conspiracy to commit wire fraud and prohibited financial transactions with Iraq, (2) wire fraud, (3) prohibited financial transactions with Iraq, and (4) violation of the International Emergency Economic Powers Act. Upon information and belief Nafta is a fugitive from justice.

36.     Mednafta Trading Company Limited ("Mednafta") is a Cypriot private company with nominal headquarters at the offices of its nominee company Corposerve (Secretarial) Limited ("Corposerve"), in Nicosia, Cyprus. The sole nominee director of Mednafta is Miguel, registered at the address in Geneva, Switzerland. Prior to June 29, 2005, Mednafta's nominal directors were Arlene Nahikian and Charis Charalambous, of Nicosia, Cyprus. On or about March 9, 2001 the former nominee shareholder, Cymanco Services Ltd., transferred all of the shares of Mednafta to nominee shareholder Miguel, on behalf of Wyatt. Upon information and belief Mednafta acted as a front company for Coastal, Wyatt, El Paso and other members of the Coastal Group and facilitated money laundering for the Coastal Group in making illegal kickbacks and payments to Saddam and the Saddam Regime for use in international terrorism. On or about April 14, 2005, Mednafta was charged by a federal grand jury of (1) conspiracy to commit wire fraud and prohibited financial transactions with Iraq, (2) wire fraud, (3) prohibited financial transactions with Iraq, and (4) violation of the International Emergency Economic

Powers Act. Upon information and belief Mednafta is a fugitive from justice.

37.     Nivaria Trading Co. Limited ("Nivaria") is a private Cypriot company with a nominal headquarters at the address of its nominee director and secretary, Corposerve. Upon information and belief, Nivaria is owned or controlled by Wyatt, Coastal and El Paso. At the direction of Wyatt, Coastal Group and El Paso, Nivaria illegally laundered millions of dollars to an illegal bank account controlled and owned by the Saddam Regime in Amman, Jordan, at the Jordan Ahli Bank.

38.     Sarenco S.A. ("Sarenco") is a Swiss company with a registered office in Geneva, Switzerland. All fifty (50) authorized shares of the company have been issued in "bearer" form, without registration with Swiss authorities or corporate records in order to conceal the ownership and control of Sarenco which upon information and belief is controlled and owned by Wyatt for the benefit of El Paso and Coastal Group. Sarenco's corporate purpose is limited to the conducting of market surveys and research, recommend formulas for joint ventures in the energy industry, principally in oil and gas. El Paso and the Coastal Group Defendants utilized the office and name of Sarenco as a front to manage Nafta and Mednafta, and conspire with the Saddam Regime to launder money and pay kickbacks and other illegal payments to Saddam and the Saddam Regime. On or about April 14, 2005, Sarenco was charged by a federal grand jury of (1) conspiracy to commit wire fraud and prohibited financial transactions with Iraq, (2) wire fraud, (3) prohibited financial transactions with Iraq, and (4) violation of the International Emergency Economic Powers Act. Upon information and belief Sarenco is a fugitive from justice. (Nafta, Mednafta, Nivaria and Sarenco, collectively the "Wyatt Offshore Front Companies").

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction over this action under 18 U.S.C. §§ 2333(a) and 2338, which authorize a private damages action in any appropriate District Court by a United States national who is injured "in his person, property or business by reason of an act of international terrorism." Subject matter jurisdiction is also conferred by 28 U.S.C. §§ 1331 and 1332(a)(1-3).

40.     Plaintiffs were all injured in acts international terrorism, consisting of suicide attacks outside the territorial jurisdiction of the United States, which were violations of the criminal laws of the United States and which would be criminal violations had they been committed within the jurisdiction of the United States.

41.     The terrorist attacks that resulted in the injury of Plaintiffs were perpetrated for the purpose of intimidating and coercing the civilian population within the State of Israel. This civilian population included a substantial amount of Americans residing within Israel, including Plaintiffs.

42.     Defendants Oscar Wyatt and David Chalmers are subject to the jurisdiction of this court pursuant to 18 U.S.C. § 2334(a) because both are domiciled and residents of the State of Texas.

43.     Defendants NuCoastal Corporation, NuCoastal Trading Co., S.A., El Paso Energy Corporation, Bayoil (USA) Inc., and Bayoil Supply and Trading Limited are subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a) as each has a principal place of business in the State of Texas.

44.     Venue is both proper and convenient in this District pursuant to 28 U.S.C. §1391, and 18 U.S.C. §2324 because a substantial part of the actions and omissions giving rise to the

claims herein complained of occurred within the District.

## FACTUAL ALLEGATIONS

## SADDAM AND THE SADDAM REGIME - FATHER OF TERRORISM

45.     In or about July 1968 the Ba'ath Party of Iraq seized control of the government of Iraq in a bloody coup.  Initially, Saddam Hussein served as head of intelligence for the army under the new regime and seized absolute power in or about 1979.  Saddam deployed terrorism as a strategic weapon directed at the United States, Israel, and other targets throughout the years of his rule.

46.     Saddam established the Arab Liberation Front ("ALF") in 1969 as an "irregular" part of the Iraqi army to conduct international terrorism.  ALF, from its initiation, had a suicide heritage and was used by the Saddam regime to commit numerous acts of international terrorism including violent terrorist attacks and attempted attacks against United States and Israel, including the civilian population.

47.     From 1969 until about 1980 Saddam headed the ALF and continued to control and direct the ALF until his demise in 2003.  During this time Saddam used the ALF to carry out numerous murderous terrorist attacks against American and other civilians in Israel and in other countries, including the killing and maiming of men, women and children.

48.     Along with the ALF, Saddam Hussein and the Saddam Regime employed, directed and controlled numerous other international terrorist organizations, including Hamas, PIJ and AAMB for use in his proxy war against his enemies in all parts of the world.

49.     Saddam and his Regime perpetrated numerous acts of terrorism and torture even against their own people, a fact that was internationally noted and known by Defendants.  As of 1993, The United Nations Working Group on Enforced or Involuntary Disappearances had

documented 16,447 cases of disappearances while in custody of the Saddam Regime, in addition to the more than 16,000 cases from the 1988 Anfal atrocities. Amnesty International reported that it has the names of more than 17,000 Kurds who disappeared during the Anfal and are presumed dead. (Iraq Human Rights Report Practices, 1993, January 31, 1994, US Department of State)

50.     On or about March 16, 1988, the Saddam Regime ordered the Iraqi Air Force to bomb the town of Halabja in the Kurdish area, Northern Iraq. The attack was the largest-scale chemical weapons attack directed against a civilian population in history and resulted in the deaths of over 10,000 men, women and children. The planes dropped bombs containing multiple chemical agents including mustard gas, sarin, soman, tabun and VX. Between 3,000 and 5,000 people were killed immediately and between 7,000 and 10,000 were injured. Thousands more died of horrific complication diseases and from birth defects in the years after the attack.

51.     It is estimated that similar attacks against Iraqi Kurds Saddam killed as many as 30,000 civilians. The US State Department reported, in its 1993 Human Rights Report, "Based on forensic evidence obtained from previously examined graves and extensive documentation...seized from Iraqi government offices...Middle East Watch and Physicians for Human Rights now estimate that between 50,000 and 100,000 Kurds were killed and up to 4,000 villages may have been destroyed during the Anfal campaign." (Iraq Human Rights Report Practices, 1993, January 31, 1994, US Department of State).

52.     In a news broadcast by Republic of Iraq Radio on October 6, 2000, recorded and translated from Arabic by BBC, Deputy Prime Minister Tariq Aziz was reported to say "there is no way to liberate Palestine other than jihad and the armed popular struggle."

53.     In a news report broadcast approximately one hour later on October 6, 2000,

official Iraqi television reported, "Under the chairmanship of the comrade secretary general [Saddam], the National Command of the Arab Socialist Ba'ath Party has held a meeting to examine the valiant popular intifada in occupied Palestine, as well as its distinguished developments in the Arab arena, and to continue its activities in support of this historic intifada...the National Command said that the pan-Arab approach, which should be focused on and inspired is [sic] leader President Saddam Hussein's speech on October 3, 2000, in which he called for pursuing jihad to liberate Palestine ... ... The National Command urged the people's masses to work relentlessly to **expel the US embassies and centers from the Arab countries** as well as to uproot and expel any Zionist presence in these countries**...** to provide the Palestinian people with all that is needed to enable them to pursue their valiant jihad..."

54.     Every year, from 1990 until the fall of the Saddam Regime, Iraq was designated a state sponsor of terrorism by the United States Department of State. The purpose and policy for designation of states as sponsors or terrorism was enunciated in the Global Terrorism Report for 2000. "The designation of state sponsors of terrorism by the United States – and the imposition of sanctions—is a mechanism for isolating nations that use terrorism as a means of political expression. US policy seeks to pressure and isolate state sponsors so they will renounce the use of terrorism, end support to terrorists, and bring terrorists to justice for past crimes. The United States is committed to holding terrorists and those who harbor them accountable for past attacks, regardless of when the acts occurred. The U.S. Government has a long memory and will not simply expunge a terrorist's record because time has passed. The states that choose to harbor terrorists are like accomplices who provide shelter for criminals. They will be held accountable for their "guests actions."

55.     Throughout January and February of 1991, during the first Gulf War, the Saddam

Regime launched 39 Scud missiles carrying military grade explosive warheads against civilian populations in major Israeli cities. The attacks caused deaths, hundreds of casualties, and tens of millions of dollars in damages to infrastructure and private property. Over one million Israeli residents, including United States civilians, were forced to flee their homes during this period.

56.     Between 1992 and 1994, the Saddam Regime and its terrorist arm ALF smuggled almost 100 bombs to international terrorist cells located throughout the world and were responsible for the death of at least one person at the bombing of the offices of American Airlines. The Saddam Regime and its terrorist arm attempted to bomb the American Ambassador's residence in Jakarta in a botched bombing attempt.

57.     In 1993, at the direction of Saddam Hussein, the Iraqi Intelligence Service (IIS) attempted to assassinate President George H. W.Bush in a terrorist attack. President Clinton retaliated to the attempted assassination launching cruise missiles attack on the Iraqi Intelligence Services' principal command and control facility in Baghdad.

58.     According to the Patterns of Global Terrorism issued by the US State Department in 1994, "Iraq remained out of compliance with the UN Security Council resolutions, including those requiring it to renounce terrorism…Iraq continues to provide safe havens and training facilities for terrorist organizations… Iraq continued to engage in state-sponsored internal and international terrorism in 1994. It is rebuilding its ability to mount terrorist attacks abroad, despite financial and diplomatic constraints imposed in the wake of the Gulf War."

59.     Throughout his reign as the leader of Iraq, Saddam Hussein vowed to topple and eradicate the State of Israel, expel and displace all Americans within Israel, target American entities within Israel, create a feeling of terror within the Israeli state, murder or throw out the Jews, forcibly remove the United States presence in Israel and throughout the Middle East, and

liberate the area by replacing it with an Islamic and/or Palestinian state through the use of suicide bombings and other shockingly egregious violent acts which constitute violations of fundamental and universally recognized precepts of international law which are reflected in a multitude of international accords.

60.    The suicide bombings and other murderous attacks, authorized by Saddam Hussein, have involved the use of explosives, incendiary weapons, and other lethal devices which were designed and built so as to maximize resulting death and serious bodily injury. To this end, suicide bombings and other murderous attacks ordered by Saddam Hussein and the Saddam regime involved the intentional delivery, placement, discharge, and/or detonation of explosives, incendiary weapons, and lethal devices in public places, State, government, and public facilities, and in public transportation system(s), including buses.

## SADDAM HUSSEIN'S SUPPORT OF PALESTINIAN TERRORIST ORGANIZATIONS

61.    In addition to acting on its own or through its ALF terror group and other Palestinian terrorist organizations, the Saddam regime had a history of being involved in proxy wars against its targeted enemies by soliciting outside terror groups in committing violent acts on their behalf. The Saddam Regime provided offices, training camps, safe haven, financing, training courses for suicide bombers and operational and logistical support for Palestinian terrorist groups. Palestinian terrorists were trained by the Saddam Regime at the "Al-Quds" army training camp, outside Baghdad in the use of small arms, RPGs, machine guns, hand grenades, use and production of explosives and detonation systems, including electrical, chemical and cellular detonators.

62.    On October 8, 2000, Iraqi television broadcast (in Arabic, translated by BBC) an audio recording of a speech delivered by Saddam. Summarizing the speech, it was reported that

"...it has been decided to open camps for volunteers for jihad to liberate Palestine so as to allow them to complete their military training. It has been decided to instruct the Defense Ministry on this, providing that priority should be given to those who had joined courses of training on weapons. The leader president decided to donate **5 million euro for the martyrs of Palestine and in aid to the intifada.** The leader president, may God grant him victory, had earlier given orders to consider the martyrs of the valiant Palestinian intifada as martyrs of the Mother of Battles."

63.     According to a report printed on the front page of the official Iraqi newspaper Al-Jumhuriya, on November 20, 2000, the goals determined by the 48th session of the Iraqi ministers include supporting the Palestinian intifada is all possible ways. On November 26, 2000 the newspaper quoted Saddam as calling on the Arab nations to be more cooperative in helping the Palestinians with their armed struggle.

64.     In excerpts of Saddam's speech on March 4, 2002, the Iraqi daily Al Qadisiya reported "As far as Iraq is concerned, we are like any Palestinian district. Nothing prevents us from giving everything we can. We are glad about the spirit of the Palestinian people's spirit of self-martyrdom (*al-ruh al-ishtishehadadiya*) and heroism. I think many were surprised by it. By Allah, what the Palestinian people have done surpasses my expectations."

65.     According to the US Department of State, Office of the Coordinator for Counterterrorism, 1968-2003: Total Persons Killed/Wounded – International and Accepted Incidents, Palestinian terrorist organizations acting under the direction and support of Saddam Hussein had killed 36 and injured 91 American citizens.

66.     Saddam Regime provided military and terrorism training (including training for suicide bombers), training camps, safe haven, financing and operational and logistical support

for Hamas, PIJ and AAMB during the years 2000-2003. During all times relevant herein, each of these Palestinian terrorist groups have acted with a united purpose to eradicate the State of Israel and displace the Zionist presence within the Israeli state. The method by which these organizations attempted to expel the American interests within Israel and the Middle East was through a campaign of international terrorism, torture, extrajudicial killings against Israeli and American citizens.

67.     The acts, giving rise to this action, are the result of a systematic and widespread campaign of suicide bombings and other murderous attacks of international terrorism that have been directed and committed by Saddam Hussein and the Saddam Regime through their contracted agents and hired hit-men, PIJ, Hamas and AAMB.

68.     Upon information and belief, and based on documents seized by US military forces from the Saddam Regime's military intelligence, the Saddam Regime provided "Palestinian [Terrorist] Groups" over 100 million dollars to conduct the intifada. This funding constituted a material and substantial amount of funds used by Hamas, PIJ and AAMB to plan and carry out acts of international terrorism, including the suicide bombings that injured Plaintiffs.

69.     From 1982 through 1984, Saddam and the Saddam Regime supported and financed the 15 May Organization, a terrorist group responsible for bombings of United States targets including the 1982 bombings of a Pan Am flight over Honolulu, Hawaii.

70.     Saddam Hussein has directed, controlled, financed and contracted with Abu Nidal Organization, the Palestine Liberation Front, 15 May Organization and numerous other international terrorist organizations in international terrorist attacks against the United States from at least 1982 through 2003. These attacks include thePan Am Flight 73 hijacking in Karachi

in September 1986, the attack in 1985 on the cruise ship Achille Lauro and the murder of US citizen Leon Klinghoffer, the bombing of a Pan Am flight over Honolulu, Hawaii and numerous attacks throughout Europe.

71.     US seized Iraqi intelligence documents include a 2001 letter sent by the Iraqi Ministry of Foreign Affairs to the Iraqi Embassy in Jordan, discussing the (Iraqi) supply of equipment for operations to be carried out in Gaza by Jihadi Islamic groups outside the scope of the Mossad, the US and Jordanian Intelligence.

72.     From 2000 until approximately early 2003 Saddam and the Saddam Regime provided Hamas with offices in Iraq, training camps, training for suicide bombing, terrorism training, weapons, explosives and funding and held high level meetings with Hamas military leaders, including Khalid Mishal and Mahmoud Al Zahar.

73.     Hamas is a terrorist organization based in the West Bank and Gaza Strip that is well-known throughout the World.   It has been designated as an institution of terror and consequent genocidal conduct since the early 1990s.

74.     In 1995, the U.S. government designated Hamas a "Specially Designated Terrorist" entity, at which time its assets subject to U.S. jurisdiction were blocked by Executive Order 12947 and implementing regulations.   The Executive Order prohibits transactions, including financial transactions, with organizations and individuals so designated.   This designation was well-known by all persons, including Defendants, who traded in oil in the mid-east, and by all financial institutions. The designation of Hamas as a terrorist organization was a public event and well-known to the entire international business community including Defendants.

75.     From about 2000 until approximately early 2003 Saddam and the Saddam Regime

provided funding, weapons, training, and military equipment to the AAMB. Special training bases were established for Palestinians at the Al Quds and Al Aziziyya special military bases. The Vice President of the Saddam Regime Taha Yassin Ramadan issued hand-written instructions to contacts within the Palestinian territories to finance military activity, purchase weapons, elect those excelling in jihad, empower local commanders and forward lists of "self martyrs" (suicide bombers), martyrs and their political affiliations.

76. The Al-Aqsa Martyrs' Brigades (Kata'ib Shuhada' al-Aqsa) acts with the help of senior officers of other elements of the Palestinian Authority's armed entities, the Tanzim and Force 17 who have provided illegal weapons, training and intelligence to help carry out the attacks.

77. The terrorist activities and ideology of AAMB are well-known by Defendants and throughout the Palestinian territories, Jordan, the Middle East, the US and the world. Its terrorist attacks are widely reported and the group publicly advertises its involvement in terrorist attacks. AAMB publishes information for distribution in the Middle East including the Palestinian territories and Jordan and maintains a public website for worldwide publication of its terrorist actions and agenda.

78. Furthermore, on March 27, 2002, pursuant to the authority of section 1(b) of Executive Order 13224 of September 23, 2001, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General designated AAMB (also known as the Al-Aqsa Martyrs Battalion) as a Specially Designated Global Terrorist ("SDGT").

79. On March 27, 2002, pursuant to section 1(a)(ii)(A) of the Executive Order 12947 of January 23, 1995, the Deputy Secretary of State, acting under the authority delegated to him

by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General determined that AAMB has committed, or poses a serious risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East Peace Process.

80.     From 2000 until approximately the end of 2002 Saddam and the Saddam Regime provided PIJ with military instructors and held high level meetings with senior PIJ military commanders including Abu Tareq Ziyad Rashid Hussein.

81.     The Palestinian Islamic Jihad – Shiqaqi Faction ("PIJ") is an international terrorist organization with "cells" or units located throughout the world.  PIJ is also known as "the Islamic Movement in Palestine," "The Movement," and "The Family."

82.     In January 1995, PIJ was designated as a Specially Designated Terrorist Entity ("SDT") by the U.S. Department of Treasury pursuant to Executive Order 12947 prohibiting transactions with groups that threaten to disrupt the Middle East peace process.

83.     On October 8, 1997, PIJ was designated a Foreign Terrorist Organization by the U.S. Secretary of State pursuant to 8 U.S.C. §1189, by publication in the Federal Register.  It became unlawful to provide material support and resources, to include currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of PIJ. The designation of PIJ was a public event well-known to the entire international business community, especially to the oil industry and persons and companies conducting business in the Middle East, including Defendants.

84.     Consistent with its goals and objectives, and known to the Defendants, the Saddam Regime provided Hamas, PIJ and AAMB training in weapons, explosives procurement and the planning and commission of joint international terrorist attacks, including suicide bombings.  Using suicide bombings and other shockingly egregious acts of international

terrorism directed at Plaintiffs and other unarmed American and Israeli civilians, Hussein, through the organizations he controlled, have for years systematically and continuously terrorized, injured and killed thousands of unarmed innocent members of the civilian population present in Israel, including numerous American citizens, through repeated suicide bombings, or "martyrdom" operations and the payments of cash stipends and new houses for the relatives of deceased terrorists.

**SADDAM HUSSEIN CONTRACTS WITH PALESTINIAN TERRORIST ORGANIZATIONS TO ENGAGE IN TERRORISM AIMED AT UNITED STATES NATIONALS**

85. In stepping up his material support to Palestinian terrorists by way of financial aid, military training, weapons supply and safe haven, on or about October 2000, Saddam and the Saddam Regime publicly offered to provide financial rewards for Palestinians killed or wounded during violent confrontations and terrorist campaigns aimed at Israeli and United States citizens.

86. Saddam Hussein, on behalf of the Iraqi government, offered to pay suicide bombers a financial reward in consideration for carrying out the regime's stated goal to displace American interests and destroy the State of Israel. Defendants knew of Saddam's offer and assisted in providing his regime with illegal hard cash dollars to finance his contracted agreement with terrorist organizations. This agreement amounted to a unilateral contract by which the suicide bombers relied upon Saddam's promise to pay the reward upon the completion of the condition precedent – the terrorist act.

87. Saddam and the Saddam Regime utilized its public commitment to the destruction of Israel and its allies the United States by contracting with terrorists within Hamas, PIJ and AAMB to engage in violent jihad (holy war) using terrorism and attacking civilian targets. The

contractual terms called for members of these organizations to target civilians in populated areas for payment of a reward and the assurance that the attacker would be revered as a "martyr".

88.     The contractual terms provided more than double the reward for suicide bombers' families. Upon the acceptance of the agreement, and the carrying out of a terrorist attack, the Saddam regime handed out checks to surviving family members at public ceremonies which were covered by Palestinian, European, American and Iraqi electronic and print media. Payment of the monies were often made via ALF representatives and by way of elaborate public ceremonies in which family members of the terrorists were praised and given a check along with a certificate signed by Saddam which read: "The payments of significant financial rewards to a poverty stricken population no doubt influenced and motivated Palestinian children and young men and women to join the terrorist organizations and seek martyrdom if not for themselves for their families."

89.     As reported within Human Rights Watch in 2002, "The government of Iraq has expressly endorsed and encouraged suicide bombing attacks against civilians.  Iraq, in its provision of funds to families of "martyrs" and others, has established a differential in which families of suicide bombing operative are said to receive a considerably larger sum of $25,000 while other families that have suffered a death receive $10,000.  In promoting suicide attacks, Iraqi leaders have made no distinction between attacks against civilians and attacks against military targets.

90.     In a March 2003 televised interview with Ali Bayati, an ALF leader, Bayati proudly exclaims that "Saddam Hussein supports the families of martyrs…he supports anyone who gets killed fighting Israel…The money is dispersed amid great fanfare." In footage of the ceremony, the ALF distributes checks made out to the families of 26 men killed in suicide

attacks against Israel totaling more than a quarter of a million dollars..

91.     The Israeli government, former Secretary of State Colin L. Powell, Defense Secretary Donald H. Rumsfeld, Deputy Defense Secretary Paul D Wolfowitz, and even captured terrorists have publicly stated that Saddam Hussein's contractual offer to terrorists encouraged suicide bomb attacks.

92.     Defendants knew or were willfully blind to the fact that Saddam Hussein used illegal surcharge funds provided to him by Defendants and others to pay the families of 'martyrs' and suicide bombers with lump-sum payments ranging between $10,000 to $25,000 as required under the contract.

93.     At a hearing on November 17, 2004, regarding the Oil-for-Food Program Congressman Henry J. Hyde, Chairman of the House of Representative Committee on International Relations, confirmed what had been alleged and known by Defendants for years which was that: "According to information provided to this Committee, Saddam paid $25,000 rewards to the families of Palestinian suicide bombers through the Iraqi Ambassador to Jordan out of accounts in the Rafidain Bank in Amman, **which held kickback money Saddam demanded from suppliers to his regime.**"

94.     Each of the terrorists' and\or suicide bombers who perpetrated the attacks against Plaintiffs accepted Saddam Hussein's offer and acted under the terms of the contract. Under the performance contract between Saddam and the suicide bombers, Saddam's obligations were realized upon the completion of a suicide bombing.  Under the terms of the contract, Saddam Hussein provided payments to the families of the terrorists responsible for the attack against Plaintiff:

    a.     On March 9, 2002, a Hamas suicide bomber, named Fuad Hurani, detonated

an explosive device strapped to his body at the entrance to Café Moment in Jerusalem. On or about June 23, 2002, the suicide bomber's mother, Khaldiyyah Ismail Abd Al Aziz Al Hurani, received a check, number 20000399, in the amount of $25,000.00, was signed by Rakad Salem, the Head of the ALF. The check was given to the mother of the suicide bomber on behalf of Saddam Hussein.

b.     On December 1, 2001, two Hamas suicide bombers, named Osama Baher and Nabil Halbiyeh, detonated explosive devices concealed in bags and explosive belts on Ben Yehudah Street in Jerusalem. Immediately thereafter, a booby-trapped car exploded in the area. On or about January 22, 2002, Muhammad Hussain 'Id Hussain Baher (Osama Baher's father), received a check, number 20000078, in the amount of $15,000.00 signed by Rakad Sakem, the head of the ALF. The check was presented to the father of the suicide bomber on behalf of Saddam Hussein. On or about January 22, 2002, Fatima 'Ali Hussain Halbiyeh (Nabil Halbiyeh's mother), received a check, number 20000077, in the amount of $15,000.00 signed by Rakad Salem, head of the ALF. The check was presented to the mother of the suicide bomber on behalf of Saddam Hussein.

c.     On November 4, 2001, PIJ terrorist, named Hatem Shweikeh, armed with M-16 automatic rifles, opened fire on Bus No. 25 at the French Hill intersection in Jerusalem killing two Israelis and injuring forty others. The terrorist's mother, Kawthar Shweikeh, received a payment from Saddam Hussein.

95.     The United States government has affirmed the effectiveness of Saddam Hussein's offer to terrorist organizations. In November 2001, a Federal Bureau of Investigation (FBI) memorandum concerning Hamas funding noted that through financial support, "Hamas provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populaces..."

96.     At all relevant times, Defendants were aware of Saddam Hussein's contract with terrorists to target American, Israeli and other civilians residing within Israel. Defendants knew that any financial support to Saddam Hussein would be used to further his goals to target American and Israeli civilians through his contracted agents.

## PUBLIC AWARENESS OF THE SADDAM REGIME'S SUPPORT AND FINANCING OF TERRORISM DIRECTED TOWARDS UNITED STATES NATIONALS

97.     Defendants knew that the Saddam Regime was a state sponsor of terrorism and that Saddam Hussein was supporting terrorism against Americans and Israel and providing financial rewards to suicide bombers who targeted United States and Israeli civilians. As such, Defendants knew that by paying illegal surcharges to the Saddam Regime it would be financing terrorism against United States nationals around the world.

98.     The Saddam Regime's support of terrorist organizations and attacks against Americans was widely publicized in press throughout the Middle East and in Western nations, including in the United States.

99.     Saddam and the Saddam Regime would generally authorize international terrorist acts against Americans in Europe and the Middle East as a means to incite violence and target American civilians.

100.     As of 1999, 184,000 American citizens were residing in Israel, amounting to 3.1 percent of the total Israeli population. Israel has the third largest American ex-patriot community

in the world after Canada and England.

101.   A large majority of the Americans living within Israel, including American tourists and students, are located in and around Jerusalem, an area continuously targeted by Saddam and Palestinian terrorist organizations.

102.   The United States Department publishes an annual "Patterns of Global Terrorism" report that has frequently cited Iraq as a global supporter of Palestinian terrorist organizations. In 1986, the report noted that Iraq has permitted safe haven to terrorists responsible for attacks against US and Israeli targets. In 1990, the deepening relationship between Iraq and these organizations was said to pose a great threat. Other reports from 1994 through 2002 noted Iraq's continued support for terrorist organizations including the fact that the Saddam regime; provided safe haven to terrorists, provided training facilities, denounced UN workers, attempted an assassination on President Bush, refused to condemn the September 11, 2001 attack against the United States, and acted as the base of organization for several terrorist outfits.

103.   On July 1, 1991, the Department of State published the "International Cooperation Counters Iraqi Terrorist Threats" which established that Saddam Hussein has repeatedly called for terrorist attacks against the United States and other countries in the international coalition that opposed Baghdad's aggression.

104.   The State Department, in its 1993 Human Rights Report submitted to Congress noted: "Iraq's abysmal record on human rights did not improve in 1993.  Systematic violations of human rights continued in virtually all categories in 1993; these included mass executions of political opponents, widespread use of torture, extreme repression of ethnic groups, disappearances, denial of due process, and arbitrary detention.  Furthermore, tens of thousands of political killings and disappearances remained unresolved from previous years. "

105.    Besides the official government reports and notice of sanctions, numerous newspapers carried prominent articles detailing the atrocities committed by Saddam and the Saddam Regime, and its support and funding of other terrorist organizations and the horrific acts perpetrated by those terrorists.

106.    According to a July 16, 1990, report broadcast on World News Tonight with Peter Jennings, ABC NEWS, "there is growing US concern that Iraq is becoming a new center of terrorism in the Middle East. US intelligence sources say Abu Nidal, head of one of the most vicious terrorist groups, has set up an office in Baghdad and several other terrorist groups appear to be doing the same. Another terrorist, Abu Abbas, responsible for several attacks against Israel and the murder of an American, is a frequent visitor to Baghdad. Further, there is information that training for some of the more violent Palestinian groups is now being conducted in Iraq. American analysts say that Iraq now has the capability to provide not only safe haven for terrorists but also financial help and an array of weapons."

107.    On August 21, 1990, the Washington Times reported that Saddam Hussein is creating "an army of terrorist fanatics ready for suicidal attacks against U.S. and Arab targets". The article quoted George Carver, former director of national intelligence at the CIA as saying that "terrorism is a major option for Saddam Hussein."

108.    On September 19, 1990, the Washington Times reported that "Iraqi President Saddam Hussein is expanding ties to anti-Western terrorists and has established a network within his own intelligence service to launch terrorist strikes around the world.". CIA Director William Webster announced that "we have seen Saddam Hussein increase his ties to terrorists who have a history of attacking Western targets…"

109.    In January 1991, following the bombing of Iraq, authorities reported attacks on

four United States facilities. Senator Orrin Hatch also reported that shots were fired at a United States consulate in Jerusalem. Senator Hatch sated that "terrorists are being set up by Saddam Hussein all over Europe and the Middle East and even in our country."

110.    In July of 1991, the CIA reported that Saddam Hussein and his government were responsible for the bombing of an Austrian airliner over Thailand that killed three Americans. The fact that an "Iraqi- sponsored terrorist group" was responsible for the attack was widely reported in the United States media.

111.    On June 27, 1993, President Clinton declared that "Saddam Hussein's, [regime] has ruled by atrocity, slaughtered its own people, invaded two neighbors, attacked others and engaged in chemical and environmental warfare." Clinton was directly responding to Iraqi's plot to assassinate former President Bush. This Presidential Address was reported on every major news station and newspaper in the United States.

112.    On July 29, 1996, Newsday reported that Iraq remains a leading sponsor of international terrorism and is "eager to punish the United States for humiliations suffered during the Gulf War."

113.    In March 1998, a panel of United States experts warned the United States Senate that "Americans could face real danger from biological or chemical terrorism." Seth Carus, a visiting professor at the National Defense University warned that it was "certainly possible" that Saddam Hussein might try to orchestrate a terrorist attack within the United States.

114.    On December 27, 1998, the Los Angeles Times reported that the State Department advised United States citizens to be alert as there was a possibility of retaliatory action against Americans abroad by Palestinian terrorist organizations. The State Department issued a travel warning to Americans traveling abroad.

115.    On January 7, 2001, major newspapers within the United States published a story from Newsday by which it was reported that "$10,000 payments to families of Palestinians killed in violence are intended to boost Saddam Hussein's influence." The news report quoted members of the ALF who were providing a $10,000 check to a family of a suicide bomber who had died in an attack against civilians. The article states that Saddam Hussein has distributed over 270 checks since November 2000 in an amount "equal to years of annual income for many Palestinian families."

116.    This same January 7, 2001 article reported that Saddam "**proposed that $900 million be given to the Palestinians from the special program through which the United Nations allows Iraq to sell crude oil for food and medicine. That assistance is supposed to go to the Iraqi people, who have suffered under the sanctions**."

117.    On January 23, 1991, the San Antonio Express News reported that "terroristic acts against the United States by Iraqis and their supporters could hit 'ferocious' proportions. The article quotes Eugene Gerringer, director of the Institute for Strategic Studies on Terrorism, as stating that while terrorist acts in the United States may not occur "Iraqi terroristic attacks are much more likely in the Arab countries and Europe because Iraqis have more organizational support in those areas." Gerringer stated that probable targets would be embassies, consulates, airlines and American multinational corporations" and "high-profile places."

118.    A February 10, 2001, the Dallas Morning News reported that "agents representing Saddam Hussein have been distributing cash payments to the families of Palestinians"

119.    On February 20, 2001, the Washington Times reported that due in part to cash payments to Palestinians Saddam Hussein is enjoying his greatest surge in popularity. Saddam Hussein ordered the training of 300,000 Palestinians to create an "army for the liberation of

Jerusalem" by blaming "Zionists" fro the air strikes against Iraq. It was reported that more than $4 million had been given to families of "martyrs"

120. On March 12, 2002 the Associated Press (AP) reported that Iraq Deputy Minister Tariq Aziz, told an Iraqi newspaper that Iraq has increased payments to families of Palestinian suicide bombers from $10,000 to $25,000. It was reported that Saddam Hussein had been making payments to families of terrorists since the beginning of the Palestinian uprising in September 2000.

121. On April 4, 2002, the New York Post reported that Hussein has increased payments to the families of Palestinian suicide bombers from $10,000 to $25,000, in order to promote a "culture of political murder". This report quotes Hussein as stating that he would continue to support Palestinian attacks "even if it means selling my own clothes". Defense Secretary Donald Rumsfeld said that Saddam has "proudly, publicly made a decision to go out and actively promote and finance human sacrifice..." The article states that "it is clear that the payments are playing an important role in convincing young Palestinians to become suicide bombers, and are being welcomed by their families."

122. On April 12, 2002, David K. Garmen, assistant secretary for energy efficiency and renewable energy for the United States Department of Energy was quoted as saying that "Saddam Hussein is the sponsor of global terrorism, and we are essentially funding him through our purchase of oil from that country."

123. On July 10, 2002, the New York Times reported that Iraq sends large cash payments to Palestinian suicide bombers, further cementing his popularity among the Palestinians.

124. On August 4, 2002, the Washington Post reported that Saddam Hussein has

earned over $6 billion from manipulating the Oil for Food program and used such funds to finance Palestinian terror and pay off the families of Palestinian suicide bombers.

125.    On September 12, 2002 the White House published a background paper for President George W. Bush's speech to the United Nations General Assembly called "A Decade of Deception and Defiance: Saddam Hussein's Defiance of the United Nations." The paper describes Saddam's support to international terrorism, including Palestinian terrorism. The report details that payments made to families of suicide bombers are made on a strict scale with different amounts for wounds, disablement and death as a "martyr."

126.    On October 17, 2004, the New York Post confirmed what had long been known by Defendants and those involved in the Oil for Food Program. It was reported that "Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program.

127.    From 1992 until the end of the Saddam Regime, El Paso, the Coastal Group and Wyatt contracted and employed lobbyists for the sole purpose to undermine the Oil for Food Program. Those lobbyists hired by El Paso, the Coastal and Wyatt were notified of the international terrorist activity and atrocities that were committed by Saddam and the Saddam Regime by the United States government.

128.    Saddam and the Saddam Regime employed various methods to direct, authorize and incite Palestinian terrorist organizations to commit acts of international terrorism, torture, extrajudicial killing.  Payment of significant financial rewards to Palestinian organizations and poverty stricken families of suicide bombers at public ceremonies influenced and motivated Palestinians to join the terrorist organizations and seek martyrdom.

129.    Saddam's program created a culture of jihad and death, glorification of

martyrdom, discrimination, anti-Semitism and genocidal fervor.

130. The Defendants, directly and through their agents, transferred millions of dollars in illegal kickbacks and payments to Saddam and to the Saddam Regime, knowing that such kickbacks and payments violated US and international laws, and knew or should have known that Saddam through the ALF would use these illegal payments to fund international terrorism against Americans, Israelis and others. These funds represented a significant source of funding from which Saddam Hussein paid the contractual amount due to each terrorist. Without the millions of dollars provided by Defendants and others by circumventing the Oil for Food Program, Hussein would not have had the funds to authorize a unilateral contract with terrorist organizations.

131. Defendants intentionally and purposefully provided illegal financing to Saddam and his Regime. This financing provided hard cash to fund international terrorism and enhance Saddam's military capabilities, all of which were directed at American and other civilians and soldiers with the expectation that Saddam would reward Defendants with tens and hundred s of million dollars in oil under favorable below market terms.

## UNITED STATES CONDEMNATION OF TERRORISM FINANCING AND SADDAM REGIME'S SUPPORT AND INCITEMENT OF TERRORISM

132. President George W. Bush stated in a joint session of Congress on September 20, 2001: "We must starve terrorists of funding, turn them against one another, drive them from place to place until there is no refuge or no rest."

133. On June 25, 2003, President Bush called for "swift, decisive action against [Palestinian] terror groups such as Hamas, to cut off their funding and support."

134.    On October 17, 2003, Vice President Richard B. Cheney stated: "Any person…that supports, protects or harbors terrorists is complicit in the murder of the innocent and will be held to account"

135.    In 1990, at hearings regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice attorney and former General Counsel of the United States Information Agency, testified: "International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism then are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable."

136.    The United States has also specifically condemned the provision of financial support to families of suicide bombers. U.S. Secretary of State, Colin Powell stated: "I think it's a real problem when you incentivize in any way suicide bombings." U.S. Vice President, Richard B. Cheney, cited such financial support as a factor for the U.S. military campaign against the regime of Saddam Hussein, noting in late 2003 that the former Iraqi regime "cultivated ties to terror, " by, among other things, "making payments to the families of suicide bombers in Israel." In July 2004, Vice President Cheney similarly criticized Hussein for "providing financial rewards to the families of suicide bombers in Israel." And in July 2004, President George W Bush said that Hussein "def[ied] the world" by, among other things, "subsidize[ing] the families of suicide bombers."

## UNIVERSAL CONDEMNATION OF THE FINANCING OF TERRORISM

137.    The international community has universally condemned the financing of terrorism thus incorporating this offense into the law of nations.

138.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the financing of terrorism is incorporated into the law of nations:

i.      The International Convention for the Suppression of the Financing of Terrorism, G.A. Es. 54.109, U.N. GA OR, 54th Sess.76[th] mtg., Supp. No. 49, U.N. doc. A/res/53/108 (1999) (In force Apr. 2002);

ii.     Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

iii.    Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

iv.     Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

v.      Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolution 1267 (1999) and 1333 (2000).

vi.     Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

vii.    Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

viii.   Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

ix.     Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

x.      Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"" stating that states must "bring to justice those who finance...terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

xi.     Resolution 1526 (2004) of January 30, 2004 calling upon states to implement full Resolution 1383 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

xii.     Resolution 1535 (2004) of March 26, 2004 calling upon states to implement full Resolution 1373 (2001).

## OSCAR WYATT AND THE SADDAM REGIME

139.    On or about August 6, 1990, approximately four days after the Iraqi army invaded Kuwait, the United Nations imposed economic sanctions on the Government of Iraq. These sanctions prohibited member states of the United Nations from, among other things, trading Iraqi commodities or products.

140.    At the time Iraq invaded Kuwait, Defendant Wyatt and Coastal owed the Iraqi government over $90 million for crude oil that was lifted from Iraq prior to the invasion. Instead of depositing the full payment into a "blocked account" controlled by the UN as required, Coastal withheld payment and Wyatt informed the Iraqi government that he would pay the money [into illegal, unblocked accounts] when the time and circumstances were available for him.

141.    In 1990, Oscar Wyatt along with his agent Samir Vincent ("Vincent"), and Governor John Connolly traveled to Baghdad Iraq in response to the Kuwait invasion. Wyatt flew the individuals to Baghdad in his private plane and was met in Iraq by Dr. Ramzi Salman, the director of the State Organization for Marketing Oil (SOMO), a good friend of Wyatt.

142.    Following their visit to Iraq, Wyatt and Vincent entered into a personal consulting agreement whereby Vincent would serve as Wyatt's agent with respect to Iraq.

143.    In the mid-1990's Wyatt and Vincent clandestinely delivered communications equipment and other devices to Iraq, in violation of United States law and UN sanctions. Wyatt delivered a INMAR satellite to the ministry of oil in Iraq and Wyatt, El Paso and the Coastal

Group continued to pay all operating charges for the communications system in order conceal the ownership of the satellite. This satellite system was delivered for the purpose of providing secret telephone communications to the Saddam Regime which was used to advance the Saddam Regime's access to illegal funds which could and were used to finance international terrorism. On another illegal clandestine visit, Wyatt provided the Saddam Regime two Global Position Systems (GPS) navigational systems, in violation of United States law and sanctions, after learning that Iraqi military pilots were using antiquated navigational systems. Upon information and belief, Wyatt provided this equipment as a means to position himself, the Coastal Group and El Paso, in order to control distribution of Iraqi oil and make millions of dollars in profit through oil contracts.

144.    On March 23, 1999, Wyatt wrote to Tariq Aziz, Deputy Prime Minister of Iraq whereby he thanked Aziz for allowing Coastal Corporation to be the only American company that Iraq was selling oil to directly.

145.    As a result of Wyatt's loyalty to the Saddam Regime, Wyatt was rewarded with special treatment from the Iraqi government. This treatment included being able to lift Iraqi crude oil without a prior agreement on the pricing methodology.

146.    On January 27, 2003, Wyatt committed treason by providing Saddam Hussein with classified, valuable information regarding an impending attack by the United States against Iraq. Wyatt notified the Saddam Regime that United States bombing of Iraq would begin on February 15, 2003, and the ground attack on March 1, 2003, and the United States would deploy around 160-180 thousand  US soldiers. Wyatt provided this intelligence to the Saddam Regime two weeks prior to the invasion, allowing Hussein enough time to escape capture. According to testimony by Iraqi officials, Wyatt provided the Saddam Regime with this information to show

his loyalty to Iraq. Upon information and belief, the purpose for committing these treasonable acts was so that Wyatt, Coastal, and El Paso would receive millions of dollars through dealing with Saddam and future Iraqi regimes.

147.   In order to dissuade the United States from invading Iraq, Wyatt claimed in secret Baghdad meetings that he persuaded Senator Edward Kennedy to give a speech against the United States declaring war on Iraq. Wyatt also suggested to members of the Iraqi State Oil Marketing Organization (SOMO) that they hire their own lobbyists in Washington.

## THE CREATION OF THE OIL FOR FOOD PROGRAM

148.   In May 1991, Vincent began working on a project to get a humanitarian aid program implemented in Iraq. Around that time, Wyatt instructed Vincent to ship sensitive medicine to Iraq in violation of United States sanctions and without permission from the United Nations. At the time of that visit Vincent met with the Iraqi Minister of Health and the head of the Red Crescent. Upon Vincent's return to Washington D.C., and at the instruction of Wyatt, Vincent discussed the possibility of engaging the American Red Cross in helping develop a program with Iraq.

149.   In 1992, Defendant Wyatt, through his agent Samir Vincent, contacted the Washington D.C. lobbying firm Timmons & Company to assist in setting up the Oil for Food program in order to lift sanctions on Iraqi oil so that Wyatt and the Coastal Group could reap hundreds of million of dollars in profit from his close association with the international terrorist, Saddam Hussein.

150.   In 1992, Wyatt instructed Vincent to meet with Tongsun Park to arrange a meeting with the U.N. Secretary General Boutros Boutros-Ghali in order to discuss the creation of a program to bypass economic sanctions on Iraqi oil. Park had connections with the United

Nations and he knew the secretary general personally. From 1992 through the end of 1996, Vincent continued to meet with Park, members of the U.N., and Iraqi officials in order to get an oil deal adopted.

151. After meetings with Bill Timmons, Tungson Park and the United Nations, Vincent always reported directly, via clandestine channels of communication, to Wyatt of his activity on behalf of Iraq and the United Nations as Wyatt and Coastal were funding all of his trips.

152. In or about March 1995, Wyatt and Vincent met personally with Saddam Hussein and Iraqi Deputy Prime Minister Tariq Aziz at a palace in Baghdad. At the meeting, which lasted three hours, Saddam Hussein discussed the problems he was having with the United Nations and the United States. Saddam Hussein told Wyatt that after the sanctions were imposed on Iraq there were very few friends to the Iraqi government but Wyatt remained one of those friends. The parties then detailed their efforts to try and reach a compromise with the United Nations that would undermine the sanctions and allow Saddam Hussein and Wyatt to control who could buy Iraq oil.

153. On or about April 14, 1995, the Security Council of the United Nations adopted Resolution 986, which authorized the Government of Iraq to sell oil under certain conditions, principally, that the proceeds of all sales of Iraqi oil were to be deposited into an escrow bank account monitored by the United Nations and used only to purchase various humanitarian goods for the benefit of the Iraqi people. The Government of Iraq agreed in writing in or about May 1996, to the terms of Security Council Resolution 986 after more than a year of negotiations over the particular methods of implementing this arrangement.

154.    Federal regulations authorized U.S. persons to enter into executory contracts with the Government of Iraq for the purchase of Iraqi-origin petroleum and petroleum products, and to trade in oilfield parts, equipment, and civilian goods, including medicine, health supplies and food.

155.    The United Nations Office of Iraq Programme, Oil-for-Food (the "Oil-for-Food Program") was subsequently established to administer, among other things, the sale of oil and purchase of humanitarian goods by Iraq.  A special bank account was established at the Bank Nationale de Paris (BNP) in Manhattan (the "Oil-for-Food" Bank Account") to handle these sales and purchases. The United Nations' economic sanctions on Iraq remained in place for all trade and transactions not authorized by the Oil-for-Food Program.

156.    During the operation of the Oil-for-Food Program, federal law prohibited United States companies and individuals from executing contracts and engaging in a variety of transactions with the Government of Iraq unless they received a license issued by the Department of Treasury's Office of Foreign Assets Control (OFAC) in Washington, D.C.

157.    OFAC required U.S. persons, who had entered into executory contracts with the Saddam Regime for the purchase of oil and/or the sale of humanitarian materials to submit an application to OFAC for a case-by case review and approval prior to performance of each contract. OFAC referred each application to the Department of State and if appropriate the Commerce Department for guidance on whether to authorize performance of the contract.

158.    The State Department was then responsible for submitting the contract to the UN 661 Committee for review concerning whether to authorize release of funds from the Iraq account at BNP New York to pay for the goods upon delivery to Iraq.

159. OFAC issued a license determination after it received from the State Department a copy of the 661 Committee approval of the contract for purchase of oil or payment and a separate memorandum from the State Department recommending that a specific license be issued to the applicant.

160. OFAC issued approximately 1,050 specific licenses to U.S. persons, including Defendants, for various aspects of the Oil for Food program.

161. The Government of Iraq began selling oil pursuant to the Oil-for-Food Program in or about December 1996. Between December 1996 and December 2002, the Security Council of the United Nations adopted a series or resolutions that re-authorized the Oil-for-Food Program for approximately thirteen 180-day phases of operation. Throughout each of these phases, the price at which Iraqi oil was sold under the Oil-for-Food Program, known as the Official Selling Price ("O.S.P."), was established by a committee made up of member states of the Security Council in Manhattan upon the recommendation of a rotating group of United Nations oil overseers. The United Nations sought to set a price for Iraqi oil at the highest rate bearable by the market in order to maximize the revenue generated by the Oil-for-Food Program. This, in turn, would increase the amount of humanitarian goods that could be purchased through the Oil-for-Food Program for the Iraqi people and minimize the potential for illegal kickbacks to Saddam and the Saddam Regime.

162. Under the Oil-for-Food Program, the Saddam Regime, through Saddam Hussein, had the power to select the companies and individuals who received the rights to purchase Iraqi oil. During every phase of the Oil-for-Food Program, Saddam Hussein and officials at the highest levels of the Saddam Regime selected a group of companies and individuals to receive the rights to purchase certain quantities of Iraqi oil at a certain price per barrel (frequently

referred to as "allocations" of oil). These companies and individuals, many of whom were not otherwise involved in the oil industry, were able to reap large profits by selling their allocations of Iraqi oil to brokers and/or companies capable of transporting the oil to a refinery.

**Creation of Front Companies and Payment of Surcharges to the Saddam Regime**

163.    From at least in or about 2000, up to and including in or about March 2003, officials of the Iraqi Government conditioned the distribution of allocations of oil under the Oil-for-Food Program on the recipients' willingness to pay a secret surcharge to the Saddam regime (hereinafter, the "Surcharge Scheme"). The Saddam regime directed that these surcharges, representing a percentage of the total amount of each oil contract and totaling at least several hundred million dollars, be paid to front companies and/or bank accounts under the control of the Saddam regime in various countries in the Middle East and elsewhere.

164.    The Saddam Regime began implementing the Surcharge Scheme in or about late 2000, simultaneous to Al Quds infitada in Israel, a surge of violent international terrorist attacks against civilian targets. In addition, at various times relevant to this Complaint, the Saddam Regime required the payment of unauthorized fees before cargo ships would be permitted to load oil at Iraqi ports. Payment of these so-called "port fees" was not made to the Oil-for-Food Bank Account and violated international law and United States laws and regulations.

165.    At the time these kickback demands were made, Coastal had an existing oil purchase contract with Iraq. El Paso, as Coastal's successor corporation, ultimately acquired 2,018,770 barrels of oil under that contract. An El Paso consultant and former Coastal official arranged to pay $0.10 per barrel in illegal surcharges to Saddam Hussein and the Saddam Regime for oil acquired under the contract. The illegal surcharge of $201,877.00 was paid in

two installments on December 19, 2001 and March 25, 2002 to an Iraqi-controlled account at Jordan National Bank.

166.    At all relevant times, Defendant Chalmers was assisting Wyatt in creating a surcharge scheme by which a select group of oil buyers could collect millions of dollars in profit. In or about November 2000, Chalmers, faxed documents to Wyatt, regarding pricing information that Chalmers was sending to officials of the Saddam Regime in Baghdad and to officials of the United Nations in Manhattan for the purpose of manipulating the Oil for Food Program. Defendants would negotiate a surcharge scheme by which each would illegally use off-shore front companies to purchase oil and launder surcharge payments to Saddam and his regime.

167.    By the end of 2000, SOMO had adopted a surcharge amount of $0.40 per barrel which impacted the quantities of oil lifted from Iraq as customers were reluctant to pay the  high surcharge.

168.    On December 3, 2000, a tanker chartered by Coastal arrived in port at Mina al-Bakr to load millions of barrels of oil under a contract between Wyatt, on behalf of the Coastal Group and El Paso, and SOMO.  Coastal was advised that the tanker would not be unloaded until the illegal surcharge was paid. El Paso initially refused to make the illegal surcharge payments. Ultimately, however, the surcharge payments were secretly made by Wyatt, on behalf of El Paso, through his Off-Shore Front Companies and the tank was loaded. After El Paso's purchase of Coastal, El Paso continued to purchase Iraqi oil through Wyatt's Off-Shore Front Companies through which the front companies would pay the illegal surcharge payments to the Saddam Regime. The Wyatt Off-Shore Front Companies then passed this cost to El Paso in the form of a "premium."

169.     Between June 2001 and June 2002, El Paso entered into transactions to purchase oil from Iraq through the Wyatt Off-Shore Front Companies to hide the illegal surcharge payments to SOMO. The Wyatt Off-Shore Front Companies lacked the resources to pay hundreds of millions of dollars for crude oil. All payments, including illegal surcharge payments were cleared in advance by El Paso and funded by El Paso.

170.     In or about December 2000, the Bayoil Foreign Company received an allocation of approximately 37 million barrels of oil from the Saddam Regime. In or about December 2000, Chalmers, on behalf of the Bayoil Companies, contracted with the Bayoil Foreign Company to purchase the oil allocation described above. In or about December 2000, Chalmers, on behalf of the Bayoil Companies, sent a letter via facsimile to officials of the Saddam Regime in which Chalmers proposed a pricing mechanism that could be used to seek a lower "Official Sales Price" (OSP) for Iraqi oil.

171.     Wyatt on behalf of Coastal and El Paso visited Iraq in January 2001 to meet with SOMO officials. Wyatt was joined at this time by Mohammed Saidji. At this meeting, Wyatt notified SOMO officials that he would be setting up four off-shore front companies.

172.     On January 6, 2001, Wyatt proposed a money laundering and distribution scheme to facilitate the buyers of the crude oil from Iraq and increase the amount of illegal funds available to the Saddam Regime and Wyatt. Wyatt informed SOMO that they could not deal directly with large buyers if they wished to receive illegal surcharge payments. As such, Wyatt proposed that he establish four or five straw-front companies which would purchase all Iraqi oil and pre-sell the oil at inflated prices to Oil Companies in order to cover the kickbacks and launder the money. One of these companies would be in Cyprus and nominally headed by Saidji but in fact controlled by Wyatt and Saddam.

173. Wyatt proposed that the front companies that he established would be created for the purpose of selling Iraqi oil quantities in four zones of the world, namely Europe, Asia, United States and other destinations.

174. Wyatt proposed to SOMO that instead of a fixed surcharge which could be discovered by United States authorities, Iraq would reduce the O.S.P. to the minimum possible and the front companies would sell off the oil and the maximum possible value. The majority of the profit would be laundered to the Saddam Regime with the minority portion paid to Wyatt, the Coastal Group and El Paso. Wyatt advised the Saddam Regime that the American authorities had uncovered Saddam's money laundering system in Lebanon and therefore proposed that the kickbacks be made through his banking connections in Jordan in a "bent" manner so that the particular payments could not be traced. Wyatt instructed that these payments would not be in any particular pattern so as to avoid detection.

175. As a result of the January 6, 2001 meeting with SOMO it was agreed that Wyatt would be allocated 4.5 million barrels of oil through Nafta Petroleum, one of the four front companies Wyatt he established in Cyprus. Wyatt agreed to pay the illegal surcharge to the Saddam regime of $0.40 even if it resulted in a loss. This surcharge payment was to be made within one month of the loading date.

176. In February 2001, Catalina Miguel, at the direction of Wyatt and/or El Paso sent a facsimile to SOMO seeking a contract extension for the shipment of oil to El Paso via Wyatt Off-Shore Front Companies. The facsimile was sent on behalf of the SOMO customer Wyatt although it was under the name Nafta.

177. In March 2001, SOMO received Powers of Attorney for Mohammed Saidji and Catalina Miguel to act on behalf of Mednafta Trading Company (another front company of

Wyatt). On March 28, 2001 Saidji sent an email to SOMO requesting a visa for himself and Wyatt and requesting a contract extension for Wyatt's oil shipments to El Paso via Mednafta through April 15, 2001.

178.    On May 23, 2001, Saidji at the request of Wyatt, sent an encoded email to SOMO requesting an immediate lifting of oil for an "important and faithful client of Iraq."

179.    From in or about April 2001, up to and including in or about September 2001, representatives of the Bayoil Company located outside the United States faxed invoices to representatives of the Bayoil Companies in Houston, Texas, requesting funds with which to pay illegal surcharges to Al Wasel and Babel General Trading (L.L.C.)

180.    In or about April 2001, Chalmers, who knew that Wyatt was illegally traveling to Iraq to negotiate illegal surcharge payments, to hand-deliver a letter from Chalmers to an official of the Saddam Regime in which Chalmers sought favorable consideration from the Iraqis on future shipments of Iraqi oil based on his and the Bayoil Companies' long history of cooperation with the Saddam Regime.

181.    From on or about May 7, 2001, up to and including on or about May 13, 2001, Wyatt, El Paso, the Wyatt Off-Shore Front Companies, Miguel and Saidji caused approximately $590,000 in cash to be deposited in a secret bank account controlled by the Saddam Regime at the Jordan National Bank in Amman.

182.    From on or about May 30, 2001, up to and including on or about June 5, 2001, Wyatt, El Paso and the Wyatt Off-Shore Front Companies, Miguel and Saidji caused approximately $390,000 in cash to be deposited in a secret bank account controlled by the Saddam Regime at the Jordan National Bank in Amman.

183.     On May 31, 2001, Doris Simmons, an employee of El Paso, sent an email titled "Urgent, urgent, urgent!!" to SOMO asking that the oil contract, entered into between SOMO and Mednafta, be amended to include Central America as a destination for the vessel M.T. Limburg. The amendment was needed so that the vessel could unload its oil cargo at the specified location. Doris Simmons, as an employee of El Paso, was acting with the knowledge and direction of senior El Paso management and at the direction of Wyatt.

184.     On July 12, 2001, Nafta at the direction of Wyatt and El Paso, sent a letter to SOMO confirming an additional shipment of 10 million barrels of oil along with a surcharge payment to be paid within a month of the lifting day.

185.     On or about June 14, 2001, in a recorded telephone conversation, Chalmers recommended to an El Paso oil trader employee that El Paso oppose the pricing policies for Iraqi oil recently adopted by the United Nations as part of the United Nations' efforts to eliminate the Surcharge Scheme.

186.     On or about July 3, 2001, in a recorded telephone conversation, Wyatt and Catalina del Socorro Miguel Fuentes, a/k/a "Cathy Miguel", negotiated a "sale" of Iraqi oil with an El Paso oil trader in the course of which Wyatt asked the El Paso oil trader to post a letter of credit on their (Wyatt and Miguel's) behalf. El Paso knew at this time that it was funding the illegal surcharges of Wyatt and the Wyatt Off-Shore Front Companies.

187.     On or about July 5, 2001, in a recorded telephone conversation, Wyatt and Catalina del Socorro Miguel Fuentes, a/k/a "Cathy Miguel", negotiated a "sale" of Iraqi oil with an El Paso oil trader in the course of which Wyatt asked the El Paso employee to fax a draft contract to Mohammed Saidji at Sarenco, S.A. in Geneva-another of Wyatt's front companies. El

Paso knew at this time that Wyatt in control of the Wyatt Off-Shore Front Companies and his front companies were paying illegal surcharges on behalf of and at the direction of El Paso.

188.    On or about July 11, 2001, Wyatt, El Paso and the Wyatt Off-Shore Front Companies, Miguel and Saidji caused approximately $588,000 in cash to be deposited in a secret bank account controlled by the Saddam Regime at the Jordan National Bank in Amman.

189.    On or about August 13, 2001, representatives of the Bayoil Companies sent via wire transfer approximately $1,287,771.60 to a bank account in Switzerland controlled by a representative of the Bayoil Foreign Company.

190.    On or about August 24, 2001, a representative of the Bayoil Company sent approximately $1,092,345 via wire transfer, which passed through a bank in Manhattan, to a bank account of Al Wasel and Babel General Trading (L.L.C.), located in the United Arab Emirates, knowing that such accounts were secretly owned and controlled by the Iraqi regime.

191.    From on or about August 26, 2001, up to and including on or about August 29, 2001, Wyatt, El Paso and the Wyatt Off-Shore Front Companies, Miguel and Saidji caused approximately $501,350 in cash to be deposited in a secret bank account controlled by the Saddam Regime at the Jordan National Bank in Amman.

192.    On or about October 4, 2001, in a recorded telephone conversation, Wyatt told an El Paso employee that he (Wyatt) had paid illegal port fees to the Saddam Regime and offered to have Catalina del Socorro Miguel Fuentes, a/k/a "Cathy Miguel", pay those fees on behalf of and for the benefit of El Paso.

193.    In November 2001, Wyatt sent a letter to SOMO indicating that he had just been informed that SOMO has been instructed "to withhold the December oil lifting because the Coastal Corporation, now El Paso Natural Gas, has had an amount outstanding for some time of

approximately $200,000." This amount was referring to the surcharge applicable to the eighth phase of the oil program. In his letter, Wyatt noted that he had been working on getting this amount paid for the past 90 days and that he had kept his surcharge accounts up to date until that time and that Coastal and El Paso has illegally paid $3 to $4 million of SOMO's clandestine communication expenses over the past 12 years. The letter was signed by Wyatt and instructed SOMO to contact him at an email address for Mednafta, a Wyatt Off-Shore Front Company. Upon information and belief, all emails were directed to Wyatt's email account for Coastal.

194.    On or about November 29, 2001, in a recorded telephone conversation, Wyatt told an El Paso employee that he (Wyatt) would have Catalina del Socorro Miguel Fuentes, a/k/a "Cathy Miguel", make an illegal surcharge payment to the Saddam Regime on behalf of and for the benefit of El Paso. This amount would allow El Paso to receive its December oil lifting.

195.    On December 4, 2001, SOMO received a facsimile that on December 5, 2001, Mohammed Saidji had contacted the office informing them that Wyatt has taken care of paying the $200,000 surcharge debt owed by Coastal and El Paso by wiring laundered funds into a secret bank account in Amman, Jordan, controlled by the Saddam Regime.

196.    On or about December 21, 2001, in a recorded telephone conversation, Wyatt, asked an El Paso employee  whether representatives of El Paso had secretly approved reimbursement to (Wyatt front company) Sarenco, S.A., of "that $200,000 I've already paid to the bastards over there." Upon information and belief, El Paso reimbursed Wyatt the money that Wyatt had sent to the Saddam Regime in order to repay the amount of debt from the failure to pay surcharge payments.

197.   In February 2002, Wyatt, for the benefit of El Paso and through Mednafta caused 100,000 Euros to be deposited into a SOMO bank account at the Al-Ahli Bank in Jordan set up to receive illegal surcharge payments from customers.

198.   On or about March 25, 2002, Wyatt, El Paso, and the Wyatt Off-Shore Front Companies, caused approximately 350,000 Euro in cash to be deposited in a secret bank account controlled by the Saddam Regime at the Jordan National Bank in Amman.

199.   From on or about March 27, 2002, up to and including on or about April 1, 2002, Wyatt, El Paso, the Wyatt Off-Shore Front Companies, Miguel and Saidji caused approximately 1,150,000 Euro in cash to be deposited in a secret bank account controlled by the Saddam Regime at the Jordan National Bank in Amman.

200.   On or about July 21, 2002, a representative of the Bayoil Company delivered to officials of the Saddam Regime a letter that was drafted in consultation with Chalmers, and that proposed a payment plan for certain illegal surcharges owed by another Oil for Food participant.

201.   On or about August 16, 2002, Wyatt, sent a letter via facsimile to an official of the United Nations in Manhattan that Wyatt signed "Oscar Wyatt, Director, Mednafta."

202.   On or about January 15, 2003, Wyatt sent via facsimile a letter, on stationery of Mednafta Trading Company Limited, to an official of the Saddam Regime proposing a meeting in Baghdad in late January 2003.

203.   In a January 2003 meeting in Baghdad, Wyatt specifically told SOMO officials that Mednafta was his company.

204.   At the direction of Wyatt, an employee of NuCoastal set up a domain name Mednafta.com which would be automatically re-routed to NuCoastal's website. In 2004, at the direction of El Paso employee Doris Simmons, a NuCoastal employee was instructed to take

down the Mednafta domain so that Mednafta would not be traced back to Wyatt, the Coastal Group or El Paso.

205.   Wyatt for the benefit of the Coastal Group and El Paso intentionally created the Wyatt Off-Shore Front Companies to manipulate the Oil for Food Program and make illegal surcharge payments to the Saddam Regime in a manner that would not be traced by the United Nations and the United States government. At all relevant times, Wyatt was acting on behalf of himself, the Coastal Group and El Paso.

206.   At all times relevant to this Complaint, Defendant Wyatt directed, arranged for, and supervised the purchase of Iraqi oil and payments of illegal kickbacks by Coastal, El Paso and the Wyatt Off-Shore Front Companies from the Saddam Regime.  Wyatt, Coastal, El Paso and the Wyatt Off-Shore Front Companies obtained this Iraqi oil by, among other things, paying the O.S.P. to the Oil-for-Food Bank Account and laundering money to pay and finance  Saddam Hussein and the Saddam Regime.

207.   At all times relevant to this Complaint, Defendant Chalmers directed, arranged for, and supervised the purchase of Iraqi oil by the Bayoil Companies from recipients of oil allocations under the Oil-for-Food Program or from brokers working on behalf of those recipients.  In purchasing these allocations of Iraqi oil, Chalmers and the Bayoil Companies paid (a) the O.S.P. to the Oil-for-Food Bank Account, and (b) a commission to the allocation-holder and/or broker.  The commissions represented, in theory, a portion of the price above the O.S.P. that the oil market could bear.

208.   After purchasing Iraqi oil, as described above, Defendant Chalmers as representative of the Bayoil Companies, and Defendant Wyatt, as representative of the Coastal Group, arranged through facsimile, electronic mail transmissions, and telephone calls, that cargo

ships were to be loaded with Iraqi oil and transported to downstream purchasers including but not limited to, larger oil companies with their own refineries.

209.    On a regular basis, from at least 1997 to March 2003, Defendant Chalmers as representative of the Bayoil Companies, and Defendant Wyatt, as representative of El Paso and the Coastal Group, offered "advice" about market conditions to the United Nations oil overseers in Manhattan and to officials of the Saddam Regime in an effort to artificially reduce the overseers' recommendation of an O.S.P, thereby diverting funds meant for humanitarian aid to illegal kickback funds available to the Saddam Regime to finance international terrorism and increase the military capabilities of the Saddam Regime. Chalmers and Wyatt offered this "advice" through facsimile transmissions, telephone calls, and/or face-to-face meetings in both Manhattan and Baghdad. Chalmers and Wyatt consulted with each other, and with representatives of each other's companies, in an effort to ensure that they were making consistent recommendations to the oil overseers and to officials of the Saddam Regime.

210.    At the request of the Saddam Regime, from mid-2000, up to and including at least in or about late 2002, Defendant Chalmers as representative of the Bayoil Companies, and Defendant Wyatt, as representative of El Paso, the Coastal Group and the Wyatt Off-Shore Front Companies, separately, together, and with officials of the Saddam Regime and other co-conspirators not named as defendants herein, lobbied the United Nations to select an O.S.P. at a level that would allow recipients of oil allocations from Iraq to pay the illegal surcharge and still retain a profit for themselves. A below-market O.S.P. would enable the Saddam Regime to achieve its objective of collecting the illegal surcharges on oil allocated pursuant to the Oil-for-Food Program.

211. From December 2000, up to and including at least in or about March 2003, Wyatt, on behalf of El Paso and the Coastal Group, agreed to pay, paid, and caused to be paid, millions of dollars of secret illegal surcharges and kickbacks to Saddam Hussein and the Saddam Regime. These secret illegal surcharge payments covered oil purchased directly from the Saddam Regime from in or about mid-2000, up to and including in or about mid-2002, by Wyatt on behalf of El Paso, the Coastal Group, and the Wyatt Off-Shore Front Companies.

212. To conceal these illegal surcharge payments, Wyatt caused the Wyatt Off-Shore Front Companies to deposit millions of dollars in a secret bank account controlled by the Saddam Regime located at the Jordan National Bank in Amman, Jordan.

213. By participating in this Surcharge Scheme and illegally bypassing the Oil-for-Food Program, Wyatt, El Paso and the Coastal Group caused funds to be diverted from the Oil-for-Food Bank Account that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program and instead be available to Saddam Hussein and the Saddam Regime for diabolical purposes including funding of international terrorists.

214. At various times relevant to this Complaint, Coastal and its successor entities, NuCoastal USA, NuCoastal Panama and El Paso, regularly recorded telephone calls placed to or from its oil traders on their office telephones. In several of those recorded conversations, Wyatt discussed his participation in the Surcharge Scheme with an El Paso employee, including, but not limited to, Wyatt's use of the Wyatt Off-Shore Front Companies to make illegal payments to the Saddam Regime on behalf of El Paso and the Coastal Group.

215. From in or about April 2001, up to and including at least in or about September 2001, Chalmers, on behalf of himself and the Bayoil Companies, agreed to pay, paid, and caused to be paid, millions of dollars of secret illegal surcharges to the Saddam Regime. These secret

illegal surcharge payments covered oil purchased from in or about mid-2000, up to and including in or about early 2001, by Chalmers and the Bayoil Companies from a foreign company that was operated by co-conspirators not named as defendants herein (the "Bayoil Foreign Company") and whose operations were funded almost exclusively by Chalmers and the Bayoil Companies.

216.    To conceal these illegal surcharge payments, Chalmers agreed to pay the Bayoil Foreign Company inflated commission prices on the original oil transactions, with knowledge, intent and expectation that the Bayoil Foreign Company would then use those monies to make the illegal surcharge payments to the Saddam Regime.  Based on the instructions from Iraqi officials, representatives of the Bayoil Companies sent these illegal surcharge payments via wire transfers, from bank accounts located within the United States, through the Bayoil Foreign Company to, among other locations, a bank account of Al Wasel and Babel General Trading (L.L.C.), a front company for the Saddam Regime, located in the United Arab Emirates.

217.    From in or about 2001, up to and including in or about March 2003, Chalmers, and the Bayoil Companies, while knowingly participating in the Surcharge Scheme, continuously purchased Iraqi oil under the Oil-for-Food Program.  Chalmers and the Bayoil Companies paid inflated commissions to sellers of Iraqi oil allocations, including the Bayoil Foreign Company and others, with the knowledge and expectation that the sellers would use some portion of those inflated commissions to satisfy their illegal surcharge obligations to the Saddam Regime.  By participating in this Surcharge Scheme and bypassing the Oil-for-Food Program, Chalmers and the Bayoil Companies caused funds to be diverted from the Oil-for-Food Bank Account that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program and those funds were used by Saddam Hussein and the Saddam

Regime to fund international terrorist activities, torture, extrajudicial killing and crimes against humanity by Saddam Hussein, ALF, Hamas, PIJ, and AAMB, including the attacks on Plaintiffs.

218. From at least mid-2000, up to and including in or about June 2002, El Paso purchased Iraqi Oil via the Wyatt Off-Shore Front Companies to illegally manipulate the Oil for Food Program and fund the Saddam Regime with untraceable hard cash United States dollars. El Paso knew that the "premiums" paid to the Wyatt Off-Shore Front Companies were used to pay illegal surcharges and kickbacks to Saddam Hussein and the Saddam Regime. El Paso traders factored in the cost of illegal surcharges payable to Saddam Hussein and the Saddam Regime when making decisions on oil trades.

219. By participating in this Surcharge Scheme and bypassing the Oil-for-Food Program, Wyatt, El Paso and the Coastal Group caused funds to be diverted from the Oil-for-Food Bank Account that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program and those funds were used by Saddam Hussein and the Saddam Regime to fund international terrorist activities, torture, extrajudicial killing, crimes against humanity and genocide by Saddam Hussein, ALF, Hamas, PIJ, and AAMB, including the attacks on Plaintiffs.

220. In recorded telephone conversations between El Paso employees, El Paso traders recount conversations with Saddam Regime officials in which "they told us – blatantly – that we would have to pay." Another El Paso trader recounts that after seeing a competitor talk with an Iraqi official, the competitor showed the El Paso trader an account number and contact for the payment of an illegal surcharge. The El Paso trader described the encounter as "Pretty blatant, isn't it?" The competitor's response was "Very blatant."

221. It was a part and an object of the conspiracy that Chalmers, Wyatt, Bayoil, (USA), Bayoil Bahamas, El Paso, NuCoastal USA and NuCoastal Panama, unlawfully, willfully, knowingly and intentionally having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit, and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of the law of nations and US law.

222. It was further a part and an object of the conspiracy that Chalmers, Wyatt, Bayoil USA, Bayoil Bahamas, El Paso and NuCoastal USA and NuCoastal Panama, knowing and having reasonable cause to know that Iraq was a country designated under section 6 (j) of the Export Administration Act of 2979 as a country supporting international terrorism, would and did unlawfully and knowingly engage in financial transactions with the Saddam Regime without complying with the licensing and authorization requirements of the Iraqi Sanction Regulation in utter disregard of a substantial and conscious disregard for safety.

223. In furtherance of the conspiracy and to effect the illegal ends of the conspiring following acts were performed:

224. On February 7, 2007, the Securities and Exchange Commission filed a civil complaint against El Paso, alleging that El Paso and its predecessor in-interest, the Coastal Corporation, knowingly and indirectly paid approximately $5.5 million in illegal surcharges to Iraq in connection with its purchases of crude oil under the under the Oil-for-Food Program.

225. On February 7, 2007, Defendant El Paso entered into a non-prosecution agreement with United States Attorney Office whereby El Paso agreed to pay $5,482,363.00 to

the United States Government, with the intent that the money be used to reimburse the Iraqi people, who were the intended beneficiaries of the Oil-for-Food program.

226.　On February 14, 2007, Defendant El Paso consented to a Judgment by the United States District Court for the Southern District of New York, requiring them to pay $2,250,000.00 in fines to the SEC, and incorporating El Paso's deal with the U.S. Attorney's Office to forfeit $5,482,363.00, in connection with its payment of illegal surcharges under the Oil-for-Food Program

227.　On August 17, 2007, Defendants Chalmers, Bayoil USA and Bayoil Bahamas pled guilty to criminal charges, including conspiracy to commit wire fraud, scheme to defraud and use of wires in furtherance of a scheme to defraud, as a result of their involvement in the Oil for Food program. Defendant Chalmers admitted that he caused letters to be sent to the United Nations that did not fully disclose the facts of his involvement with Saddam Hussein, specifically causing illegal payments to the Saddam Regime to allow oil to be lifted. Chalmers admitted that he both expected and intended that the illegal surcharge payments would be turned over to the Saddam Regime. Chalmers admitted that he knew that such payments were illegal as they were circumventing the Oil for Food program rules and regulations and were in violation of United Nations sanctions on Iraq.

228.　On October 1, 2007, Defendant Oscar Wyatt pled guilty to conspiracy to commit wire fraud. Wyatt pled guilty to his participation in a scheme or artifice to defraud or obtain money or property by false pretenses in which he knowingly and willfully participated with knowledge of its fraudulent nature. Wyatt testified that he caused surcharge payments to be deposited into a bank account, in the Jordanian National Bank, controlled by Iraqi officials. Wyatt testified that he knew such payments were in violation of the Oil for Food program,

because the program required all payments to be made directly to the United Nations Bank Escrow Account. Wyatt testified that he had intent to defraud the United Nations by causing the surcharge payments and that such actions were illegal. Defendant Wyatt affirmatively represented, at his sentencing that he understood he was under oath and must testify truthfully. Wyatt was guilty of secretly funding Saddam and the Saddam Regime and providing material support and funding genocide, torture, extrajudicial killing, crimes against humanity and international terrorist attacks that killed and maimed Plaintiffs and others.

## Saddam Hussein Used Funds Derived From The Oil For Food Program To Pay the Suicide Bombers Who Injured Plaintiffs

229.    Saddam Hussein paid the families of the suicide bombers who injured plaintiffs from funds generated through the Oil for Food Program.

230.    The millions of dollars paid by Defendants in illegal surcharges represented a significant and material percentage of the funds utilized by Saddam Hussein to pay the contractual amount due to Palestinian terrorist organizations and suicide bombers.

231.    The funds illegally paid by the Defendants were responsible for the following acts of international terrorism, which were committed with the intent to injury American citizens and destroy the State of Israel.

232.    On March 9, 2002, a Hamas suicide bomber, named Fuad Hurani, detonated an explosive device strapped to his body at the entrance to Café Moment in Jerusalem. Fifty-eight people were wounded including plaintiffs Yoseff Cohen and Asael Fridman, On or about June 23, 2002, the suicide bomber's mother, Khaldiyyah Ismail Abd Al Aziz Al Hurani, received a check, number 20000399, in the amount of $25,000. The check, sighed by the head of the ALF – Rakad Salem, was delivered on behalf of Saddam Hussein.

233.    On December 1, 2001, two Hamas suicide bombers, named Osama Baher and

Nabil Halbiyeh, detonated explosive devices concealed in bags and explosive belts on Ben Yehudah Street in Jerusalem. Immediately thereafter, a booby-trapped car exploded in the area. 170 were wounded, including plaintiff Baruch Yehuda Ziv Brill. On or about January 22, 2002, Muhammad Hussain 'Id Hussain Baher (Osama Baher father), received a check, number 20000078, in the amount of $15,000. The check, sighed by the head of the ALF – Rakad Salem, was delivered on behalf of Saddam Hussein. On or about January 22, 2002, Fatima 'Ali Hussain Halbiyeh (Nabil Halbiyeh mother), received a check, number 20000077, in the amount of $15,000. The check, sighed by the head of the ALF – Rakad Salem, was delivered on behalf of Saddam Hussein.

234.    On November 4, 2001,  PIJ terrorist, named Hatem Shweikeh, armed with M-16 automatic rifles, opened fire on Bus No. 25 at the French Hill intersection in Jerusalem injuring 40 people mostly teenagers, including plaintiffs Yissachar  Zvi Lebowitz, plaintiff Shifra Markowitz,  plaintiff Sarah Mordechai; plaintiff Ora Rubinoff; plaintiff Gila Schnall,. The terrorist's mother, Kawthar Shweikeh, received a payment from Saddam Hussein.

235.    Plaintiffs, who were civilians, were injured in these terrorist attacks. Those responsible for the attacks were contractual agents of Saddam Hussein and the Saddam Regime and were acting under the direction and control of Saddam and his Regime.

236.    Defendants knew or should have known that the millions of dollars paid in illegal kickbacks to Saddam Hussein and the Saddam Regime  were to be used to materially aid, support, encourage, incite, entice and make possible these suicide bombings and other murderous attacks causing the murder and maiming of the Plaintiffs and others in that Defendants Wyatt, the Coastal Group, Chalmers and the Bayoil Companies funded an elaborate and highly organized program to make financial payments to Saddam Hussein and the Saddam Regime who

provided training, training camps, offices, weapons, explosives, safe haven, and funds to the Terrorists and subsidized the families of Palestinian "martyrs" and "self martyrs," including the suicide bombers who killed and injured the Plaintiffs and others.

**COUNT ONE**
**PROVIDING MATERIAL SUPPORT TO TERRORIST ORGANIZATIONS IN VIOLATION OF THE ANTI TERRORISM ACT OF 2001 (ATA), 18 U.S.C. 2333.**

237. Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

238. Plaintiffs, are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism perpetrated by Saddam Hussein, the Saddam Hussein regime, Hamas and PIJ.

239. The suicide bombings that injured Plaintiffs occurred outside the territorial jurisdiction of the United States and constituted violations of United States criminal law. These acts were supported, directed and financed by Saddam Hussein for the purpose of intimidating and coercing Plaintiffs.

240. At all times Defendants Wyatt, Chalmers, the Bayoil Companies, Coastal, NuCoastal USA, NuCoastal Panama and El Paso knew that its payment of illegal kickbacks to the Saddam Regime were being used to finance international terrorism including indiscriminate suicide bombings and other murderous attacks against Plaintiffs, other Israeli civilians and foreign visitors to Israel.

241. Defendants knew that Saddam Hussein and the Saddam Hussein regime were engaged in terrorist acts against United States civilians within the State of Israel and knowingly provided substantial resources to the Saddam Hussein regime in order to carry out these terrorist attacks.

242. The payments of the illegal kickbacks by Defendant amounted to a significant source of money used by Saddam Hussein to pay the families of those actors who engaged in suicide bombings at his direction.

243. Along with financial support, the Coastal Defendants also provided tangible property, including communications equipment to Saddam Hussein and the Saddam Hussein regime in order to carry out attacks against United States citizens.

244. Defendants provided material support and resources to Saddam Hussein and the Saddam regime concealed and disguised the nature, location, source, and ownership of their material support and resources, knowing and intending that they were to be used in preparation for, or in carrying out of international terrorism.

245. The defendants illegally paid millions of dollars with actual knowledge and awareness that these same funds were to be used in part for the purpose of supporting Palestinian genocidal murders and maimers; routed these same deposits into bank accounts created and maintained by Saddam Hussein from transferred funds from those accounts to their participating banks and these funds were disbursed to, among others, Palestinian genocidal murders and maimers of the Saddam Regime, ALF, PIJ, Hamas and AAMB that engaged in suicide bombings and other murderous attacks against Plaintiffs, who are nationals of the United States.

246. The Defendants knew that the kickback funds that were raised, deposited, transferred and disbursed helped to develop materially and contributed to the creation of a self-sustaining system of terrorist financing, suicide bombings, and their murderous attacks.

247. The Defendants knew that its money was being transferred directly to Saddam Hussein and that the Saddam Hussein regime was engaged in terrorist acts against United States citizens.

248. The Defendants knew that they were paying illegal kickbacks to Saddam Hussein and the Saddam Hussein regime and that the kickbacks would bypass restrictions implemented by the United Nations.

249. The Defendants are in violation of the Anti-Terrorism Act by providing material support and financial services to Saddam Hussein and the Saddam Regime, knowing that this material support would be used to finance the suicide bombings and other terror attacks, which caused the Plaintiffs to suffer death and serious physical and mental injury.

250. Defendants had knowledge that the Saddam Regime was designated a state supporter/sponsor of terrorism and that he directed, authorized and incited terrorist organizations including Hamas, PIJ and AAMB to commit terrorist attacks against United States civilians.

251. During the time that Defendants provided illegal kickbacks, it was common knowledge, and Defendants were aware that Saddam Hussein engaged and had engaged in acts of international terrorism and contracted with Palestinian terrorist organizations to carry out suicide bombings.

252. Defendants violated the Anti-Terrorism Act by providing material support and financial services and conspiring to provide material support and funding to Saddam Hussein and the Saddam Regime, knowing that the regime utilized terrorist organizations to engage in murderous attacks against United States civilians. Defendants provided the Saddam regime with material support knowing that this material support would be used to finance the suicide bombings and other attacks of international terrorism which caused the Plaintiffs to suffer death and serious physical and mental injury.

253. Defendants fraudulently and diligently concealed their material support of terrorists, and thereby prevented Plaintiffs from seeking redress for their injuries.

**WHEREFORE**, Plaintiffs, nationals of the United States, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, for damages arising out of serious injury, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in or financing or aiding crimes against humanity, torture, extrajudicial killing, genocide against the people of the State of Israel in violation of the law of nations or providing material support and financing to terrorist states and organizations in violation of the ATA and other US and international laws.

## COUNT TWO
## CONDUCTING FINANCIAL TRANSACTIONS WITH IRAQ IN VIOLATION OF THE ANTI TERRORISM ACT OF 2001 (ATA), 18 U.S.C. 2333.

254.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

255.     Plaintiffs, are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism perpetrated by Saddam Hussein and the Saddam Regime through its contracted agents.

256.     Defendants knew or had a reasonable cause to know that Iraq was designated as a country supporting international terrorism under Section 6(j) of the Export Administration Act of 1979.

257.     Defendants illegally and purposefully paid millions of dollars to Iraq which were used to finance Palestinian murders and maimers and their families pursuant to a contract between Saddam Hussein and the suicide bombers.

258. The illegal surcharge payments were routed to the same o bank accounts created and maintained by Saddam Hussein and the Saddam Regime to disburse the contractual funds to, among other, Palestinian genocidal murders and maimers of PIJ, Hamas and AAMB.

259. Saddam Hussein used the funds generated through the illegal kickback funds paid by Defendants to fund those terrorists who conducted the suicide bombings against Plaintiffs, who are nationals of the United States.

260. During the time that the defendants made these payments of illegal kickbacks to Saddam Hussein and the Saddam Regime, Iraq was designated as a country supporting international terrorism under the Export Administration Act of 1979.

261. Defendants violated the Anti-Terrorism Act by engaging in illegal financial transactions with Iraq, knowing that Iraq was designated as a state sponsor of terrorism, and caused the Plaintiffs to suffer death and serious physical and mental injury.

262. Defendants knew that Saddam Hussein was engaged in acts of international terrorism and that he would use these illegal kickbacks to pay suicide bombers.

263. The Defendants knew that the kickback funds that were raised, deposited, transferred and disbursed helped to develop materially and contributed to the creation of a self-sustaining system of terrorist financing, suicide bombings, and their murderous attacks of international terrorism.

264. The Defendants knew that its money was being transferred directly to Saddam Hussein and that the Saddam Hussein regime was engaged in terrorist acts against United States civilians.

265. The Defendants knew that they were paying illegal kickbacks to Saddam Hussein and the Saddam Hussein regime and that the kickbacks would bypass restrictions implemented by the United Nations.

266. Defendants fraudulently and diligently concealed their illegal financial transactions with Iraq, and thereby prevented Plaintiffs from seeking redress for their injuries.

**WHEREFORE** Plaintiffs, who are U.S. nationals, demand judgment in their favor against the Defendants and demand three times the amount necessary to compensate them for the damages suffered as a result of the Defendants' violations of the Anti-Terrorism Act, plus interest, court costs, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT THREE
### SUCCESSOR LIABILITY AGAINST DEFENDANT EL PASO CORPORATION – DE FACTO MERGER

267. Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

268. Upon information and belief, Defendant El Paso Corporation is a continuation of the enterprise of Defendant Wyatt's Coastal Corporation, so that there is a continuity of personnel, physical location, assets and general business operations.

269. Upon information and belief, there is a continuity of shareholders between Defendant El Paso Corporation and Coastal Corporation.

270. Upon information and belief, Coastal Corporation has ceased operating and is insolvent.

271.     Upon information and belief, Defendant El Paso Corporation has assumed the liabilities of Coastal Corporation ordinarily necessary for the uninterrupted continuation of normal business operations of Coastal Corporation.

272.     Upon information and belief, Coastal Corporation conveyed its assets to Defendant El Paso Corporation without valuable consideration.

273.     Upon information and belief, El Paso Corporation continued to act through Coastal Corporation and off-shore front companies exclusively controlled and directed by Wyatt and the Coastal Corporation following the merger of Coastal and El Paso.

274.     El Paso Corporation paid all surcharge payments and made oil purchases from Iraq through the Coastal front companies.

275.     At all relevant times, El Paso directed and controlled any and all transactions made by the Coastal off-shore front companies with SOMO and the Saddam Regime.

276.     El Paso Corporation is a mere continuation of Coastal Corporation and is therefore liable for the debts of Coastal Corporation as successor entities as a result of a de facto merger.

### COUNT FOUR
### RESPONDEAT SUPERIOR
### LIABILITY FOR EL PASO CORPORATION

277.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

278.     Defendant El Paso Corporation is liable for the actions of its employee and executive officer, Oscar Wyatt, under the theory of respondeat superior.

279.     From at least 2000, Wyatt was an employee of El Paso Corporation.

280.     Wyatt, acting at the direction and on behalf of El Paso Corporation, paid illegal kickbacks and surcharge payments to Saddam and the Saddam Regime knowing that such money would be used to finance international terrorism.

281.     At the time that El Paso hired Wyatt as an officer and employee of the corporation, El Paso knew that Wyatt was illegally laundering money through off-shore front companies in order to pay surcharges to Saddam and the Saddam Regime.

282.     Upon the hiring of Wyatt, El Paso authorized Wyatt to continue to purchase Iraqi oil through his off-shore front companies on behalf of and for the benefit of El Paso. Wyatt purchased Iraqi oil and made illegal surcharge payments while acting within the general scope of his employment with El Paso.

283.     El Paso expressly authorized Wyatt to continue paying illegal surcharge payments to Saddam and the Saddam Regime knowing that such funds would be used to finance international terrorism.

284.     While acting as a managerial employee for El Paso, Wyatt made the illegal surcharge payments within his scope of employment for El Paso.

285.     Executives at El Paso authorized and approved any and all transactions made by Wyatt with Saddam and the Saddam Regime, including but not limited to, any illegal surcharge payments.

286.     As Wyatt was acting under the general scope of his employment under the direction of, and in furtherance of El Paso's business, El Paso is liable for the acts of its employee Wyatt under a respondeat superior theory of liability.

## COUNT FOUR

### SUCCESSOR LIABILITY AGAINST DEFENDANT NUCOASTAL CORPORATION – ALTER EGO

287.　Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

288.　Upon information and belief, Defendant NuCoastal USA, NuCoastal Panama and Coastal Corporation possess an identity of ownership and there exists a complete identity of objects, assets, shareholders and directors between these defendants.

289.　Upon information and belief, Wyatt was at all times relevant herein and is an officer, director, and shareholder of Coastal Corporation, NuCoastal USA and NuCoastal Panama and exercises dominion and control and is responsible for the management of all of these corporations.

290.　Upon information and belief, Defendant NuCoastal USA and NuCoastal Panama assumed the assets and business of Coastal, and were created by Defendant Wyatt, to avoid liability to Plaintiffs.

291.　Upon information and belief, Defendant NuCoastal USA, NuCoastal Panama and Coastal Corporation use or have used the same office or business location.

292.　The actions of Defendants Wyatt and NuCoastal USA, NuCoastal Panama as alleged hereinabove establish that there is such unity of interest and ownership between NuCoastal Corporation and Coastal Corporation that there is no existence of separate identities.

293.　NuCoastal USA and NuCoastal Panama, jointly and severally, are therefore liable for the debts of Wyatt and Coastal Corporation, including the debts owed to Plaintiffs'.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all triable issues.

Attorneys for Plaintiffs

*/s/ Raul Suazo*
Raul Suazo
MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
808 Travis Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

/s/ Michael J. Miller
Michael J. Miller
THE MILLER FIRM, LLC
The Sherman Building
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224
Fax: (540) 672-3055

/s/ Gavriel Mairone
Gavriel Mairone, Esq.
Bar Number 6181698
Mann & Mairone
Rehov Ha-Mered, 25, Suite 3000
POB 50236
Tel Aviv 61501, Israel
Tel: 972.3.51.700.88