**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ODELIA ABECASSIS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-09-3884 |
| | § | |
| OSCAR S. WYATT, JR., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This suit arises out of terrorist attacks in Israel between 2000 and 2003.  The plaintiffs are Americans injured in the attacks and their relatives.  The defendants are companies and individuals involved in the oil and gas business.  The plaintiffs allege that these defendants purchased oil from Iraq and made payments that violated the United Nations Oil for Food Program.  The Program required anyone buying oil from Iraq to place the purchase money into an escrow account monitored by the United Nations.  Funds from this account could only be used for humanitarian purposes.  The plaintiffs allege that the defendants were involved in buying Iraqi oil with payments that included illegal kickbacks to a secret bank account in Jordan controlled by Saddam Hussein.  The plaintiffs allege that Hussein used funds from this account to provide money and services to Palestinian terrorist organizations and to make payments to the families of suicide bombers and others killed in carrying out the terrorist attacks.  According to the plaintiffs, such payments were important in recruiting terrorists.

The original complaint included 193 plaintiffs, all of whom alleged violations of the Torture Victims Protection Act ("TVPA").[1]  Most of these plaintiffs were aliens who also asserted claims arising under the Alien Tort Statute ("ATS"),[2] which permits aliens to sue for some violations of customary international law.  Those plaintiffs who were United States nationals and their estates, survivors, and heirs alleged that the defendants violated what is commonly referred to as the Antiterrorism Act ("ATA")[3] by providing material support to terrorist organizations and by engaging in illegal financial transactions with Iraq.  (Docket Entry No. 3).  On March 31, 2010, this court granted motions to dismiss filed by all the defendants.  The claims other than the ATA claim were dismissed both for lack of Article III standing and for failure to state a claim.  The ATA claim was dismissed only for failure to state a claim.  This court gave the plaintiffs leave to amend the ATA claim but not the other claims.

On April 23, 2010, the plaintiffs filed an amended ATA complaint.  The remaining plaintiffs are eight United States nationals or citizens and twelve of their relatives.  (Docket Entry No. 121).  The plaintiffs alleged that the defendants violated the ATA by providing material support to terrorist organizations and by engaging in financial transactions with Iraq during Hussein's rule.  The plaintiffs also alleged that El Paso Corporation and Nucoastal Corporation are liable for the actions of El Paso's predecessor, Coastal Corporation, and its president, Oscar Wyatt, on the basis of successor liability.  This claim appeared in the original complaint.  The plaintiffs have added a claim that El Paso is liable for Wyatt's actions under respondeat superior.

---

[1] Pub. L. 102-256, Mar. 12, 1992, 106 Stat. 73, *reprinted as a note to* 28 U.S.C. § 1350.

[2]  28 U.S.C. § 1350.  The ATS is sometimes referred to as the Alien Tort Claims Act ("ATCA").

[3]  18 U.S.C. § 2333.

The defendants have all filed motions to dismiss under Rule 12(b)(6).  The defendants argue that the plaintiffs have not sufficiently alleged knowledge of Hussein's use of OFP kickbacks to fund terrorism targeting Americans or a causal connection between the defendants and the terrorist attacks.  The defendants also argue that the plaintiffs' ATA claim is barred by limitations.  El Paso contends that the plaintiffs have served the wrong El Paso corporate entity and also seeks dismissal on that basis.  (Docket Entry Nos. 127, 128, 130, 133, 134).  The plaintiffs have responded to each motion, (Docket Entry Nos. 141, 142, 143), and the defendants have replied.  (Docket Entry Nos. 145, 146, 147, 148).

Based on the motions and responses, the allegations in the amended complaint, and the applicable law, the motions to dismiss the amended complaint are denied except as to: (1) the conspiracy allegations; (2) the allegations against Bayoil Supply & Trading and NuCoastal Panama based on violations of 18 U.S.C. § 2332(d); and (3) limitations.  The motions to dismiss based on limitations are converted to motions for summary judgment.  A status conference is set for **April 18, 2011 at 4:00 PM** in Courtroom 11-B to discuss a time line for additional discovery and briefing. The basis for this court's opinion is set out in detail below.

# I.    The Allegations in the Amended Complaint

## A.    The Iraq Oil for Food Program

Less than a week after Saddam Hussein invaded Kuwait on August 6, 1990, the United Nations issued economic sanctions precluding member states from buying Iraqi oil.  (Docket Entry No. 121, ¶ 145).  On April 14, 1995, the U.N. Security Council adopted Resolution 986, lifting the embargo but restricting Iraq's ability to sell its oil.  Iraq's government and the U.N. negotiated the details of the restrictions, resulting in a written agreement some time in May 1996.  This agreement

led to the U.N. Oil For Food Program ("OFP").  Under the OFP, a new U.N. office was created to oversee Iraq's sale of oil and purchase of humanitarian goods.  An escrow account was established at the New York branch of the Banque Nationale de Paris ("BNP").  The proceeds of Iraqi oil sales were to be deposited into the escrow account, which the U.N. monitored.  Iraq could use the funds only to purchase food and other humanitarian goods for the country.  (*Id.*, ¶¶ 153–55).  The United States government allowed American individuals and companies to enter into executory contracts with Iraq to purchase oil or sell humanitarian goods, including food and medical supplies.  Before they could perform these contracts, the American entities were required to obtain a license from the Treasury Department's Office of Foreign Assets Control ("OFAC").  OFAC evaluated these license applications in conjunction with the State and Commerce Departments and the U.N. committee responsible for overseeing the BNP account.  The plaintiffs allege that "OFAC issued approximately 1,050 specific licenses to U.S. persons, including defendants for various aspects of the Oil for Food Program."  (*Id.*, ¶¶ 156–60).

In December 1996, Iraq began selling oil through the OFP.  Under the OFP, although buyers would send the purchase money to the BNP account in New York, Saddam Hussein's government retained the right to choose the buyers.  Those selected had to purchase the oil at the Official Selling Price ("OSP"), which was determined by a U.N. committee made up of representatives of the Security Council member states.  The plaintiffs allege that the U.N. "sought to set a price for Iraqi oil at the highest rate bearable by the market in order to maximize the revenue generated," which "would increase the amount of humanitarian goods that could be purchased" and "minimize the potential for illegal kickbacks" to Saddam Hussein.  Presumably, buyers already paying full market price would be unable or unwilling to pay more in kickbacks.  (*Id.*, ¶¶ 161–62).

4

The plaintiffs allege that many of the companies and individuals Iraq chose to receive "allocations" of Iraqi oil "were not otherwise involved in the oil industry [and] were able to reap large profits by selling their allocations of Iraqi oil to brokers and/or companies capable of transporting the oil to a refinery." (*Id.*, ¶ 162). Beginning in 2000, the plaintiffs allege, Iraqi officials conditioned oil allocations on the buyer's willingness to pay a "surcharge" to Hussein's government. These surcharges, calculated as a percentage of the total contract price, were not permitted under OFP. The buyers allegedly paid these surcharges through "front companies" to bank accounts Hussein controlled. The plaintiffs also allege that Hussein charged "port fees" before allowing tankers to receive oil at Iraqi ports. Like the surcharges, the port fees were paid to Hussein instead of the OFP bank account. The plaintiffs allege that these surcharges and port fees were kickbacks made possible by lobbying efforts persuading the U.N. to select a below-market OSP. The plaintiffs also allege that at least some of the cost of these kickbacks was passed on by the direct purchasers to the next purchaser down the line. (*Id.*, ¶¶ 163–68).

### B.     The Defendants' Actions

Oscar Wyatt, a Texas oil trader, was the chairman and sole shareholder of Coastal Corporation. Wyatt later formed NuCoastal Corporation, a Houston energy company, and NuCoastal Trading, S.A., a Panama corporation. Both Nucoastal entities are also defendants. The plaintiffs allege that on the day Iraq invaded Kuwait, Wyatt owed Iraq $90 million. After the U.N. sanctions froze Iraq's bank accounts, Wyatt began repaying the money directly to the Hussein government and not to the U.N.-controlled accounts. (*Id.*, ¶¶ 139–43). Wyatt maintained a close relationship with Hussein while the U.N. embargo was in place, hoping that he would be rewarded with Iraqi oil-purchase contracts once the sanctions were lifted. This relationship extended to

5

providing Hussein communications equipment and GPS devices in the mid-1990s, including an INMAR satellite, which Wyatt allegedly gave to the ministry of oil and paid to operate.[4] (*Id.*, ¶ 143).

The plaintiffs allege that Wyatt was involved in lobbying the U.N. to lift its sanctions and make Iraqi oil available for purchase.  The plaintiffs allege that Wyatt also lobbied the U.N. to reduce the OSP to below-market level, enabling Iraq to extract surcharges from Wyatt and other direct buyers while allowing those buyers to make a profit.  (*Id.*, ¶¶ 148–52, 210).  The plaintiffs allege that Wyatt obtained allocations under the OFP and paid under-the-table surcharges— kickbacks—in exchange for some of those allocations, which involved traveling to Iraq to negotiate with Hussein and others.  Wyatt allegedly made the payments through "front companies" he controlled in Switzerland and Cyprus using two associates who are not named as defendants.  (*Id.*, ¶¶ 31–38).

Wyatt was prosecuted for conduct related to the OFP and pleaded guilty to conspiracy to commit wire fraud on October 1, 2007.  (*Id.*, ¶ 228).  According to the complaint in this case, Wyatt has testified that he caused surcharge payments to be deposited in a bank account in Jordan controlled by Hussein.  Wyatt acknowledged knowing that the payments violated the OFP and stated that he had intended to defraud the U.N.  (*Id.*).  The plaintiffs also allege that Wyatt committed treason by giving Hussein information about American war plans.  (*Id.*, ¶ 146).

Similar allegations are made against David Chalmers, an American businessman involved in oil and gas; Bayoil (USA), Inc., a Delaware company based in Houston that Chalmers owned; and Bayoil Supply & Trading Limited, a Bahamas affiliate of Bayoil USA, of which Chalmers was the

---

[4]The plaintiffs allege that "Wyatt, El Paso, and the Coastal Group continued to pay all operating charges."  (*Id.*, ¶ 143).

sole director and shareholder.  (*Id.*, ¶¶ 28–29).  On August 17, 2007, Chalmers and the Bayoil companies also pleaded guilty to conspiracy to commit wire fraud.  According to the allegations in this suit, Chalmers admitted that he had made payments that he "both expected and intended" would go to Hussein, and that he had concealed those payments from the U.N.  Chalmers stated that he knew the payments violated the OFP.  (*Id.*, ¶ 227).  Chalmers told an El Paso trader to oppose U.N.-proposed pricing policies designed to eliminate kickbacks.  (*Id.*, ¶ 185).  Chalmers and Bayoil did not receive allocations of Iraqi oil.  Instead, they purchased the oil from a third party who did receive allocations.  The amended complaint alleges that the third party receiving the allocation was controlled by Chalmers and Bayoil, referring to it as the "Bayoil Foreign Company."  The plaintiffs allege that Bayoil transferred the purchase money through a Bahama account to accounts in the Middle East and paid it to the party who had received the allocation.  That party then transferred a large portion of the money to accounts controlled by Hussein.  One of the accounts was held by Al Wasel and Babel General Trading, a United Arab Emirates company allegedly "secretly owned and controlled" by Hussein.  (*Id.*, ¶ 190).  Bayoil and Chalmers were allegedly closely involved in the payments to Hussein.  The complaint alleges that a Bayoil representative delivered a letter to Iraqi officials in 2002 proposing "a payment plan for certain illegal surcharges owed by another Oil for Food participant."  (*Id.*, ¶ 200).

In January 2001, the El Paso Corporation acquired Coastal.[5]  El Paso is a large oil and gas company incorporated in Delaware and based in Houston.  Wyatt was no longer Coastal's Chairman when the acquisition occurred, and his contract as a consultant to Coastal was terminated when Coastal became an El Paso subsidiary.  The plaintiffs allege that El Paso knew when it acquired

---

[5]El Paso states that the proper defendant is not the El Paso Corporation but a wholly owned subsidiary, El Paso CGP Company, LLC.  This issue is discussed below.

Coastal that Wyatt had paid illegal surcharges in exchange for Iraqi oil allocations and that he had other illegal dealings with Hussein. (*Id.*, ¶ 4). Much of the amended complaint alleges that Wyatt and his "front companies" took certain actions on behalf of El Paso or for the benefit of El Paso. Generally, these allegations appear to be based on El Paso's acquisition of Coastal or El Paso's purchases of oil from Wyatt's "front companies" after El Paso acquired Coastal.

In the original complaint, the plaintiffs alleged 16 transactions involving El Paso. One was a direct allocation of oil purchased by Coastal before it was acquired by El Paso, for which Wyatt allegedly paid Hussein a kickback. One was an oil purchase by Coastal from a third party that had received an allocation. The rest were purchases by El Paso from third parties that had received direct allocations and had passed "kickbacks" to El Paso in the form of higher prices after El Paso acquired Coastal. In the amended complaint, the plaintiffs allege that the third parties from whom El Paso purchased oil were front companies Wyatt controlled. The plaintiffs allege that these front companies "lacked the resources to pay hundreds of millions of dollars for crude oil," meaning that "[a]ll payments, including illegal surcharge payments were cleared in advance by El Paso and funded by El Paso." (*Id.*, ¶ 169). They also allege that El Paso had some control over, and interest in, these front companies. The plaintiffs allege that, on January 6, 2001, Wyatt traveled to Iraq to propose a scheme under which he would establish four front companies located outside the United States. These companies would purchase oil from Iraq at low prices and "pre-sell the oil at inflated prices to Oil Companies in order to cover the kickbacks and launder the money." (*Id.*, ¶ 172). Under this system, in which the front companies collected the surplus on behalf of Hussein, the "majority of the profit would be laundered to the Saddam Regime with the minority portion paid to Wyatt, the Coastal Group and El Paso." (*Id.*, ¶ 174).

The complaint states that at the January 6, 2001 meeting, Wyatt's front company, Nafta Petroleum, received a 4.5 million barrel allocation, for which Wyatt agreed to pay a 40-cent per-barrel surcharge to Hussein within one month of the oil being loaded "even if it resulted in a loss." (*Id.*, ¶ 175). This is consistent with the scheme described. The complaint also alleges that in December 2001, Wyatt asked El Paso to reimburse Sarenco, S.A., another of his front companies, for a $200,000 outstanding balance on a kickback to Hussein. (*Id.*, ¶¶ 188, 196). In the original complaint, there was no allegation that El Paso had agreed to the reimbursement. The amended complaint alleges: "Upon information and belief, El Paso reimbursed Wyatt the money that Wyatt had sent to the Saddam Regime in order to repay the amount of debt from the failure to pay surcharge payments." (*Id.*, ¶ 196).

As in the original complaint, the plaintiffs allege in the amended complaint that El Paso traders were recorded recounting conversations with Iraqi officials "in which 'they told us—blatantly—that we would have to pay," and in which a competitor showed an El Paso trader an account number and contact given to him by an Iraqi official for paying kickbacks, an action that both traders regarded as "blatant." (*Id.*, ¶ 220). The plaintiffs allege that, on May 31, 2001, Doris Simmons, an El Paso employee, e-mailed Iraqi oil officials asking that an allocation contract between Iraq and Mednafta, one of Wyatt's front companies, be amended to change the destination of an oil tanker to a location in Central America. (*Id.*, ¶ 183). The plaintiffs allege that two sale negotiations took place over the phone in July 2001 among an El Paso oil trader, Wyatt, and Wyatt's associate Cathy Miguel, who was involved with Wyatt's front companies. On July 3, Wyatt allegedly asked the trader to post a letter of credit on behalf of Wyatt and Miguel. On July 5, Wyatt allegedly asked the trader to fax a draft contract to Mohammed Saidji, who ran Sarenco, S.A., one

of Wyatt's front companies in Geneva.  (*Id.*, ¶¶ 186–87).  On October 4, 2001, Wyatt allegedly told an El Paso employee in a phone conference that he had paid "illegal port fees" to Hussein and offered to have Cathy Miguel "pay those fees on behalf of and for the benefit of El Paso."  (*Id.*, ¶ 192).  In 2004, Simmons allegedly told  a NuCoastal employee to take down a domain name owned by Mednafta, one of Wyatt's front companies, "so that Mednafta would not be traced back to Wyatt, the Coastal Group or El Paso."  (*Id.*, ¶ 204).

On February 7, 2007, the Securities and Exchange Commission filed a civil action against El Paso in the Southern District of New York, alleging that El Paso had knowingly and illegally paid $5.5 million to Iraq.  The same day, El Paso entered into a nonprosecution agreement with the U.S. Attorney's office, agreeing to pay $5,482,363 to the United States.  The money was to be paid to the people of Iraq as the OFP's intended beneficiaries.  One week later, on February 14, 2007, the district court entered a consent judgment in the S.E.C. lawsuit.  The judgment incorporated the $5,482,363 payment arranged with the U.S. Attorney's office and included a separate $2.25 million fine to the S.E.C.  (*Id.*, ¶¶ 224–26).  The plaintiffs have not alleged that the consent judgment or nonprosecution agreement included any admission of wrongdoing by El Paso.

### C.    Hussein's Actions

The amended complaint exhaustively catalogs the human rights abuses directed by Saddam Hussein during his rule.  More so than in the original complaint, the plaintiffs focus on Hussein's relationship with Palestinian terrorist organizations, particularly terrorism directed against Israel and the West.  The allegations describe Hussein's reign in Iraq and his role in terrorist activities.  After the Ba'ath Party came to power in Iraq in 1968, Hussein was named head of intelligence.  In 1969, Hussein founded the Arab Liberation Front ("ALF"), an Iraqi army affiliate that carried out suicide bombings and other terrorists attacks, including attacks on Israeli and American civilians in Israel.

He allegedly served as head of the ALF from 1969 until 1980 and "continued to control and direct the ALF until his demise in 2003." (*Id.*, ¶ 47).  The plaintiffs allege that during the first Gulf War, Hussein launched 39 Scud missiles at major Israeli cities, causing deaths, injuries, and property damage.  (*Id.*, ¶ 55).  In 2000, Hussein gave a speech urging "the people's masses to work relentlessly to expel the US embassies and centers from the Arab countries as well as to uproot and expel any Zionist presence in these countries."  (*Id.*, ¶ 54).

The plaintiffs also allege that Hussein "provided offices, training camps, safe haven, financing and operational and logistical support" for other organizations that have carried out terrorist attacks, including the Abu Nidal Organization ("ANO"), the Palestine Liberation Front ("PLF"), Hamas, Palestinian Islamic Jihad ("PIJ"), and the Al-Aqsa Martyrs' Brigade ("AAMB"). (*Id.*, ¶¶ 66–70).  The plaintiffs focus on the ALF, Hamas, PIJ, and the AAMB, all designated by the United States as terrorist groups.  Beginning in 1990, the State Department designated Iraq as a state sponsor of terrorism.  (*Id.*, ¶ 54).

After the second intifada broke out in September 2000, Hussein gave a speech supporting the Palestinian cause and announced that he would provide rewards to the families of Palestinians injured or killed during an attack on Israel.  The plaintiffs allege that Hussein encouraged suicide bombing attacks against civilian targets in Israel by publicizing a rewards program under which he would pay over twice as much in reward to the family of a person killed carrying out a suicide bomber than to the family of a "martyr" killed inadvertently.  (*Id.* at ¶¶ 85–89).  Hussein "handed out checks to surviving family members at public ceremonies which were covered by Palestinian and Iraqi electronic and print media."  (*Id.*, ¶ 88).  Hussein gave $25,000 to families of suicide bombers and $10,000 to families of other Palestinians who died in the intifada.  (*Id.*, ¶¶ 120, 124). The plaintiffs allege that on January 7, 2001, major United States newspapers carried an article

stating that Hussein was giving $10,000 checks to families of Palestinians killed under violent circumstances "intended to boost Saddam Hussein's influence." (*Id.*, ¶ 115). The article also stated that Hussein had proposed giving $900 million from the OFP escrow account to Palestinians. (*Id.*, ¶ 116). These payments were later reported in the United States by the *Dallas Morning News* on February 10, 2001, the *Washington Times* on February 20, 2001, the Associated Press on March 12, 2002, the *New York Post* on April 4, 2002, the *New York Times* on July 10, 2002, and the *Washington Post* on August 4, 2002. The plaintiffs allege that the *Washington Post* report stated that Hussein had "earned over $6 billion from manipulating the Oil for Food program and used such funds to finance Palestinian terror and pay off the families of Palestinian suicide bombers." (*Id.*, ¶¶ 118–20). The plaintiffs allege, on information and belief, that Hussein provided over $100 million to Palestinian terrorist organizations to help conduct the second intifada. (*Id.*, ¶ 68).

### D. The Plaintiffs' Injuries and this Lawsuit

The amended complaint is based on three terrorist attacks in Israel during the second intifada. The plaintiffs are eight United States nationals who were injured in the attacks and two of their family members. The plaintiffs allege that Hussein made reward payments to the families of the terrorists who carried out each attack. The following attacks are alleged:

• On November 4, 2001, a PIJ terrorist named Hatem Shweikeh, opened fire with automatic weapons in a bus in Jerusalem. He killed two people and injured 40, including plaintiffs Yissachar Zvi Lebowitz (the son of plaintiffs Rosalyn Shoshanna Pearl and Shimon Lebowitz), Shifra Markowitz (the daughter of plaintiffs Ester Devora Markowitz and Gerald Markowitz), Sarah Mordechai (the daughter of plaintiff Shirin Mordechai), Ora Rubinoff (the daughter of Aviva Rubinoff and Mitchell Jay Rubinoff, and the sister of plaintiffs Eliezer Rubinoff, Yosef Rubinoff, and Shoshanna Rubinoff) and Gila Schnall (the daughter

of plaintiffs Frances Schnall and Ira Schnall).  The terrorist's mother received a payment on

behalf of Saddam Hussein.  (*Id.*, ¶ 234).

- On December 1, 2001, two Hamas suicide bombers named Osama Baher and Nabil Halbiyeh detonated explosives on their persons and rigged to a car on Ben Yehudah Street in Jerusalem.  The attack killed 11 and wounded 170, including plaintiff Baruch Yehuda Ziv Brill.  On January 22, 2002, the father of one attacker and the mother of the other each received a $15,000 check on behalf of Hussein.  Both were signed by Rakad Salem, "the head of the ALF."  (*Id.*, ¶ 233).

- On March 9, 2002, a Hamas suicide bomber named Fuad Hurani detonated explosives at a café in Jerusalem.  Eleven people were killed, and fifty-eight people were wounded, including plaintiff Yoseff Cohen. Plaintiff Asael Firdman alleges that he suffered serious psychological injures as a result of the attack.[6]  On June 23, 2002, the suicide bomber's mother received a $25,000 check on behalf of Hussein signed by Salem.  (*Id.*, ¶ 232).

The plaintiffs seek compensation for the injuries suffered in these attacks from El Paso,

Wyatt, the NuCoastal Companies, Chalmers, and the Bayoil Companies.  The plaintiffs allege that

Hussein used money obtained from the defendants, either directly or through intermediaries, in

violation of the OFP's restrictions, to fund terrorism in Israel primarily by paying "rewards" to the

families of the terrorists who killed and injured the plaintiffs and their family members.  This suit

was filed on January 2, 2009 in the United States District Court for the District of Columbia.

---

[6]Fridman also alleges that he "lost a close friend" in the attack.  The defendants have moved to dismiss his claims because there is no cause of action under the ATA to recover for death of a friend.  *See Little v. Arab Bank*, 507 F. Supp. 2d 267, 271 (E.D.N.Y. 2007).  The plaintiffs have clarified in their responses that Fridman was present at the bombing and is seeking recovery for his own injuries.  The motions to dismiss Fridman's claims on this basis are denied.

(Docket Entry No. 3).  The defendants' motion to transfer venue was granted and the case transferred to this court on December 3, 2009.  (Docket Entry No. 60).

On March 31, 2010, this court dismissed claims filed by the plaintiffs who were not American nationals or citizens and who sued under the Alien Tort Statute, 28 U.S.C. § 1350.  This court held that these plaintiffs lacked standing and that they had failed to state a claim.  (Docket Entry No. 118).  This court also dismissed claims brought by all the plaintiffs—those that were United States nationals or citizens and those that were not—under the Torture Victim Protection Act, Pub. L. 102-256, Mar. 12, 1992, 106 Stat. 73, *reprinted as a note to* 28 U.S.C. § 1350, and claims based on imputed successor liability against El Paso (for Coastal's liability) and alter ego liability against the NuCoastal Companies (for Wyatt's and Coastal's liabilities), all for lack of standing and failure to state a claim.  Because there was no standing to pursue any of these claims, the plaintiffs were not given leave to replead.  On June 30, 2010, this court denied a motion to certify the ATS claims only for interlocutory appeal.  (Docket Entry No. 144).

The March 31, 2010 opinion also dismissed the claims brought by United States nationals and citizens injured by the attacks (or their estates, survivors, or heirs) under the Antiterrorism Act of 2001, 18 U.S.C. § 2333.  These claims were for providing material support to terrorist organizations and engaging in illegal business dealings with Iraq.  (Docket Entry No. 116).  But this court dismissed only on the basis of failure to state a claim.  Because standing was proper, these plaintiffs were given leave to replead.  On April 23, 2010, they did so.  (Docket Entry No. 121).  The defendants have all filed motions to dismiss the amended complaint under Rule 12(b)(6).  The plaintiffs have responded to each motion and the defendants have replied.  These motions are considered below.

## II.    The Applicable Law

14

### A.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  *Twombly* abrogated the Supreme Court's prior statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Twombly*, 550 U.S. at 562–63 ("*Conley's* 'no set of facts' language . . . is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . .").  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1974).

In *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).  With respect to the "plausibility" standard described in *Twombly*, *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The *Iqbal* Court noted that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

15

unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* also rejected the theory that Rule 9(b)'s endorsement of pleading generally in certain circumstances permits a complaint to survive based on only conclusory allegations. The Court acknowledged that while Rule 9 requires pleading with particularity "when pleading 'fraud or mistake,'" it allows "'[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally.'" *Id.* at 1954 (alterations in original) (quoting FED. R. CIV. P. 9(b)). But the Court explained that the term "generally," as used in Rule 9, "is a relative term." *Id.* The Court stated that "[i]n the context of Rule 9, ['generally'] is to be compared to the particularity requirement applicable to fraud or mistake," that "Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard," and that Rule 9 "does not give [a party] license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 129 S. Ct. at 1954 (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1301, at 291 (3d ed. 2004)). The Court concluded that "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.*

"'Rule 8(a)(2) . . . requires a showing, rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.'" *Dark v. Potter*, 293 F. App'x 254, 258 (5th Cir. 2008) (unpublished) (per curiam) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1965 n.3). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the

plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1964–65); *see also S. Scrap Material Co. v. ABC Ins. Co.* (*In re S. Scrap Material Co.*), 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1965), *cert. denied*, 129 S. Ct. 1669 (2009). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'"" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1966).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).  However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ."  6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam) ("'[A] district court acts within its discretion when dismissing a motion

17

to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

### B.    The Antiterrorism Act

The ATA provides a civil action for treble damages to "[a]ny national of the United States injured in his or her person, property, or business *by reason of an act of international terrorism*, or his or her estate, survivors, or heirs."  18 U.S.C. § 2333(a) (emphasis added).[7]  International terrorism is defined in the statute as "activities that":

>  (A) *involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States* or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

>  (B) appear to be intended--

>>  (i) to intimidate or coerce a civilian population;

>>  (ii) to influence the policy of a government by intimidation or coercion; or

>>  (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

>  (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

18 U.S.C. § 2331(1) (emphasis added).  Subsection (A) requires an underlying violation of criminal law.  Five criminal provisions are relevant.

---

[7] Although most of the provisions at issue in this case were enacted in the 1990s, before Congress passed the Antiterrorism Act of 2001, the civil liability provision is commonly referred to as part of the ATA.  *See, e.g.*, *Linde v. Arab Bank*, 384 F. Supp. 2d 571, 580 (E.D.N.Y. 2005); *In re Terrorist Attacks on Sept. 11, 2001* (*Terrorist Attacks I*), 349 F. Supp. 2d 765, 828–29 (S.D.N.Y. 2005); 2 Ved P. Nanda & David K. Pansius, Litigation of Int'l Disputes in U.S. Courts § 9.18 (2d ed. 2008 & Supp. 2010).

First, it is a crime to kill, attempt to kill, conspire to kill, or intentionally cause serious bodily injury to a United States national outside the United States.  18 U.S.C. § 2332.

The second statute, 18 U.S.C. § 2339A, makes it a federal crime to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various federal criminal statutes]" or to attempt to or conspire to do such an act.  18 U.S.C. § 2339A(a).  One of the criminal statutes listed in § 2339A is § 2332, which, as stated, criminalizes killing, attempting to kill, conspiring to kill, or intentionally causing serious bodily injury to a United States national outside the United States.

The third relevant criminal statute, 18 U.S.C. § 2339B, states that "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so" is guilty of a crime.  Under both § 2339A and § 2339B, "material support or resources" includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."  18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4). A "terrorist organization" is a designated Foreign Terrorist Organization under 8 U.S.C. § 1189.[8] A 2004 amendment to the statute clarified that "[t]o violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or

---

[8]  The plaintiffs allege that Hamas and PIJ were so designated FTOs during the time the attacks in this case occurred, and that the AAMB was so designated on March 27, 2002.  None of the attacks alleged in the amended complaint occurred after March 9, 2002.

engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)." 18 U.S.C. § 2339B.  Because this language was not in place when the events at issue in this case occurred, it does not apply.  The Supreme Court recently upheld the current version § 2339B against First Amendment and vagueness challenges.  *See Holder v. Humanitarian Law Project*, 561 U.S. ----, 130 S. Ct. 2705 (2010).

The fourth relevant criminal statute, 18 U.S.C. § 2339C, punishes:

Whoever, [subject to jurisdictional requirements in] subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out--

(A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or

(B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act[.]

18 U.S.C. § 2339C(a)(1).  Conspiracy and attempt are also punishable.  18 U.S.C. § 2339C(a)(2). There is no requirement that the funds provided or collected "were actually used to carry out" an act of international terrorism.  18 U.S.C. § 2339C(a)(3).

Finally, the plaintiffs have now stated that they also rely on 18 U.S.C. § 2332d, which prevents a "United States person" from "engag[ing] in a financial transaction" with the government of a country that he knows or reasonably should know to be designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism.  "Financial transaction" is defined to include "a transaction which in any way or degree affects interstate or foreign commerce [] involving the movement of funds by wire or other means."  18 U.S.C. §§

2332d(b)(1), 1956(c)(4).  Iraq had been designated as a state sponsor of terrorism when the transactions and attacks in this case occurred.

## III.    Analysis

### A.    The ATA Claims

This court found that in the original complaint, the plaintiffs had failed to state an ATA claim for two reasons.  First, there were insufficient allegations of scienter.  Other than conclusory statements, there were "no allegations that, if proven, would show that the defendants had information that Hussein was using OFP kickback money to fund terrorism targeting Americans." And, to the extent the plaintiffs alleged a conspiracy claim, it failed because there were "no factual allegations of an agreement or common plan to fund or otherwise support terrorism targeting Americans."  (Docket Entry No. 118 at 68–69).  Second, although "[t]he lack of sufficient factual allegations of scienter [was] a sufficient basis on which to dismiss the ATA claims," the attenuation in the causal chain between the defendants' actions and the plaintiffs' injuries provided "further support for dismissal."  (*Id.* at 69).  The present motions to dismiss argue that the plaintiffs' efforts to address these deficiencies in their amended complaint were insufficient.

Much of the dispute in the initial round of motions to dismiss was over the proper causation and scienter standards applicable to an ATA claim.  This court's opinion addressed those issues at length, comparing the various cases, statutes, and arguments before settling on the appropriate standards and applying them to the allegations.  A complete analysis of the issues presented by this second round of motions to dismiss requires a renewed examination of the legal standards in detail and in light of the Supreme Court's opinion in *Holder v. Humanitarian Law Project*, 561 U.S. ----, 130 S. Ct. 2705 (June 21, 2010) and lower court cases applying that opinion.

21

The major lower court case leading up to *Humanitarian Law Project* was *Boim v. Holy Land Foundation* (*Boim III*), 549 F.3d 685 (7th Cir. 2008) (en banc), *cert. denied sub nom Boim v. Salah*, 130 S.Ct. 458 (2009).  The plaintiffs were the parents of an American-Israeli teenager shot at a bus stop in Israel by Hamas terrorists.  The parents sued Islamic charities that allegedly provided money to Hamas.  One of the defendants did not give the money directly to Hamas but made donations to another defendant that in turn paid Hamas.  The plaintiffs alleged that the defendants had provided material support to terrorists, violating the ATA.  The court held that because Congress had not specifically provided for secondary liability under the ATA, secondary actors could not be held liable for aiding and abetting.  *Boim III*, 549 F.3d at 689.[9]  The court nonetheless concluded that the plaintiffs had a claim against the defendant charities for *primary* liability.  The ATA provided a cause of action for persons injured "by reason of" acts of "international terrorism," which the statute defined to include activities involving violent acts and "acts dangerous to human life that are a violation of the criminal laws of the United States."   18 U.S.C. §§ 2331(1), 2333.  The court concluded that "[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life,'" *Boim III*, 549 F.3d at 690 (quoting 18 U.S.C. § 2331(1)), which would violate 18 U.S.C. § 2339A.  That statute makes it a federal crime to "*provide*[ ] *material support or resources . . .* , *knowing or intending* that they are to be used in preparation for, or in carrying out, a violation of" specified criminal statutes, including 18 U.S.C.

---

[9] As discussed below, other courts have reached the opposite conclusion.  *See Boim v. Quranic Literacy Institute* (*Boim I*), 291 F.3d 1000, 1016–21 (2002) ("aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of [the ATA's civil liability provision]"); *In re Terrorist Attacks on Sept. 11, 2001* (*Terrorist Attacks I*), 349 F. Supp. 2d 765, 828–29 (S.D.N.Y. 2005) (citing *Boim I*, 291 F.3d at 1023); *Linde*, 348 F. Supp. 2d at 583 (same); *Wultz v. Islamic Rep. of Iran*, --- F. Supp. 2d ----, 2010 WL 422835, at *40–41 (D.D.C. Oct. 20, 2010) (same); *see also Rothstein*, 647 F. Supp. 2d at 295 ("assuming *arguendo* that a defendant in a private action brought under the Antiterrorism Act can be held liable on an aiding and abetting theory").  Both *Terrorist Attacks I*, 349 F. Supp. 2d at 829, and *Linde*, 384 F. Supp. 2d at 583, held that civil conspiracy liability is available under the ATA (in addition to aiding and abetting liability), a question not addressed in *Boim I*.

§ 2332.  18 U.S.C. § 2239A(a) (emphasis added).  Section 2332 makes it a federal crime to kill,

conspire to kill, or inflict bodily injury on a U.S. citizen abroad.  18 U.S.C. § 2332.  The court

concluded that "[b]y this chain of incorporations by reference . . . we see that a donation to a terrorist

group that targets Americans outside the United States may violate section 2333."  *Boim III*, 549

F.3d at 690.  The court concluded that this reading was not only mandated by the text but was also

a sensible approach; it is difficult to recover damages from terrorists and terrorist organizations,

"whereas suits against financiers of terrorism can cut the terrorists' lifeline" and compensate the

plaintiffs.  *Id.* at 691.

In *Boim III*, the plaintiffs' ATA claim for giving money to Hamas was "international

terrorism" for which the defendants could be primarily liable based on the incorporation of § 2333.

The court emphasized, however, that "[p]rimary liability in the form of material support to terrorism

has the character of secondary liability."  *Id.* at 691.  Congress had "expressly imposed liability on

a class of aiders and abettors."  *Id.* at 692.  Because "functionally the primary violator is an aider and

abettor or other secondary actor," "the ordinary tort requirements relating to fault, state of mind,

causation, and foreseeability" did not apply.  *Id.*  Instead, the tort requirements ordinarily governing

secondary liability applied.  *Id.*  Two dissenting opinions argued that this reasoning manipulated the

ATA to "reap the advantages of both kinds of theories."  *Id.* at 721 (Wood, J., concurring in part and

dissenting in part); *id.* at 707–09 (Rovner, J., concurring in part and dissenting in part).

Analyzing the hybrid nature of a primary liability claim that has "the character of secondary

liability" in light of the "*sui generis*" nature of terrorism, the court crafted a standard of liability for

civil claims under the ATA resting on an underlying violation of § 2339A.[10]  Under the Seventh

---

[10]  The court did not address § 2339B or § 2339C as predicate criminal statutes giving rise to civil liability under the ATA.  David Boim was killed on May 13, 1996, before § 2339C was enacted on June 25, 2002.  Section 2339B was enacted on April 24, 1996, less than a month before Boim's death, but Hamas was not designated a Foreign Terrorist

Circuit's approach, it appears that such a claim by an American injured by a terrorist attack in Israel has the following elements:[11]

> (1) the defendant provided a material benefit of any value to a terrorist organization, either directly or indirectly ("the fact of contributing to a terrorist organization rather than the amount of the contribution is the keystone of liability");

> (2) the defendant, in providing the benefit, gave an outward appearance that its acts are intended to: "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; [or] (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," *see* 18 U.S.C. § 2331(1), which is satisfied by giving a benefit to a terrorist organization when it is a "foreseeable consequence" that, given more money, the organization will kill or wound, or attempt to kill, or conspire to kill more people in Israel; and

> (3) the defendant knew or was deliberately indifferent to the character of the organization as one that engages in terrorism.

*See Boim III*, 549 F.3d at 690–702.

No additional showing of causation was required. *Id.* at 696–700; *see also id.* at 709 (Rovner, J., concurring in part and dissenting in part) ("[T]he majority relieves the plaintiffs of any obligation to demonstrate a causal link between whatever support the defendants provided to Hamas and Hamas's terrorist activities (let alone David Boim's murder in particular)."); *id.* at 722–24 (Wood, J., concurring in part and dissenting in part) ("The *en banc* majority freely concedes that

---

Organization under the statute until 1997. *See Boim I*, 291 F. 3d at 1002. *Boim III* was limited to § 2339A.

[11]  The *Boim III* court, in equating knowledge of Hamas's "aims and activities" with a sufficient scienter to harm American victims (the only victims covered by the ATA), stated that Hamas limited its terrorism to Israel.  The court noted "that Americans are frequent visitors to and sojourners in Israel," and "that many U.S. citizens live in Israel." *Boim III.*, 549 F.3d at 693–94.  The court cited statistics showing that in 1999, 184,000 American citizens lived in Israel, making up 3.1 percent of Israel's population. *Id.* at 694.  It is not clear whether rule would be the same for attacks carried out in other countries or for donations to a group that operates in more than one country.

24

there are no limits at all to its rule, and that a donor who gave funds to an organization affiliated with Hamas in 1995 might still be liable under § 2333 half a century later, in 2045.").

The *Boim III* court held that two charitable organizations were liable under the ATA for making financial donations to the "social services" wing of Hamas. The court saw no meaningful difference between these donations and directly funding Hamas's terrorist activities. One defendant, the American Muslim Society, funneled its donations through a third party (also a defendant, but one whose liability was not considered). The other, the Quranic Literary Institute, donated directly to Hamas's charitable wing. The *en banc* court upheld the district court's grant of summary judgment for the plaintiff as to the American Muslim Society and the jury's verdict that the Quranic Literary Institute was liable. *Id.* at 701–02. The court held it irrelevant that the American Muslim Society's donations had been indirect. Because the money ultimately reached Hamas and because the American Muslim Society knew that Hamas was a terrorist organization, it was appropriate to find liability under the ATA. The court explained its resolution of the attenuation argument, stating:

> [A]s the temporal chain lengthens, the likelihood that a donor has or should know of the donee's connection to terrorism shrinks. But to set the knowledge and causal requirement higher than we have done in this opinion would be to invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare). Donor liability would be eviscerated, and the statute would be a dead letter.

*Id.* at 702. The length of the temporal chain was relevant to whether the plaintiffs could show that the defendants had the requisite scienter. But the court did not require a showing that the defendants intended or even knew that their contributions would be used for terrorist activities. *Id.* at 698. A defendant could "earmark" its contribution for humanitarian purposes and nonetheless be liable if

it knew that the organization's activities included terrorism.  *Id.*[12]  As an example, the *Boim* majority stated:

> So consider an organization solely involved in committing terrorist acts and a hundred people all of whom know the character of the organization and each of whom contributes $1,000 to it, for a total of $100,000.  The organization has additional resources from other, unknown contributors of $200,000 and it uses its total resources of $300,000 to recruit, train, equip, and deploy terrorists who commit a variety of terrorist acts one of which kills an American citizen.  His estate brings a suit under section 2333 against one of the knowing contributors of $1,000.  The tort principles that we have reviewed would make the defendant jointly and severally liable with all those other contributors.  The fact that the death could not be traced to any of the contributors . . . and that some of them may have been ignorant of the mission of the organization (and therefore not liable under a statute requiring proof of intentional or reckless misconduct) would be irrelevant.  The knowing contributors as a whole would have significantly enhanced the risk of terrorist acts and thus the probability that the plaintiff's decedent would be a victim, and this would be true even if Hamas had incurred a cost of more than $1,000 to kill the American, so that no defendant's contribution was a sufficient condition of his death.

*Id.* at 698.

It did not affect the result that Hamas, in addition to carrying out terrorist operations, provided health, educational, and social welfare services.  Nor did it matter that the defendants had directed their donations exclusively to those services.  *Id.*  As the majority saw it, "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for

---

[12]  The majority stated that defendants assisting organizations outside the ATA definition of "international terrorism" could not be subjected to liability.  If a defendant's assistance did not "appear to be intended . . . to intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnaping," that defendant would not be liable under the ATA because the chain of incorporation by reference establishing primary liability would fall apart.  The court provided an example of medical aid given to a terrorist by the Red Cross or Doctors Without Borders.  *Boim III*, 449 F.3d at 699.  But, as one of the dissenters notes, it is not "evident (to say the least) that financially supporting a Hamas-affiliated charity is an act that 'appear[s] to be intended' to have the sorts of coercive or intimidating effects on government policy or upon a civilian population as described in section 2331(1)(B)."  *Id.* at 708–09 (Rovner, J., concurring in part and dissenting in part) (alteration in original).

26

the organization's nonterrorist activities does not get you off the liability hook." *Id.* Because money is fungible, Hamas could reallocate other social services money to terrorism. And "Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect . . . and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren." *Id.*

The Supreme Court picked up on these themes in *Humanitarian Law Project*, 130 S. Ct. at 2724–30. Unlike the present case and unlike *Boim III*, *Humanitarian Law Project* was focused only on criminal liability under the ATA, not on the interaction between the ATA's criminal prohibitions and § 2333, its civil liability provision. *Humanitarian Law Project* involved a constitutional challenge to one of the ATA's criminal prohibitions, § 2339B—making it a crime to "knowingly provide[] material support or resources to a foreign terrorist organization"—as applied to certain activities in which the plaintiffs wanted to engage.[13] Unlike in the present case, in *Humanitarian Law Project*, it was undisputed that the plaintiffs' support would have been provided directly to two groups that were designated as foreign terrorist organizations by the State Department. The plaintiffs argued that it was nonetheless impermissible for the statute to prevent their activities—advocacy on behalf of ethnic groups, training in international law and conflict resolution, and training on petitioning the U.N. for relief—because these activities were directed at the nonviolent, legitimate activities of the terrorist organizations.

The Court observed that "[w]hether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question." *Id.* at 2724.

---

[13]The statute analyzed in *Boim III* was § 2339A, which criminalizes providing "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" relevant criminal statutes.

It was a question that Congress had already addressed in the statute.  When it passed § 2339B,

Congress included a statement of findings and purposes.  The findings included that "foreign

organizations that engage in terrorist activities are so tainted by their criminal conduct that any

contribution to such an organization facilitates that conduct."  Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA") § 301(a)(7), 110 Stat. 1247, *reprinted as note following* 18 U.S.C.

§ 2339B.  According to the Court, this "explicitly rejects plaintiffs' contention that their support

would not further the terrorist activities" of the organizations they supported.  *Humanitarian Law*

*Project*, 130 S. Ct. at 2724.  The Court elaborated:

> Congress's use of the term "contribution" is best read to reflect a
> determination that any form of material support furnished "to" a
> foreign terrorist organization should be barred, which is precisely
> what the material-support statute does.  Indeed, when Congress
> enacted § 2339B, Congress simultaneously removed an exception
> that had existed in § 2339A(a) (1994 ed.) for the provision of
> material support in the form of "humanitarian assistance to persons
> not directly involved in" terrorist activity. AEDPA § 323, 110 Stat.
> 1255; 205 F.3d at 1136.  That repeal demonstrates that Congress
> considered and rejected the view that ostensibly peaceful aid would
> have no harmful effects.

*Id.* at 2725.

And the Court held that "Congress was justified in rejecting that view." *Id.*  The terrorist

groups at issue were responsible for numerous deaths and injuries in both targeted and

indiscriminate attacks.  For three broad reasons, the Court found support for Congress's factual

findings.  First, because "[m]oney is fungible," material support for nonviolent activities "frees up

other resources within the organization that may be put to violent ends." *Id.*  The Court cited

evidence that terrorist groups in fact commingle their funds between nonviolent and violent

functions. *Id.* at 2725–26. Second, material support to the groups' nonviolent functions "importantly

helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups

to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks." *Id.*
at 2725.  Finally, the Court noted that United States "allies would react sharply to Americans
furnishing material support to foreign groups like the [terrorist groups involved in the case], and
would hardly be mollified by the explanation that the support was meant only to further those
groups' 'legitimate' activities." *Id.* at 2726.  As further support for all three arguments, the Court
pointed to an affidavit from a State Department consistent with Congress' findings.  The Court found
no basis for substituting its own judgment for that of the two political branches, particularly given
the national security and foreign policy concerns. *Id.* at 2727–30.  As applied to the specific forms
of material support the plaintiffs sought to provide, the statute did not violate the First Amendment.
*Id.* at 2730.

Because it does not deal with civil liability under § 2333, *Humanitarian Law Project* does
not discuss what it means to be injured "by reason of" material support to terrorism.  *Boim III*
required a minimal showing of causation.  The cases before *Boim III* generally required plaintiffs
to show that the defendants' actions were a proximate cause of their injuries. *See, e.g.*, *Boim I*, 291
F.3d at 1011 ("Additionally, the statute itself requires that in order to recover, a plaintiff must be
injured 'by reason of' an act of international terrorism. The Supreme Court has interpreted identical
language to require a showing of proximate cause."); *In re Terrorist Attacks on Sept. 11, 2001
(Terrorist Attacks III)*, 462 F. Supp. 2d 561 (S.D.N.Y. 2006) ("Assuming [material] support is
alleged, Plaintiffs will have to present a sufficient causal connection between that support and the
injuries suffered by Plaintiffs. . . .  Proximate cause will support this connection."); *Terrorist Attacks
I*, 349 F. Supp. 2d at 825–26 (requiring proximate cause); *Burnett v. Al Baraka Investment &
Development Corp.*, 274 F. Supp. 2d 86, 104–05 (D.D.C. 2003) (same).  *Rothstein v. UBS AG*, 647
F. Supp. 2d 292, 294–95 (S.D.N.Y. 2009), decided after *Boim III,* stated that proximate cause was

required.  Another case decided after *Boim III* has also held that a showing of a "sufficient causal connection," although not "but for" causation, is required.  *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litigation*, 690 F. Supp. 2d 1296, 1313–15 (S.D. Fla. 2010). *In re Chiquita Brands* concluded that proximate cause could be sufficient and that *Boim III* provided an example of proximate causation.  *See id.* (collecting cases).

*Humanitarian Law Project*, 130 S. Ct. at 2717–18, does shed light on the scienter analysis. This is true in part because the discussion of fungibility, legitimacy, and foreign affairs confirms the broad sweep of the statute and supports the reasoning of *Boim III.*  More importantly, the Court addressed the *mens rea* requirements of § 2339B, one of the underlying criminal statutes at issue in this case.  The Court stated that "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities."  *Id.* at 2717.  This conclusion was bolstered by Congress's use of "knowing or intending" in § 2339A, and "willfully" and "with the intention" in § 2339C, terms that it could have, but did not, use in § 2339B.  In response to the specific argument that a different standard should apply when the material support alleged is pure speech, the Court found "no basis whatever in the text of § 2339B to read the same provisions in that statute as requiring intent in some circumstances but not others."  *Id.* at 2718.

Justice Breyer, in a dissenting opinion, agreed that intent to further an organization's terrorist activities was not required.  But he stated that a "fairly possible" reading of the statute was that it criminalized "First-Amendment-protected pure speech and association only when the defendant knows or intends that those activities will assist the organization's unlawful terrorist actions."  *Id.* at 2740 (Breyer, J., dissenting).  Under such a reading, a defendant's activity would violate the statute "where a defendant purposefully intends it to help terrorism or where a defendant knows (or

wilfully blinds himself to the fact) that the activity is significantly likely to assist terrorism." *Id.* Justice Breyer reached this interpretation by construing the scienter requirement in § 2339B—"knowingly"—as applying to all elements of the crime, which he stated that the Court "normally" does, *id.* (citing *Flores-Figueroa v. United States*, 556 U.S. ----, 129 S. Ct. 1886, 1891–92 (2009)), and by reading the term "material" to require support of "importance or great consequence." *Id.* at 2741. For a defendant to knowingly provide "material support," he must know that he is providing support of importance or great consequence, meaning that the support "bears a significant likelihood of furthering the organization's terrorist ends." But the dissent clarified that this definition may not apply when the support is something other than "training," "expert advice or assistance," and "personnel." When the support takes the form of money, for example, it was possible that a looser definition of "material" could be appropriate because such aid would be "inherently more likely to help an organization's terrorist activities, either directly or because [it is] fungible in nature." *Id.*

The majority took issue with this reading, stating that "Congress explained what 'knowingly' means in § 2339B, and it did not choose the dissent's interpretation of that term." *Id.* at 2718 n.3. Although the Court engaged with the dissent on this point in a brief footnote, it is clear that the Court's objections are to Justice Breyer's reading of the word "material," his requiring knowledge of materiality, and his requiring knowledge that the organization was a "foreign terrorist organization." The statute did not require that a defendant know that the support provided would "assist the organization's unlawful terrorist ends." Instead, according to the majority, the statute required that a defendant either know the organization is a designated foreign terrorist organization or know that it has engaged in terrorism or terrorist activity. *Id.* Justice Breyer's reading rendered

31

the latter—the one explicitly in the statutory text—irrelevant.[14]  Similarly, it would not have made sense to require knowledge that the organization supported was actually a designated foreign terrorist organization when the amendment to the statute clarified that was only one of the three ways to show knowledge of the organization's character.

The majority did not hold that there is *no* knowledge requirement for the remaining element of the statue, that the defendant provided support "to" a group that is designated as a foreign terrorist organization.  *See id.* at 2722 ("The use of the word 'to' indicates a connection between the service and the foreign group.").  Regardless of whether the defendant knows the group is designated as a foreign terrorist organization, he must know that the support he provided was *to* that group.  This was not an issue in *Humanitarian Law Project* because both relevant groups had been so designated, the defendants knew that fact, and the question was whether benign motive provided a defense.  In other cases, reading this requirement out of the statute could lead to absurd results.  If a person knows that Hamas is a designated foreign terrorist organization, he does not violate the statute by providing material support to some other group that is not a foreign terrorist organization.  Requiring the defendant to have known his support was *to* the relevant group is particularly appropriate in the present case, which involves acts that occurred before the statute was amended to further describe the requisite mental state.  The statutory language — "knowingly provide material support to a

---

[14]This  is confirmed by Justice Breyer's response to the majority's argument that Congress had the opportunity to use his definition and decided to choose a different one.  As applied to the type of support at issue in *Humanitarian Law Project*, which Justice Breyer saw as pure speech and assembly, there was "grave" doubt about the constitutionality of the statute as written.  130 S. Ct. at 2739.  Under such circumstances, he reasoned, precedent required a reading of the statute that eliminated that doubt.  Justice Breyer thought that the interpretation of the statute with the heightened knowledge requirement on the materiality element which was still consistent with the statute's text and "with Congress' basic intent."  *Humanitarian Law Project*, 130 S. Ct. at 2742 (Breyer, J., dissenting)  ("For this reason, the majority's statutory claim that Congress did not use the word 'knowingly' as I would use it is beside the point." (internal citations omitted)).

32

foreign terrorist organization" — plainly means that at least that the defendant knows that he is providing support to a particular group.

*Humanitarian Law Project* informs the analysis of the issues in this case but does not specifically address or resolve those issues.  And, as stated in this court's earlier opinion, in terms of both scienter and causation, *Boim III* stretched civil liability under the ATA more than previous courts had.  *See* 2 VED P. NANDA & DAVID K. PANSIUS, LITIGATION OF INT'L DISPUTES IN U.S. COURTS § 9.18 (2d ed. 2008 & Supp. 2010) ("*Boim III* arguably advocates the broadest possible civil liability for third parties providing material assistance to terrorist organizations.").  It is useful to examine other cases adopting different approaches.  The case of *Terrorist Attacks I*, 349 F. Supp. 2d at 825–37, in which survivors and representatives of victims of the September 11 attacks sued al Qaeda and some alleged supporters, is a good example.  In that case, the court characterized donors as secondary actors, not primary actors (as *Boim III* did).[15]  For such secondary actors to be liable for aiding and abetting under the ATA, the court held that "[t]o adequately plead the provision of material support, . . . a plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant *desired to help those activities succeed*, and the defendant engaged in some act of helping those activities."  *Id.* at 828 (emphasis added).  For such secondary actors to be liable for conspiracy, the plaintiffs would have to allege that "the Defendants were involved in an agreement to accomplish an unlawful act and that the attacks of September 11 were a reasonably foreseeable consequence of that conspiracy."  *Id.* at 829.  The plaintiffs were not required to allege

---

[15]Because the court decided that providing material support to terrorism under the ATA was a secondary offense, there was no need analyze whether the defendants' actions fit within §2339A, § 2339B, or § 2339C.  To satisfy the underlying crime element of the definition of "international terrorism," it would have been enough under a theory of secondary liability, for the September 11 attacks to be a crime publishable under state or federal law.  The court did not directly address this issue, stating in a footnote that it would "assume[] the attacks of September 11 were an act of international terrorism."  *Terrorist Attacks I*, 349 F. Supp. 2d at 829 n.39.

that the defendants knew about the planned September 11 attacks or that the defendants committed any act in furtherance of those particular attacks. *Id.*

The court also required that the plaintiffs "present a sufficient causal connection between [the defendant's material] support and the injuries suffered by Plaintiffs," which could be accomplished by pleading a basis for inferring proximate cause. *Id.* at 825–26. The court cited a case describing the proximate cause requirement as limiting liability to those injured persons "'with respect to whom [the defendants' acts] were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated.'" *Id.* (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)). The court noted, however, that because al Qaeda had publicly declared war on the United States, it might be that the September 11 attacks were "the natural and probable consequence of *knowingly and intentionally* providing material support to al Qaeda." *Id.* (citing *Burnett*, 274 F. Supp. 2d at 104) (emphasis added).

Applying this approach to the defendants' Rule 12(b)(6) motions, the court dismissed the claims against a bank alleged to have aided and abetted the attackers by donating to charities that supported terrorism and by serving as the bank for these charities. The court noted the absence of any allegations that the bank knew the charities were involved in terrorist activities. There was "no basis for a bank's liability for injuries funded by money passing through it on routine banking business." *Id.* at 831–33. The court was not swayed by the allegations that the bank was connected to Hamas because the plaintiffs had not alleged a relationship between Hamas and al Qaeda or the September 11 attacks. *Id.* at 833. The court reached the same conclusion for a second bank alleged to have provided an account for charities to deposit money raised to support reward payments to suicide bombers' families. Because there was no allegation that the bank knew "anything relating to terrorism was occurring through the services it provided," the allegations were of routine banking

services, which were not a basis for liability. *Id.* at 833–34.  This was true despite allegations of

close ties generally between the bank and the bin Laden family.  *Id.*  The same result applied for the

Arab Bank, which allegedly knew that some of its accounts were used to transfer funds to terrorist

organizations, particularly Hamas.  The court dismissed the complaint because, again, there was no

allegation that Hamas was connected to bin Laden, al Qaeda, or the September 11 attacks.  *Id.* at

835.

In a subsequent opinion, *In re Terrorist Attacks on September 11, 2001* (*Terrorist Attacks*

*II*), 392 F. Supp. 2d 539, 566–67 (S.D.N.Y. 2005), by contrast, the court denied a motion to dismiss

by an individual defendant who allegedly gave Osama bin Laden a satellite phone battery.  The ATA

includes communications equipment as a form of material support.  The plaintiffs had alleged that

when the defendant gave Osama bin Laden the phone battery, the defendant *knew* he was involved

in terrorist activities.  *Id.*  Noting that "even small donations made knowingly and intentionally in

support of terrorism may meet the standard of civil liability in section 2333," the court denied the

motion to dismiss.  *Id.* at 567.

Another pre-*Boim III* case carefully analyzed liability under the ATA.  In *Linde v. Arab*

*Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005), the court denied the Arab Bank's motion to dismiss

ATA claims based on Hamas suicide bombings in Israel.  The complaint alleged that the Arab Bank,

a Jordan-based bank with a location in New York, held an account in which charities controlled by

Hamas deposited money to be distributed to the families of suicide bombers.  In that case, the

plaintiffs were United States victims of Hamas attacks in Israel in 2000.  The plaintiffs alleged that

the Arab Bank acted as a claims administrator, distributing payments to the suicide bombers'

families who claimed financial benefits because their sons had completed successful attacks.  The

plaintiffs alleged that the bank, in consultation with Hamas and another entity, maintained a list of

"eligible martyrs," "open[ed] a dollar account for each beneficiary," reviewed documentation from families of martyrs to determine if it was sufficient, and, if so, "issue[d] a receipt to the designated recipient of the benefit." *Id.* at 577. The bank also provided banking services for organizations the plaintiffs alleged were Hamas fronts. *Id.* at 575–79.

The *Linde* court read the relevant ATA language somewhat differently than *Boim III*. In applying the statutory definition of "terrorist acts," the *Linde* court focused on the actual suicide bombings rather than on the defendant's act of providing money. The bombings were both "violent acts" and "acts dangerous to human life" (either would have been sufficient), and violated criminal statutes. *Id.* at 580–81. The court found that apart from the Arab Bank's actions, the plaintiffs had been injured "by reason of international terrorism," as the ATA requires. The issue was whether the Arab Bank could be held liable, either primarily or secondarily, for that injury. *Id.* at 581. Unlike *Boim III*, the court held that the ATA did permit a cause of action for secondary liability and concluded that such liability was available on both conspiracy and aiding and abetting theories. *Id.* at 582–83. The court looked to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and the *Restatement (Second) of Torts*, on which *Halberstam* had relied.

The *Restatement* recognizes three types of secondary civil liability:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> > (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> >
> > (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> >
> > (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

36

RESTATEMENT (SECOND) OF TORTS § 876 (1979).  In *Linde*, the court found that the plaintiffs'
allegations supported all three theories.  The plaintiffs alleged that the Arab Bank had violated
subsection (a) by agreeing to provide banking services to what it knew was a terrorist organization,
leading to an overt act in furtherance of the conspiracy that injured the plaintiffs.  *Id.* at 584.  The
plaintiffs alleged that the Arab Bank had violated subsection (b) by being aware of Hamas's "role
as a part of an overall illegal activity" and providing "knowing and substantial assistance" in the
form of financial services and administration of the death benefits.  These benefits allegedly
encouraged terrorist attacks, which was a form of aiding and abetting.  The court found that
plaintiffs had also alleged a violation of subsection (c) because they had alleged that the Arab Bank
breached independent duties, including by violating the ATA criminal statues.  *Id.* at 584–85.

As to the mental state required, the court held that a bank may be liable under § 2339B if it
"provides material support in the form of financial services to a designated foreign terrorist
organization and the bank either knows of the designation or knows that the designated organization
has engaged or engages in terrorist activities."  *Id.* at 587.  Section 2339B is the criminal statute
forbidding donations to designated terrorist groups.  For violations of §§ 2339A and 2339C, the
court held that it was necessary to show "knowledge or intent that the resources given to terrorists
are to be used in the commission of terrorist acts."  *Id.* at 586 n.9.  None of the three statutes required
"specific intent to commit [the] specific acts of terrorism" that injured the plaintiffs.  *Id.* at 586.[16]

---

[16] It is somewhat unclear why, having applied the *Restatement* standard to determine the elements of secondary liability,
the court discussed these criminal statutes.  It appears that the court had already concluded by referring to the
*Restatement* that the allegations against the Arab Bank satisfied the act component of secondary liability and proceeded
to consider whether Arab Bank had the necessary scienter with respect to both direct and secondary liability.  The court
appeared to use the criminal statutes to help determine the scienter required.  The analysis was premised on the
underlying crimes being the bombings, not the material support provided by the Arab Bank.

As to causation, the court held that "but for" causation is not required to recover against secondary tortfeasors. *Id.* at 584–85. The court's discussion indicated that some causal connection had to be alleged, although the limits are not defined. In finding that the allegations against the Arab Bank were sufficient, the court distinguished *Terrorist Attacks I*, in which the bank defendants were dismissed. The court emphasized the specific allegations that the Arab Bank "plays a central role in a well-publicized plan to reward terrorists killed and injured in Israel and that the Bank *knows* that the groups to which it provides services are engaged in terrorist activities. *The very groups the Bank is alleged to support are the same groups alleged to be responsible for the terrorist attacks that injured the plaintiffs.*" *Id.* at 588 (emphasis added). These were not "innocent business services."

*Linde* and the *Terrorist Attacks* opinions rely heavily on *Boim I*, 291 F.3d at 1000, in their discussions of donor liability under the ATA. *Boim I*—written in 2002 by Judge Rovner, the author of the primary dissent in *Boim III*—was the Seventh Circuit's panel opinion in an interlocutory appeal from the ruling on the defendants' motions to dismiss. It was not the panel opinion vacated on the rehearing *en banc* that produced *Boim III*. The second, now-vacated, panel opinion was not issued until after the case was remanded to the district court by *Boim I*. *See Boim v. Holy Land Foundation for Relief & Development* (*Boim II*), 511 F.3d 707 (7th Cir. 2007), *vacated and reh'g en banc granted*, 511 F.3d 707 (7th Cir. 2007). Although *Boim I* was not vacated, it has been overruled in the Seventh Circuit by *Boim III* to the extent it conflicts with the *en banc* opinion or with *Humanitarian Law Project*. In other circuits, of course, both opinions are authority only insofar as they are persuasive. *Linde*, an Eastern District of New York case, made it clear that the *reasoning* in *Boim I* was persuasive. Other courts continued to rely on *Boim I* (and the courts following it) after the *en banc* decision. *See Chiquita Brands*, 690 F. Supp. 2d at 1309; *Rothstein*, 647 F. Supp. 2d at 295.

In *Boim I*, the court first addressed whether funding terrorism was actionable under the ATA. *Boim I*, 291 F.3d at 1010 ("Although the statute defines the class of plaintiffs who may sue, it does not limit the class of defendants, and we must therefore look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute."). With no precedent on the question, the court turned to legislative history, finding "an intent by Congress to allow a plaintiff to recover from anyone along the causal chain of terrorism." *Id.* at 1011. Nonetheless, the court was unwilling to accept the plaintiffs' argument that giving money to Hamas was, *by itself*, sufficient to give rise to liability under the ATA because it would "give the statute an almost unlimited reach." *Id.* "Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent could be construed to 'involve'" violent acts or acts dangerous to human life. *Id.* The court also held that the "by reason of" language in the ATA required proximate causation. This meant that the plaintiffs were required to "show that murder was the reasonably foreseeable result of making the donation." *Id.* The court also suggested that a showing of knowledge and intent was required. *Id.*

The court addressed whether violations of §§ 2339A and 2339B fit the definition of "international terrorism," making them actionable primary torts under the ATA. The court concluded that there was "no textual, structural, or logical justification for construing the civil liability imposed by section 2333 more narrowly than the corresponding criminal provisions." *Id.* at 1015. This was consistent with the text; even though giving money to terrorists was not itself violent or dangerous to human life, the statute defined "international terrorism" as "activities that *involve* violent acts or acts dangerous to human life." The underlying terrorist attack satisfied the "act" part of the definition, and giving money to terrorists was an activity involving that act. The court address the term "material support" in §§ 2339A and 2339B, stating that the question is

39

whether the aid is of a type listed in the statute, not whether it is "substantial or considerable." *Id.* Finally, the court provided the standard for direct liability suits under these ATA provisions, stating:

> For civil liability, section 2333 requires that the plaintiff be injured "by reason of" the act of international terrorism. Because we believe Congress intended to import standard tort law into section 2333, causation may be demonstrated as it would be in traditional tort law. Congress has made clear, though, through the criminal liability imposed in sections 2339A and 2339B, that even small donations *made knowingly and intentionally in support of terrorism* may meet the standard for civil liability in section 2333. Congress' goal of cutting off funding for terrorism would be seriously compromised if terrorist organizations could avoid liability by simply pooling together small donations to fund a terrorist act.

*Id.* (emphasis added). The requirement of a *knowing and intentional* support of terrorism for a violation of § 2339A or § 2339B alleviates the concern that the ATA will create limitless liability against anyone whose money ends up in the hands of a terrorist organization.

The final liability issue the court addressed was whether the ATA recognized civil aiding and abetting liability. The court noted the Supreme Court's holding in *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), that aiding and abetting liability was not available under § 10(b) of the Securities Exchange Act of 1934 because the statute did not expressly provide for such liability.[17] But the court distinguished *Central Bank* and held that aiding and abetting liability was available. First, § 2333 creates an express cause of action; the statute at issue in *Central Bank* was only subject to an implied right of action recognized by courts. Accordingly, there was less risk in *Boim* of stretching the statute beyond Congress's intent. Second, the text of § 2333 and its legislative history indicated an "intent to import general tort law principles," which would include aiding and abetting liability. *Id.* at 1020. The court cited

---

[17] *Central Bank* was the basis for *Boim III*'s holding that secondary liability is not available under the ATA. 291 F.3d at 1006–07.

Congress's intent to "make civil liability at least as extensive as criminal liability," based primarily on the use of the word "involve" in the definition of "international terrorism." *Id.* As the court stated:

> If we were to interpret "involve" literally, we would be attributing almost unlimited liability to any act that had some link to a terrorist act. Congress could not have meant to attach unlimited liability to even remote acts; it must have meant something else. As we have seen from the language and legislative history of section 2333, that something else is traditional tort and criminal liability. . . . Indeed, limiting the term "involve" to the familiar definitions of aiding and abetting (or even conspiracy, for that matter) provides the necessary clarification that saves the statute from vagueness.

*Id.* at 1020–21. Finally, the court distinguished *Central Bank* based on the ATA's policy objectives. "[I]f we failed to impose liability on aiders and abettors who *knowingly and intentionally* funded acts of terrorism, we would be thwarting Congress'[s] clearly expressed intent to cut of the flow of money to terrorists at every point along the causal chain of violence." *Id.* at 1021 (emphasis added). The only effective way to deter terrorism, the court concluded, was to impose aiding and abetting liability because the terrorists were unlikely to have recoverable assets and, more importantly, because the attacks could not go forward without funding. *Id.* To succeed on an aiding and abetting theory, however, the court required that the plaintiff allege and show that the defendant knew of Hamas's terrorist activity, knew that the money was going to Hamas, and *intended* to help Hamas's terrorist activities succeed. It was not necessary that the defendant know about or intend the particular acts that injured the plaintiffs. *Id.* at 1021–23.

Two courts have issued opinions after *Humanitarian Law Project*, *Rothstein v. UBS AG*, --- F. Supp. 2d ----, 2011 WL 70354 (S.D.N.Y. Jan. 3, 2011), and *Wultz v. Islamic Republic of Iran*, --- F. Supp. 2d ----, 2010 WL 4228350 (D.D.C. Oct. 20, 2010). The *Rothstein* case generated two opinions because during the appeal from the first, the Second Circuit remanded so that the district

court could reconsider in light of *Humanitarian Law Project*.  In its initial opinion, the court considered allegations by 45 victims of Hezbollah and Hamas bombings and rocket strikes against UBS AG, asserting primary and secondary liability under § 2333.  The plaintiffs' allegations were based on UBS's public admission that it had transferred United States currency to Iran and Iranian "counterparties," in violation of regulations issued by the United States Office of Foreign Asset Control ("OFAC").  *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 293–94 (S.D.N.Y. 2009).  Based on this admission, the plaintiffs alleged that UBS was liable for their injuries because:

> [T]he Iranian Government is a recognized sponsor of terrorism and has funded Hamas and Hezbollah, and other Palestinian organizations; that these terrorist organizations require U.S. cash dollars to carry out their activities; and that UBS's involvement in banknote transactions with Iranian counterparts had the effect of providing U.S. cash dollars to the Iranian government, which, in turn, supplied the aforementioned terrorist organizations with U.S. cash dollars that were used to facilitate terrorist acts.

*Id.* at 294.  The plaintiffs asserted claims involving both primary and secondary liability under the ATA.

The district court found the plaintiffs' primary liability allegations too attenuated to confer standing or to state a claim for relief.  Noting that standing requires a "proximate causal relationship between UBS's transfer of funds to Iran and Hamas' and Hezbollah's commission of the terrorist acts," the court identified three "deficiencies in the causal chain": (1) the plaintiffs did not allege that UBS was a primary or relatively significant source of U.S. bank notes for the Iranian government; (2) cash dollars have multiple legitimate uses other than funding terrorism; and (3) there were no specific allegations that the terrorist groups in question raised their funds from monies transferred to Iran.  The complaint failed to state a claim for the same reasons.  The court applied proximate cause as § 2333's causation standard based on the "by reason of" language and concluded that "[i]f

the allegations here are so speculative and attenuated as to deprive plaintiffs of standing, it follows *a fortiori* that they fail to adequately plead causation." *Id.* at 295.

Addressing the sufficiency of the allegations of secondary liability and assuming that an aiding and abetting theory of liability is viable under the ATA, the court reasoned that "such a theory would require adequate allegations that the defendant not only knew that its funds would be used to sponsor terrorist acts by Hamas and Hezbollah, but also intended to do so." *Id.* (citing *Boim I*, 291 F.3d at 1023). Noting that no such allegations were made, the court dismissed the aiding and abetting claims.

On remand, the Second Circuit asked the district court to consider the following aspects of *Humanitarian Law Project*: (1) the Court's rejection of the argument that terrorist and peaceful activities of terrorist organizations can be segregated; (2) the Court's rejection of the contention that the government was required to offer proof that the defendants' proposed activities would support terrorist attacks; and (3) the Court's determination that only knowledge of an organization's connection to terrorism is necessary but no specific intent to further the organization's terrorist activities is required. *Rothstein v. UBS AG*, --- F. Supp. 2d ----, 2011 WL 70354, at *3 (S.D.N.Y. Jan. 3, 2011). The district court concluded that *Humanitarian Law Project* did not alter its earlier decision to dismiss. As to the primary liability allegations, the court emphasized that *Humanitarian Law Project* did not address Article III standing or § 2333's causation standard. *Id.* at *4. The court also noted that *Humanitarian Law Project* addressed allegations of supporting "foreign terrorist organizations" as defined by 8 U.S.C. § 1189. The *Rothstein* plaintiffs, by contrast, alleged support of a "state sponsor of terrorism." *Id.* The court noted that the "the Supreme Court's finding that FTO s 'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct,' . . . is specific to FTOs." *Id.* (quoting *Humanitarian Law Project*, 130 S.

43

Ct. at 2724) (internal citation omitted).  The court noted the fundamental differences between an

FTO and a state sponsor of terrorism:

> Congressional policy determinations are likely to be quite different
> with respect to the two entities, as reflected by the fact that 50
> U.S.C.App. § 2405(j)(1) permits certain transactions with state
> sponsors of terrorism as long as a valid license is obtained.  It thus
> appears highly unlikely that the same stringent prohibitions on
> providing material support to FTOs apply with equal force to state
> sponsors of terrorism, with whom lawful contact is permitted.

*Id.*  As to the secondary liability allegations, the court found that *Humanitarian Law Project* did not

support altering "traditional knowledge and intent of for aiding and abetting liability" for § 2333(a)

claims.  The district court noted that the Supreme Court's construction of the scienter requirements

for § 2339B was expressly limited to that statute and that the Court "explicitly contrasted with the

'sections immediately surrounding Section 2339B (i.e., Sections 2339A and 2339C), which, like

Section 2333(a) expressly require intent."[18]  *Id.* at *5.  Because *Humanitarian Law Project* did not

change the ATA's scienter requirement, the district court did not disturb its prior ruling.

In *Wultz*, the plaintiffs sued the Bank of China to recover damages resulting from a suicide

bomber associated with the Palestinian Islamic Jihad ("PIJ").  The plaintiffs alleged that Bank of

---

[18]The basis for the conclusion that allegations of primary liability under § 2339A or § 2339C requires allegations of "intent to further the organization's terrorist activities" is unclear.  Section 2339A requires "knowledge" *or* "intent" that the defendant's material support is 'to be used in preparation for, or in carrying out, a violation of [the listed statutes]."  Similarly, § 2339C criminalizes willful provision or collection of funds "with the intention that such funds will be used, *or with knowledge* that such funds are to be used, in full or in part, to carry out [an act violating  §§ 2339C(a)(1)(A) or 2339C(a)(1)(B)]."  The statutes do not require "the intent to further the organization's activities"; knowledge that the defendant's material support or funds will be used for the organization's terrorist activities suffices.  As the *Rothstein* court notes, the Court in *Humanitarian Law Project* did distinguish the *mens rea* required for § 2339B from that required for §§2339A and 2339C.  Section 2339B requires only "knowledge that the organization is a designated terrorist organization."

Section 2333(a) does not use the word "intend" or "intent."  The ATA provides a civil action for treble damages to "[a]ny national of the United States injured in his or her person, property, or business *by reason of an act of international terrorism*, or his or her estate, survivors, or heirs."  18 U.S.C. § 2333(a) (emphasis added).  "International terrorism" is defined in the statute as "activities that *appear to be intended* (i) to intimidate or coerce a civilian population . . . ."  18 U.S.C. § 2331(1).

China was liable under the ATA for executing millions of dollars in wire transfers to the PIJ through an account held by Said al-Shurafa, who the BOC knew was using the money to support PIJ terrorism activities. *Wultz*, 2010 WL 422835, at *2.[19] The plaintiffs alleged both primary and secondary liability under the ATA.

Like *Rothstein*, the court addressed causation both in determining whether the plaintiffs had standing and whether the plaintiffs stated a claim for relief. The court distinguished the allegations from those in *Rothstein* on the basis that the plaintiffs alleged that BOC directly provided funding to an FTO. By contrast, *Rothstein* involved allegations against a defendant who provided United States cash to a state sponsoring terrorism. *Id.* at *6. The *Wultz* court also noted that the plaintiffs alleged that BOC knowingly transferred the funds to an FTO because it had notice that transfer to al-Shurafa were in effect transfers to the PIJ. In finding that the plaintiffs' allegations were sufficient to support standing, the court pointed to the plaintiffs' allegations that: (1) the PIJ "is subject to strict economic sanctions programs imposed by the United States as the result of its designation [as an FTO] . . . the enforcement of which is intended to limit the PIJ's 'ability to plan, to prepare, and to carry your terrorist attacks"; (2) "were these sanctions universally enforced by financial institutions, plaintiffs allege that 'the ability of the PIJ to conduct banking activities would be severely restricted and PIJ's ability to plan, to prepare, and to carry out terrorist attacks would be significantly limited"; (3) "very few banks and financial institutions do not observe and enforce the U.S. sanctions regime"; and (4) "BOC executed dozens of wire transfers totaling several million dollars on behalf of Mr. Al-Shurafa, a BOC account holder and a senior officer and agent both of

---

[19]The plaintiffs alleged that Bank of China nonetheless knew that Said al-Shurafa was "effectively providing financial services to the PIJ" because "officials of the counterterrorism division of the Office of the Prime Minister of the State of Israel met with officials of the [Peoples' Republic of China's] Ministry of Public Security and [BOC] regarding the PIJ transfers" and informed them that the transfers to al-Shurafa were in effect to the PIJ and that the funds were being used to support terror. *Wultz*, 2010 WL 4228350, at *35.

the PIJ and of the Hamas terrorist organization which were necessary for planning, preparing, and carrying out the attack." *Id.* at *7 (internal punctuation and quotations omitted).  The court also found that the plaintiffs alleged causation.  Like *Rothstein*, the court found that § 2333(a)'s "by reason of" language established proximate cause as the causation standard.  *Id.* at *38 (citing *Boim III*, 549 F.3d at 691–98).  Noting that "foreseeability is the cornerstone of proximate cause," and reiterating its standing analysis, the court found BOC could have reasonably anticipated the plaintiffs' injuries.  *Id.*

In determining the sufficiency of the remaining allegations, the *Wultz* court followed *Boim III*'s "chain of incorporations" approach and evaluated the scienter required at each stage of the chain.  *Id.* at *26.  Finding that providing funding to terrorist organizations is an "act[] dangerous to human life," the court evaluated the plaintiffs' allegations that the BOC violated §§ 2339A, 2339B, and 2339C.  As to the § 2339A allegations, the court, citing *Linde*, stated that the plaintiffs must allege "that BOC provided financial services knowing or intending that such provision would generally facilitate the terrorist activities of the PIJ," not that the BOC "had the 'specific intent to aid or encourage the particular attacks."  *Id.* at *30 (citing *Linde*, 384 F. Supp. 2d at 586 n.9).  As to the § 2339B allegations, the court, citing *Humanitarian Law Project*, noted that the requisite mental state for § 2339B violations is "knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities."  *Id.* at *31.  And as to the § 2339C claims, the court, again citing *Linde*, stated that the plaintiffs must allege the defendant acted "with the knowledge that such funds are to be used . . . to carry out . . . any . . . act intended to cause death or serious bodily injury."  *Id.* at *31.  The court reasoned that because § 2339C does "require a showing of specific intent that the defendant acted to further the organization's terrorist activities," "[m]ere knowledge that the funds provided and collected would be used to carry out the predicate

46

act is enough." *Id.* at *32.  For each criminal-law-violation allegation, the court found that the plaintiffs' allegations that the BOC provided financial services to the PIJ knowing that the PIJ used transferred funds to support its terrorism activities alleged a claim for relief.

Following the chain of incorporations, the court then addressed whether the plaintiffs' allegations met the second part of the definition of "international terrorism," § 2331(1)(B).  Because § 2331(1)(B) requires only that the defendant's acts "appear to be intended . . . (i) to intimidate or coerce a civilian population . . . .," and because the ATA is not concerned with "actual subjective intent," the court, citing *Boim III*, looked to whether the defendant allegedly "created the objective 'external appearance' . . . that BOC shared the PIJ's goals." *Id.* at *33 (citing *Boim III*, 549 F.3d at 694).  The court reasoned that the plaintiffs' allegations met § 2331(1)(B) because "a reasonable person could easily infer . . . intent of BOC by virtue of its having allegedly provided material support to PIJ despite having allegedly been aware of a substantial probability that its support would facilitate the planning, preparation for, and execution of terrorist attacks in Israel." *Id.* at *34.

The chain of incorporation complete, the court proceeded to analyze whether the allegations met "the overarching knowledge requirement imposed by § 2333."  The court, like the Seventh Circuit in *Boim III*, concluded that § 2333's treble-damages provision requires a showing of "'intentional misconduct' on the part of the tortfeasor." *Id.* at *34 (citing *Boim III*, 549 F.3d at 692).  Like the Seventh Circuit in *Boim III*, the court reasoned that misconduct is intentional when the defendant "'knows that the consequences are certain, or substantially certain to result from his act.'" *Id.* (quoting *Boim III*, 549 F.3d at 693).  The court found that the plaintiffs alleged intentional misconduct by alleging that the BOC continued to provide the PIJ financial services even after it knew the funds it transferred were used to support terrorism. *Id.* at *36.

47

Citing *Boim I*, *Chiquita Brands*, and *Linde*, the court also found a basis to allege secondary liability under the ATA. *Id.* at * 41.  The court distinguished *Central Bank* on the basis that unlike § 10(b) of the Securities and Exchange Act, the ATA expressly created a private right of action. Like *Boim I*, the court also noted that the ATA expressly incorporated "general principles of tort law," including "all the traditional elements of a traditional tort."  Based on the ATA's incorporation of tort law and legislative history showing that Congress intended to "bring all of the substantive law of the American tort law system into play," the court concluded that the ATA was intended to incorporate other principles of tort law, including aiding and abetting liability. *Id.* at *40.  The BOC did not argue that the plaintiffs insufficiently alleged secondary liability, challenging only whether the ATA allows secondary liability.  The court found the statute created a basis for such liability and that the plaintiffs' allegations were sufficient.

This court has previously characterized the pre-*Humanitarian Law Project* cases as representing a struggle between this country's profound commitment to combating terrorism and the traditional strictures of tort law, particularly the risk of imposing liability on actors whose conduct is divorced from terrorism.  The opinion stated:

> *Boim III* is so broad that, if taken to its logical extension, it could make any person liable if that person knows that (or is deliberately indifferent to whether) Hamas commits terrorist attacks in Israel, if even $1 of that person's money ends up in Hamas's bank account. Could that extend to a man in St. Louis who lacks significant understanding of the OFP or Hussein's funding of terrorism but who is generally aware that Hamas is a Palestinian terrorist group that targets Israelis, and who fills his car with gasoline that the service station had purchased from a refining company that had purchased it from another company that had paid kickbacks to Hussein to receive its allocation of Iraqi oil?  This is clearly not what the *Boim III* court held, as evidenced by its decisions to carve out exceptions for the Red Cross and Doctors Without Borders.  But the limits of liability are unclear under *Boim III*, which removes a causation requirement and removes an intent, or purpose, or knowledge requirement and

48

> only demands awareness that the organization that ends up receiving
> the funds is a terrorist group.

(Docket Entry No. 118 at 65–66).

The risk of setting the liability bar low must be balanced with Congress's clear intent to resist terrorism by cutting off the sources of funding to terrorist groups. Cases that require allegations that the defendant have the *intent* to further terrorist objectives set the bar too high. Allegations of intent are not required under either direct or secondary liability theories, except for a conspiracy claim, for which an agreement must be alleged. Assuming, without deciding, that secondary liability is available under the ATA, it would be governed by the tort principles cited in *Linde*, which, as to aiding and abetting, require the secondary actor to "*know*[] that the [primary actor's] conduct constitutes a breach of duty." RESTATEMENT (SECOND) OF TORTS § 876 (emphasis added). If primary liability is at issue, the criminal material-support statutes apply. Section 2339A criminalizes providing material support "knowing *or* intending" it will be used for carrying out a terrorist attack. Section 2339B criminalizes "knowingly" providing material support to a terrorist organization. And Section 2339C criminalizes "willfully" providing or collecting funds "with the intention that such funds are to be used, *or* with the knowledge" that they will be used for terrorism. The defendant must collect funds willfully but the only required knowledge is that the funds will be used for terrorism. Knowledge is sufficient.

When the allegations are for secondary liability as an aider and abettor or for direct liability based on § 2339A or § 2339C, the defendant must know (or intend) that its money is going to a group engaged in terrorist acts or is being used to support terrorist acts. Because civil liability under the ATA is restricted to American victims, the defendant must also know (or intend) that the

terrorism or terrorist group it is supporting targets Americans.  *See Boim III*, 549 F. 3d at 725–26 (Wood, J., concurring in part and dissenting in part).

*Humanitarian Law Project* makes clear that after the 2004 amendments, a lower showing of knowledge is required to establish direct liability based on § 2339B.  But, particularly because those amendments do not govern this case, the plaintiffs in the present case must still allege that each defendant knew its money was going "to" a particular entity if the basis of liability is that the entity falls in a particular category, such as a designated foreign terrorist organization.  As the Supreme Court emphasized, the defendant need not know that its money will reach any particular aspect of the terrorist group's activities.

To state a secondary liability claim based on  conspiracy, the plaintiffs must also allege an agreement to accomplish an unlawful act or participation in a common plan to do so.  *Linde*, 384 F. Supp. 2d at 584; *Terrorist Attacks I*, 349 F. Supp. 2d at 829.  All the courts apparently agree that, under any of these theories, there is no need to allege that when a defendant contributed money, it was aware of a particular planned attack or intended to further that attack.

The courts agree that "but for" causation is not required.  The courts disagree on what causal standard must be alleged and proven.  If the defendant's liability is direct, the "by reason of international terrorism" language in the statute creates a proximate cause requirement.  *Boim I*, 291 F.3d at 1011; *Chiquita Brands*, 690 F. Supp. 2d at 1313–15; *Rothstein*, 647 F. Supp. 2d at 294–95; *Terrorist Attacks III*, 462 F. Supp. 2d at 563; *Terrorist Attacks I*, 349 F. Supp. 2d at 825–26; *Burnett*, 274 F. Supp. 2d at104–05; *Wultz*, 2010 WL 4228350, at *38.  Under a direct liability theory, the act of giving money is the act of "international terrorism."  *See Boim III*, 549 F. 3d at 690–91, 699.  If the defendant's liability is secondary, proximate cause is required as a matter of ordinary tort law. *Chiquita Brands*, 690 F. Supp. 2d at 1313–15; *Terrorist Attacks I*, 349 F. Supp. 2d at 825–26; *see*

50

*also Boim III*, 549 F.3d at 724 (Wood, J., concurring in part and dissenting in part). In either case, "[f]oreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." *Boim I*, 291 F.3d at 1012; *Wultz*, 2010 WL 4228350, at *38. The conspiracy claim also requires proximate cause in this sense. *Terrorist Attacks I*, 349 F. Supp. 2d at 829.        In the present case, the amended complaint has changed the character of the allegations. This is particularly true with respect to El Paso. In analyzing the original complaint, this court focused on the lack of nonconclusory allegations that El Paso knew it was effectively paying kickbacks to Hussein by paying a purchase premium in its transactions with third parties. As in the original complaint, the plaintiffs allege in the amended complaint that El Paso was told by Wyatt and others that Hussein was forcing direct buyers to pay kickbacks. These allegations have been augmented. More importantly, the amended complaint has added allegations that the transactions between El Paso and the direct buyers were not at arms' length. The allegations are that El Paso purchased the oil not from legitimate operators but from Wyatt's front companies. There are allegations of conversations between El Paso employees and representatives of Wyatt's front companies concerning transactions and the management of the front companies. There are also allegations that El Paso was responsible for paying kickback funds to the front companies because they were not sufficiently liquid. In its briefing, El Paso has not argued that it was unaware it was paying kickbacks. There are sufficient allegations that El Paso knowingly paid kickbacks to Hussein. The allegations on this issue for the other defendants were sufficient in the original complaint and they continue to be so. The plaintiffs allege that Wyatt, NuCoastal, Chalmers, and Bayoil paid kickbacks directly and knowingly.

The opinion on the original complaint also stated that an ATA claim based on § 2339A required allegations that "Hussein was using OFP kickback money to fund terrorism that targeted American nationals." (Docket Entry No. 118 at 68). The allegations in the original complaint were not sufficient to meet this requirement. It relied on two newspaper articles, one of which was published before the OFP even began and stated that Hussein has used oil money to arm his troops and live in luxury, and the other of which, an August 2002 *Washington Post* story, was not published until after the last of the attacks at issue. The amended complaint has added a number of other news stories published during the relevant time period. None of these stories states the ultimate conclusion reached later by the *Washington Post*, that money from OFP kickbacks was being diverted to make reward payments to families of suicide bombers. But, without stating the source of the money, they make clear that Hussein was making reward payments to the families of Palestinian "martyrs." The amended complaint also includes a long list of allegations about Hussein's involvement in terrorist activities targeting Israel and his support for Palestinian terrorist organizations doing the same.

These allegations support an inference that the defendants knew that money paid in kickbacks would be used to support terrorist activity in Israel. As the plaintiffs argue, the very object of sidestepping the OFP was to provide money for Hussein to achieve ends other than providing for the welfare of Iraqi civilians. It is true that there were many improper uses for the money other than supporting terrorism. But the plaintiffs have alleged that Hussein's financial support for terrorist efforts against Israel was extensive and well-known. *Humanitarian Law Project* suggests that a broader approach is appropriate. Just as the "'purposes, organizational structure, and clandestine nature of foreign terrorist organizations'" make it "'highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist

functions,'" *Humanitarian Law Project*, 130 S. Ct. at 2727 (quoting the record).  The allegations as to the complex scheme to pay kickbacks to Hussein to maintain their secrecy and to avoid the restrictions on the use of funds for humanitarian purposes; the evidence of Hussein's use of funds to pay rewards to families of suicide bombers in Israel; and the evidence that such payments were well-known and well-publicized, create a high likelihood that unrestricted money put into Hussein's hands would  be used for such activities.  Because money is fungible, *id.* at 2725, even if Hussein had not used the funds given to him by the defendants for terrorism, the use of the kickbacks for a different purpose would have freed money otherwise needed for that purpose and made it available for terrorist activities.  Unlike *Rothstein*, in which the defendants provided funds to a state sponsoring terrorism in violation of applicable regulations and the plaintiffs failed to allege a basis to infer that the funds were spent to support terrorists, the plaintiffs' allegations in the present case provide a reasonable basis to infer that the alleged kickbacks paid to Hussein were used to support terrorist activities — specifically suicide bombings in Israel — and the defendants knew the kickbacks would be used for that purpose.  Under the facts alleged in the amended complaint, at a minimum, the defendants willfully blinded themselves to knowledge that their money would be used to fund terrorist attacks on Israel.[20]

In their briefing, the plaintiffs have also flagged 18 U.S.C. § 2332d as an underlying crime supporting direct liability under the ATA.  That statute makes it a crime for a "United States person" to "engage in a financial transaction" with the government of a country that he *knows or reasonably*

---

[20]To the extent there is a concern that this is not sufficient knowledge that the terrorist attacks could target Americans, the *Boim III* court stated well the reasons why terrorist attacks on Israel necessarily put Americans at risk.  As stated above, the court explained "that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel."  *Boim III*, 549 F.3d at 693–94.  The court cited statistics that in 1999, 184,000 American citizens lived in Israel, making up 3.1 percent of Israel's population.  *Id.* at 694.  There are also allegations that Hussein targeted Americans specifically.  The amended complaint describes a speech that Hussein delivered in 2000 urging his followers to remove United States embassies from Arab countries.

*should know* to be designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism, "[e]xcept as provided in regulations issued by the Secretary of the Treasury, in consultation with the Secretary of State."  18 U.S.C. § 2332d(a). "Financial transaction" is defined to include "a transaction which in any way or degree affects interstate of foreign commerce [ ] involving the movement of funds by wire or other means."  18 U.S.C. §§ 2332d(b)(1), 1956(c)(4).  Iraq was designated as a state sponsor of terrorism at all times relevant to this case.  Regulations were issued to permit Americans and American companies to take part in the OFP.  The plaintiffs allege that the defendants in this case were issued licenses to do so under those regulations.  But the allegations are that the defendants violated the terms of the OFP, and thus the federal regulations insulating them from liability under § 2332d.  The plaintiffs allege that because the defendants participated in the OFP and went through the licensing process, they knew that Iraq was designated as a state sponsor of terrorism.  Of course, as the defendants argue, the definition of "international terrorism" also requires that the underlying criminal violation is an act "dangerous to human life."  18 U.S.C. § 2331(1).  But like giving a loaded gun to a child, or giving money to Hamas, *see Boim III*, 549 F.3d at 690, giving money to a state sponsor of terrorism in knowing violation of strict rules set for transacting business with that country is an act dangerous to human life.  The allegations in the complaint state a violation of the ATA based on § 2332d.

This basis for liability does not extend to Bayoil Supply & Trading or NuCoastal Panama, because they are foreign entities.  *See United States v. Chalmers*, 474 F. Supp. 2d 555, 565–66 (S.D.N.Y. 2007) (dismissing criminal charges against Bayoil Supply & Trading under § 2332d on the ground that it was not United States person because it was registered in the Bahamas).  The basis for El Paso's liability under § 2332d is also a closer call.  El Paso did not "engage[] in a financial transaction with the government of [Iraq]."  *See* § 2332d(a).  But according to the allegations, El

Paso made its purchases through intermediaries.  Because of the allegations that El Paso directed these intermediaries, however, the amended complaint has sufficiently stated a claim based on this type of primary liability as well.

As to the conspiracy claims, there are still no factual allegations of an agreement or common plan to fund or otherwise support terrorism targeting Americans.  This case is not close to *Linde*, in which the Arab Bank was alleged to be intimately involved in awarding and distributing death benefits to terrorists' families.  The defendants here were conducting business with Iraq without any alleged direct involvement in Hussein's support for terrorism.  There are no allegations to support a conspiracy claim.

The amended complaint also contains factual allegations that, if proven, would show proximate cause.  Although there is only an attenuated connection between the plaintiffs' injuries and each of the defendants, the alleged facts are sufficient to support an inference that it was foreseeable that Hussein would use the kickbacks to support Palestinian terrorist attacks.  As the court noted in *Rothstein*, there are differences between paying money to a state sponsor of terrorism and paying money to a foreign terrorist organization.  2011 WL 70354 at *3.  Iraq under Hussein was not the same as Hamas or the terrorist organizations in *Humanitarian Law Project* who were "so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  (*Id.*, quoting *Humanitarian Law Project*, 130 S. Ct. at 2712).  Money provided to Iraq was not tainted in the same way as money provided to a designated foreign terrorist organization.  Oil companies were permitted and even encouraged to do business with Iraq.  But they were restricted to doing so within the bounds of the OFP.  The allegations are that the defendants all knowingly bypassed the strict rules of the OFP by agreeing to pay the kickbacks described.  The purpose of these kickbacks was clearly to provide money to Hussein for unlimited discretionary use

55

rather than the very limited humanitarian uses permitted for money paid to the OFP escrow account. Given the expanded allegations about Hussein's publicly stated dedication to, and involvement in, attacks on Israel, it was foreseeable that if given off-book money, Hussein would use at least some of it to support terrorist attacks in that country intended and likely to target Americans.

The amended complaint sufficiently alleges facts supporting ATA claims based on aiding and abetting liability and primary liability under § 2339A, § 2339B, § 2339C.  It also states a claim based on primary liability under § 2332d, except with respect to Bayoil Supply & Trading and NuCoastal Panama.  The plaintiffs have not stated an ATA claim for conspiracy liability.

**B.      Imputed Liability**

The plaintiffs have also alleged three additional theories of liability.  They allege that El Paso has assumed Coastal's liability under a theory of de factor merger because El Paso continued Coastal's normal business operations.  They also allege that El Paso is liable under respondeat superior for the acts of Wyatt as a "managerial employee of El Paso" beginning in 2000.  Finally, the defendants allege that NuCoastal Corporation has assumed Coastal's liabilities because it is Coastal's alter ego.  El Paso and NuCoastal have moved to dismiss these claims for the reasons they were dismissed in the March 31 opinion.[21]

The de facto merger claim against El Paso and the alter ego claim against NuCoastal are based on conclusory allegations.  The amended complaint simply recites the elements of each claim, which is insufficient to provide fair notice of the claims and the grounds upon which they rest.  Even under the pleading standards in existence before *Twombly* and *Iqbal*, this is not sufficient to survive

---

[21] El Paso and NuCoastal also argue that because there are not sufficient allegations of liability on any claim, there is no liability to impute through these theories.  This is no longer a valid objection.  For the reasons described above, the factual allegations in the amended complaint state ATA violations by Coastal and Wyatt.

a motion to dismiss.  *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (finding that after *Twombly* and *Iqbal*, the rule remains that "a plaintiff must provide notice to defendants of her claims.").

The respondeat superior claim against El Paso for Wyatt's acts as an employee was not alleged in the original complaint.  El Paso has not made a specific argument as to why this claim should be dismissed.  "Under the doctrine of respondeat superior, a principal or employer may be vicariously liable for the tortious acts of an agent or employee if the acts are within the course and scope of employment."  *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Sys., Inc.*, 300 S.W.3d 348 (Tex. App.–Dallas 2009, pet. denied) (citing *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 686 (Tex. 2007); *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998)).  The plaintiffs have alleged that Wyatt was an employee of El Paso beginning in 2000, that he was "employee and executive officer," "an officer and employee of the corporation," and that he was a "managerial employee."  (Docket Entry No. 121, ¶¶ 278, 279, 281, 284).  Although the plaintiffs have not stated Wyatt's specific job title, they have alleged that he was responsible for purchasing Iraqi oil using his front companies and paying kickbacks to Iraq.  The amended complaint contains numerous allegations about Wyatt's improper activities in this area after 2000.  The plaintiffs allege that Wyatt took these actions in the scope of his employment.  Although El Paso argues that he was not acting as an El Paso employee, the allegations are sufficient to survive a motion to dismiss on the respondeat superior claim.

## C.    Proper Party

Relatedly, El Paso has moved to dismiss on the ground that it is not a proper party to this suit because the alleged acts were taken by a wholly owned subsidiary of El Paso with its own corporate form.  This argument is based on an affidavit from Thomas Malone, an Associate General Counsel

of El Paso and one of the lawyers who has appeared for El Paso in this suit.  Malone described the transaction in which Coastal merged with El Paso.  He stated that Coastal continues to operate as El Paso CGP Company L.L.C., a subsidiary wholly owned by El Paso.  (Docket Entry No. 26, Ex. 1).  El Paso submitted S.E.C. filings and state corporate registration documents to support these statements.  The plaintiffs responded by arguing that El Paso assumed responsibility for El Paso GCP's acts in its settlement with the S.E.C. and that El Paso has since acquired all or substantially all of the assets and liabilities of El Paso GCP.  (Docket Entry No. 42 at 8–11).  The plaintiffs have attached the S.E.C. complaint and settlement agreement as well an El Paso GCP S.E.C. filing.  The plaintiffs argue that these documents support the theory that El Paso has expressly assumed El Paso GCP's liabilities.

A court generally must limit itself to the contents of the pleadings in considering a Rule 12(b)(6) motion but may consult documents attached to the defendant's motion if "they are referred to in the plaintiff's complaint and are central to [its] claim."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).  There are a number of cases from courts around the country in which S.E.C. filings and other public documents, such as court records, have been considered appropriate to consider in deciding a Rule 12(b)(6) motion.  *See, e.g.*, *Bovee v. Coopers & Lybrand C.P.A.*; 272 F.3d 356, 360–61 (6th Cir. 2001); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1275–78 (11th Cir. 1999); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).  In the Fifth Circuit, their use is strictly limited.  "Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996); *see also Warden v. Barnett*, 252 F.3d 1356, at n.1 (5th Cir. 2001) (unpublished) (no page numbers

available); *In re Landry's Seafood Restaurant, Inc.*, No. H-99-2279, 2001 WL 34115784, at *1 n.8 (S.D. Tex. Feb. 20, 2001).   For example, in *Lovelace*, the statements in an S.E.C. filing were relevant, regardless of their truth, because the allegations were that the defendant had committed securities fraud, based in part on those filings.  *Lovelace*, 78 F.3d at1018 & n.1.  In *Barnett*, a prior state court pleading was relevant regardless of the truth of its allegations because it "was offered as proof that Barnett was on notice of his alleged injury when his state court suit was filed."  *Barnett*, 252 F.3d 1356, at n.1.

In the present case, the S.E.C. filings are not offered as proof of notice or proof that certain legally relevant statements were made.  Whether the corporate relationship between El Paso and El Paso GCP subjects El Paso to liability for El Paso GCP's acts depends on the truth of the statements in the S.E.C. filings.   Under the Fifth Circuit's holding in *Lovelace*, they are not appropriately considered in deciding a Rule 12(b)(6) motion.  As to the corporate registrations, they might fit the *Lovelace* standard because the fact of having a corporate registration is itself relevant.  But they do no more than establish the existence of El Paso GCP and the proper names of El Paso GCP and the parent corporation.  These facts are not sufficient for El Paso to prevail on a motion to dismiss based on corporate structure.  Similarly, El Paso's admissions in its S.E.C. settlement might also satisfy *Lovelace* to the extent the plaintiffs use it as a legally operative document in which El Paso accepted liability for El Paso GCP's actions.  Malone's affidavit and most of the attached exhibits are not properly part of a Rule 12(b)(6) analysis, and the exhibits submitted by the parties that might be acceptable to consider are not decisive.  El Paso's motion to dismiss based on corporate form cannot be granted at this stage.

### D.     Limitations

The defendants have also moved to dismiss based on limitations.  A motion to dismiss for failure to state a claim under Rule 12(b)(6) is a valid means to raise a statute of limitations defense. *Bush v. United States*, 823 F.2d 909, 910 (5th Cir. 1987).  A court should dismiss based on the statute of limitations only if that bar to relief appears on the face of the complaint or other appropriately considered materials.  *Garrett v. Commonwealth Mortgage Corp. of Am.*, 938 F.2d 591, 594 (5th Cir. 1991).  Appropriate materials include attachments to the complaint.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 127 S. Ct. 2499 (2007); *Collins*, 224 F.3d at 498.

The limitations period on an ATA claim is four years from the date the claim accrues.  18 U.S.C. § 2335(a).  The three attacks in this case occurred on November 4, 2001, December 1, 2001, and March 9, 2002.  A suit arising out of the third attack would have been timely as of March 2006.  This case was not filed until January 2, 2009.  It is undisputed that this suit would be untimely under the ordinary limitations rule.  The plaintiffs argue that, under the doctrine of equitable tolling, their case was nonetheless timely filed.  They have stated explicitly that they do not argue for application of the discovery rule or for a statutory tolling provision in the ATA.

Equitable tolling is "to be applied sparingly.'" *Manning v. Chevron Chem. Co.*, *LLC*, 332 F.3d 874, 880 (5th Cir. 2003) (quoting *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061 (2002)).  The plaintiffs bear the burden of demonstrating that equitable tolling should apply.  *Manning*, 332 F.3d at 880; *Ramirez v. City of San Antonio*, 312 F.3d 178, 183 (5th Cir. 2002).  Equitable tolling is appropriate if the defendants concealed material facts relating to their wrongdoing, which prevented the plaintiffs from learning the facts necessary to pursue their claims within the limitations period.  *Manning*, 332 F.3d at 880; *Litle v. Arab Bank*, 507 F. Supp. 2d 267, 276–79 (E.D.N.Y. 2007) (finding no equitable tolling in cases brought under the ATA).  The plaintiffs must also show that they exercised due diligence in pursuing the claim during the

limitations period.  *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990); *Litle*, 507 F. Supp. 2d at 277.  Unlike the discovery rule, which delays accrual of a claim, the effect of equitable tolling is that the claim accrues upon injury but is then tolled until the plaintiff learns the nature of his cause of action.  *Litle*, 507 F. Supp. 2d at 276.  This means that, if equitable tolling is appropriate, the plaintiffs in this case would have had a full four years from whenever the equitable tolling period ended to file their suit.  *See Henderson v. AT&T Corp.*, 933 F. Supp. 1326, 1334–35 (S.D. Tex. 1996).

Courts have held that "because the question whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) motion."  *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 301–02 (3d Cir. 2010); *see also Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003–04 (9th Cir. 2006) ("Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue."); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) (rejecting defendant's argument that plaintiffs; claims were "untimely under the one-year periods of limitations contained in both the TILA and the RESPA," and noting that "because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)").  Both parties have submitted evidence outside the pleadings to support their statute of limitations arguments.  Subsection (d) of Rule 12 requires that "if a district court intends to rely on other evidence, it must convert the Rule 12(b) (6) motion to a motion for summary judgment, giving proper notice to the parties."  The court will convert the motion to dismiss on the statute of limitations issue to one for summary judgment.

While this court does not rule on limitations, it is worth nothing that the amended complaint emphasizes facts showing that the kickback scheme and its connection to funding terrorism, may have been publicly apparent within the limitations period.  As discussed, in August 2002, the *Washington Post* reported that Hussein was manipulating the OFP and using the money to pay rewards to families of suicide bombers launching attacks in Israel.  The plaintiffs have also alleged that the *New York Post* reported in October 2004 that Hussein "secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program."  (Docket Entry No. 121, ¶ 126).  El Paso has submitted materials publicly implicating the defendants in this wrongdoing.  On October 11, 2004, the *Wall Street Journal* ran a story with the headline "Iraq Oil-for-Food Probe Hits U.S. — Exxon, Chevron and El Paso Are Named in CIA Report On Hussein-Era Program."  (Docket Entry No. 148, Ex. I).  The article stated that El Paso (apparently as successor to Coastal), Bayoil, and Wyatt were identified in a report written by a Central Intelligence Agency arms inspector evaluating the Iraq sanctions.  The report "described efforts by the Hussein regime to manipulate the Oil-for-Food program in its favor, circumventing U.N. mandates, and possibly U.S. law."  (*Id.*).  The article also stated that a federal grand jury in New York was investigating OFP corruption and had subpoenaed El Paso for that purpose.  (*Id.*).  On December 16, 2004, CNNMoney.com published an  article stating that El Paso was under investigation by "prosecutors and regulators" for its involvement in the OFP.  The story stated that El Paso bought Coastal in 2001 and that Coastal was  the largest U.S. purchaser of Iraqi oil during the OFP.  According to the article, "Coastal and its former CEO, Oscar Wyatt" had been subpoenaed by the federal grand jury, as had Bayoil.  In addition to the federal criminal investigation, investigations by the Manhattan district attorney, the S.E.C., several congressional committees, and "an independent panel led by former Federal Reserve Chairman Paul Volcker" were also underway.

The article stated that El Paso had received subpoenas from federal prosecutors and the Senate Permanent Subcommittee on Investigations.  According to the article, the C.I.A arms inspector concluded that Wyatt was allocated 24.2 million barrels of oil by Hussein.  But a Wyatt spokesman denied that Wyatt had ever "individually held a contract to purchase crude oil from Iraq [or] ever purchased crude oil from Iraq."  (*Id.*).

El Paso has also submitted an excerpt of a November 23, 2004 quarterly report it filed with the S.E.C.  The report disclosed the following:

> In September 2004, The Coastal Corporation (now known as El Paso CGP Company, which we acquired in January 2001) received a subpoena from the grand jury of the U.S. District Court for the Southern District of New York to produce records regarding the United Nations' Oil for Food Program governing sales of Iraqi oil. The subpoena seeks various records relating to transactions in oil of Iraqi origin[] during the period from 1995 to 2003.  In November 2004, we received an order from the S.E.C. to provide a written statement and to produce certain documents in connection with the Oil for Food Program.  We have also received an inquiry from the United States Senate's Permanent Subcommittee [on] Investigations related to a specific transaction in 2000.
>
> In September 2004, the Special Advisor to the Director of Central Intelligence issued a report on the Iraqi regime, including the Oil for Food Program.  In part, the report found that the Iraqi regime earned kick backs or surcharges associated with the Oil for Food Program. The report did not name U.S. companies or individuals for privacy reasons, but according to various news reports congressional sources have identified the Coastal Corporation and the former chairman and CEO of Coastal, among others, as having purchased Iraqi crude during the period when allegedly improper surcharges were assessed by Iraq.

(*Id.*, Ex. H at 26).

This publicly available information undercuts the plaintiffs' assertion that they could not have been aware of the nature of their claims until after the limitations period ran.  But this issue is best addressed on summary judgment, when the evidence outside the pleadings can be appropriately

developed and considered, with the burden on the party invoking tolling to show that it should be applied. The motion to dismiss based on limitations is converted to a motion for summary judgment.

## VI.     Conclusion

The motions to dismiss the amended complaint are denied except as to: (1) the conspiracy allegations; (2) the allegations against Bayoil Supply & Trading and NuCoastal Panama based on violations of 18 U.S.C. § 2332(d); and (3) limitations. The motions to dismiss based on limitations are converted to motions for summary judgment. A status conference is set for **April 18, 2011 at 4:00 PM** in Courtroom 11-B to discuss a time line for additional discovery and briefing targeted to the threshold limitations issue.

SIGNED on March 31, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge