**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ODELIA ABECASSIS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-09-3884 |
| | § | |
| OSCAR S. WYATT, JR., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This suit arises out of terrorist attacks in Israel between 2000 and 2002. The plaintiffs are Americans injured in the attacks and their relatives. The defendants are companies and individuals involved in the oil and gas business. The plaintiffs allege that these defendants used the United Nations Oil-for-Food Program to purchase oil from Iraq with payments that included illegal kickbacks to a secret bank account controlled by Saddam Hussein. The plaintiffs allege that Hussein used funds from this account to provide money and services to Palestinian terrorist organizations and to make payments to the families of suicide bombers and others killed in carrying out the terrorist attacks. According to the plaintiffs, such payments were important in recruiting terrorists.

In their amended complaint, the plaintiffs alleged that the defendants violated the Antiterrorism Act ("ATA") by providing material support to terrorist organizations and by engaging in illegal financial transactions with Iraq. (Docket Entry No. 121).[1] The defendants moved to dismiss the amended complaint under Rule 12(b)(6). (Docket Entry Nos. 127, 128, 130, 133, 134).

---

[1] The original complaint included 193 plaintiffs, all of whom alleged violations of the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350. Most of these plaintiffs were aliens who also asserted claims under the Alien Tort Statute ("ATS"), which permits aliens to sue for some violations of customary international law. These claims were dismissed, with prejudice.

This court denied the motions to dismiss except the conspiracy allegations and the allegations against Bayoil Supply & Trading and NuCoastal Panama based on violations of 18 U.S.C. § 2332(d).  The court converted the motions to dismiss based on limitations to motions for summary judgment.

The issue on summary judgment is whether, as the defendants assert, the plaintiffs' claims are barred by the ATA's four-year limitations period.  (Docket Entry No. 172).  The three terrorist attacks made the basis of this action occurred on November 4, 2001, December 1, 2001, and March 9, 2002.  An ATA claim arising out of the third attack would have been timely filed as late as March 2006, but the original complaint in this case was not filed until January 2, 2009.  The plaintiffs argue that because the defendants fraudulently concealed the facts giving rise to the ATA claims, equitable tolling applies to make the plaintiffs' complaint timely.  The defendants respond that, even if they engaged in fraudulent concealment, the plaintiffs waited too long to sue.  The defendants maintain that the plaintiffs were on notice of the facts underlying their claims more than four years before they filed suit.  Alternatively, the defendants argue that, because the plaintiffs became aware of their claims before the limitations period ended, tolling doctrines do not provide them with the several years of additional time that elapsed before the plaintiffs filed their original complaint.

Based on a careful review of the pleadings; the motion, response, and reply; the arguments of counsel; and the relevant law, the court denies the defendants' joint motion for summary judgment.  The reasons are explained below.

## I.      Background

Prior opinions have summarized the plaintiffs' factual allegations.  *Abecassis v. Wyatt*, 785

F. Supp. 2d 614 (S.D. Tex. 2011); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623 (S.D. Tex. 2010).  The background is repeated here to the extent necessary for the limitations analysis.

A.      **The Iraq Oil-for-Food Program**

Less than a week after Saddam Hussein invaded Kuwait on August 6, 1990, the United Nations issued economic sanctions precluding member states from buying Iraqi oil.  (Docket Entry No. 121, ¶ 145).  On April 14, 1995, the U.N. Security Council adopted Resolution 986, lifting the embargo but restricting Iraq's ability to sell its oil.  Iraq's government and the U.N. negotiated the details of the restrictions, resulting in a written agreement some time in May 1996. This agreement led to the U.N. Oil-For-Food Program ("OFP").  Under the OFP, a new U.N. office was created to oversee Iraq's sale of oil and purchase of humanitarian goods.  An escrow account was established at the New York branch of the Banque Nationale de Paris ("BNP").  The proceeds of Iraqi oil sales were to be deposited into the escrow account, which the U.N. monitored.  Iraq could use the funds only to purchase food and other humanitarian goods.  (*Id.*, ¶¶ 153–55).  The United States government allowed American individuals and companies to enter into executory contracts with Iraq to purchase oil or sell humanitarian goods, including food and medical supplies.  These contracts required a license from the Treasury Department's Office of Foreign Assets Control ("OFAC").  OFAC evaluated these license applications in conjunction with the State and Commerce Departments and the U.N. committee responsible for overseeing the BNP account.  The plaintiffs allege that OFAC issued approximately 1,050 specific licenses to American individuals and entities, including the defendants, for various aspects of the OFP.  (*Id.*, ¶¶ 156–60).

In December 1996, Iraq began selling oil through the OFP.  Under the OFP, although buyers

would send the money to buy oil to the BNP account in New York, Saddam Hussein's government retained the right to choose the buyers. Those selected had to purchase the oil at the Official Selling Price ("OSP"), which was determined by a U.N. committee. The plaintiffs allege that the U.N. "sought to set a price for Iraqi oil at the highest rate bearable by the market in order to maximize the revenue generated," which "would increase the amount of humanitarian goods that could be purchased" and "minimize the potential for illegal kickbacks" to Saddam Hussein. Presumably, buyers already paying full market price would be unable or unwilling to pay more in kickbacks. (*Id.*, ¶¶ 161–62).

The plaintiffs allege that many of the companies and individuals Iraq chose to receive "allocations" of Iraqi oil "were not otherwise involved in the oil industry [and] were able to reap large profits by selling their allocations of Iraqi oil to brokers and/or companies capable of transporting the oil to a refinery." (*Id.*, ¶ 162). Beginning in 2000, the plaintiffs allege, Iraqi officials conditioned oil allocations on the buyer's willingness to pay a "surcharge" to Hussein's government. These surcharges, calculated as a percentage of the total contract price, were not permitted under the OFP. The buyers allegedly paid these surcharges through "front companies" to bank accounts Hussein controlled. The plaintiffs also allege that Hussein charged "port fees" before allowing tankers to receive oil at Iraqi ports. Like the surcharges, the port fees were paid to Hussein instead of the OFP bank account. The plaintiffs allege that these surcharges and port fees were kickbacks and that the kickbacks were made possible by lobbying that persuaded the U.N. to select a below-market OSP. The plaintiffs also allege that at least some of the cost of these kickbacks was passed on by the direct purchasers to the next purchaser down the line. (*Id.*, ¶¶

4

163–68).

### B.    The Allegations as to the Defendants' Actions

Oscar Wyatt, a Texas oil trader, was the chairman and sole shareholder of Coastal Corporation.   Wyatt later formed NuCoastal Corporation, a Houston energy company, and NuCoastal Trading, S.A., a Panama corporation.  Both NuCoastal entities are also defendants.

The plaintiffs allege that when Iraq invaded Kuwait, Wyatt owed Iraq $90 million.  After the U.N. sanctions froze Iraq's bank accounts, Wyatt began repaying the money directly to the Hussein government and not to the U.N.-controlled accounts.  (*Id.*, ¶¶ 139–43).  Wyatt maintained a close relationship with Hussein while the U.N. embargo was in place, hoping that he would be rewarded with Iraqi oil-purchase contracts once the sanctions were lifted.  This relationship extended to providing Hussein communications equipment and GPS devices in the mid–1990s, including an INMAR satellite, which Wyatt allegedly gave to the Iraqi ministry of oil and paid to operate.  (*Id.*, ¶ 143).

The plaintiffs allege that Wyatt lobbied the U.N. to lift its sanctions to make Iraqi oil available for purchase, and to reduce the OSP to a below-market level so that Iraq could extract surcharges from direct buyers while allowing those buyers to make a profit.  (*Id.*, ¶¶ 148–52, 210). The plaintiffs allege that Wyatt negotiated for and obtained allocations under the OFP in exchange for illegal surcharges, or kickbacks.  Wyatt allegedly made the payments through "front companies" he controlled in Switzerland and Cyprus.  (*Id.*, ¶¶ 31–38).

Wyatt was prosecuted for his actions relating to the OFP.  He pleaded guilty to conspiracy to commit wire fraud on October 1, 2007.  (*Id.*, ¶ 228).  According to the amended complaint in this

case, Wyatt has testified that he caused surcharge payments to be deposited in a Hussein-controlled bank account in Jordan.  Wyatt acknowledged knowing that the payments violated the OFP and stated that he had intended to defraud the U.N.  (*Id.*).  The plaintiffs also allege that Wyatt committed treason by giving Hussein information about American war plans.  (*Id.*, ¶ 146).

The plaintiffs make similar allegations against David Chalmers, an American businessman involved in oil and gas; Bayoil (USA), Inc., a Delaware company based in Houston that Chalmers owned; and Bayoil Supply & Trading Limited, a Bahamas affiliate of Bayoil USA, of which Chalmers was the sole director and shareholder.  (*Id.*, ¶¶ 28–29).  On August 17, 2007, Chalmers and the Bayoil companies also pleaded guilty to conspiracy to commit wire fraud.  According to the plaintiffs, Chalmers admitted that he had made payments that he "both expected and intended" would go to Hussein, and that he had concealed those payments from the U.N.  The plaintiffs allege that Chalmers stated that he knew the payments violated the OFP,  (*Id.*, ¶ 227), and told an El Paso trader to oppose U.N.-proposed pricing policies designed to eliminate kickbacks.  (*Id.*, ¶ 185).

Chalmers and Bayoil did not receive allocations of Iraqi oil.  Instead, they purchased the oil from a third party who did receive allocations.  The plaintiffs' amended complaint alleges that Chalmers and Bayoil controlled the third party receiving the allocations, referring to it as the "Bayoil Foreign Company."  The plaintiffs allege that Bayoil transferred the purchase money through a Bahamas account to accounts in the Middle East and paid it to the party that had received the allocations.  That party then transferred a large part of the money to accounts controlled by Hussein.  One of the accounts was held by Al Wasel and Babel General Trading, a United Arab Emirates company allegedly "secretly owned and controlled" by Hussein.  (*Id.*, ¶ 190).  Bayoil and Chalmers

6

were allegedly closely involved in the illegal payments to Hussein.  The amended complaint alleges that a Bayoil representative delivered a letter to Iraqi officials in 2002 proposing "a payment plan for certain illegal surcharges owed by another Oil for Food participant."  (*Id.*, ¶ 200).

In January 2001, the El Paso Corporation acquired Coastal.  El Paso is a large oil and gas company incorporated in Delaware and based in Houston.  Wyatt was no longer Coastal's chairman when the acquisition occurred, and his contract as a consultant was terminated when Coastal became an El Paso subsidiary.  The plaintiffs allege that El Paso knew when it acquired Coastal that Wyatt had paid illegal surcharges in exchange for Iraqi oil allocations and that he had other illegal dealings with Hussein.  (*Id.*, ¶ 4).  Much of the amended complaint alleges that Wyatt and his "front companies" took certain actions on El Paso's behalf or for its benefit.  Generally, these allegations appear to be based on El Paso's acquisition of Coastal or on El Paso's purchases of oil from Wyatt's "front companies" after the acquisition.

In the original complaint, the plaintiffs alleged 16 transactions involving El Paso.  One was a direct allocation of oil purchased by Coastal before it was acquired by El Paso, for which Wyatt allegedly paid Hussein a kickback.  Another was an oil purchase by Coastal from a third party that had received an allocation.  The rest were purchases by El Paso from third parties that had received direct allocations and had passed "kickbacks" to El Paso in the form of higher prices after El Paso acquired Coastal.  In the amended complaint, the plaintiffs allege that the third parties from whom El Paso purchased oil were front companies Wyatt controlled.  The plaintiffs allege that because these front companies "lacked the resources to pay hundreds of millions of dollars for crude oil, . . . [a]ll payments, including illegal surcharge payments were cleared in advance by El Paso and

7

funded by El Paso." (*Id.*, ¶ 169).  They also allege that El Paso had some control over, and interest in, these front companies.

The plaintiffs allege that on January 6, 2001, Wyatt traveled to Iraq to propose a scheme under which he would establish four front companies outside the United States.  These companies would buy oil from Iraq at low prices and "pre-sell the oil at inflated prices to Oil Companies in order to cover the kickbacks and launder the money." (*Id.*, ¶ 172).  Under this system, in which the front companies collected the surplus on Hussein's behalf, the "majority of the profit would be laundered to the Saddam Regime with the minority portion paid to Wyatt, the Coastal Group and El Paso." (*Id.*, ¶ 174).The amended complaint alleges that at the January 6, 2001 meeting, Nafta Petroleum, one of Wyatt's front companies, received a 4.5 million-barrel allocation, for which Wyatt agreed to pay a 40-cent-per-barrel surcharge to Hussein within one month after the oil was loaded, "even if it resulted in a loss." (*Id.*, ¶ 175).  This is consistent with the alleged scheme described.

The amended complaint also alleges that in December 2001, Wyatt asked El Paso to reimburse Sarenco, S.A., another of his front companies, for a $200,000 balance on a kickback to Hussein. (*Id.*, ¶¶ 188, 196).  The amended complaint states: "Upon information and belief, El Paso reimbursed Wyatt the money that Wyatt had sent to the Saddam Regime in order to repay the amount of debt from the failure to pay surcharge payments." (*Id.*, ¶ 196).

The plaintiffs allege in the amended complaint that El Paso traders were recorded recounting conversations with Iraqi officials "in which 'they told us — blatantly — that we would have to pay,'" and in which a competitor showed an El Paso trader an account number and contact given to him by an Iraqi official for paying kickbacks, an action that both traders regarded as "blatant." (*Id.*,

¶ 220).  The plaintiffs allege that on May 31, 2001, Doris Simmons, an El Paso employee, e-mailed Iraqi oil officials asking that an allocation contract between Iraq and Mednafta, one of Wyatt's front companies, be amended to change the oil tanker's destination to a location in Central America.  (*Id.*, ¶ 183).  The plaintiffs allege that two sale negotiations took place over the phone in July 2001 among an El Paso oil trader, Wyatt, and Wyatt's associate Cathy Miguel, who was involved with Wyatt's front companies.  On July 3, Wyatt allegedly asked the trader to post a letter of credit on behalf of Wyatt and Miguel.  On July 5, Wyatt allegedly asked the trader to fax a draft contract to Mohammed Saidji, who ran Sarenco, S.A., one of Wyatt's front companies in Geneva.  (*Id.*, ¶¶ 186–87).  On October 4, 2001, Wyatt allegedly told an El Paso employee in a phone conference that he had paid "illegal port fees" to Hussein and offered to have Cathy Miguel "pay those fees on behalf of and for the benefit of El Paso."  (*Id.*, ¶ 192).  In 2004, Simmons allegedly told a NuCoastal employee to take down a domain name owned by Mednafta, one of Wyatt's front companies, "so that Mednafta would not be traced back to Wyatt, the Coastal Group or El Paso."  (*Id.*, ¶ 204).

On February 7, 2007, the Securities and Exchange Commission filed a civil action against El Paso in the Southern District of New York, alleging that El Paso had knowingly and illegally paid $5.5 million to Iraq.  The same day, El Paso entered into a nonprosecution agreement with the U.S. Attorney's office, agreeing to pay $5,482,363 to the people of Iraq as the OFP's intended beneficiaries.  One week later, on February 14, 2007, the district court entered a consent judgment in the S.E.C. lawsuit.  The judgment incorporated the $5,482,363 payment arranged with the U.S. Attorney's office and included a separate $2.25 million fine to the S.E.C.  (*Id.*, ¶¶ 224–26).  The plaintiffs have not alleged that the consent judgment or nonprosecution agreement included any

admission of wrongdoing by El Paso.

### C.    The Allegations as to Hussein's Actions

The amended complaint exhaustively catalogs the human-rights abuses directed by Saddam Hussein during his rule.  The plaintiffs focus on Hussein's relationship with Palestinian terrorist organizations responsible for acts directed against Israel and the West.  The plaintiffs allege that Hussein "provided offices, training camps, safe haven, financing and operational and logistical support" for organizations that have carried out terrorist attacks, including the Abu Nidal Organization ("ANO"), the Palestine Liberation Front ("PLF"), Hamas, Palestinian Islamic Jihad ("PIJ"), and the Al–Aqsa Martyrs' Brigade ("AAMB").  (*Id.*, ¶¶ 66–70).  The plaintiffs focus on the ALF, Hamas, PIJ, and the AAMB, all designated by the United States as terrorist groups.

Beginning in 1990, the State Department designated Iraq as a state sponsor of terrorism.  (*Id.*, ¶ 54).  After the Second Intifada broke out in September 2000, Hussein gave a speech supporting the Palestinian cause and announced that he would provide rewards to the families of Palestinians injured or killed carrying out attacks on Israel.  The plaintiffs allege that Hussein encouraged suicide bombing attacks against civilian targets in Israel by publicizing the rewards program.  This program paid over twice as much to the family of a suicide bomber than to the family of a "martyr" killed inadvertently.  (*Id.*, ¶¶ 85–89).  Hussein "handed out checks to surviving family members at public ceremonies which were covered by Palestinian and Iraqi electronic and print media."  (*Id.*, ¶ 88).  Hussein gave $25,000 to families of suicide bombers and $10,000 to families of other Palestinians who died in the Intifada.  (*Id.*, ¶¶ 120, 124).

### D.    The Plaintiffs' Injuries and This Lawsuit

The amended complaint is based on three terrorist attacks in Israel during the Second Intifada.  The plaintiffs are eight United States nationals who were injured in the attacks and two of their family members.  The plaintiffs allege that Hussein made reward payments to the families of the terrorists who carried out each attack.  The following attacks are alleged:

- On November 4, 2001, a PIJ terrorist named Hatem Shweikeh, opened fire with automatic weapons in a bus in Jerusalem.  He killed two people and injured 40, including plaintiffs Yissachar Zvi Lebowitz (the son of plaintiffs Rosalyn Shoshanna Pearl and Shimon Lebowitz), Shifra Markowitz (the daughter of plaintiffs Ester Devora Markowitz and Gerald Markowitz), Sarah Mordechai (the daughter of plaintiff Shirin Mordechai), Ora Rubinoff (the daughter of Aviva Rubinoff and Mitchell Jay Rubinoff, and the sister of plaintiffs Eliezer Rubinoff, Yosef Rubinoff, and Shoshanna Rubinoff), and Gila Schnall (the daughter of plaintiffs Frances Schnall and Ira Schnall).  The terrorist's mother received a payment on behalf of Saddam Hussein.  (*Id.*, ¶ 234).

- On December 1, 2001, two Hamas suicide bombers named Osama Baher and Nabil Halbiyeh detonated explosives on their persons and rigged to a car on Ben Yehudah Street in Jerusalem.  The attack killed 11 and wounded 170, including plaintiff Baruch Yehuda Ziv Brill.  On January 22, 2002, the father of one attacker and the mother of the other each received a $15,000 check on behalf of Hussein.  Both were signed by Rakad Salem, "the head of the ALF."  (*Id.*, ¶ 233).

- On March 9, 2002, a Hamas suicide bomber named Fuad Hurani detonated explosives at a café in Jerusalem.  Eleven people were killed, and fifty-eight people were wounded, including plaintiff Yoseff Cohen.  Plaintiff Asael Firdman alleges that he suffered serious psychological injures as a result of the attack.  On June 23, 2002, the suicide bomber's mother received a $25,000 check on behalf of Hussein signed by Salem.  (*Id.*, ¶ 232).

The plaintiffs seek compensation for the injuries suffered in these attacks from El Paso, Wyatt, the NuCoastal Companies, Chalmers, and the Bayoil Companies.  The plaintiffs allege that Hussein used money obtained from the defendants, either directly or through intermediaries, in violation of the OFP restrictions, to fund terrorism against Israel primarily by paying "rewards" to the families of the terrorists whose attacks in Israel injured the plaintiffs.  This suit was originally filed on January 2, 2009 in the United States District Court for the District of Columbia.  (Docket

Entry No. 3).  The defendants' motion to transfer venue was granted and the case transferred to this court.  (Docket Entry No. 60).

On March 31, 2010, this court dismissed claims filed by the plaintiffs who were not American nationals or citizens and who sued under the Alien Tort Statute, 28 U.S.C. § 1350.  This court held that these plaintiffs lacked standing and that they had failed to state a claim.  (Docket Entry No. 118).  This court also dismissed claims brought by all the plaintiffs under the Torture Victim Protection Act, Pub. L. 102–256, Mar. 12, 1992, 106 Stat. 73, *reprinted as a note to* 28 U.S.C. § 1350, and claims based on imputed successor liability against El Paso (for Coastal's liability) and alter-ego liability against the NuCoastal Companies (for Wyatt's and Coastal's liabilities), all for lack of standing and failure to state a claim.  Leave to amend was denied on the basis of futility.

The March 31, 2010 opinion also dismissed the claims brought by United States nationals and citizens injured by the attacks (or their estates, survivors, or heirs) under the Antiterrorism Act of 2001, 18 U.S.C. § 2333, for failure to state a claim.  (Docket Entry No. 116).  On April 23, 2010, the plaintiffs filed an amended petition.  (Docket Entry No. 121).  This court denied the defendants' motions to dismiss the amended complaint under Rule 12(b)(6) except as to the plaintiffs' conspiracy allegations and allegations against Bayoil Supply & Trading and NuCoastal Panama based on violations of 18 U.S.C. § 2332(d).  The court converted the defendants' motion to dismiss based on limitations to a motion for summary judgment and invited the parties to supplement the record and briefs on limitations.

E.    **The Summary Judgment Evidence**

The plaintiffs and the defendants have submitted extensive summary judgment evidence on limitations.  The record includes: newspaper and other media reports; discovery responses; court documents from the defendants' criminal proceedings; hearing excepts from the United States Congress; reports produced by governmental and nongovernmental organizations; affidavits; and a stipulation.  This evidence is summarized below.

1.    **Newspaper and Other Reports**

The parties have submitted hundreds of newspaper and other media reports for the purpose of showing when the plaintiffs knew or should have known that they might have an ATA claim against the defendants.  As the OFP scandal unfolded, it was reported by media outlets from around the world.  The timeline shown by the articles and reports the parties submit is as follows:

•    A newspaper piece by Susan Blaustein, printed in the *Washington Post* in 2002, is one of the earliest-published articles the defendants submitted. The Blaustein article includes a detailed discussion of Saddam Hussein's manipulation of the OFP and extraction of illegal surcharges and other kickbacks.  The article does not mention any of the defendants.  It suggests that American firms are downstream purchasers of oil that others may have paid surcharges to buy.[2]   (Docket Entry No. 173, Ex. 8 at 2–5 (Susan Blaustein, *Saddam Hussein's Billions*, WASH. POST, Aug. 4, 2002)).

•    In early 2004, *al-Mada*, an Iraqi newspaper, published a leaked list of OFP oil recipients.

---

[2]  The following excerpt is particularly relevant:

> No U.S.-based oil firms are currently direct purchasers of Iraqi oil, but the illegal 20-cent to 70-cent-per-barrel surcharges that Hussein has managed to embed in the pricing system worked out with the U.N. Sanctions Committee are passed up the line —from the buyers who must actually agree to the kickbacks (mostly Russian, Chinese, Thai, Indian and Vietnamese firms and small shell company registered in western countries that tolerate money-laundering) to the major traders to the American refineries and, presumably, to the ordinary motorist.

(*Id*. at 4).

This list was reprinted and referenced in several English-language publications. When first published, it did not name any of the defendants or link oil recipients to the payment of bribes. (Docket Entry No. 173, Ex. 12 at 2–5 (*The Saddam Oil Bribes: The Complete al-Mada List*, FREE REPUB. (Jan. 31, 2004, 6:01:48 AM), http://www.freerepublic.com/focus/f-news/1068890/posts)).

- The first report to mention any of the defendants is an April 7, 2004 *Financial Times* article. It discusses methods used by Chalmers and Bayoil in order to acquire oil from Iraq. The article is unclear as to whether these methods were illegal and quotes Bayoil as saying that its purchases followed "strict regulatory compliance procedures." Bayoil was also quoted as saying it had "suspended further purchases of oil from early May 2001 'due to wide press reports of alleged demands by the Iraqis to impose surcharges on those companies in which it had direct contracts.'"[3] The article notes "how difficult it will be for the UN and national investigators to pinpoint clearly illegal behavior." It also states that, "[a]s long as the official revenue went through the UN escrow account, it was legal." (Docket Entry No. 173, Ex. 8 at 76–81 (Claudio Gatti & Mark Turner, *Dealing with Saddam's Regime*, FIN. TIMES, April 7, 2004)).

- In the beginning of October 2004, a list of those receiving oil through the OFP was leaked. This list had been compiled by Charles Duelfer, the chief Iraq weapons inspector for the United States and was commonly referred to as the "Duelfer Report." Coastal Petroleum, Bay Oil, and Oscar Wyatt were listed in the Duelfer Report, which was widely reported in the press. In an October 11, 2004 interview with NPR, *New York Times* reporter Eric Lipton discussed these defendants. Lipton stated that Wyatt "has asserted that he has worked through the official sanctions program and was respecting the rules." When asked what was known about the grand jury investigation, Lipton replied, "Other than the fact that there was subpoenas this summer — that's as much as we know. And we haven't heard much detail about what wrongdoing they might be trying to identify." (Docket Entry No. 173, Ex. 8-5 at 76–79 (*All Things Considered*, *Interview: Eric Lipton Discussed Individuals and Corporations Under Scrutiny Related to UN's Oil-Fo-Food Program with Iraq*, (NPR radio broadcast Oct. 11, 2004))).

- Another article published around the same time noted: "None of the ongoing inquiries into the UN scheme has stated that the players who were allegedly allocated oil vouchers were involved in any wrongdoing, although . . . linking allocations with improprieties is clearly the next step in the investigation . . . ." (Docket Entry No. 173, Ex. 8-5 at 74 (Catherine *Hunter, US Players Received Oil Vouchers Under Iraq's Oil-for-Food Programme*, IHS

---

[3] An October 19, 2004 piece in the *New York Times* apparently corroborates this claim. (Docket Entry No. 173, Ex. 8-7 at 28–32 (Simon Romero & Eric Lipton, *The Man Who Bought the Oil From Iraq*, N.Y. TIMES, Oct. 19, 2004 ("During the ninth phase of the exports, from January 2001 to June 2001, . . . many existing customers refused to pay said surcharge."))).

GLOB. INSIGHT, Oct. 11, 2004)).

- An October 11, 2004 *New York Times* article noted that the independent U.N. inquiry "had not begun investigating whether or how American and other oil companies had benefitted" and was instead concentrating on wrongdoing by U.N. officials. The article further noted that the receipt of oil by companies listed in the Duelfer Report "does not mean that they did anything illegal." (Docket Entry No. 173, Ex. 8-5 at 69–72 (Simon Romero & Scott Shane, *The Conflict In Iraq: The U.N. Program*, N.Y. TIMES, Oct. 11, 2004)).[4]

- When these articles were published in 2004, Wyatt and several of the other defendants publicly denied acting illegally: "Oscar Wyatt says he and his former company Coastal Corp. did not pay kickbacks or improperly buy Iraqi oil in connection with a United Nations-monitored oil-for-food program." (Docket Entry No. 23, Ex. 8-7 at 3–4 (Tim Fowler, Lynn J. Cook, & David Ivanovich, *Wyatt Denies Role in Iraqi Kickbacks*, HOUS. CHRON., Oct. 16, 2004 ("I think it's important to distinguish between legal transactions and illegal ones. So far there's nothing to suggest that American corporations acted illegally."))).

- The first article in the record that directly suggests any of the defendants made illegal payments was published on October 19, 2004 in the *New York Times*. The article states that records show Coastal paid $201,877 in surcharges and that two other Wyatt-associated companies made additional payments. It quotes Wyatt as stating that he did not pay surcharges and that any amounts listed may have been paid without his knowledge by a broker. (Docket Entry No. 173, Ex. 8-7 at 28–32 (Simon Romero & Eric Lipton, *The Man Who Bought the Oil From Iraq*, N.Y. TIMES, Oct. 19, 2004))).

- A November 16, 2004 version of the "Oil-for-Food Programme" Wikipedia entry references the publication of the al-Mada list, which it states may have been forged, as well as a 2003 GAO Report, which noted the ability of the Iraqi regime to levy illegal surcharges. (Docket Entry No. 173, Ex. 26 at 2–8 (*Oil-for-Food Programme*, WIKIPEDIA (Nov. 16, 2004, 23:51)).

- On November 30, 2004, the *Financial Times* published a second report discussing in detail Chalmers's purported use of a front company to buy Iraqi oil for Bayoil. The article mentions a letter from Chalmers asking the company to "specifically warrant that no surcharge or other payment was made to SOMO." The article describes this letter as a "smokescreen" for illegal activity. A quote from Chalmers's attorney denies the accusations made in the article. (Docket Entry No. 173, Ex. 8-13 at 92–94 (Claudio Gatti & Mark

---

[4] Other articles published around the same time include similar language. (*See, e g.*, Docket Entry No. 23, Ex. 8-5 at 11–13 (T. Christian Miller, *Americans Among Beneficiaries in Oil Scandal*, L.A. TIMES, Oct. 9, 2004 ("It remains unclear whether any of the companies' transactions were illegal since all companies named in the report were cleared to purchase oil from Iraq . . . . It's like peeling an onion. We really don't have a good sense of what the whole thing looks like yet."))).

Turner, *Inside the Oil-For-Food Scandal*, FIN. TIMES, Nov. 30, 2004)).

- A December 15, 2004 *Wall Street Journal* article mentions that the S.E.C. issued a request to El Paso as well as to nondefendants Tyco International and Wyeth as part of the investigation into the OFP. The article states that, "The SEC's requests for information don't mean any of the companies is a specific target of the inquiry or suspect of wrongdoing." (Docket Entry No. 173, Ex. 8-16 at 13–15 (Mark Maremont & Michael Schroeder, *SEC Seeks Data From Tyco, Wyeth Over Iraq Program*, WALL ST. J., Dec. 15, 2004)).

- A December 21, 2004 *Newsweek* article cautions that "some of the heated rhetoric from U.N. critics may be running well ahead of the facts available to official investigators." It notes that, "U.S. investigators trying to develop criminal cases out of the scandal . . . appear to be running into some serious roadblocks" and that "the evidence is sketchy that Oil-for-Food money played a significant role in financing terrorism." (Docket Entry No. 173, Ex. 8-16 at 60–62 (Michael Isikoff, *Terror Watch: The Paper Chase, Investigators Are Struggling to Find Concrete Evidence of Fraud and Corruption in the U.N.'s Oil-for-Food Program in Iraq*, NEWSWEEK, Dec. 21, 2004.).

- On January 18, 2005, an Iraqi-American businessmen named Samir Vincent was charged with crimes relating to the OFP. He pleaded guilty the same day. The bill of information does not mention any of the defendants. *United States v. Vincent*, 1:05-cr-00059 (S.D.N.Y. Jan. 18 2005) (information).

- News reports after Vincent's plea noted his connections to Wyatt. A Wyatt spokesperson stated that, while Vincent "at one time may have been a consultant for Coastal . . . that was during a period when Wyatt was merely a shareholder and was no longer running the company." Wyatt "denied paying kickbacks." His spokesperson stated that he had developed a reputation "as a man of integrity, someone who keeps his word." (Docket Entry No. 173, Ex. 8-17 at 59–61 (David Ivanovich, *Oil-For-Food Probe Nets First Guilty Plea*, HOUS. CHRON., Jan. 19, 2006)).

- A February 28, 2005 *New York Post* article linked Vincent to Wyatt's efforts to finance shipments of medicines and baby formula to Iraq in 1997 and 1998. It does not mention illegal surcharges. (Docket Entry No. 173, Ex. 8-18 at 11–12 (Niles Lathem, *Celebs' Charity Was Oil-Scandal Pipeline*, N.Y. POST, Feb. 28, 2005)).

- On May 4, 2005, several individuals and corporations, including Bayoil and Chalmers, were indicted in the United States District Court for the Southern District of New York. Chalmers and Bayoil were charged with crimes relating to the payment of illegal surcharges in exchange for Iraqi oil. (Docket Entry No. 173, Ex. 8-18 at 11–12 (*United States v. Chalmers*, 1:05-cr-00059 (S.D.N.Y. May 4, 2005) (indictment)).

16

- Chalmers's attorney publicly denied the charges.  (Docket Entry No. 173, Ex. 8-18 at 45–46 (Kristen Hays, *Texas Oilmen Charged with Kickbacks to Saddam Hussein*, A.P., Apr. 14, 2005)).

- Around the same time, both the U.S. Senate and House of Representatives were investigating the OFP Scandal.  On May 16, 2005, the Democratic members of the Senate's Permanent Subcommittee on Investigations issued a report, based on both SOMO and Bayoil documents, that accused Bayoil of paying over $37 million in illegal surcharges.  The report also notes Wyatt's association with Bayoil for lobbying U.N. officials.  (Docket Entry No. 173, Ex. 8-19 part 2 at 18–20 (Robert DiNardo, *US Facilitated Illegal Oil Shipments From Iraq: Senate Democrat Report*, PLATTS OILGRAM NEWS, May 17, 2005).

- On October 19, 2005, the May 4 indictment was amended to add charges against Wyatt and several others, in part for making illegal oil payments to Iraq.  NuCoastal and El Paso were not named in the indictment.  *United States v. Chalmers*, 1:05-cr-00059 (S.D.N.Y. Oct. 19, 2005) (indictment).

- On October 27, 2005, the final version of the Volcker Report was issued by U.N. investigators.  The "scathing final report" documented "massive corruption in the U.N. oil-for-food program."  It was "meticulously detailed" and included both Bayoil and Coastal Corporation among those who were responsible for paying illegal kickbacks in exchange for oil contracts.  (Docket Entry No. 173, Ex. 8-22 at 79–82 (Nick Wadhams & Edith M. Lederer, *U.N.: 2,200 Cos. Gave Iraq Illicit Funds*, A.P., Oct. 27, 2005)).

- On the same day, Wyatt, Chalmers, and Bayoil pleaded not guilty to the criminal charges pending against them.  Wyatt's attorney was quoted as stating, "This is a questionable prosecution."  (Docket Entry No. 173, Ex. 8-22 at 93–94 (Chad Bray, *Texas Oilman Wyatt Pleads Not Guilty to Kickback Charges*, DOW JONES NEWSWIRES, Oct. 27, 2005)).

### 2.    Affidavits

The plaintiffs submitted affidavits from two attorneys, Stephen J. Landes and Steven M. Goldberg.  According to the affidavits, plaintiffs' counsel, Gavriel Mairone, discussed with the attorneys the possibility of bringing a suit on behalf of the victims of terrorism against companies and individuals who paid illegal surcharges to Iraq under the OFP.

- Landes states that Mairone contacted him in September 2005 to ask whether Landes would be interested in working with him on what became this lawsuit.  According to Landes, "there

17

was reason to believe that a case could be made under federal law on behalf of victims of Palestinian terror." (Docket Entry No. 175, Ex. 1, ¶ 2). However, based on his experience in a previous suit, Landes notes that "bringing claims on behalf of terror victims is challenging . . . [because] the evidence in terror cases is difficult to uncover." (*Id.*, ¶ 4). During their first meeting, Landes was "concerned about the need for reliable evidence as to the specific parties who had transferred funds to Saddam Hussein and how the transfers actually occurred." (*Id.*, ¶ 5). Landes believed that after the October 27, 2005 Volcker Report, "which described in great detail the role defendants herein played in funding Saddam-supported terrorism," he could properly weigh the merits of bringing a lawsuit. (*Id.*, ¶ 6-7). Although he completed his research in November 2006, Landes's firm decided in the summer of 2007 that it lacked the resources to represent the plaintiffs in the present suit. (*Id.*, ¶ 9).

- Goldberg states that he met with Mairone in December 2005 to discuss serving as co-counsel in the present suit. (Docket Entry No. 175, Ex. 2, ¶ 2). At that meeting, "Mairone made a detailed presentation to me of a potential case to be brought against various corporations and entities who had allegedly violated the sanctions imposed by the United States and international community against Saddam Hussein's regime in Iraq." (*Id.*, ¶ 2). Mairone also showed Goldberg several newspaper articles discussing potential criminal acts, as well as the October 2005 Volcker Report. (*Id.*, ¶ 4). Sometime in 2006, Goldberg declined to represent the plaintiffs but tried to help Mairone find other firms to act as co-counsel. (*Id.*, ¶ 5–7).

### 3. Discovery Responses

In answer to the defendants' interrogatories, the plaintiffs state that they did not become aware of their claims against the defendants until sometime in 2006. (Docket Entry No. 173, Ex. 1 (Pls.' Resp. to Defs.' Interrog. Nos. 10, 12, 14, 16, 18)).[5] In other interrogatories, the defendants asked that each plaintiff identify every act or omission and all facts relating to each act or omission

---

[5] After responding to the defendants' interrogatories, the plaintiffs sent separate signed statements to the defendants attesting to the veracity of those responses. (Docket Entry No. 6). In their joint motion for summary judgment, the defendants point out that several of the plaintiffs did not produce such statements and have not signed their interrogatory responses. The defendants do not point out which responses remain unsworn. (Docket Entry No. 172 at 22 n.12). Unsworn interrogatory answers are not competent summary judgment evidence. *Alvarado v. Shipley Donut Flour & Supply Co., Inc.*, 526 F. Supp. 2d 746, 764 (S.D. Tex. 2007). The absence of sworn statements for one or more of the plaintiffs is not material to resolving this motion.

of the defendants that prevented each plaintiff from becoming apprised of potential claims within the limitations period.  Among other things, the plaintiffs objected to the interrogatories to the extent that they called for information that was not relevant to a claim or defense, given the stipulation and the limited scope of discovery.  The plaintiffs also referred the defendants to the complaint allegations of fraudulent concealment.  (*Id.* (Pls.' Resp. to Defs.' Interrog. Nos. 9, 11, 13, 15, 17)).

### 4.    The Parties' Stipulation

Finally, the parties stipulated that, "[f]or purposes of the pending motions for summary judgment based on limitations, the Court may assume that Defendants affirmatively and fraudulently concealed the nature of their wrongdoing through each of the instances of concealment alleged in the First Amended Complaint."  (Docket Entry No. 162).

The record evidence on the limitations defense is analyzed under the applicable legal standards.

## II.    The Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).

As the party seeking to invoke equitable tolling, the plaintiffs bear the burden of demonstrating at trial that it should apply. *Manning v. Chevron Chemical Co.*, 332 F.3d 874, 880

(5th Cir. 2003); *Ramirez v. City of San Antonio*, 312 F.3d 178, 183 (5th Cir. 2002); *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999).  When the trial burden of proof is on the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the

light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non moving

party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289

(1968)).

### B.  Limitations

The limitations period on an ATA claim is four years from the date the claim accrues.  18

U.S.C. § 2335(a).  The three attacks in this case occurred on November 4, 2001, December 1, 2001,

and March 9, 2002.  A suit arising out of the third attack would have been timely as late as March

2006.  The original complaint in this case was not filed until January 2, 2009.  It is undisputed that

this suit would be untimely under the ordinary limitations rule.  The plaintiffs argue that the doctrine

of equitable tolling applies.[6]  The plaintiffs have stated explicitly that they do not argue for

application of the discovery rule or for a statutory tolling provision in the ATA.  (Docket Entry No.

141 at 29 n.18).

The terminology and concepts used to describe the several tolling doctrines vary across and

within circuits.  *See S.E.C. v. Microtune, Inc.*, 783 F. Supp. 2d 867, 874 (N.D.Tex. 2011) ("Courts

sometimes use terms such as fraudulent concealment, the discovery rule, equitable tolling, and

---

[6]  This court assumes that, as other courts have held, the common-law doctrine of equitable tolling applies to the ATA.  *See In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig.*, 690 F. Supp. 2d 1296, 1305–06 (S.D. Fla. 2010) ("[T]he Court rejects Defendant's contention that the statuary tolling provision of § 2335(b) is inconsistent with the application of the equitable tolling to Plaintiffs' ATA claims."); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96 (1990) (finding that, generally, there is a rebuttal presumption that equitable tolling applies to all statutes of limitations).  The defendants do not challenge this point.

equitable estoppel interchangeably, which all operate to allow plaintiffs to continue with claims that may otherwise be barred by statutes of limitations, either by postponing the accrual of the claims or tolling the running of the statute of limitations.").

Courts within the Fifth Circuit are among those that use inconsistent tolling-doctrine terminology. In many cases, courts in this circuit use the terms "fraudulent concealment" and "equitable tolling" interchangeably or classify the former as a subset of the latter. *See, e.g.*, *Microtune*, 783 F. Supp. 2d at 874; *see also Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002) ("Courts grant requests for equitable tolling most frequently where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights."). Under this approach, the term "equitable estoppel" is used to describe the doctrine that applies when a defendant tricks or deceives a plaintiff who is aware of her cause of action into delaying suit until after limitations ends. *See Edwards v. Centenary College of Louisiana*, 1995 WL 153261, at *2 (5th Cir. Mar. 28, 1995) ("Equitable estoppel . . . comes into play only if the employee's untimeliness in filing the charge results either from 'deliberate design' to delay the filing or actions that the employer 'should unmistakably have understood' would result in the employee's delay."). At other times, courts have distinguished between "equitable tolling" and "equitable estoppel," holding that if there is fraudulent concealment, equitable estoppel applies. *See, e.g.*, *Rhodes v. Guiberson Oil Tools Div.*, 927 F.2d 876, 878 (5th Cir. 1991) ("Equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act. Equitable estoppel, in contrast, examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights."). This adopts the approach, follow by the Seventh Circuit, in which fraudulent concealment is considered a subset of equitable estoppel. *See In re Copper*

22

*Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006) ("Fraudulent concealment is a type of tolling within the doctrine of equitable estoppel.").

This case reflects the inconsistent terminology. In their reply brief, the defendants castigated the plaintiffs for "invok[ing] the doctrine of equitable tolling, not fraudulent concealment, which is a different doctrine." (Docket Entry No. 176 at 5). In this opinion, except when discussing or citing the terminology of a particular circuit, the term "fraudulent concealment" is used to describe the doctrine that suspends a limitations period when a defendant has concealed the facts underlying a plaintiff's claim.

Regardless of the terminology, the fraudulent-concealment doctrine, when applicable, suspends limitations to prevent a defendant from "concealing a fraud, or . . . committing a fraud in a manner that is concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover*, 21 Wall. 342, 88 U.S. 342, 349 (1874)). The fraudulent-concealment doctrine applies if two elements are proven: (1) "the defendants concealed the conduct complained of"; and (2) "the plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Rx.com v. Medco Health Solutions, Inc.*, 322 Fed. App'x. 394, 397 (5th Cir. 2009) (quoting *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1528 (5th Cir. 1988)). At times, court within the Fifth Circuit have divided this second element into two questions. First, were the plaintiffs on inquiry notice within the limitations period? Second, did the plaintiffs act diligently once they were on inquiry notice? *Microtune, Inc.*, 783 F. Supp. 2d at 874; *see also Little v. Arab Bank*, 507 F. Supp. 2d 267, 276 (E.D.N.Y. 2007) (citing *Corcoran v. New York Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999) (considering these two issues).

## III.    Analysis

## A.    The Defendants' Fraudulent Concealment

There is no dispute about the first element of the fraudulent-concealment test.  The plaintiffs pleaded in their amended complaint that the "[d]efendants through their affirmative misrepresentations and omissions actively concealed from Plaintiffs their illegal surcharge payments to Saddam Hussein[,] . . . intentionally misleading the United States, United Nations and Plaintiffs." (Docket Entry No. 121, ¶ 9).  The parties stipulated that, "[f]or purposes of the pending motions for summary judgment based on limitations, the Court may assume that Defendants affirmatively and fraudulently concealed the nature of their wrongdoing through each of the instances of concealment alleged in the First Amended Complaint."  (Docket Entry No. 162, ¶ 2).

## B.    Inquiry Notice

Whether the defendants are entitled to summary judgment on limitations turns on when the plaintiffs, exercising reasonable diligence, discovered or should have discovered that they had a claim against the defendants under the ATA.  Even if there is a factual dispute material to determining whether or for how long a defendant fraudulently concealed the claim, once the plaintiffs are on notice, the statute of limitations begins to run.  *See Crummer Co. v. Du Pont*, 255 F.2d 425, 431 (1958) ("[I]f plaintiffs who sue after the statutory period of limitation following the accrual of a cause of action knew of their of action for more than the statutory period before filing suit, the effect of any effort at concealment is ended when knowledge is acquired.").[7]

_____

[7] Few decisions apply the fraudulent-concealment doctrine in the ATA context.  Unlike the present case, these decisions consider the sufficiency of the plaintiffs' pleadings in alleging fraudulent concealment in response to motions to dismiss.  *See Chiquita Brands*, 690 F. Supp. 2d at 1307 (denying a motion to dismiss because the "[p]laintiffs have pled sufficient facts to raise a question of equitable tolling based upon fraudulent concealment."); *Strauss v. Credit Lyonnais, S.A.*, 2007 WL 2296832, at *8 (E.D.N.Y. Aug. 6 2007) (granting a motion to dismiss because the "plaintiffs themselves concede that defendant did not fraudulently conceal its activities . . . .").  Only *Litle v. Arab Bank*, 507 F. Supp. 2d 267

To determine when fraudulent concealment no longer tolls a limitations period, courts typically look initially to inquiry notice.  Courts are inconsistent as to the amount of information necessary to put a plaintiff on inquiry notice.  Some decisions find that a plaintiff is on inquiry notice once the operative facts necessary for filing suit are within a reasonably diligent plaintiff's reach.  *See, e.g.*, *Marks v. CDW Computer Ctrs. Inc.*, 122 F.3d 363, 368 (7th Cir. 1997) ("Inquiry notice does not begin to run unless and until the investor is able, with the exercise of due diligence (whether or not actually exercised), to ascertain the information needed to file suit.").  *But see Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997) (holding that "mere suspicions" are insufficient to put a party on inquiry notice but the party is not required to have discovered "all the facts he needs in order to file suit.").  Other courts have held that a party is on inquiry notice when the party is able to learn facts that should "excite inquiry," even before the party knows the facts underlying the wrongdoing.  *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1202 n.19 (10th Cir. 1998) ("[The Seventh Circuit] apparently holds that inquiry notice does not exist until the investor is able to discover the facts underlying the illegal activity.  Our holding, however, recognizes that inquiry notice, which is triggered by evidence of the possibility of fraud, may exist before a reasonable investor is able to discover the facts underlying the alleged fraud.") (citing *Marks*, 122 F.3d at 368); *In re Catfish Antitrust Litigation*, 826 F. Supp. 1019, 1031 (N.D. Miss. 1993) ("The plaintiffs need

---

(E.D.N.Y. 2007), examines the "notice" issue in depth.  *Id.* (concerning a suit by the victims of attacks in Israel against a bank allegedly providing funding to terrorist organizations).  In granting the motion to dismiss on limitations grounds, that court held that the defendants' provision of banking services to Palestinians injured in the Second Intifada was not concealed from the plaintiffs.  *Id.* at 275–78.  In their complaint, the *Litle* plaintiffs themselves noted, among other things, that an Arabic cable television program displayed the name of the bank and the account numbers where donations to fighters could be deposited, and the bank publicly announced that it would make donations to injured attackers.  *Id.* at 275. Moreover, because some of the plaintiffs filed their claims within the original statute of limitations, the court was skeptical that the cause of action had been concealed from the limited plaintiffs.  *Id.* at 278.

25

not have actual knowledge of the acts before the duty of due diligence arises; rather, knowledge of certain facts which are calculated to excite inquiry give rise to the duty to inquire.").

These distinctions are significant to whether a party has been duly diligent, but they do not affect when fraudulent concealment ceases to toll the limitations period.   When defendants fraudulently conceal the conduct that gives rise to the claim, courts hold that the limitations period does not begin to run until the plaintiff learns or reasonably should learn the essential facts necessary to file suit.   *See Allan Constr.*, 851 F.2d at 1533 (5th Cir.) ("[T]he statute of limitations is tolled only until such time as the plaintiff, exercising reasonable diligence, could have discovered the facts forming the basis for the claim."); *Morton's Market*, 198 F.3d at 835 (11th Cir.) ("The statute of limitations is tolled until the plaintiffs discover the operative facts underlying their claims."); *Sterlin*, 154 F.3d at 1202 (10th Cir.) ("While we recognize there is a strong federal interest in requiring plaintiffs to file suit soon after they are put on notice of their claims, the applicable statute of limitation should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims."); *Young v. Lepone*, 305 F.3d 1, 9–10 (1st Cir. 2002) (the limitations period does not run until the plaintiff discovers facts underlying the claim); *Law v. Medco Research*, 113 F.3d 781, 785 (7th Cir. 1997) (same).

The defendants argue that the plaintiffs' ATA claim was no longer concealed by January 2, 2009, four years before the plaintiffs filed suit.  (Docket Entry No. 172 at 11–23).  The defendants list four different causal links that they claim the plaintiffs knew or should have known before January 2, 2005:

      1.     "It Was Widely Reported That Saddam Hussein And His Regime Were Using

Money Illegally Obtained Through The Oil-For-Food Program To Sponsor Terrorism" (*Id*. at 14).

2.  "It Was Widely Reported That Saddam Hussein And His Regime Were Illegally Obtaining Money from Companies Participating In The Oil-For-Food Program" (*Id*. at 16).

3.  "It was Widely Reported That Saddam Hussein And His Regime Were Using Money Illegally Obtained Through The U.N.'s Oil-For-Food Program To Pay Families of Dead Palestinian Suicide Bombers" (*Id*. at 17).

4.  "It was Widely Reported That Defendants Might Be Implicated In And Were Being Investigated For Possibly Making Illegal Payments In The Oil-For-Food Program." (*Id*. at 20).

The defendants attach as exhibits (and describe in their summary judgment motion) a large number of newspaper articles and other media reports to demonstrate that the basic facts supporting each of these causal links was reported widely by the international press before January 2, 2005.  (*Id*. at 12–21).  The defendants also point to a leaked U.N. report listing the OFP participants; several congressional investigations into corruption in the OFP; and acknowledgments by at least some of the defendants that they were issued subpoenas by courts and other official bodies to provide information and documents regarding their participation in the OFP.  The defendants argue that the plaintiffs possess constructive knowledge of facts and events receiving widespread publicity.  (*Id*. at 6).

The plaintiffs do not contest the defendants' arguments that the basic facts underlying the first three causal links were widely known.   Indeed, this is central to the plaintiffs' case.  To meet

27

the ATA's scienter requirement, the plaintiffs must demonstrate that the defendants were aware that Saddam Hussein was extracting money from OFP participants and using that money to fund Palestinian terrorists.  *See* 18 U.S.C. § 2339B ("Whoever *knowingly* provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so" is guilty of a crime) (emphasis added).

The plaintiffs argue that they lacked knowledge of the essential facts underlying the fourth link.  They note that "mere knowledge that Defendants received oil through the OFP would not be sufficient" to bring an ATA claim without a factual basis to conclude that these particular defendants knowingly made illegal payments to the Iraqi regime.  (Docket Entry No. 175 at 9).  The plaintiffs maintain that the media reports and other documents the defendants attached as exhibits contained speculation and rumor and that information sufficiently reliable to limitations was not publicly available until after January 2, 2005.  (*Id*. at 9–10).

Courts have noted that summary judgment motions are poorly suited to resolving issues involving constructive notice and inquiry notice in the fraudulent concealment context.  *See, e.g.*, *In re Energy Transfer Ptnrs. Natural Gas Litig*., 2009 WL 2633781, at *15 (S.D. Tex. Aug. 26, 2009) ("Summary judgment and motions to dismiss are often ill-suited to questions of constructive knowledge and inquiry notice.").  "[T]he question of when the statute of limitations began to run on the plaintiffs' cause of action is a factual one." *In re Beef Indus. Antitrust Litig*., 600 F.2d 1148, 1170 (5th Cir. 1979); *see also Morton's Market*, 198 F.3d at 832.

In this case, there is no dispute as to what was in the published media reports.[8]  The party

---

[8]  The plaintiffs note that they suffered "serious psychological injuries" because of the terrorist attacks.  They argue that "[i]n light of these unique circumstances the reasonableness of plaintiffs' failure

28

invoking fraudulent concealment is generally considered to have constructive knowledge of publicly available information.  *See, e.g.*, *Allan Constr. Co.*, 851 F.2d at 1534 ("On the basis of news accounts, the state is deemed to have been aware in 1980 that Allan's records were subpoenaed by the grand jury."); *Beef Industry,* 600 F.2d at 1170 (finding constructive knowledge from another suit that "was widely publicized in numerous issues of numerous trade publications, including . . . an issue of The American National Cattlemen's Association's weekly publication Beef Business Bulletin, which, according to the supporting affidavit, had at the relevant time a circulation of nearly 300,000."); *Klans of America v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980) ("Where events receive such widespread publicity, plaintiffs may be charged with knowledge of their occurrence."). This approach is consistent with the objective nature of the inquiry-notice standard.  *See Morton's Market*, 198 F.3d at 835 ("[T]he overwhelming weight of authority treats 'inquiry notice' as an objective standard.  Under this standard, when defendants are guilty of concealing their anti-competitive activities, the plaintiff is not charged with knowledge of his claims until he should have discovered the basis for his claims.").  It was objectively reasonable for individuals in the plaintiffs' position to be aware of the media reports describing the OFP scandal as it unfolded.

Nevertheless, there is a genuine dispute of material fact as to whether, by January 2, 2005, the details available in media reports and other publicly available documents were sufficient to put the plaintiffs on inquiry notice that *the defendants* had made illegal oil payments to Iraq.  Viewed

---

to discover his claim at the time that news reports were published is an issue for the jury."  (Docket Entry No. 175 at 14).  The plaintiffs do not cite to evidence in the record supporting their argument that the physical or psychological injuries of individual plaintiffs prevented them from discovering the operative facts behind their ATA cause of action during the relevant period.  Allegations in motions and pleadings are insufficient to raise a factual dispute.  *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002).

in the light most favorable to the plaintiffs, as required on summary judgment, these reports and the other exhibits show that the defendants were the subject of early stages of official inquiry and speculation as to their involvement. Before January 2, 2005, the publicly available information about the defendants was carefully hedged to note that they may not have engaged in any wrongdoing at all. The defendants acknowledged their participation in OFP but emphatically and repeatedly maintained that they acted in full compliance with U.N. rules and other regulations and laws. "When the information in the public domain only contains reports of activities that are within the defendant's normal, non-illegal activities, a fact question exists as to when the plaintiff was put on inquiry notice of defendant's wrongdoing." *Energy Transfer Partners*, 2009 WL 2633781, at *16 (citing *In re Copper Antitrust Litig.*, 436 F.3d 782, 790 (7th Cir. 2006)); *cf. Bell Atlantic v. Twombly*, 550 U.S. 544, 556–57 (2007) ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Denying summary judgment on this record is consistent with the Fifth Circuit case law. In *Beef Industry*, 600 F.2d at 1170, the plaintiffs filed an antitrust suit on June 5, 1975. Because the applicable limitations period was four years, absent fraudulent concealment, the plaintiffs could not recover for damages sustained before June 5, 1971. In 1968, an antitrust suit alleging similar claims to the 1975 suit had been filed in California. The defendants' summary judgment evidence showed that the 1968 suit was well-publicized nationally. The defendants argued that, by not filing suit until seven years later, the plaintiffs failed to act diligently in uncovering the factual basis for their claims. *Id.*

30

The Fifth Circuit noted that "[f]rom the affidavit and exhibits it is abundantly clear that the plaintiffs knew or should have known in 1968 and 1969 of the allegations of the [1968] complaint." *Id.* at 1171. Nevertheless, the court held that the plaintiffs' knowledge of the complaint was not "as a matter of law tantamount to actual or constructive knowledge of their claim." *Id.* The court explained:

> Although the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it. The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so as a matter of law is to compel a person situated like these plaintiffs to file suit on the pain of forfeiting his rights, regardless of whether his attorney believes that there is "good ground to support it" [as required by FED. R. CIV. PROC. 11]. The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might be frivolous or baseless.

*Id.* The court further explained that no record evidence suggested that the plaintiffs "turned up any verification for the allegations before June 5, 1971, or that the plaintiffs had independent access before that time to any information, beyond the Bray complaint itself, that tended to verify suspicions." *Id.* Although the court noted that the 1968 suit and newspaper articles "might support an inference" that the plaintiffs exercising reasonable diligence could have discovered the operative facts within the limitations period, the court found that this inference was "not so compelling as to entitle the defendants to summary judgment." *Id.*

The Fifth Circuit later affirmed this holding in light of the Supreme Court's clarification of the summary judgment standard in *Celotex. See Allan Constr.*, 851 F.2d at 1534 (holding that a district court errs in granting summary judgment under *Celotex* unless a defendant's evidence

against fraudulent concealment is "so compelling that no reasonable jury could consider a [plaintiff's] attempts reasonable diligence."). In *Allan Construction*, the State of Texas filed a lawsuit in 1985 against Allan Construction Company alleging violations of the Clayton Act. The limitations period was four years. By 1980, a federal grand jury in Texas had begun to investigate whether several construction companies, including Allan Construction, had conspired to fix the bid prices for highway construction contracts. The existence of the grand jury proceedings was widely publicized. The plaintiffs became aware that same year that federal prosecutors had subpoenaed Allan Construction's records. The State filed its civil lawsuit more than four years after it became aware of both the grand jury proceedings and the federal investigation. *Id.* at 1528.

The court found that Allan Construction fraudulently concealed the facts giving rise to the State's claim. The court then analyzed whether the State, exercising reasonable diligence, could have discovered the factual basis behind its claims before November 5, 1981. The Fifth Circuit agreed with the district court that, "[o]n the basis of news accounts, the State is deemed to have been aware in 1980 that Allan's records were subpoenaed by the grand jury." *Id.* at 1534. That was not sufficient to show that limitations barred the suit. Assuming both the State's knowledge of the news reports and the investigations, and the defendants' fraudulent concealment, the court held that "these facts do not conclusively establish that greater diligence on the State's part would have led to evidence that the claim was well grounded in fact." *Id.*

The defendants cite several cases that they suggest point to a lower standard than *Allan Construction* for granting summary judgment when at least some information is available that might arouse a plaintiff's suspicions. These cases do not show that the defendants are entitled to summary judgment. In *United States v. McGovern*, 621 F.2d 152 (5th Cir. 1980), the Fifth Circuit ruled that

limitations barred the Ku Klux Klan's suit against an FBI agent over purported constitutional violations arising from the FBI's COINTELPRO program.  In reaching this conclusion, the court relied primarily on evidence that: (1) a published United States Senate report described in detail the FBI's intelligence operations against the plaintiff; (2) the Attorney General in a press conference stated that the FBI  had targeted "White Hate" groups as part of COINTELPRO; and (3) the Department of Justice stated in a letter sent to the plaintiff that its president might have been affected by COINTELPRO.  Based on these facts, the Fifth Circuit concluded, "[D]efendants have conclusively shown that more than one year before the Klan filed suit, the government lifted the veil of secrecy covering the COINTELPRO program." *Id.* at 154 n.5.  *McGovern* is distinguishable.  In contrast to the government's public acknowledgment in *McGovern* of its actions against the plaintiff, the defendants in the present case not only failed to publicly acknowledge their role in the illegal OFP kickback scheme before January 2, 2005, but vehemently denied making illegal payments.

The other cases the defendants cite are few and similarly inapposite.  In *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (1975), the plaintiff failed to plead due diligence with sufficient particularity under Rule 9(b).  In addition, 15 years before the plaintiff's suit, Congress conducted hearings that unearthed the facts underlying the plaintiff's claim.  Thirteen years earlier, the Federal Trade Commission had filed a successful suit based on the same set of facts as the plaintiff's suit.  *Grynberg v. Total S.A.*, 538 F.3d 1336 (10th Cir. 2008), is a diversity case applying Colorado law and is not based on the fraudulent-concealment doctrine.  *Id.* at 1336 (finding that plaintiff's fraudulent-concealment allegations were not preserved for appeal).  The operative facts underlying the plaintiff's untimely claims in that case arose from oil deals that two of the defendants publicly admitted and that were reported in newspaper articles known to the plaintiff.  *Id.* at 1343,

1348–51. In *FEC v. Williams*, 104 F.3d 237 (9th Cir. 1996), the court held that fraudulent concealment did not toll limitations when the defendant provided documents directly to the plaintiff that contained the operative facts of the defendants' untimely campaign-finance claims.

The Fifth Circuit precedent supports the conclusion that the public reports of the defendants' involvement in illegal payments under the OFP were sufficiently unclear and undeveloped as to make summary judgment inappropriate. The defendants' own carefully couched language is telling. The defendants' reports showed that, by January 2, 2005, they "*might* be implicated in and were *being investigated* for *possibly* making illegal payments in the Oil-for-Food Program." (Docket Entry No. 172 at 20) (emphasis added). The Duelfer Report, released in October 2004, noted that the defendants were OFP participants but did not accuse them of any wrongdoing. By late 2004, the S.E.C., the U.N., a federal grand jury, and several congressional subcommittees were investigating the defendants' potential wrongdoing in the OFP. But no indictments against defendants had been issued, and no reports implicating the defendants in wrongdoing were published until well into 2005. *See In re Enron Corp. Securities, Derivative & ERISA Litig.*, 2004 WL 405886, at *20 (S.D. Tex. Feb. 25, 2005) (holding that the existence of a Senate subcommittee investigation of wrongdoing was insufficient to place a plaintiff on inquiry notice, but the subcommittee report might be).

By the end of 2004, some journalists were beginning to report the possibility that several of the defendants might have manipulated the OFP by making illegal payments to Iraq in exchange for oil. These and other reports, however, recognized the complicated nature of the pending investigations and the likelihood that not every recipient of Iraqi oil had acted illegally, and cautioned against premature conclusions of the defendants' involvement in any wrongdoing. *Id.* at *10 n.34 (finding it relevant to the issue of notice that "the nature of the alleged fraud is so complex

34

. . . that experts to this day have difficulty unraveling the intricacies."). The defendants themselves publicly acknowledged both the investigations and their participation in the OFP, but they repeatedly and vociferously asserted their compliance with the law.

The defendants argue that their repeated public denials were insufficient to prevent the plaintiffs from learning of their claims, (Docket Entry No. 172 at 21), but this argument appears to conflate the first and second elements of the fraudulent-concealment test.[9] The defendants *stipulated* that they fraudulently concealed from the plaintiffs the facts essential to their claims. A plaintiff claiming fraudulent concealment need not prove that a defendant continuously took affirmative actions throughout the concealment period. Fraudulent concealment tolls limitations from the initial act of fraudulent concealment until a plaintiff exercising reasonable diligence would become aware of her claim, whether the defendants affirmatively take steps to deny their actions or simply maintain silence. *See generally Allan Constr.*, 851 F.2d at 1534.

The record does not permit this court to conclude that, as a matter of law, the plaintiffs were on notice of their claims before January 2, 2005.

### C.    Whether the Plaintiffs Exercised Reasonable Diligence

The fraudulent-concealment test incorporates a duty of reasonable diligence. *See Martinez Tapia v. Chase Manhattan Bank,* 149 F.3d 404 (5th Cir. 1998) ("[T]he party claiming fraud and/or misrepresentation must exercise due diligence to discover the alleged fraud and cannot close his eyes

---

[9] The defendants quote the statement in *Allan Construction* that a "denial of wrongdoing is no more an act of concealment than is silence." 851 F.2d at 1532. But the court went on to hold: "denial of wrongdoing may constitute an affirmative act of concealment where the denial is made under circumstances indicating it was reasonable for plaintiff to rely on the denial in failing to discover the wrongful conduct that caused plaintiff's injury." *Id.* at 1534. Although bare denials may not be sufficient to establish concealment, they may be used with other facts as evidence of fraudulent concealment.

and simply wait for facts supporting such a claim to come to his attention."); *see also Wood v. Carpenter*, 101 U.S. 135, 140 (1879) ("If underlying frauds existed, as [the plaintiff] alleges, he did nothing to unearth them.  It was his duty to make the effort.").  Whether a party has fulfilled this duty is typically a fact issue appropriate for a jury.  *Morton's Market*, 198 F.3d at 832.

The defendants maintain that the plaintiffs' failure to exercise due diligence precludes them from invoking the fraudulent-concealment doctrine to suspend limitations.  The defendants argue that even if the facts available in the public record did not put the plaintiffs on notice of their claims, the plaintiffs provided no evidence that they exercised due diligence in learning additional facts, given the public reports of investigations into the defendants' activities.  (Docket Entry No. 172 at 23, 26–29).  The discovery responses the plaintiffs filed demonstrate that most of them did not become aware of their claims or hire lawyers until 2006, despite the publicity about the OFP abuse as early as 2002.  (Docket Entry No. 173, Ex. 1 (Pls.' Resp. to Defs.' Interrog. Nos. 10, 12, 14, 16, 18)).

The tolling effect of the defendants' fraudulent concealment "depends upon when [the plaintiffs] should have discovered the facts supporting their claims."  *Morton's Market*, 198 F.3d at 835.  "This is true regardless of whether [the plaintiffs] actually investigated."  *Id.*  As a result, "it is possible for a plaintiff to satisfy [the due-diligence requirement] without demonstrating that it engaged in any specific inquiry . . . if reasonable further investigation would not have revealed the basis" for the claim.  *Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 128 (4th Cir. 1995); *see also Allan Constr.*, 851 F.2d at 1534 (5th Cir.) ("Even though a plaintiff might have inquiry notice of a potential claim, it does not necessarily follow that reasonable diligence will discover sufficient facts to support legal action."); *Caviness v. Derand Resources*

36

*Corp.*, 983 F.2d 1295, 1303 (4th Cir. 1993) (the limitations period begins "when the plaintiff knows of the facts on which the actions is based or has such knowledge as would put a reasonably prudent purchaser on notice to inquire, *so long as that inquiry would reveal the facts on which a claim is ultimately based*.") (emphasis added); *Gumbus v. United Food & Com. Workers Int'l Union*, 47 F.3d 1168 (6th Cir. 1995) ("Whether plaintiffs have met their burden to show that they exercised due diligence is judged by an objective standard."); *Marks*, 122 F.3d at 368 (7th Cir. 1997) ("Inquiry notice does not begin to run unless and until the investor is able, with the exercise of due diligence (*whether or not actually exercised*), to ascertain the information needed to file suit.") (emphasis added); *Sterlin*, 154 F.3d at 1201 (10th Cir.) ("[A]lthough a plaintiff has an 'obligation of diligence,' the plaintiff need not show the actual exercise of diligence in order to 'toll' the limitations period."); *cf. Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–96 (1997) (in the civil RICO context, construing the doctrine of due diligence as one of "reasonable diligence"); *Ford v. Gonzalez*, 683 F.3d 1230, 1235–36 (9th Cir. 2012) (collecting cases holding that due diligence under AEDPA's statutory tolling scheme is an objective standard).

Reasonably diligent individuals in the plaintiffs' position may not have discovered that they possessed ATA claims against the defendants until sometime in 2005. Unlike the United Nations, the S.E.C., and the grand jury investigating the OFP, the plaintiffs lacked the power to compel the defendants and others to produce documents. The information available in the public record provides the sole basis for what plaintiffs should have known. *See Morton's Market*, 198 F.3d at 834 ("Neither do they point to evidence that plaintiffs had independent access before that time to any information, beyond the newspaper articles, that would have tended to verify their suspicions had they had any."). And the record evidence about that information shows that even some of those

entities and agencies responsible for investigating the OFP and the defendants' activities lacked reliable information that could provide a basis for taking legal action before January 2, 2005. (Docket Entry No. 173, Ex. 8-16 at 60–62 (Michael Isikoff, *Terror Watch: The Paper Chase, Investigators Are Struggling to Find Concrete Evidence of Fraud and Corruption in the U.N.'s Oil-for-Food Program in Iraq*, NEWSWEEK, Dec. 21, 2004) (noting that "U.S. investigators trying to develop criminal cases out of the scandal . . . appear to be running into some serious roadblocks" and that "the evidence is sketchy that Oil-for-Food money played a significant role in financing terrorism."). The first defendants were not charged with any crimes until May 4, 2005. (Docket Entry No. 173, Ex. 8-18 at 11–12 (*United States v. Chalmers*, 1:05-cr-00059 (S.D.N.Y. May 4, 2005) (indictment))). The Senate Report accusing Bayoil of paying illegal surcharges on oil purchased through the OFP was published the same month. (Docket Entry No. 173, Ex. 8-19 part 2 at 18–20 (Robert DiNardo, *US Facilitated Illegal Oil Shipments From Iraq: Senate Democrat Report*, PLATTS OILGRAM NEWS, May 17, 2005). The final Volcker Report, which described in detail the methods the defendants purportedly used to exchange illegal payments for oil, was not released until October 27, 2005. (Docket Entry No. 173, Ex. 8-22 at 79–82 (Nick Wadhams & Edith M. Lederer, *U.N.: 2,200 Cos. Gave Iraq Illicit Funds*, A.P., Oct. 27, 2005)). The law does not require the plaintiffs to

be more capable of learning information than those entities and individuals conducting the investigations and issuing reports.

The record does not permit a finding that, as a matter of law, plaintiffs' inability to acquire the essential facts underlying their ATA claims resulted from their failure to exercise reasonable diligence.

**D.      Whether the Limitations Period is Four Years After Tolling Ends**

The defendants argue in their reply brief that the plaintiffs should not have the full four-year limitations period after receiving notice of their claims to file their suit. Instead, the plaintiffs should only have a reasonable period after they were on notice of their claims before they must file their suit.

The plaintiffs acknowledge that the latest they should have discovered their claims is October 27, 2005, when the final version of the Volcker Report was released. (Docket Entry No. 175 at 25 (""Plaintiffs did not have a cognizable cause of action under the ATA until at least October 2005.")); (Docket Entry No. 175, Ex. 1, ¶ 6–7 (Landes Decl. (stating that the Volcker Report contained sufficient facts upon which to based a lawsuit))). The plaintiffs did not file their original complaint until January 2, 2009. The defendants contend that the plaintiffs have failed to explain  why they could not have filed their suit earlier than 2009. (Docket Entry No. 176 at 12).

In *Abecassis II*, the court stated that, under the law, "if equitable tolling is appropriate, the plaintiffs in this case would have had a *full four years* from whenever the equitable tolling period ended to file their suit." 785 F. Supp. 2d at 652 (emphasis added). In reaching the conclusion that fraudulent concealment extends the plaintiff's time to file by the full limitations period, this court relied primarily on *Henderson v. AT&T Corp.*, 933 F. Supp. 1326 (S.D. Tex. 1996). In *Henderson*, the district court noted that the "reasonable time" requirement was most clearly articulated by the Seventh Circuit in its *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452–5 (7th Cir. 1990), decision. While the Fifth Circuit has cited *Cada* for other purposes, the Fifth Circuit has never adopted the Seventh Circuit's position that plaintiffs should not receive the entire limitations period. The *Henderson* court also distinguished the duty of plaintiffs invoking fraudulent concealment to

39

exercise reasonable diligence in learning the facts underlying their claims from any duty that plaintiffs, once on notice of their claims, might have to file suit before the full limitations period has run. 933 F. Supp. at 1334–35 ("[T]he cases in which the Fifth Circuit has refused to grant equitable relief because of the plaintiff's lack of diligence generally are factually distinct from the case at bar, and do not indicate that a plaintiff entitled to toll the limitations period until a specific date received less than the full limitations period after that date.").

There are strong reasons for providing the plaintiffs in this case with the full limitations period after they were on notice of their ATA claims. In *Henderson*, the defendants were blameless for the plaintiff's lack of sufficient knowledge. In this case, the defendants have stipulated that they concealed the facts necessary for the plaintiffs to learn of their claims. Even the Seventh Circuit, which adopted the "reasonable filing period" rule, distinguishes fraudulent-concealment cases (involving what it calls "equitable estoppel) from cases in which the defendants are not responsible for a plaintiff's inability to file suit (what it calls "equitable tolling"). As the Seventh Circuit explained in *Cada:*

> We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term. It is, after all, an equitable doctrine. It gives the plaintiff extra time if he needs it. . . . When we are speaking not of equitable estoppel but of equitable tolling, we are (to repeat) dealing with two innocent parties and in these circumstances the negligence of the party invoking the doctrine can tip the balance against its application.

920 F.2d at 452–5 (internal citations omitted). In a more recent decision involving fraudulent concealment, the Seventh Circuit reversed a lower court's holding that "the plaintiffs acted too slowly in bringing their suit, regardless of questions of discovery or fraudulent concealment." *In*

*re Copper Antitrust Litigation*, 436 F.3d 782 (7th Cir. 2006).  The plaintiffs in that case did not file

their lawsuit for more than three years after discovering their claims.  However, because the

defendants had fraudulently concealed the plaintiffs' claims, the Seventh Circuit held that "the

[district] court was *not* free to shorten the four-year limitations period." *Id.* at 792 (emphasis added).

This approach is also supported by cases in which a plaintiff learns of her claims within the

limitations period but is subsequently induced by the defendant's acts to file suit after limitations

ends.[10] *See Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 876 (7th Cir. 1997)

("[W]e have trouble seeing why a defendant whose own activities made the plaintiff miss the

deadline should be allowed to litigate over whether the plaintiff could have sued earlier."); *Buttry*

*v. General Signal Corp.*, 68 F.3d 1488, 1494 (1st Cir. 1995) (applying a reasonable time standard

but defining it based on "the unused portion of the limitations period"); *Ott v. Midland-Ross Corp.*,

600 F.2d 24, 33 (6th Cir. 1979) ("We generally adhere, as did the district judge, to the equitable

standard of a reasonable time measured from the discovery date but believe that where relief from

the statute of limitations is sought on the basis of fraud and misrepresentation, reference to the

applicable limitations period established by the Congress provides a reliable and consistent statutory

determination of reasonableness.").

The defendants cite several cases to support their argument that the plaintiffs are not entitled

to the full ATA limitations period after January 2005.  In *Microtune*, 783 F. Supp. 2d at 878, a case

---

[10]  As noted above, the Fifth Circuit has, at times, called the doctrine that applies to toll
limitations in such circumstances "equitable estoppel."  *See, e.g.*, *Centenary College*, 1995 WL 153261,
at *2.  This use of "equitable estoppel" differs from the Seventh Circuit's use of the term to refer also to
instances in which a defendant conceals a cause of action (in addition to those in which a defendant lulls a
plaintiffs into filing an out-of-time complaint).

involving fraudulent concealment, the court "glean[ed] from [the duty of due diligence] a requirement that the [plaintiff] must have acted diligently in filing its complaint in a timely manner once it had inquiry notice." *Id.* As justification for requiring a reasonable filing period, the court cited *Jay E. Hayden Foundation v. First Neighbor Banks, N.A.*, 610 F.3d 382 (7th Cir. 2010). In *Hayden*, the Seventh Circuit noted that a number of tolling decisions involving fraudulent concealment (as opposed to blameless defendants) provide plaintiffs who uncover their claims with the full limitations period for filing suit. The court sidestepped this larger issue by holding that RICO's purpose and language require especially prompt filing.[11] *Id.* at 387 ("In a RICO case, *given the Supreme Court's emphasis noted earlier on the importance of prompt suit to achieve the statute's public purposes*, the plaintiff should not be entitled to an automatic extension of the statute of limitations by the length of the period of concealment by the defendants.") (emphasis added). The Seventh Circuit has declined to impose a "reasonable filing period" requirement outside the RICO context. *See Copper Antitrust Litig.*, 436 F.3d at 792.

The only Fifth Circuit case the defendants cite is *Centenary College*, 1995 WL 153261, at *3, an unpublished per curiam decision. In *Centenary*, the court's holding was based on the plaintiff's failure to prove the first element of fraudulent concealment. The *Centenary* court cited *Cada*'s reasonable-period filing requirement in dicta, in response to the plaintiff's argument that she

---

[11] In contrast to civil RICO, there is support for interpreting the ATA statute of limitations in a more forgiving manner. *See* 137 CONG. REC. S8143 (1991) (statement of Sen. Grassley) ("The ATA removes the jurisdictional hurdles in the courts confronting victims and it empowers victims with all the weapons available in civil litigation . . . ."); H.R. REP. NO. 102-1040, at 5 (1992) (noting that the purpose of the ATA is "to facilitate civil actions" against international terrorism and to extend "civil jurisdiction to accommodate the reach of international terrorism"). In 1992, Congress increased the limitations period applicable to civil suits under the ATA from three years to four years. *See* Pub.L. 102-572, Title X, § 1003(a)(4), Oct. 29, 1992, 106 Stat. 4523, (codified at 18 U.S.C. § 2335(a)), *repealing* Pub.L. 101-519, § 132(b)(4).

should get the benefit of equitable tolling even if the defendant was *not* to blame for her failure to timely file suit.[12]  No other Fifth Circuit decisions goes this far.

Neither the case law nor the principles underlying the tolling doctrines support requiring the plaintiffs to demonstrate that they filed suit within a reasonable period after they learned of their claims.  The full limitations period applies once limitations begins to run.

### E.   Whether Fraudulent Concealment Is Barred by the Plaintiffs' Discovery of their Claims Within the Limitations Period

In their reply brief, but not in their original motion for summary judgment, the defendants argue that equitable tolling does not apply in this case because, even if the plaintiffs lacked knowledge of their claims until after January 2, 2005, the plaintiffs have admitted that they learned of their claims during the original limitations period.  (Docket Entry No. 176 at 8–10).  The three terrorist attacks at issue occurred on November 4, 2001, December 1, 2001, and March 9, 2002.  The defendants correctly point out that the plaintiffs have largely conceded that they uncovered their claims no later than October 27, 2005, when the final version of the Volcker Report was released. (Docket Entry No. 175, Ex. 1 at ¶ 6–7 (Landes Decl.); Docket Entry No. 175 at 25 (""Plaintiffs did not have a cognizable cause of action under the ATA until at least October 2005.")).  These dates all fall within the last year of the plaintiffs' original four-year statute of limitations.

In support of their argument, the defendants cite primarily to boilerplate language from decisions stating that equitable tolling applies when plaintiffs can "show that they exercised due

---

[12]  The other cases the defendants cite also involve plaintiffs attempting to invoke tolling doctrines against blameless defendants.  *See Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1197 (11th Cir. 2008); *Graham-Humpgreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000); *Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993).

diligence in pursuing the claim during the limitations period." *See Abecassis II*, 785 F. Supp. 2d at

652; *see also Manning*, 332 F.3d at 880; *Ramirez*, 312 F.3d at 184. These cases do not, however,

decide whether a plaintiff is precluded from invoking the fraudulent-concealment doctrine to toll

limitations if she discovers her claims within that period.

The defendants also rely heavily on *Microtune*, 783 F. Supp. 2d at 882. *Microtune* is

distinguishable. The district court in that case stated that "if a plaintiff discovers his claims within

the limitations period, *especially if he still has two years or more remaining in which to file his

complaint (as is this [sic] case here)*, there is obviously a lesser need, if any to toll his claims." *Id.*

This court has already found that the plaintiffs, unlike the plaintiff in *Microtune*, may not have

discovered their claims until October 27, 2005 — only one week before limitations expired for some

of them. Even if a jury were to find that some of the plaintiffs should have learned of their claims

earlier in 2005, this would still leave the plaintiffs with relatively little time to sue in a case far more

complex than *Microtune*.

Moreover, *Microtune*'s foundation in the case law is weak. The court in *Microtune* noted

that no sign of the "discovery outside the limitations period" requirement appears in the Fifth

Circuit's case law on tolling doctrines. *Id.* at 881 (citing *Allan Constr.*, 851 F.2s at 1528 & *Energy

Transfer Pnrs*, 2009 WL 2633781, at *13). Attempting to sidestep this fact, the court distinguished

*Allan Construction* as applying the fraudulent-concealment doctrine under state law. *Microtune*, 783

F. Supp. 2d at 881. In fact, *Allan Construction*[13] involved a federal suit filed by the State of Texas

---

[13] *Allan Construction* involved claims under the Clayton Act, which has included its own statute
of limitations since 1955. 15 U.S.C. § 15b; *see also* Charles Evan Stewart, *The Government Suspension
Provision of the Clayton Act's Statute of Limitations: For Whom Does It Toll?*, 60 St. John's L. Rev. 70,
70 ("The primary reason Congress enacted § 4B was to prevent forum shopping. The 'evil' of

alleging federal claims.[14]   Additionally, in *Microtune*, the district court relied on a case in which

state law *did* apply, *Roberts v. Barreras*, 484 F.3d1236, 1242 (10th Cir. 2007).  In that case, New

Mexico law applied.  Under that law, the court held, "if a plaintiff discovers the injury within the

time limit, fraudulent concealment does not apply because the defendant's actions have not

prevented the plaintiff from filing the claim within the time period and the equitable remedy is not

necessary."  *Id.* (citation omitted).   *Barreras* did not involve fraudulent concealment.  The court

held that there was no evidence of concealment and, even if there was, that at the time the plaintiff

discovered his claims, he had more than two years of his original three-year statute of limitations

within which to sue.

The other cases the defendants cite either do not involve fraudulent concealment, *see New

Castle County v. Halliburton NUS Corp.*, 11 F.3d 1116, 1126 (3rd 1997) (denying tolling to party

that claimed it was too "busy" to file suit); *Unterreiner v. Volkswagen of America, Incorp.*, 8 F.3d

1206 (7th Cir. 1993), or do not hold that fraudulent concealment applies only when the cause of

action is uncovered after the original limitations period, *see Federal Elections Comm'n v. Williams*,

104 F.3d 237, 241 (9th Cir. 1996) (holding that even the suspended limitations period had run due

---

forum-shopping existed because, prior to the addition of § 4B, the period of limitations applicable to
private treble damage actions arising under the Clayton Act was governed by state statutes of limitations.
Since the plaintiff's injury could have occurred in a number of states, the plaintiff would often forum
shop for the state with the most favorable statute of limitations.  Section 4B put an end to forum-shopping
by establishing a national period of limitations.") (internal citations omitted).

[14]   The court's apparent misstatement in *Microtune* derives from a footnote in an unpublished
Fifth Circuit decision that describes *Allan Construction* as a Texas state-law case.  *Liddell v. First Family
Financ. Serv., Inc.*, 146 Fed. App'x. 748, 750 n.9 (5th Cir. 2005).  No other decisions from the Fifth
Circuit or other courts have repeated this mischaracterization, and courts continue to cite *Allan
Construction* as federal-law precedent.  *See, e.g.*, *Welk v. Simpkins*, 402 Fed. App'x. 15, 18–19 n.14–16
(5th Cir. 2010); *Rx.com v. Medco Health Solutions, Inc.*, 322 Fed. App'x. at 398–98 (5th Cir. 2009);
*Energy Transfer Pnrs.*, 2009 WL 2633781, at *13.

to the F.E.C.'s failure to act on claims it would have discovered had it exercised reasonable diligence); *Hamilton County Bd. of Com'rs v. NFL*, 491 F.3d 310, 317–18 (6th Cir. 2007) (holding that the plaintiff was aware of the operative facts underlying its cause of action from the moment of injury).

Several courts from other jurisdictions have provided persuasive reasons against imposing this additional requirement.  One district court noted that it would benefit defendants who willfully conceal a cause of action:

> It is well established that a party who fraudulently conceals a violation of law shall not benefit from that fraud through the exercise of a statute of limitation.  By accepting defendants' argument that the doctrine of fraudulent concealment should only apply where the underlying facts were uncovered after the expiration of the original limitation period, a party who fraudulently concealed a violation of law would, in effect, benefit in the form of a shorter limitation period.  This Court declines to accept that proposition and, instead, adheres to the well-established rule that where a party proves fraudulent concealment, the limitation period begins to run upon discovery of a cause of action.

*S.E.C. v. Cochran*, 1999 WL 33292713, at *5 (W.D. Okla. Jan. 28, 1999), *rev'd on other grounds*, 214 F.3d 1261 (10th Cir. 2000).  The Sixth Circuit also cautioned that "such a rule literally applied would lead to an untenable result such as the situation in which the plaintiff discovers or should discover his cause of action just before the period of limitations."  *Norton-Children's Hosp., Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 444 (6th Cir. 1981); *see also In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1225 n.8 (D. Kan. 2010) ("[I]n the event of fraudulent concealment . . . [a plaintiff] has the full four years in which to file, even if the discovery occurred within the original four-year limitations period as if applied without tolling.").  In addition to the two concerns noted by other courts, prohibiting parties who discover their claims at the end of the original

46

limitations period from invoking fraudulent concealment would have arbitrary effects.

The case law does not support a rule preventing the plaintiffs, who have presented evidence that they discovered the facts underlying their cause of action at the end of the original limitations period, from invoking the fraudulent-concealment doctrine.  This additional requirement does not provide a basis to grant summary judgment on limitations.

### F.   Whether Twelve Plaintiffs Who Were Not Listed in the Original Complaint's Caption Were Parties to that Complaint

The original complaint was filed on January 2, 2009.  Twelve of the plaintiffs, all of whom were injured in the November 1, 2001 "French Hill" attack, were not listed as plaintiffs in the caption of the original complaint.[15]  They were later added in the caption of the plaintiffs' first amended complaint, which was filed on April 23, 2010.  Rule 10(a) states that "the title of the complaint must name all the parties."  FED. R. CIV. PROC. 10(a).  The defendants argue that because these twelve French Hill plaintiffs did not comply with Rule 10(a), the limitations period continued to run against them until the first amended complaint was filed.  (Docket Entry No. 172 at 10).  If the defendants are correct, then these plaintiffs would be required to show under the fraudulent-concealment doctrine that they were not aware of their claims until April 23, 2006.  Because the plaintiffs have already admitted that they discovered their claims by October 27, 2005, at the very latest, the twelve plaintiffs' claims would be untimely.

In response, the plaintiffs point out that the twelve French Hill plaintiffs were clearly designated as plaintiffs in the body of the complaint.  They argue that the court should look beyond

---

[15]  These individuals are: Simon Lebowitz, Rosalyn Pearl Lebowitz, Gerald Markowitz, Ester Devora Markowitz, Shirin Mordechai, Michael Rubinoff, Aviva Rubinoff, Eliezer Rubinoff, Yosef Robinoff, Shoshana Rubinoff, Ira Schnall, and Francis Schnall.

Rule 10(a) and to consider whether the defendants reasonably had notice of the twelve plaintiffs'

claims when the original complaint was filed.  (Docket Entry No. 175 at 9–11).

This court agrees with the plaintiffs that the twelve French Hill plaintiffs who were not

included in the original complaint's caption were, nonetheless, joined as plaintiffs in the original

complaint.  An initial complaint must be construed liberally.  FED. R. CIV. P. 8(e).  Technical defects

do not provide a basis for dismissal.  *Jones v. State of La. Through Bd. of Trustees for State Colleges

& Universities*, 764 F.2d 1183, 1185 (5th Cir. 1985).  Although the caption may serve as a guide,

courts look to the body of the complaint to determine the parties.  *See Blanchard v. Terry & Wright,

Inc.*, 331 F.2d 467, 469 (6th Cir. 1964) ("It is true that the name of the United States does not appear

in the caption of the complaint, but the caption is not regarded as containing any part of plaintiffs'

claim.  We must look to the allegations of the complaint in order to determine the nature of

plaintiffs' cause of action."); *Deaville v. Capital One Bank*, 425 F. Supp. 2d 744, 750 (W.D. La.

2006) ("[A] defective caption is not a fatal defect."); *Tyrolf v. Veterans Admin.*, 82 F.R.D. 372, 375

(E.D. La. 1979) (holding that the United States was properly joined as a party because "the body of

the complaint named the United States as a party defendant.").  *But see Williams v. Bradshaw*, 459

F.3d 846, 849 (8th Cir. 2006) (holding "[a caption] is entitled to considerable weight when

determining who the plaintiffs to a suit are since plaintiffs draft complaints" and that putative

plaintiffs missing from the caption were not parties to the suit where "the complaint refers repeatedly

to only a singular 'plaintiff'").  As a leading treatise notes:

> Although helpful to the district court, the contents of the caption
> usually are not considered a part of the pleader's statement of the
> claim or the response thereto for purposes of applying the pleading
> rules.  Moreover, the caption is not determinative as to the identity of
> the parties to the action. . . .  [F]ederal courts generally will allow an

48

> amendment under Rule 15 to correct technical defects in the caption when that is thought necessary. This corrective action seems appropriate inasmuch as a defective caption or even its complete absence is merely a formal error and never should be viewed as a fatal defect, particularly when it can be remedied early in the action. Moreover, allowing the defect to be corrected is consistent with the spirit of the federal rules in general and with Rule 8[(e)] in particular.

20 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1321 (3d ed. 2012).

The original complaint includes the twelve French Hill plaintiffs in its lists of "Plaintiffs" possessing claims under the ATA. (Docket Entry No. 3 at 102 & 105). The complaint also includes a general description: "Plaintiffs, are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism perpetrated by Saddam Hussein, the Saddam Regime, ALF, Hamas, PU and AAMB." (*Id.* at ¶¶ 293 & 306). This was sufficient to put the defendants on notice of the twelve French Hill plaintiffs' status as parties.

**IV.    Conclusion**

The defendants' joint motion for summary judgment on the limitations issue, (Docket Entry No. 172), is denied.

SIGNED on September 30, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge