Calendar No. 568

| 102D CONGRESS<br>2d Session | SENATE | REPORT<br>102-342 |
|---|---|---|

# FEDERAL COURTS STUDY COMMITTEE IMPLEMENTATION ACT

JULY 27 (legislative day, JULY 23), 1992.—Ordered to be printed

Mr. BIDEN, from the Committee on the Judiciary,
submitted the following

# REPORT

[To accompany S. 1569]

The Committee on the Judiciary, to which was referred the bill (S. 1569) to implement the recommendations of the Federal Courts Study Committee, and for other purposes, having considered the same, reports favorably thereon with an amendment in the nature of a substitute, and recommends that the bill as amended do pass.

CONTENTS

|   |   | Page |
|---|---|---|
| I. | Purpose | 16 |
| II. | Legislative History | 16 |
| III. | Discussion | 17 |
| IV. | Vote of the Committee | 22 |
| V. | Section-by-Section Analysis | 23 |
| VI. | Cost Estimate | 47 |
| VII. | Regulatory Impact Statement | 49 |
| VIII. | Changes in Existing Law | 50 |

The amendment is as follows:
Strike all after the enacting clause and insert the following:

That this Act may be cited as the "Federal Courts Study Committee Implementation Act of 1992".

59-010

SJI also plays a critical role in supporting improvements in the working relationship between the State and Federal courts in areas such as habeas corpus review, mass torts, and joint judicial planning. One of SJI's most important contributions in this area is its support of the State Judges Asbestos Litigation Committee. The Institute's grant enables judges hearing a significant portion of the 60,000 asbestos cases pending in the State courts to meet on a regular basis to discuss common issues, including case management practices, new trends in the litigation, and coordination with the asbestos cases pending in Federal court. An SJI grant also supports an analysis of the asbestos judges' case management procedures for the purpose of developing a manual for future State and Federal judges hearing mass tort cases.

The demand for SJI funds has grown significantly each year of its current authorization. The Institute has operated at a very modest funding level, and title IX would provide only a limited increase to enable the Institute to respond to the State courts' great need for Federal assistance over the next 4 years.

### J. TERRORISM CIVIL REMEDY

Title X is known as the Civil Remedies for Victims of Terrorism. This legislation was first introduced in the 101st Congress (as S. 2465) by Senator Charles Grassley. On July 25, 1990, the Senate Judiciary Subcommittee on Courts and Administrative Practice held a hearing on the Bill. It passed the subcommittee on September 25, 1990, and was thereafter incorporated into the fiscal year 1992 Military Construction Appropriations bill. In Conference, the conferees intended to delete the provisions of Civil Remedies for Victims of Terrorism. The enrolling clerk, however, erred and the provisions were included in Public Law 101–519 of November 5, 1990.

The Civil Remedies sections of the Military Construction Appropriations Act were repealed in 1991, and Senator Grassley reintroduced the bill, S. 740, in the 102d Congress. The Senate passed this bill by voice vote on April 16, 1991.

Title X would allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed. By its provisions for compensatory damages, tremble damages, and the imposition of liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money.

### IV. VOTE OF THE COMMITTEE

On June 25, 1992, the Committee on the Judiciary by unanimous consent approved an amendment in the nature of a substitute by Senator Heflin. The committee ordered the Federal Courts Study Committee Implementation Act of 1992, as amended, favorably reported.

## V. SECTION-BY-SECTION ANALYSIS

### TITLE I—IMPLEMENTATION OF FEDERAL COURTS STUDY COMMITTEE RECOMMENDATIONS

*Section 101. Establishment of bankruptcy appellate panels*

This section further implements a recommendation of the Federal Courts Study Committee found on page 74 of the Study Committee Report, which called for Congress to require each circuit to establish bankruptcy appellate panels (BAPs), with an opt-out provision. The Judicial Improvements Act of 1990 [8] included the counterpart Study Committee recommendation authorizing the creation of multicircuit BAPs by two or more small circuits.

BAP's clearly reduce the workload of district court judges since an appeal decided by a BAP need not be heard by a district court judge. BAP's may also reduce the number of appeals to the courts of appeals.

The BAPs' well-studied success in the ninth circuit warrants their use nationwide. A study of the ninth circuit BAP by the Federal Judicial Center noted that 25 percent of the district courts' bankruptcy decisions are appealed to the court of appeals, compared to 10 percent of the BAP's decisions. According to the study, in 1987, the BAP may have reduced the number of bankruptcy appeals taken to the ninth circuit by 135—a 40-percent decrease. Experience in 1988 was similar: district court decisions were three times as likely as BAP decisions to be the subject of an appeal.

BAP's may reduce appeals to the courts of appeals because attorneys have more confidence in the correctness of their decision or believe that these decisions will be more difficult to overturn on appeal. BAP's also contribute to the development of more predictable and coherent bankruptcy law. The BAP is a small, collegial court that can keep up with changing doctrines in bankruptcy law. In addition, BAP's publish opinions more frequently than the district courts. In 1987 and 1988, for example, the BAP was 2.5 times more likely than the district court to publish an opinion in a bankruptcy case. This, in turn, enhances the parties' ability to plan their out-of-court conduct.

Under existing law, a judicial council of a circuit, or, if authorized by the Judicial Conference of the United States, the judicial councils of two of more circuits, may establish a bankruptcy appellate panel. If the parties consent, the BAP will hear and determine the appeal. Otherwise, the district court will hear the appeal. An appeal from either a bankruptcy appellant panel or a district court shall be taken in the same manner as appeals in civil matters generally are taken to the courts of appeals.[9]

Section 101 of S. 1569 would require each circuit to establish a BAP, unless that circuit's judicial council establishes its circuit has insufficient judicial resources to do so. In determining whether its circuit has insufficient resources to establish a BAP, the judicial council shall take into account the bankruptcy judges' caseloads,

---

[8] See supra note 3.
[9] 28 U.S.C. 158.

*Section 902. Interagency agreements*

The first change in this section amends subsection 206(b)(3) of the SJI Act by deleting references to contracts the Institute may enter into with Federal agencies. The second amendment creates a new subsection 206(b)(4) authorizing the Institute to enter into contracts with Federal agencies without the conditions set forth in subsection (3). The third amendment redesignates current subsection (4) as subsection (5).

### TITLE X—TERRORISM CIVIL REMEDY

This title would provide a civil cause of action in Federal court for victims of terrorism.

*Section 2331. Definitions*

The definition of international terrorism is drawn from the Foreign Intelligence Surveillance Act, 50 U.S.C. 1801(c). It consists of activities that:

 (a) are acts of violence that would, if committed in the United States, violate States or Federal criminal laws:
 (b) appear to be intended to intimidate or coerce a civilian population or a government or to affect, through assassination or kidnapping, a government's conduct; and
 (c) occur primarily outside the territorial jurisdiction of the United States or in ways that transcend national boundaries.

The definition of "person" reflects the experience of the Racketeering Influenced and Corrupt Organizations (RICO) Act, 28 U.S.C. 1961(3).

*Section 2333. Civil remedies*

This section creates the right of action, allowing any U.S. national who has been injured in his person, property, or business by an act of international terrorism to bring an appropriate action in a U.S. district court. The substance of such an action is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts. This bill opens the courthouse door to victims of international terrorism.

This section extends the same jurisdictional structure that undergrids the reach of American criminal law to the civil remedies that it defines.

This section also creates a rule of estoppel that would permit civil plaintiffs to introduce evidence of criminal conviction—both U.S. and foreign—to establish conclusively civil liability for the same act. This section does not, however, require that a civil action be preceded by American or foreign criminal prosecution of the terrorists guilty of the act in question.

*Section 2334. Jurisdiction and venue*

This section establishes reasonable venue rules that take into account the unusual mobility of terrorists, their organizations, and their financiers.

*Section 2335. Limitation of actions*

This section provides for a 4-year statute of limitations, but in recognition of the peculiar characteristics of terrorism, it tolls the limitation during any periods when the terrorists have concealed their acts or identities or remain outside the United States.

*Section 2336. Other limitations*

This section excludes from the scope of any civil action a claim brought on account of "an act of war." The intention of this provision is to bar actions for injuries that result from military action by recognized governments as opposed to terrorists, even though governments also sometimes target civilian populations. Injuries received by noncombatants as a result of open, armed conflict, including civil war, should not be actionable.

The section also provides that a stay of discovery may be sought by the Department of Justice, in the event of a pending criminal investigation or prosecution of the incident. The Department of Justice may object to the discovery request in certain limited circumstances—if compliance will interfere with a criminal investigation or a national security operation related to the incident. The objection will be heard by the judge, in camera, and it is within the court's discretion as to whether to grant the stay of discovery. In no case shall a stay of discovery be grounds for dismissal of the case.

This section also provides that a stay of the civil action may be sought by the Attorney General of the United States. The court has discretion as to whether to grant the stay and may only grant a stay if the continuation of the civil action will substantially interfere with a criminal prosecution which involves the same subject matter and in which an indictment has been returned, or if it will interfere with national security operations related to the terrorist incident that is the subject of the civil action. A stay may be granted for up to 6 months and may be renewed for additional 6-month periods until the criminal prosecution is completed or dismissed.

Sections (b) and (c) were added to afford the Department of Justice the discretion it needs to conduct criminal investigations and prosecutions. These sections merely set forth well recognized standards for Government intervention in civil actions. The Department of Justice, under rule 26 of the Federal Rules of Civil Procedure, has the authority to assert a privilege against discovery of its investigative files. These provisions do not enhance the rights of the U.S. Government. These sections are not, however, intended to prevent victims and their survivors from conducting civil litigation against terrorists. It is expected the Department of Justice will demonstrate to the court's satisfaction that there is a live investigation and a significant likelihood of prosecution, or conduct of a national security operation, in order to stay the discovery. In instances where the Attorney General seeks to stay a civil action, the Attorney General will have a heavy burden of proof in order to establish that the continuation of the civil action will substantially interfere with a criminal prosecution underway or the conduct of a national security operation related to the terrorist incident which gave rise to the civil action. Moreover, the victims or their survi-

vors are entitled to be heard at the Department of Justice or Attorney General's arguments on behalf of a stay.

*Section 2337. Suits against Government officials*

This section prohibits civil actions against the United States, U.S. officials, foreign states or foreign officials. This provision maintains the status quo, in accordance with the Foreign Sovereign Immunities Act, with respect to sovereign states and their officials: there can be no cause of action for international terrorism against them.

### TITLE XI—EFFECTIVE DATE

Unless otherwise provided in this act, the effective date for this legislation is January 1, 1993.

## VI. Cost Estimate

U.S. Congress,
Congressional Budget Office,
*July 24, 1992.*

Hon. Joseph R. Biden, Jr.,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

Dear Mr. Chairman: The Congressional Budget Office has reviewed S. 1569, the Federal Courts Study Committee Implementation Act of 1992.

This bill would affect direct spending and receipts, and thus would be subject to pay-as-you-go procedures under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

Robert D. Reischauer,
*Director.*

### Congressional Budget Office Cost Estimate

1. Bill number: S. 1569.
2. Bill title: Federal Courts Study Committee Implementation Act of 1992.
3. Bill status: As ordered reported by the Senate Committee on the Judiciary on June 25, 1992.
4. Bill purpose: This bill would make many changes and additions to laws related to the operation of the federal judicial system.
5. Estimated cost to the Federal Government:

[By fiscal years, in millions of dollars]

|  | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Direct spending: | | | | | |
| Estimated budget authority | 5 | 5 | 5 | 5 | 5 |
| Estimated outlays | 2 | 1 | (¹) | −1 | −1 |
| Revenues ² | 2 | 2 | 2 | 2 | 2 |